1
2
3
4
5
6
7
8                       **UNITED STATES DISTRICT COURT**
9                       **SOUTHERN DISTRICT OF CALIFORNIA**
10

11    RUDOLPH ROYBAL,                        Case No.    99cv2152-JM (KSC)
12                         Petitioner,
13                                           **DEATH PENALTY CASE**
14                                           **ORDER:**
15           vs.                             **(1) DENYING PETITIONER'S**
                                             **REQUEST FOR AN EVIDENTIARY**
16                                           **HEARING AND/OR DISCOVERY ON**
                                             **CLAIMS 4-8, 10-11, 25-27, AND 29-31;**
17
18    RON DAVIS, Acting Warden of the        **(2) DENYING RESPONDENT'S**
                                             **REQUEST TO DISMISS CERTAIN**
19    California State Prison at San Quentin, **CLAIMS ON THE BASIS OF STATE**
                                             **PROCEDURAL BARS;**
20                                           **(3) DENYING HABEAS RELIEF ON**
                                             **CLAIMS 1-8, 10-11, AND 13-38 IN THE**
21                         Respondent.       **FIRST AMENDED PETITION; AND**
22                                           **(4) GRANTING HABEAS RELIEF**
                                             **ON CLAIMS 9, 12, AND 39 IN THE**
23                                           **FIRST AMENDED PETITION**
24
25
26
27
28

TABLE OF CONTENTS

I. PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II. TRIAL PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

      A. Guilt Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

      B. Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

III. PROCEDURAL MATTERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

    A.    Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

          1.    Dixon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

              a.    Independence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

              b.    Adequacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

          2.    Contemporaneous Objection. . . . . . . . . . . . . . . . . . . . . . . -13-

    B.    Teague v. Lane. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

IV. STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

    A.    Standard of Merits Review under AEDPA. . . . . . . . . . . . . . . . . . . -17-

    B.    Standard for Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . -20-

V. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

    A.    CLAIMS OF TRIAL COURT ERROR AND JUROR BIAS. . . . . . . -22-

          1.    Claim 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

              a.    State Court Decision. . . . . . . . . . . . . . . . . . . . . . . . . -22-

              b.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . -25-

              c.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

          2.    Claim 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

          3.    Claim 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -47-

1    4.    Claim 15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -51-

2    5.    Claim 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -54-

3    6.    Claim 17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -58-

4    7.    Claim 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-

5    8.    Claim 19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-

6    9.    Claim 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -69-

7    10.   Claim 21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -73-

8    11.   Claim 22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -75-

9    12.   Claim 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -78-

10   13.   Claim 24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -80-

11   14.   Claim 25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -82-

12   B.   PROSECUTORIAL MISCONDUCT CLAIMS. . . . . . . . . . . . . . . . . . -90-

13       1.   Claim 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -90-

14       2.   Claim 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -94-

15       3.   Claim 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -108-

16   C.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS. . . . . . . . . -110-

17       1.   Claim 4 - Ineffective Assistance of Counsel- Failure to Investigate

18           and Present Evidence to Rebut Flight and Consciousness of Guilt

19           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -115-

20       2.   Claims 5 and 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -119-

21           A.    Trial Counsels' Investigation and Presentation of Organic

22                 Brain Damage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -120-

23           B.    Information Submitted in Post-Conviction Proceedings

24                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -125-

25           C.    Claim 5- Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . -129-

26           D.    Claim 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -137-

27       3.   Claim 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -143-

28           A.    Petitioner's Penalty Phase Presentation. . . . . . . . . . . . . -143-

B. Information Submitted in Post-Conviction Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -147-

C. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -151-

4. Claim 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -155-

5. Penalty Phase Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . -162-

6. Claim 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -170-

7. Claim 10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -175-

8. Claim 28. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -178-

D. CLAIMS CONCERNING POST-CONVICTION PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -180-

1. Claims 26 and **27**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -180-

2. Claim 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -186-

E. STATUTORY CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -189-

1. Claim 30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -189-

2. Claim 31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -191-

3. Claim 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -192-

4. Claim 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -195-

5. Claim 34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -196-

6. Claim 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -198-

7. Claim 36. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -200-

8. Claim 37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -202-

A. Statute Does Not Explain Which Factors are Mitigating and Which Are Aggravating. . . . . . . . . . . . . . . . . . . . . . . . -203-

B. Vague and Standardless Factors. . . . . . . . . . . . . . . . . -204-

C. Statute Does Not Require Written Findings. . . . . . . . . -204-

D. Statute Does Not Require Unanimity Regarding Aggravating Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -205-

E. Statute Does Not Require Unanimity Beyond a Reasonable

Doubt As To the Penalty Decision. . . . . . . . . . . . . . . . -205-

F.  Statute Does Not Require Comparative Appellate Review

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -206-

G.  Statute Does Not Exclude Inapplicable Factors in Aggravation

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -206-

9.  Claim 38. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -207-

F.  ATKINS CLAIM AND CUMULATIVE ERROR.  . . . . . . . . . . . . . -208-

1.  Claim 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -208-

2.  Claim 39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -217-

VI. CERTIFICATE OF APPEALABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -220-

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -221-

99cv2152

On June 17, 2013, Petitioner filed the First Amended Petition ["FAP"] and filed a motion for leave to file the FAP on August 1, 2013. (ECF Nos. 215, 220.) After briefing on issues discussed in more detail below, on December 16, 2013, the Court granted Petitioner's motion. (ECF. No. 240.) On February 14, 2014, Respondent filed an Answer ["Ans."] to the FAP, and on April 15, 2014, Petitioner filed a Traverse. (ECF Nos. 241, 243.) On June 6, 2014, Petitioner filed a Request for an Evidentiary Hearing and Discovery on Claims 4-8, 10-11, 25-27 and 29-30[1] in the FAP. (ECF No. 249.) On June 25, 2014, Respondent filed a Response. (ECF No. 250.) On September 4, 2014, Petitioner filed a Reply. (ECF No. 264.) The Court held oral arguments on April 22, 2015. The parties also submitted supplemental briefing on the impact, if any, of Davis v. Ayala, 576 U.S. ___, 135 S.Ct. 2187 (2015), on the Court's consideration of Petitioner's claims. (See ECF Nos. 278-81.)

For the following reasons, and based on the arguments presented in the written pleadings and at oral argument, the Court **DENIES** Respondent's request to dismiss certain claims on the basis of procedural default, **DENIES** Petitioner's request for an evidentiary hearing and/or discovery on Claims 4-8, 10-11, 25-27, and 29-31, **DENIES** habeas relief as to Claims 1-8, 10-11, and 13-38 in the FAP, and **GRANTS** habeas relief as to Claims 9, 12, and 39 in the FAP.

## I. PROCEDURAL HISTORY

On July 21, 1992, a San Diego County jury found Petitioner guilty of first-degree murder in violation of California Penal Code section 187(a), first-degree robbery in violation of Cal. Penal Code section 211, and first-degree burglary in violation of Cal. Penal Code section 459, in the death of Yvonne Weden. (Clerk's Transcript ["CT"] 2506-09.) As to each offense, the jury found true that Petitioner personally used a knife, that he inflicted great bodily injury on the victim, and that the victim was a person 60 years of age or older. (Id.) The jury also found true two special circumstances, murder in the commission of a robbery and murder in the commission of a burglary. (Id.) On

---

[1] In the Traverse, Petitioner requested an evidentiary hearing on Claim 31. (See Traverse at 115.)

August 24, 1992, the jury sentenced Petitioner to death. (CT 2534-35.)  The trial court denied Petitioner's motion for a new trial and sentenced him to death on October 20, 1992.  (CT 2536-37.)

On January 24, 1996, attorney Barry Morris was appointed by the California Supreme Court to represent Petitioner on direct appeal and on state habeas proceedings.[2] The California Supreme Court affirmed Petitioner's conviction and sentence on November 12, 1998.  See People v. Roybal, 19 Cal. 4th 481 (1998).  On January 13, 1999, the California Supreme Court denied the petition for rehearing.  After one extension of time, a petition for writ of certiorari was filed in the United States Supreme Court on May 13, 1999, which was denied on October 4, 1999.

On October 5, 1999, Petitioner filed a motion for appointment of counsel in this Court.  On December 14, 1999, the Court appointed Elizabeth Barranco and Russell Babcock as federal habeas counsel.  On September 29, 2000, federal counsel Barranco and Babcock timely filed a federal habeas Petition.  The federal Petition contained a footnote indicating in part that, "[p]ursuant to the ruling of this Court on June 30, 2000, petitioner alleges herein only those claims previously exhausted in the courts of the State of California.  Petitioner intends to file a subsequent petition in this Court should claims which have not yet been adjudicated in the courts of the State of California be denied in that forum." (ECF No. 25 at 1, fn.1.)  Respondent filed an Answer to the federal Petition on October 27, 2000, and on May 2, 2001, Petitioner filed a Traverse.  Further proceedings surrounding efforts to file a state habeas petition, and events surrounding the destruction of records in Petitioner's case, are recounted in the Court's prior Order granting Petitioner's motion to file an amended petition (see ECF No. 240), and resulted in the removal of initial federal habeas counsel and the appointment of current counsel.

On March 12, 2004, attorneys John Lanahan and Elizabeth Missakian were

---

[2] As discussed in greater detail in the Order granting Petitioner's motion to file an amended petition (see ECF. No. 240), in December 2001, the California Supreme Court granted permission for Morris to withdraw as state habeas counsel and appointed Elizabeth Barranco and Russell Babcock as concurrent state habeas counsel.

conditionally appointed as federal habeas counsel, subject to their concurrent appointment as state habeas counsel.  On July 1, 2004, Babcock moved to withdraw as state habeas counsel and on August 30, 2004, Lanahan and Missakian moved for appointment as state habeas counsel.  On September 29, 2004, the California Supreme Court removed Barranco as state habeas counsel and noted that: "Barranco is hereby referred to the State Bar of California for appropriate disciplinary proceedings in light of her abandonment of her condemned client."   (Case No. S029453 at http://www.courts.ca.gov/supremecourt.htm.)    Also on September 29, 2004, the California Supreme Court granted Babcock permission to withdraw as counsel, and appointed Lanahan and Missakian as state habeas counsel.  On October 29, 2004, the Court converted the conditional appointment of Lanahan and Missakian to an unconditional appointment and relieved Babcock of further representation in Petitioner's federal habeas case.

On October 1, 2007, Petitioner filed a state habeas petition in the California Supreme Court in Case No. S156846.  On April 28, 2008, Respondent filed an Informal Response, and on December 23, 2008, Petitioner filed an Informal Reply.  On January 3, 2013, the California Supreme Court denied the state habeas petition.

On January 17, 2013, this Court held a status hearing and later issued a briefing schedule, setting a deadline for filing the amended petition and a motion for leave to amend the petition, on or before June 17, 2013.  On June 17, 2013, Petitioner filed the FAP, the operative pleading in this action.  After a July 12, 2013 status hearing, the parties agreed upon, and the Court ordered, a revised briefing schedule.  Petitioner filed a Motion for leave to amend the petition on August 1, 2013.  Respondent filed an Opposition on September 16, 2013, and on November 1, 2013, Petitioner filed a Reply.  On December 16, 2013, the Court granted Petitioner's motion.  On February 14, 2014, Respondent filed an Answer to the FAP, and on April 15, 2014, Petitioner filed a Traverse.

On June 6, 2014, Petitioner filed a Memorandum  ["Pet. EH Mem."] in Support

of the Request for Evidentiary Hearing and Discovery, requesting an evidentiary hearing and/or discovery on Claims 4-8, 10-11, 25-27, and 29-30.  On June 25, 2014, Respondent filed a Response ["Resp. to EH Mem."] to Petitioner's Statement Regarding Evidentiary Development.  On September 4, 2014, Petitioner filed a Reply ["EH Reply."].

## II. TRIAL PROCEEDINGS

The Court refers the parties to the statement of evidence issued by the California Supreme Court in <u>Roybal</u>, 19 Cal. 4th at 495-502.  The California Supreme Court's factual findings are presumptively correct and entitled to deference in these proceedings. <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

To provide context to the Court's discussion of the claims in the FAP, particularly the claims asserting ineffective assistance of counsel, restated below is the California Supreme Court's summary of evidence and testimony presented during the guilt and penalty phase proceedings.

### A. <u>Guilt Phase</u>

The People introduced evidence to the following effect.

In 1989, Yvonne Weden lived with her husband, Paul, in Oceanside. She was 65 years old and suffered from arthritis and loss of hearing and was using crutches because of an injury to her ankle. Paul worked nights at a supermarket; Yvonne usually went to bed around 11:30 p.m. and awoke early. She did not smoke; Paul had quit smoking in January. Even when he smoked, he did not do so in the house; he usually smoked Marlboro brand cigarettes, never Camel brand.

Defendant had lived in Santa Fe, New Mexico, with his mother for most of his life. In April or early May 1989, he lived with his half brother, Frank Orozco, and the latter's family in Oceanside, about a half-mile from the Weden home. He was not permitted to use the car, but he was able to use his brother's bicycle. He smoked Camel brand cigarettes. He earned money doing yard work in Oceanside and helped in his brother's business.

In May 1989, defendant came to the Wedens' home and offered to do yard work, leaving his name and telephone number on a slip of paper. He was hired to perform yard work, mostly pulling weeds, for four days in late May. He stopped working for the Wedens when Paul became dissatisfied with the slowness of the work. The slip of paper with his name and telephone number remained pinned to a bulletin board in the den.

On Thursday, June 8, defendant knocked on the door of the Wedens'

neighbor, asking for gardening work. The neighbor, who described him as appearing aggressive and nervous, did not hire him. The following day, Friday, June 9, he sought work at the home of another Oceanside resident, leaving his name and telephone number.

On June 9, at 7:45 p.m., Paul left the house. He finished work at 7:30 a.m. on June 10, went out for a "couple of beers" with some coworkers, and then, at 8:00 a.m., drove to pick up a new gardener but was unable to locate him. When he returned home, he was unable to open the garage door, his usual entry into the house. When he entered the house, he found his wife lying on the floor of the bedroom in her pajamas; there was blood on the wall and her body was cold. He called 911 around 8:30 a.m.

The front door was unlocked and there was no sign of a forced entry. The slip of paper with defendant's name and telephone number was missing. A Camel brand filter cigarette butt was on the floor of the guest bedroom.

A jewelry box containing Paul's wedding ring, some Masonic rings, and other items, was missing from the master bedroom. The outer box in which it had been kept had a blood smear or stain on it. Some of Yvonne's jewelry was missing, including gold chains and costume jewelry, as was some cash. A pistol and holster were missing from a dresser.

The police arrived. Yvonne was pronounced dead at the scene. There was a bloody laceration around her neck and blood on her pajamas, the walls, and the carpet. Her wedding ring was missing from her finger.

She died from multiple stab wounds. The coroner estimated the time of death as occurring between midnight and 2:00 a.m. An autopsy showed blunt force injuries to her head and multiple stab wounds to her chest, shoulder, hands, and neck. The stab wounds were deep; there was a jagged gaping wound to the neck, and multiple punctures of the lungs, and a rib was fractured by the force of the knife. There were wounds and blood on the palm of her left hand. It was difficult to obtain fingerprints from the hand, because the fingers were clenched.

On the night of June 9, defendant telephoned his mother, Stella Orozco, in New Mexico. He left Oceanside for New Mexico on June 10, around 10:00 p.m, arriving on June 11. When she asked about cuts on his face, he said he had been injured in a robbery earlier the same week or the week before.

Later, she saw him take a plastic produce bag from her kitchen, go into the backyard, and place it in one of the cinder blocks on top of the wall between her yard and that of neighbors. The day after he arrived, he offered to sell some jewelry to his half sister, Theresa Romero, who lived next door. Theresa called the probation department the next day and told a probation officer that defendant was staying at their mother's house, and that he was selling jewelry.

On June 13, Theresa led police to the back room of Stella's home, where defendant was watching television. In the course of a patdown search, police discovered a small folding knife in his pocket. They also found hypodermic syringes in his sock and marijuana in his pocket. He had

a packet of Camel brand filter cigarettes in his shirt pocket. Before he was taken into custody, he left a gold rope chain in the room; as he was removing articles from his pocket to leave behind, a foil packet containing tar heroin fell to the ground. Defendant told police he had been in Seattle for months and had returned to New Mexico to visit his ailing mother; he did not mention that he had been living in Oceanside.

After the police left, Theresa learned from Stella that defendant had hidden something in the wall "right in between everyone's yard." She telephoned the police to say that Stella wanted to turn over some items, and they returned that evening. Stella told them that she wanted them to remove things that were not hers; she gave them several articles, including a folding knife, and asked them to remove the plastic bag that defendant had placed in her backyard wall. The police saw a portion of a plastic bag protruding from a hole in a cinder block. They removed what proved to be two plastic produce bags with green writing on them, containing a paper bag from a Santa Fe drug store. The bags contained jewelry, later identified as including rings and other items belonging to Paul and Yvonne Weden. Stella also gave police a folding knife in a black sheath. They asked her for the gold rope chain he had left behind; she said "Absolutely" and also gave them some of his soiled laundry from the washing machine.

Detective Sheila Hancock, who was investigating the possibility that defendant was involved in the Weden crimes, contacted Santa Fe police to report the homicide in Oceanside involving theft of jewelry. She flew to New Mexico on June 13, and searched the residence of Stella Orozco. She also saw defendant at the police department; she noticed he was smoking Camel brand cigarettes.

Several items, including the cigarette butt, a dinner knife, a jewelry case, a sock, and knives, were tested at the Serological Research Institute in Richmond, California. Both Yvonne Weden and defendant had the same blood type and were both secretors; their blood tested differently in only three genetic markers tested. Researchers at the institute examined the saliva on the cigarette butt using polymerase chain reaction (PCR) DNA testing. An employee of the institute was of the view that bloodstains from the knife and sock, as well as saliva from the cigarette butt, could have come from defendant, Yvonne Weden, or others with the same DNA characteristics. There were no identifiable fingerprints on the cigarette butt. Blood on the jewelry box had the same blood type as defendant and Yvonne Weden. Microfibers similar to fibers from Yvonne Weden's pajamas were found on defendant's socks and sweatshirt.

A partial print in "orangish-red," possibly blood, was found on a metal doorjamb to the utility room of the Weden residence. Photographs were taken of it, and an attempt was made to lift a fingerprint; the doorjamb was thereafter removed at Detective Hancock's direction for further testing. Attempts were made by an expert to obtain a usable print from the doorjamb, but were unsuccessful. Thereafter, the doorjamb, which was kept after the testing in a locked evidence area in Oceanside, was found to be missing.

For his part, defendant introduced evidence as follows.

On the evening of June 9, both Frank Orozco and his wife were out, and defendant was supposed to watch their children. When Frank returned

home, he found defendant "completely and totally inebriated, drunk to the point that he was falling down." This was the first time he had found him drunk at his home. He picked defendant up and led him to the bedroom. His wife was angry and they discussed asking defendant to leave. He checked on defendant an hour later; defendant had "passed out."

On June 10, he awoke defendant around 7:00 or 8:00 a.m. by shaking him. Defendant asked, "What's wrong? What's wrong?" Frank and his wife argued with defendant about his drinking. Defendant complained that Frank's wife was treating him "like a slave" and stated that he wanted to return to Santa Fe. That evening, Frank drove him to the bus depot for the trip to Santa Fe, and gave him money for the ticket and food.

A forensic pathologist estimated that Yvonne Weden had been murdered as early as 8:00 p.m. on June 9 or as late as 4:00 a.m. on June 10. A police detective recalled that he was asked to take defendant's fingerprints and compare them with prints collected at the crime scene, including the doorjamb; he recalled being told there was no match. A fingerprint expert was of the view that the print on the doorjamb was of a finger or thumb, rather than a palm; he was unable to exclude the victim as the maker of the print because of the poor quality of the prints that were taken from her.

Another fingerprint expert concluded that the print on the doorjamb could have been left by someone wearing surgical latex gloves; similar gloves appeared in a photograph taken after the crime of a trash can outside the side door leading to the Wedens' garage. But he could not tell by looking at the photograph of the print on the doorjamb whether the person who left the print was wearing gloves. Emergency personnel from the Oceanside Fire Department testified that it was standard procedure to wear latex gloves, but they were not usually disposed of at a crime scene. A resident of Oceanside who had hired defendant to do yard work in the spring of 1989 did not remember seeing him use gloves.

A newspaper delivery girl and her father drove past the Wedens' house on June 10, about 6:30 a.m., and noticed two cars in the street near the driveway.

## B. Penalty Phase

The People presented evidence in aggravation to the following effect.

Defendant was convicted of six prior felonies in New Mexico, for larceny, auto burglary, shoplifting, attempted residential burglary, and burglary. He was also involved in four violent incidents in New Mexico.

On September 15, 1976, at 10:30 in the evening, Santa Fe Police Officer Robert Guillen attempted to stop defendant's car, which had jumped the curb. Defendant sped away and was followed, in a high-speed chase, through residential areas of the town. Defendant pulled up to his mother's house. A passenger in his car fired several gunshots at Officer Guillen; defendant backed his car into Guillen, causing Guillen to hit the hood of his patrol car. Another police officer chased defendant, who fled into his mother's house and hid under a bed. After he was pulled out from under the bed, he broke away and attempted to hide behind his mother to avoid arrest.

On July 23, 1982, Curtis Bruce encountered George Cervantes near a store in Santa Fe. An argument ensued about $2 Cervantes owed for marijuana cigarettes. After an exchange of pushes, Bruce ran toward the store. Cervantes and three others, including defendant, followed and a fight ensued. During the fight, defendant sprayed Bruce's arm, neck, and face with silver paint. Someone stabbed Bruce; he managed to flee. Defendant was arrested carrying a can of spray paint and two marijuana cigarettes. It was the same kind of paint defendant would ordinarily "sniff" in order to become "high."

On June 15, 1985, the Santa Fe police, including Officer Joseph Lopez, were telephoned by Stella Orozco about a domestic dispute; she wanted defendant to leave her house after he threatened her with a knife. Officer Lopez found defendant in the bedroom and told him that Stella wanted him to leave. Angry and intoxicated, defendant responded with loud cursing, but eventually was persuaded to leave. As he left the house, he swore at the police and started coming toward the officers. He resisted arrest, trying to hit them. He was carrying a container of marijuana in his pocket.

On May 11, 1986, Carmen Annette Pacheco, who identified herself as defendant's former girlfriend, went to a Mother's Day dinner with Stella Orozco and Theresa Romero. After she dropped them off at home, she bought two glass bottles of water, for herself and defendant, and went to find him in a park. He had "round, blank, scary eyes" and was "high." He grabbed the bottles, then attacked her, hitting, punching, kicking and throwing her to the ground. She deliberately broke the bottles so he could not use them in his attack. She yelled for help and was assisted by her sister and two friends, who were driving by. Later that evening, defendant told police that "someone had beaten the fuck out of him." They took defendant to the hospital, where Pacheco was also being treated. She declined to press charges and subsequently saw him a few times. Defendant did not remember hitting Pacheco and did not apologize.

As to the murder of Yvonne Weden, the autopsy physician testified that it involved a struggle and numerous stab wounds inflicted over several minutes. There were abrasions on her face and stab wounds to her lungs, armpit, abdominal cavity, windpipe, and a large artery. Several wounds were inflicted while she was no longer moving.

In mitigation, defendant introduced evidence relating to his background and character.

Stella Orozco left school in the third grade and did not learn to read or write. She spent the ages between 13 and 19 first in a convent and then in a reform school in New Mexico. She then worked in California, returning at age 20 to New Mexico, where she married John Orozco. They lived in a one-room house built by her husband, without water or utilities. He could not have children because "he was sterilized or something." They adopted a son, Frank. After John began "gambling and going out on" her, she became pregnant, with defendant, by another man. She offered to give defendant away if John would remain with her, but then decided to keep him. John divorced her before defendant was born and did not return; her mother, who had been living with her, also left.

Stella drank alcohol while she was pregnant with defendant. When

he was 18 months old, defendant fell from his crib and broke his front teeth; his aunt took him to the hospital, but his mother refused to come.

Stella was "basically" a "prostitute" when she was not living with a man. The family was poor. She later lived with a truck driver for three years and bore his child, Ralphie. She had another child, Theresa, with Dewie Brazfield, a heavy drinker who beat her every weekend and burned her with a hot knife. He also hit defendant and the other children. Frank, who lived on and off with his grandmother, finally joined the Marines to get away from home.

Defendant was nicknamed "Mojo" or "Mojado"-Spanish slang for "wetback"-by Stella. She did not show him affection, as she did the other children; she never praised him or told him that she loved him. He was a difficult child and frequently truant from school. At one point, he was left alone with his brother Ralphie and began drinking alcohol. He also sniffed paint. By the time he was 21, he had been involved in several drug programs. Stella did not accompany him.

Two former employers testified that defendant was a dependable employee.

Defendant also presented testimony concerning his drug and mental problems.

Lucie Madrid, a certified alcohol counselor, met defendant in 1976 through a residential alcohol treatment program and became his counselor. He participated in the program over a 10-year period. He was "deep in the disease of alcoholism" and had "very little" self-esteem. Once, Madrid found him crying in a park; he described himself as a failure who was unable to make a different life for himself. Madrid, herself a recovering alcoholic, explained that, like defendant, she sometimes had blackouts, for as long as eight days.

Nan Busby knew defendant from Seadrunar, a drug and narcotics treatment center in Seattle, which he attended from June 1987 until February 1989. She described him as shy and withdrawn at first, but eventually more expressive about his feelings. He had several relapses during the program and left the aftercare program after four days.

James Blackmer, a judge and former prosecutor, prosecuted defendant in 1986 for four pending felony cases. Defendant pleaded guilty to charges including auto burglary, shoplifting, attempted residential burglary, and burglary. After he was evaluated by the New Mexico Department of Corrections, he was sentenced to a term of eight years, six months, which was suspended on the condition that he enter a residential drug program. He enrolled at Seadrunar, which Blackmer described as "often tougher than going to prison."

Timmen Cermak, M.D., a psychiatrist, evaluated defendant and his family. He found that defendant had significant impairment from brain dysfunction, a schizoid personality structure, and was profoundly chemically dependent since age nine, resulting in disruption of his personality development. Intelligence testing indicated organic-based learning disabilities. Cermak considered it likely that defendant had organic brain damage, possibly the result of fetal alcohol effects, but did not believe

he met the criteria for diagnosis as an "anti-social personality." Defendant also suffered "psyche numbing" as the result of physical and emotional abuse. He experienced memory blackouts since the age of nine, when he starting sniffing glue and using alcohol. Regarding the time of Yvonne Weden's murder, defendant told Dr. Cermak that he took drugs on "Thursday" and "the next thing he remembered was getting off the bus in Santa Fe." He said that he had "absolutely no idea how he got the jewelry."

In rebuttal, the prosecution presented the testimony of Steven Bucky, Ph.D., a clinical psychologist. Bucky reviewed Dr. Cermak's report and a videotaped interview of Stella Orozco but did not personally interview defendant or his family and did not review the trial testimony of Stella or Frank Orozco. In his opinion, defendant had a long-standing multi-polysubstance abuse problem and a personality disorder "closely aligned to an anti-social personality disorder." He disputed Dr. Cermak's conclusions that defendant's alcoholism was genetic and that defendant suffered from a schizoid personality or posttraumatic stress syndrome. It was his view that defendant suffered from a "mild, subtle brain dysfunction" caused by substance abuse.

Roybal, 19 Cal. 4th at 495-502.

# III. PROCEDURAL MATTERS

## A.   Procedural Default

Generally, when a state court's rejection of a federal claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," a habeas petitioner has procedurally defaulted his claim.   Coleman v. Thompson, 501 U.S. 722, 729 (1991).  To be adequate, the state procedural rule "must have been 'firmly established and regularly followed' by the time as of which it is to be applied."   Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997), quoting Ford v. Georgia, 498 U.S. 411, 424 (1991).  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  La Crosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001), citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983) and Harris v. Reed, 489 U.S. 255, 265 (1989).  If found to be both adequate and independent, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.

### 1.   **Dixon**

On state habeas review, the California Supreme Court denied habeas relief on Claims 13, 23, 24 and 33 of the FAP (raised in state court as Claims 6, 8, 7, and 4, respectively) on the merits, and alternatively stated that "claims 4, 6, 7, 8, and 9[3] are denied on the ground that they could have been, but were not, raised on appeal. (*In re Dixon* (1953) 41 Cal.2d 756, 759.)"  (Lodgment No. 144.)

### a.   **Independence**

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." La Crosse, 244 F.3d at 704, citing Long, 463 U.S. at 1040-41 and Harris, 489 U.S. 255, 265.  In 1998, the California Supreme Court announced that it would thereafter refrain from considering federal law in determining whether a claim was procedurally defaulted.  See In re Robbins, 18 Cal.4th 770, 811-12 (1998); see also Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) ("The California Supreme Court has adopted in Robbins a stance from which it will now decline to consider federal law when deciding whether claims are procedurally defaulted.")  The independence of a state procedural rule is examined at the time the rule is applied.  See Park, 202 F.3d at 1151-53.  In this case, the rule was applied by the California Supreme Court when Petitioner's state habeas petition was denied on January 3, 2013.

While the Ninth Circuit has not ruled that a post-Robbins application of the Dixon procedural bar was independent of federal law, several California district courts have found the procedural bar to be independent.  See e.g. Protsman v. Pliler, 318 F. Supp. 2d 1004, 1007-08 (S.D. Cal. 2004); Gallardo v. Barnes, 2014 WL 2854162 (C.D. Cal. 2014) (collecting cases).  As the Dixon rule was applied in this case nearly fifteen years after Robbins and the California Supreme Court's stated intention to refrain from considering federal law in applying state procedural bars, this Court is in accord with other district courts in concluding that the procedural rule was independent of federal law at the time

---

[3] Petitioner notes that Claim 9 in the state habeas petition was not raised in the First Amended Petition.  (Traverse at 16 n. 3.)

of its application to Petitioner's habeas claims.

###### b. **Adequacy**

To be adequate, a state procedural rule "must have been 'firmly established and regularly followed' by the time as of which it is to be applied." Fields, 125 F.3d at 760, quoting Ford, 498 U.S. at 424. In Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003), the Ninth Circuit outlined a burden-shifting test to determine the adequacy of a state procedural bar, stating that:

> [T]he ultimate burden of proving the adequacy of the California state bar is upon the State of California. . . . Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.
>
> Accordingly, because it is the State who seeks dismissal based on the procedural bar, it is the State who must bear the burden of demonstrating that the bar is applicable-in this case that the state procedural rule has been regularly and consistently applied in habeas actions.

Bennett, 322 F.3d at 585-86.

Respondent asserts that Claims 13, 23, 24, and 33 are procedurally defaulted under Dixon and that the procedural rule in question was both independent and adequate. (Ans. at 15-17.) Here, Respondent has satisfied the initial burden of pleading the Dixon procedural bar as an affirmative defense, and the burden shifts to Petitioner. See Bennett, 322 F.3d at 586.

Petitioner "may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." Id. "Because the Dixon rule precludes collateral review of a claim that could have been brought on direct appeal, the procedural default, though announced by the California Supreme Court when the habeas petition is denied, technically occurs at the moment the direct appeal did not include those claims that should have been included for review." Fields, 125 F.3d at 761. Petitioner's default with respect to the Dixon rule occurred on June 16, 1997, the date

1    he filed an opening brief on direct appeal.  (Lodgment No. 123.)

2        Petitioner argues that "*Dixon* was not being followed in the vast majority of cases

3    at the time of Petitioner's alleged default," and cites <u>Dennis v. Brown</u>, 361 F.Supp.2d

4    1124, 1130-31 (N.D. Cal. 2005), which in turn noted 200 cases demonstrating

5    inconsistent application of state procedural bars, including <u>Dixon</u>. (Traverse at 19-20.)

6    Petitioner also argues: "It is notable that, when federal courts have examined California's

7    application of *Dixon* on the basis of evidence from both the petitioner and respondent,

8    they have found the rule inadequate to bar federal habeas review.  Only when there has

9    been a technical failure on the part of a petitioner to present any evidence at all have the

10   courts ruled on behalf of respondent and held the bar adequate." (Traverse at 20-21)

11   (footnotes omitted.)  Petitioner cites to numerous cases in which the <u>Dixon</u> rule was

12   found inadequate, as well as numerous other cases in which <u>Dixon</u> was ruled adequate

13   on "technical grounds."  (<u>Id.</u>)  Given Petitioner's argument and citation to authority

14   showing  the <u>Dixon</u> rule has been applied inconsistently, the Court finds that Petitioner

15   has satisfied the "burden to place that defense in issue."  <u>Bennett</u>, 322 F.3d at 586.

16       Therefore, "the ultimate burden is the state's."  <u>Id.</u>; <u>see also</u> <u>King v. Lamarque</u>,

17   464 F.3d 963, 967 (9th Cir. 2006).  Because Respondent has not attempted to

18   demonstrate the adequacy of the <u>Dixon</u> bar, the Court cannot conclude that this state

19   procedural rule is sufficient to bar consideration of Petitioner's claims on the merits.  The

20   Court will consider Claims 13, 23, 24, and 33 on the merits.

21       **2.    <u>Contemporaneous Objection</u>**

22       Respondent contends that "Claim Twelve is procedurally barred because the

23   California Supreme Court found that the claim was not preserved for appellate review."

24   (Ans. at 17, citing <u>Roybal</u>, 19 Cal. 4th at 520.)  The state supreme court denied this claim

25   on alternative grounds, as follows:

26       As a threshold matter, because he did not object to the prosecutor's
         remarks, defendant failed to preserve the claim of prosecutorial misconduct
27       for review. (*People v. Wash* (1993) 6 Cal.4th 215, 259-260 [24 Cal.Rptr.2d
         421, 861 P.2d 1107].) But the claim also fails on its merits, in the absence
28       of prejudice.

Roybal, 19 Cal. 4th at 520.

Petitioner argues that claims denied on the merits are not barred from federal habeas review unless "the state court 'actually relied' on the procedural bar as an independent basis for disposing of the claim." (Traverse at 23.)  In this case, it appears that the state court did rely upon a state procedural bar as an independent basis for denying Claim 12, and the procedural bar stands regardless of the state court's decision to also adjudicate the claim on its merits.  See Harris, 489 U.S. at 264 n. 10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.")

Petitioner does not appear to offer any specific argument on the independence or adequacy of this particular procedural bar, but instead generally argues that "[t]o the extent that this Court might find that a claim for relief in the First Amended Petition is defaulted because the California Supreme Court denied relief based on an adequate and independent state procedural bar, Petitioner is excused from that default because he can demonstrate cause and prejudice." (Traverse at 23.) Petitioner offers a lengthy argument asserting that the ineffective assistance of counsel he suffered satisfies cause and prejudice for any defaulted claims.  (Id. at 23-28, 88-91, 94-96.)  With respect to the allegations raised in Claim 12, Petitioner has separately alleged in Claim 9 that trial counsel's failure to object to the prosecutor's comments is an independent claim of constitutional error.

"'Cause' is a legitimate excuse for the default; 'prejudice' is actual harm resulting from the alleged constitutional violation." Magby v. Wawrzaszek, 741 F.2d 240, 244 (9th Cir. 1984).  The Supreme Court has held that a cause and prejudice analysis applies to the contemporaneous objection rule.  See e.g. Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977); United States v. Frady, 456 U.S. 152, 167-68 (1982).

The Supreme Court has explained that while "[a]ttorney ignorance or inadvertence

is not 'cause' because the attorney is petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error,'" that "[a]ttorney error that constituted ineffective assistance of counsel is cause, however." Coleman, 501 U.S. at 753-54. "Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the costs of any resulting default and the harm to state interests that federal habeas review entails." Id. at 754.

In this case, trial counsel's failure to object to the prosecutor's biblical argument prevented the preservation of that prosecutorial misconduct claim for appeal. Again, "counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation." Coleman, 501 U.S. at 755. With respect to trial counsel's failure to object, the Ninth Circuit has indicated that "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013), quoting United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993). However, as discussed below with respect to Claim 9, the prosecutor's exhortation to the jury about biblical law was egregious, and defense counsel's failure to object to the misconduct fell outside the admittedly "wide range" of constitutionally tolerable conduct. In light of the prosecutor's clearly and conspicuously improper remarks, the Court concludes that Petitioner's claim of ineffective assistance satisfies cause in this regard. See Edwards v. Carpenter, 529 U.S. 446, 451 (2000) ("Although we have not identified with precision exactly what constitutes 'cause' to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice."), citing Murray v. Carrier, 477 U.S. 478, 488-89 (1986).

Petitioner has also shown "actual prejudice." Coleman, 501 U.S. at 750. Prejudice is "actual harm resulting from the claimed constitutional violation." LaGrand

v. Stewart, 173 F.3d 1144, 1148 (9th Cir. 1999), citing Magby, 741 F.2d at 244.  The California Supreme Court recognized that the prosecutor's remarks constituted "clear misconduct."  See Roybal, 19 Cal. 4th at 521.  Here, given the closeness of the penalty phase case, evidenced by the fact that the jurors deliberated for several days, during which they requested read back of witness testimony, received supplemental instructions and repeatedly expressed that they were deadlocked prior to finally reaching a verdict, in combination with the inflammatory nature of the improper remarks, it is evident to this Court that Claim 12 is meritorious, and that the misconduct at issue resulted in "actual harm."  LaGrand, 173 F.3d at 1148.  Petitioner has demonstrated cause and prejudice sufficient to excuse the procedural default.  Accordingly, the Court will evaluate Claim 12 on the merits.

**B.    Teague v. Lane**

"Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  Teague v. Lane, 489 U.S. 288, 316 (1989) (plurality); see also Stringer v. Black, 503 U.S. 222, 227 (1992) ("Subject to two exceptions, a case decided after a petitioner's conviction and sentence became final may not be the predicate for federal habeas corpus relief unless the decision was dictated by precedent existing when the judgment in question became final.")  A new rule is one that "breaks new ground or imposes a new obligation on the States or the Federal Government," or one whose "result was not dictated by precedent existing at the time defendant's conviction became final."  Teague, 489 U.S. at 301.  The two exceptions to Teague are if the new rule in question: (1) "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" or (2) "requires the observance of procedures 'implicit in the concept of ordered liberty.'"  Id. at 307, quoting Mackey v. United States, 401 U.S. 667, 692, 693 (1971).  "That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is

*seriously* diminished.'" Schriro v. Summerlin, 542 U.S. 348, 352 (2004), quoting Teague, 489 U.S. at 313. "[I]f the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply Teague v. Lane before considering the merits of the claim." Caspari v. Bohlen, 510 U.S. 383, 389 (1994).

Here, Respondent generally references Teague, but fails to offer any argument specific to the claims in the FAP, stating only that: "To the extent any of Roybal's claims rely upon a new rule of constitutional law, including so-called 'actual innocence,' the non-retroactivity doctrine forecloses federal habeas relief because, at the time his conviction became final, existing precedent did not 'compel' the result he now seeks." (Ans. at 18.) The Ninth Circuit has previously declined to conduct a Teague analysis when it is noted "only in passing." Arredondo v. Ortiz, 365 F.3d 778, 781 (9th Cir. 2004) ("Normally we decline to address an issue that is simply mentioned but not argued, and we see no reason to depart from that practice in a habeas appeal.") (internal citation omitted). In this case, Respondent does not offer any specific Teague argument with respect to the claims in the FAP and has not properly raised the issue before the Court. See Arredondo, 365 F.3d at 782 ("No true Teague argument having been made by the state in this case, we decline to conduct a Teague analysis on our own."), citing Caspari, 510 U.S. at 389.

## IV. STANDARDS OF REVIEW

### A.    Standard of Merits Review under AEDPA

The provisions of the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"] apply to federal habeas petitions filed after its effective date of April 24, 1996. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Woodford v. Garceau, 538 U.S. 202, 207 (2003). Because Petitioner filed his federal petition in this Court after that date, AEDPA applies to this case.

Pursuant to AEDPA, a state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits unless that ruling: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Harrington v. Richter</u>, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case  differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>; <u>Bruce v. Terhune</u>, 376 F.3d 950, 953 (9th Cir. 2004).  "Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions at the time of the relevant state-court decision.'" <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003), quoting <u>Williams</u>, 529 U.S. at 412.

"[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. 2254(d)(1).  It therefore cannot form the basis for habeas relief under AEDPA." <u>Parker v. Matthews</u>, 567 U.S. ___, 132 S.Ct. 2148, 2155 (2012).  However, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011), quoting <u>Maxwell v. Roe</u>, 606 F.3d 561, 567 (9th Cir. 2010); <u>see also</u> <u>Marshall v. Rodgers</u>, 569 U.S. ___, 133 S.Ct. 1446, 1450-51 (2013) (per curiam) (While a reviewing court may "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, . . . it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.") (internal citations and quotations omitted).

Additionally, with respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Rice v. Collins, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101, quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Richter, 562 U.S. at 102.

Claims 4-11, 13, 23-30, and 32-39 were each denied on the merits by the California Supreme Court in a January 2, 2013, Order which stated in relevant part:

> The "Petition for Writ of Habeas Corpus" filed October 1, 2007, is denied. Claim 19 is denied as premature without prejudice to petitioner's filing a renewed petition after any execution date is set. (*People v. Lawley* (2002) 27 Cal.4th 102, 169, fn. 25.) All remaining claims are denied on the merits.

(Lodgment No. 144.)

Because these claims were denied on the merits without a statement of reasoning, the Court will conduct an independent review of the record with respect to Claims 4-11, 13, 23-30, and 32-39[4] in order "to determine whether the state court clearly erred in its

---

[4] Aspects of Claim 39 were raised on both direct appeal and state habeas review and therefore, to the extent that the California Supreme Court issued a reasoned opinion on certain contentions, the Court will review the state supreme court's direct appeal opinion in order to determine, pursuant to section 2254(d), whether its adjudication was contrary to, or an unreasonable application of, clearly established federal law, or was

application of Supreme Court Law." See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (in the absence of a reasoned decision by the state court, "[o]nly by [an independent review of the record] may we determine whether the state court's decision was objectively unreasonable.")

Petitioner also argues that a number of claims in the FAP are "not entitled to deference because there was a complete breakdown in the state habeas corpus procedure as a result of the destruction of the trial files by former habeas counsel," and asserts that de novo review is instead appropriate. (FAP at 139.) Petitioner contends that "the lack of a complete or even cohesive trial record makes it impossible to determine which facts could have been presented by current habeas counsel or considered by the California Supreme Court in its 'postcard' denial on the merits" with respect to Claims 4-10 and 25-26. (Id.) He also asserts that de novo review of Claim 1 is appropriate because the state court proceeding was "procedurally defective." (Id. at 153-54.) The Court will address these arguments in the merits discussion of those claims.

**B.    Standard for Evidentiary Hearing**

For claims previously decided on the merits by a state court, the Supreme Court has held that a federal habeas court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 1398 (2011). "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Id. at 1401. Section 2254(d)(2), meanwhile, expressly limits a reviewing court to the "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Section 2254(e)(2) of AEDPA further limits the circumstances under which a district court may hold an evidentiary hearing. If the prisoner "has failed to develop the factual basis of a claim in State court proceedings," a district court is precluded from holding an evidentiary hearing unless the prisoner meets certain narrow exceptions. 28

based on an unreasonable determination of the facts. See Williams, 529 U.S. at 413.

U.S.C. § 2254(e)(2). The claim in question must either rely upon "(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;" and the prisoner must show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Id. "Section 2254(e)(2) continues to have force where 2254(d)(1) does not bar habeas relief," for instance, "when deciding claims that were not adjudicated on the merits in state court." Pinholster, 131 S.Ct. at 1401.

"Because the deferential standards prescribed by 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Landrigan, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes relief, a district court is not required to hold an evidentiary hearing." Id.; see also Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

In light of these limitations, the Court will therefore conduct a section 2254(d) review, provided the claims at issue are subject to section 2254(d), together with the evaluation of whether Petitioner's federal habeas claims warrant an evidentiary hearing.

## V. DISCUSSION

The claims presented in the FAP include allegations of ineffective assistance of counsel, trial court error, prosecutorial misconduct, juror bias, claims of error in jury instructions during the guilt and penalty phase proceedings, an Atkins claim, claims concerning issues surrounding Petitioner's post-conviction representation and destruction of the record, and several claims alleging defects in California's death penalty statute.

## A.   CLAIMS OF TRIAL COURT ERROR AND JUROR BIAS

### 1.   <u>Claim 1</u>

Petitioner alleges that his sentence and incarceration are in violation of the United States Constitution "because of the trial court's rulings that a bloody fingerprint found at the Weden residence- a fingerprint made by someone other than Mr. Roybal- was not exculpatory evidence and because of the trial court's refusal to appropriately instruct the jury given the circumstances surrounding the collection including, but not limited to the negligent preservation of this evidence."  (FAP at 140.)

#### a.   <u>State Court Decision</u>

The California Supreme Court rejected this claim on direct appeal, detailing the background of the claim and the grounds for the ruling, as follows:

> During the search of the Weden residence, police found an "orangish-red" print on a doorjamb. The print was photographed and, after unsuccessful attempts to lift it, the doorjamb was removed for further analysis. When defense counsel later sought to view the doorjamb, it was missing from the police department facility where it had been stored after testing.

> Defendant moved to dismiss or, in the alternative, for sanctions, on the grounds that the prosecution had lost or destroyed exculpatory evidence in violation of the due process clause of the Fourteenth Amendment, and that comparable evidence could not be obtained by other reasonable means. Both the defense and the prosecution subpoenaed numerous witnesses to testify at the hearing on the motion. At the hearing, the superior court determined that, to "streamline" the procedure, defendant would first be required to make an offer of proof, which the court would take "at face value" subject to further examination; the prosecution would then be permitted to rebut the offer of proof through the testimony of witnesses, who would also be available for cross-examination by defendant. Defense counsel reluctantly agreed to the procedure: "I'm only hesitant because of the nature of the proof, your honor. The quality of my talking to the court versus live testimony is a concern to me. And, as you've indicated, you have the power in this courtroom to decide. And I still have my reservations about proceeding this way; but I will, if that's the court's desire."

> Defendant's offer of proof was to the effect that the print "was believed to have been made by the person who committed the homicide or by a person involved," and that analysis showed that it was not defendant's print. Police were subsequently unable to produce the doorjamb for inspection by the defense because it was missing.

> With the exception of two witnesses-Lee Smith, an expert in fingerprint comparison who purportedly would have testified that the photograph was limited in usefulness compared to the doorjamb itself, and Prosecutor James Koerber, who purportedly would have been asked why it

took two years to arraign defendant formally on murder charges-all of defendant's proposed witnesses were called by the prosecution and cross-examined by defendant. Their testimony regarding the identity of the print was to the effect that attempts to lift the print from the doorjamb were unsuccessful, but the photographs of the print were of sufficient quality for comparison purposes. Based on analysis of the photographs, the print could not be positively identified as belonging to defendant, but neither could defendant be eliminated as a donor. The superior court denied defendant's request to permit his expert, Smith, to sit in on the testimony of one of the prosecution's witnesses on this point, Joe Sypnicki, a print examiner for the Department of Justice.

The testimony of the prosecution's witnesses as to the disappearance of the doorjamb was to the effect that it was routinely booked into the Oceanside Police Department but disappeared during the time when the police department moved its evidence facilities. Police personnel made several unsuccessful searches to locate the item.

At the close of the prosecution's presentation of evidence, the superior court asked defendant whether he wished to present a "[w]itness or evidence on behalf of the defense." Defendant declined: "We rest, your honor, after submitting what's been submitted."

The superior court ruled that the print had "no exculpatory value for the defendant" because it was not of sufficient quality to determine whether it matched defendant's prints. It also ruled that there was no bad faith by the police: "[T]his is probably an administrative screw up . . . . [T]his door jamb has been somehow misplaced or misfiled."

At trial, witnesses for both the defense and the prosecution testified that there was not a match between the print on the doorjamb and defendant's fingerprints. Defendant's witnesses included expert Smith, who also testified that the print was not defendant's. At the close of evidence, defendant verbally requested an instruction to the effect that the police department's loss of the doorjamb made testing the print for blood impossible and police error prevented use of various forensic methods to enhance the print. The superior court rejected the proposed instruction as argumentative, but did not preclude defendant from submitting a written proposed instruction concerning the doorjamb. Defendant did not do so.

Defendant claims the superior court erred in failing to impose sanctions based on the disappearance of the doorjamb. The claim is without merit.

Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 2534, 81 L.Ed.2d 413]; accord, *People v. Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta*, *supra*, 467 U.S. at p. 489 [104 S.Ct. at p. 2534]; *People v. Beeler*, *supra*, 9 Cal.4th at p. 976). The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can

be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 337, 102 L.Ed.2d 281].) In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58 [109 S.Ct. at p. 337]; accord, *People v. Beeler*, *supra*, 9 Cal.4th at p. 976.)

On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1022 [251 Cal.Rptr. 643, 761 P.2d 103].) Under that standard, the superior court did not err in concluding that the evidence at issue did not possess an exculpatory value that was apparent before it disappeared; the print may or may not have been defendant's and may or may not have been the perpetrator's. Nor did it err in concluding that the disappearance of the doorjamb was inadvertent and not the product of bad faith conduct by the police; indeed, nothing in defendant's offer of proof disputed such a conclusion. [FN3]

> FN3 Defendant did not seek to present additional witnesses or evidence after the prosecution rested. The only witnesses referred to in the offer of proof who did not testify at the hearing were Smith and Koerber. Smith's testimony, which, according to the offer of proof, would have been to the effect that the doorjamb itself was more useful than a photograph of the print because the detail would be sharper, was not inconsistent with the superior court's conclusion that the missing evidence did not have apparent exculpatory value. Koerber's testimony, which, according to the offer of proof, would have concerned the purported delay in arraigning defendant on murder charges, was also not inconsistent with that conclusion.

Defendant also claims that the superior court erred by refusing to permit him to call witnesses or to allow his expert to observe the examination of the prosecution's expert, by limiting cross-examination of Sypnicki about specific forensic techniques, and by refusing to give his proposed instruction. The claims are unavailing; the superior court properly concluded that the evidence did not, in any event, have apparent exculpatory value. Moreover, the record reveals that, although the prosecution was permitted to present its witnesses first, defendant was not precluded from presenting his case or from examining most of the witnesses mentioned in his offer of proof; he did not seek to present additional witnesses after the prosecution rested. As defendant concedes, the superior court had discretion to regulate the order of proof. (Evid. Code, § 320.) Nor did the superior court abuse its discretion by excluding all witnesses from the courtroom during Sypnicki's testimony (see Evid. Code, § 777 [with limited exceptions, "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses"]), or by limiting the cross-examination of Sypnicki about forensic techniques on relevance grounds. In light of its conclusion that the evidence did not have apparent exculpatory value, it was also not error for the superior court to refuse defendant's proposed instruction on the ground that it was argumentative. [FN4]

FN4 Defendant claims that he was denied effective assistance of counsel under the federal and state Constitutions because his counsel failed to request an appropriate instruction permitting the jurors to draw an adverse inference from the disappearance of the doorjamb. "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to assistance of counsel. [Citations.] The ultimate purpose of this right is to protect the fundamental right to a trial that is both fair in its conduct and reliable in its result [Citations.] [¶] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], original italics.) To establish entitlement to relief, defendant must show deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*Id.* at pp. 215-218.) For the reasons discussed, there are no grounds for establishing deficient performance; the evidence lacked apparent exculpatory value. In addition, defendant asserts violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution. The claims are predicated on alleged state law error; because, for the reasons discussed in the text, we discern no such error, the constitutional claims necessarily also fail.

Roybal, 19 Cal. 4th at 508-11 (alterations in original).

### b.   **Standard of Review**

Petitioner argues that the Court should review Claim 1 de novo because the state court's fact-finding process was deficient, asserting that:

> In this case, the hearing on the loss or destruction of the doorjamb was procedurally defective in that (1) it precluded the defense from presenting witnesses prior to the prosecution's witnesses and (2) the trial court ordered the defense expert excluded during the testimony of Joseph Sypnicki, thereby precluding the trier of fact from determining all the facts and circumstances surrounding the condition of the fingerprint and its potential exculpatory value. Finally, the trial court refused to offer any curative instruction in lieu of a sanction such as dismissal.

(FAP at 153-54.)

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004). "[B]efore we can determine that the state-court factfinding process is defective

in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly.  Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate."  Id. at 1000.  "If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts."  Id. at 1001, citing Weaver v. Thompson, 197 F.3d 359, 363 (9th Cir. 1999) and Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003).

Here, Petitioner fails to persuasively show that the hearing on the defense motion regarding the loss/destruction of the doorjamb evidence was somehow defective or inadequate.  Petitioner first contends that the trial court "precluded the defense from presenting witnesses prior to the prosecution's witnesses."  (FAP at 153.)  Specifically, Petitioner argues that "[i]nstead of permitting live testimony, the trial court limited Mr. Roybal's attempt to establish that the prosecution had lost and/or destroyed exculpatory evidence to an offer of proof," and that "[t]he power to control the *order* of proof is neither synonymous nor coextensive with the court's power to exercise control over the admission of evidence."  (FAP at 170.)  The California Evidence Code provides that "the court in its discretion shall regulate the order of proof."  Cal. Ev. Code § 320.

Moreover, the California Penal Code instructs that "[i]t shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."  Cal. Penal Code § 1044.  After reviewing the record, it is clear that the trial court was within its discretion in conducting the hearing in this manner.  Petitioner does not show that the trial court prevented him from presenting relevant evidence, only that he was directed to initially present such evidence through an offer of proof rather than via live

testimony.[5]

Petitioner's reliance on <u>Old Chief v. United States</u>, 519 U.S. 172 (1997), is distinguishable from the instant situation, as first, that case concerned a defendant's attempt to stipulate to the commission of a prior offense. Petitioner insists that the situations are "parallel," arguing that:

> While Petitioner was not compelled to accept a stipulation, like a party so compelled, Mr. Roybal was forced to forgo presentation of his case via live witnesses, and, instead, present his evidence in the lifeless form of an offer of proof. As Justice Souter reasoned in *Old Chief*, *supra*, "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. *Id.*, at 189.

(FAP at 171.) The <u>Old Chief</u> Court held that in most situations "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." <u>Old Chief</u>, 519 U.S. at 186-87. However, it is also clear that the <u>Old Chief</u> Court was specifically concerned with the impact of evidence on a criminal trial jury. <u>See</u> <u>e.g.</u> <u>id.</u> at 187 ("Jury duty is usually unsought and sometimes resisted, and it may be as difficult for one juror suddenly to face the findings that can send another human being to prison, as it is for another to hold out conscientiously for acquittal. When a juror's duty does seem hard, the evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, . . .") The Court finds no compelling "parallel" to the current case, which concerns evidence presented at a pre-trial motion hearing before a trial judge, presented in the form requested by that judge, rather than a proceeding before a jury.

The trial court did not prevent the defense from examining the live witnesses that were called to testify by the prosecution after the offer of proof, and indeed, the defense

---

[5] Courts, including this district, routinely develop and enact procedures to streamline matters for timely and efficient adjudication of pending matters. <u>See</u> <u>e.g.</u> CivLR 40.1 (Assignment of Civil Cases), Crim LR 11.1 (Referral of Felony Cases to Magistrate Judges for Taking of Guilty Pleas), CrimLR 57.2 (Assignment).

engaged in an often extensive cross-examination of the witnesses. (See e.g. PRT[6] 71-86 (cross of DOJ latent print examiner Joe Sypnicki), PRT 105-20 (San Diego County Sheriff's examiner Frederick Freiberg), PRT 127-35 (Detective Richard Trotter), PRT 152-67 (Detective Sheila Hancock), PRT 183 (Sergeant William Krunglevich).) Nor was the defense precluded from calling witnesses on their behalf, as the trial court provided the defense an opportunity to call witnesses or present additional evidence, evidenced by the following exchange between the trial judge and defense counsel:

| The Court: | Witnesses or evidence on behalf of the defense? |
|---|---|
| Ms. Cannon: | We rest, Your Honor, after submitting what's been submitted. |

(PRT 185.)

Ultimately, the majority of the witnesses mentioned in the defense's original offer of proof testified at the hearing- only prosecutor Koerber and fingerprint analyst Lee Smith did not. After hearing the offer and proof and testimony, the trial court stated that Mr. Koerber's testimony was "not necessary," and the prosecutor declined to provide an offer of proof. (PRT 185.) With respect to Mr. Smith, as noted above, the record reflects that the defense affirmatively declined to present additional evidence or testimony.

Similarly unavailing is Petitioner's second argument, in which he asserts that the procedure was defective because the trial court "ordered the defense expert excluded during the testimony of Joseph Sypnicki." (FAP at 153.) When Sypnicki was about to testify, defense counsel requested that Smith be allowed to listen to the testimony; the trial court denied that request. (PRT 36-37.) As Petitioner acknowledges, it is within a trial court's discretion to exclude witnesses from the courtroom who have not yet testified. (See FAP at 171-72.); see also Cal. Ev. Code § 777 ("[T]he court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses.") Moreover, it was *defense counsel* that initially requested the exclusion of all testifying witnesses from the courtroom. Just prior

---

[6] All references to the pre-trial transcripts in Claim 1 are to Volume PT-17, which is entitled "in Limine Motions" and dated February 20, 1992. (See Lodgment No. 62.)

to commencing the offer of proof, defense counsel stated: "At this time I would ask the Court to exclude all witnesses to this hearing," and when asked to identify the witnesses, counsel included both Mr. Sypnicki and Mr. Smith in the list; the trial court granted the request. (PRT 18-19.)  Defense counsel also requested that the trial court "admonish them not to speak to each other with regard to the nature of the circumstances of the facts relating to this area;" the trial court accordingly issued an admonishment not to discuss the testimony or offers of proof until the witnesses had been called to testify. (PRT 18.) The Court finds no abuse of discretion in the trial court's ruling.

Third, Petitioner simply contends that de novo review is required because the "trial court refused to offer any curative instruction in lieu of a sanction such as dismissal." (FAP at 153-54.)  At the conclusion of the pre-trial hearing on the request for sanctions due to the loss or destruction of evidence, the Court held that a curative instruction was not warranted because the defense failed to meet the standards set forth in Youngblood and Trombetta with respect to the doorjamb.  (See PRT 197.)  Petitioner fails to persuasively explain how the trial court's final ruling implicates the adequacy of the state court's fact-finding *process* so as to warrant de novo review of this claim.

Given that the trial court's procedure allowed for the presentation of evidence and the examination of witnesses, that the trial court specifically asked the defense if they wished to present additional evidence or witnesses prior to issuing its ruling, and that the request to exclude witnesses from the courtroom came from defense counsel, the trial court's actions appear to be well within the bounds of discretion.  The Court remains unpersuaded that the state court's fact-finding process was deficient, nor does Petitioner demonstrate the much higher burden demanded by Taylor.  Id., 366 F.3d at 1000 ("Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.")  For the reasons stated above, de novo review is not appropriate. Accordingly, the Court will evaluate this claim pursuant to § 2254(d).

### c.   Discussion

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  Trombetta, 467 U.S. at 488-89 (footnote and internal citation omitted).  In Youngblood, the Supreme Court further held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58.

Petitioner asserts that: "When taken together, the trio of *Brady*, *Trombetta*, and *Youngblood*, set up a tripartite test for determining the government's duty to preserve and disclose evidence depending on the strength of the exculpatory character of the evidence." (FAP at 156.)  He argues that: "The distinctions between the three tests are significant in this case because as the investigation progressed, as the prosecution learned more about the exculpatory nature of the bloody print on the door jamb, its duty to preserve the print became more exacting.  From the moment the prosecution learned that the bloody print on the door jamb was not Mr. Roybal's, that evidence became material exculpatory evidence which the prosecution was bound to preserve, disclose,

1    and make available for examination to the defense." (Id.)

2        The trial court held that the doorjamb had "no exculpatory value" for Petitioner,

3    stating that: "The print, patent that it is, I'm satisfied is not of sufficient quality for any

4    qualified examiner to render an opinion that it does or does not belong, that is match,

5    with known prints or exemplars, . . ." (PRT 196.)  The trial court stated that: "It's

6    essentially a piece of neutral evidence in terms of its forensic value, that is its fingerprint

7    value, and accordingly, I also conclude that the investigating agency had no knowledge

8    of its exculpatory nature."  (Id.)  The trial court also concluded that the "far better

9    evidence is the photograph of the bloody palm print on the door jamb, and of course that

10   is available," that the photo was "comparable evidence, in fact better evidence" than the

11   doorjamb, and reiterating that the print was insufficient for identification purposes.

12    (PRT 197.)  The trial court also concluded there was no proof of bad faith,[7] stating that

13   "this is probably an administrative screw up," as the police had followed procedures and

14   "this door jamb has been somehow been misplaced or misfiled."  (Id.)

15       These conclusions appear reasonable.  Smith indicated, through an offer of proof,

16   that the doorjamb was better evidence than the photograph, as the original item would

17   contain greater detail, and that "the photograph of the bloody print was limited in its

18   usefulness." (PRT 33-34.)  However, Sypnicki, who examined both items, stated that

19   while neither the photo nor the doorjamb was particularly good evidence, the photo was

20   sufficient for comparison purposes. (PRT 50, 55-57.) Specifically, Sypnicki stated that:

21   "Well, I looked at the print on the door frame that had been dusted, and I found that that

22   was of absolutely no value whatsoever.  By the time it had been dusted, it was more or

23   less a black smudge." (PRT 61.)  He noted that the photos were better, as: "That shows

24   the print in its unadulterated form.  It hasn't been touched, It's just a straight photo, one-

25   to-one photo of a fingerprint or palm print." (PRT 68.)  He also indicated that, in his

26   opinion, neither the doorjamb nor the photos was very useful for either eliminating or

27   _____

28       [7] The trial court also allowed defense counsel to offer argument that the police
     destroyed the print in bad faith by applying fingerprint powder to the doorjamb. (PRT
     189.)

identifying anyone, and that he was not able to either match or eliminate Petitioner as the donor of the print. (PRT 58-59, 69-70.) It is apparent from the record that this evidence merely was not inculpatory as to Petitioner, rather than being exculpatory, and the trial judge reasonably concluded that the lost doorjamb itself was "essentially a piece of neutral evidence." (PRT 196.)

Freiberg photographed the print at the crime scene in June 1989, unsuccessfully attempted to lift and preserve it by applying powder, and attempted to illuminate it to obtain more detail. (PRT 93-95.) Freiberg agreed that the print was "not a real good quality" print, stating that "the print was of a marginal quality." (PRT 99, 118.) Freiberg also later performed a quick comparison of the print to an inked print card provided by Detective Trotter, and recalled telling Trotter that he could not say whether the prints were a match. (PRT 97-99, 118.) Trotter affirmed Freiberg's statement, testifying that: "He said he felt it was not Roybal's prints." (PRT 126.) Trotter relayed that information to Detective Hancock, whose notes indicated that: "Bloody print is not Roybal's. None of the other prints belong to Roybal." (PRT 155-57.) Hancock's later written report stated the print "did not appear" to be Roybal's. (PRT 161.)

With respect to the loss of the doorjamb, Detective Hancock stated that the doorjamb was removed from the victim's home on June 22, 1989, she took it to the Department of Justice for Sypnicki's examination on June 23, that she was present for the testing, and afterwards, she booked the item into evidence on September 21, 1989. (PRT 143-47.) Between June 23 and September 21, the item was locked in the Sheriff's facility. (PRT 147.) Hancock last saw the doorjamb in January or February of 1991, just prior to the police department's move to a new evidence facility; when she accompanied defense counsel to the new evidence facility in November 1991, they were unable to locate the item. (PRT 147-50.) Sergeant Krunglevich, who administered the evidence and property clerks, stated that they located the tag for the doorjamb, which showed that the item had not been removed from the facility after it was booked into evidence in September 1989. (PRT 173-78.) Krunglevich noted that the police department moved

to a new evidence facility in February 1991, while he became aware that the item was missing two months prior to the February 1992 hearing, and the misfiled box that previously held the doorjamb had been located one month prior.  (PRT 179, 181-82.) The police department had conduced unsuccessful searches looking for the item, and there had not been any similar loss or inability to find evidence.  (PRT 182.)  The department had procedures in place for storing evidence, and Krunglevich stated that those procedures had been followed.  (PRT 183.)

As noted previously, the California Supreme Court rejected Petitioner's claim of error, reasoning:

> [T]he superior court did not err in concluding that the evidence at issue did not possess an exculpatory value that was apparent before it disappeared; the print may or may not have been defendant's and may or may not have been the perpetrator's.  Nor did it err in concluding that the disappearance of the doorjamb was inadvertent and not the product of bad faith conduct by the police; indeed, nothing in defendant's offer of proof disputed such a conclusion.

Roybal, 19 Cal. 4th at 510.

Petitioner now argues that once the police knew that Petitioner had been excluded as a donor of the bloody print, they had a duty to preserve the evidence, and alleges that the police and prosecution acted in bad faith in losing the evidence and misleading the trial court about its value.  (FAP at 159-60.)  Petitioner also asserts the doorjamb evidence was "uniquely exculpatory" in comparison to the photos of the print.  (Id. at 164.)  First, a review of the testimony presented at the pre-trial hearing does not reflect that the trial court erred in concluding the doorjamb was not exculpatory.  Again, both Sypnicki and Freiberg testified that the evidence was not of a good quality, and Sypnicki opined that the evidence would not be useful for identification or elimination. Meanwhile, Smith's offer of proof at the hearing did not include any testimony about whether Petitioner's prints matched or did not match the evidence, while Freiberg's brief review of the prints did not match them to Petitioner, and Sypnicki testified that he was unable to either exclude or match the print to Petitioner.

Petitioner argues that the trial testimony shows that the prosecution misled the trial

court about the evidentiary value of the doorjamb, and asserts that trial testimony revealed that, "Sypnicki did indeed eliminate Mr. Roybal as the donor of the print, assuming that it was a fingerprint, as opposed to a palm print, which he agreed it most likely was." (See FAP at 164, citing Reporter's Transcript ["RT"] 3592-93.) A review of the record does not support Petitioner's assertion. At one point during the examination, Sypnicki stated that he felt he "could eliminate the fingerprints, but not the palm prints" of known exemplars, including Petitioner's, as having made the print on the doorjamb, but went on to clarify that: "Wherever that print was, that print I couldn't make or I would say I couldn't find anything at all that would lead me to believe that it could be those people. But that print could very well be a portion of a palm, and that part I can't, on the known prints, I wouldn't eliminate anybody." (RT 3595-96.) Sypnicki reaffirmed several times that, due to the poor quality of the print, he was unable to eliminate either Petitioner or Mr. Weden, the victim's husband, as donors of the print on the doorjamb; this conclusion was also clearly reflected in his written report. (See RT 3597-98, 3600-01.)[8]

  The Court also remains unpersuaded that the doorjamb was "uniquely" exculpatory. Defense expert Smith testified, via the offer of proof, that he believed the

---

[8] Indeed, Sypnicki and defense counsel had the following exchange about Sypnicki's report and opinion, during which Sypnicki again affirmed his inability to either exclude or include Petitioner as the donor of the print:

Q:   In that report, what do you say about eliminating or including Rudolph Roybal as the donor of the print on the doorjamb?

A:   In my summary on that report, and I'll read it, it says: "Examination has determined that due to the lack of clear ridge detail, the visible impression appearing in the photograph marked item B can neither be eliminated nor identified as having been made by the fingers or palms of subject Rudy Roybal."

Q:   Then it is your testimony that, with respect to Rudolph Roybal, you cannot eliminate him as the donor of the print on the doorjamb; is that correct?

A:   That's what I stated. Maybe it wasn't too clear, but that's what I mean.

(RT 3597-98.)

doorjamb was better evidence than the photo because it was likely to provide more detail, as it was the original surface of the print.  However, Sypnicki, who actually examined both the photos and the doorjamb, opined that neither item was particularly good evidence, and that the photo actually showed more detail than the doorjamb, which had been dusted with fingerprint powder in an attempt to lift the print.  The trial court reasonably credited Sypnicki's testimony.  Petitioner also argues that the doorjamb would have provided additional evidence in support of his defense that someone else had committed the crime, and had done so while wearing gloves; testimony in support of this theory was presented at trial. (FAP at 164-65.) Petitioner cites to conflicting expert trial testimony about whether the photographs reflect visible sweat pores, and argued that the doorjamb would have provided evidence superior to that from the photos.  However, it is clear that the preserved photographs allowed the experts to examine the evidence and testify on the matter.  Petitioner only speculates that an examination of the doorjamb could have revealed additional evidence that could have further supported the defense theory; this assertion is insufficient to show that the doorjamb was in fact exculpatory. See Youngblood, 488 U.S. at 57 ("The Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.") Moreover, irrespective of Petitioner's assertions as to the evidentiary value of the doorjamb, the loss or destruction of that item did not leave Petitioner without "comparable evidence," in the form of the photographs, that he could use in his defense. See Trombetta, 467 U.S. at 489.

Indeed, despite the loss of the doorjamb evidence, several experts testified at trial about whether Petitioner was included or excluded as a donor of the print based on their examination of the photographs.  As discussed, Sypnicki testified at trial that he could

not eliminate or identify Petitioner as having made the print on the doorjamb. (RT 3597-98.) Larry Harper, an FBI print examiner, compared the photographed print to those of Petitioner, as well as other individuals, and testified that he eliminated Petitioner and the other known individuals from having made the print. (RT 3518-20.) Harper could not eliminate the victim as a donor, explaining that her prints were not clearly recorded, and acknowledged that taking prints from a person with arthritis could be difficult. (RT 3520-21.) Defense expert Smith testified that he compared the prints of Mr. Weden and Petitioner to the photographed print, and was able to exclude both individuals as the donor of the print. (RT 4267-72.) Smith was also able to exclude some of the victim's fingers as having made the prints, but not others, given the condition of the victim's rolled prints. (RT 4268-69.) The defense also called Freiberg, Trotter, and Hancock to testify about Freiberg's brief comparison of the prints; as at the pre-trial hearing, Freiberg again indicated that he was unable to match the print on the doorjamb to the known prints, Trotter stated that Freiberg indicated the prints were not a match, and Hancock again testified that her understanding of the results of the comparison was that the print was not Petitioner's. (RT 4380-82 (Freiberg), 4536-39 (Trotter), 4548-49 (Hancock).) Thus, the primary exculpatory evidence presented and argued at the pre-trial hearing, that Petitioner's prints did not match the print on the doorjamb, was ultimately introduced into evidence at trial.

Petitioner contends that the trial court's conduct of the pre-trial hearing and refusal to provide the jury with a curative instruction violated his constitutional rights, and that the trial court's refusal to allow Smith to observe Sypnicki's testimony violated a myriad of constitutional rights, including his right to due process, to effective assistance of counsel, and to confront and cross-examine witnesses. (FAP at 175.) He also asserts that the trial court's refusal to allow the defense to cross-examine Sypnicki about proper procedures to preserve the print violated due process. (Id. at 177.) The California Supreme Court rejected this claim on appeal, reasoning as follows:

> Defendant also claims that the superior court erred by refusing to permit him to call witnesses or to allow his expert to observe the examination of

1    the prosecution's expert, by limiting cross-examination of Sypnicki about
2    specific forensic techniques, and by refusing to give his proposed
     instruction. The claims are unavailing; the superior court properly
3    concluded that the evidence did not, in any event, have apparent
     exculpatory value.

4  Roybal, 19 Cal. 4th at 510.

5        With respect to the trial court's refusal to allow Smith to observe the testimony of

6  Sypnicki, as the Court has determined in the section above, the trial court acted within

7  its discretion in excluding witnesses from the courtroom.  Moreover, as previously noted,

8  the original request to exclude witnesses came from the defense.  Petitioner fails to

9  demonstrate that the trial court's ruling amounts to error of a constitutional dimension.

10  See Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("[I]t is not the province of a federal

11  habeas court to reexamine state-court determinations on state-law questions.")

12        Regarding the trial court's refusal to allow the defense to cross-examine Sypnicki

13  about proper print-taking procedures, Petitioner fails to show that any error in limiting

14  the cross-examination resulted in prejudice.  While the trial court held the procedural

15  questions were not relevant to the noticed motion insofar as it was based on the loss of

16  the doorjamb, the trial court still allowed the defense to argue that Freiberg's decision

17  to apply powder to the print  was evidence of bad faith.  (See RT 188-89.)  In any event,

18  the ultimate issue at the hearing was whether exculpatory evidence had been lost or

19  destroyed, and Petitioner fails to demonstrate that allowing him to question Sypnicki on

20  procedures would have resulted in a different outcome, as there was no dispute that the

21  evidence had been lost or destroyed.  Given that the trial court allowed defense argument

22  on bad faith despite the tenuous relevance to the issue at hand, Petitioner fails to show

23  that the trial court's ruling limiting cross-examination on this subject rose to the level of

24  constitutional error.  See McGuire, 502 U.S. at 68.

25        Finally, Petitioner asserts that the trial court's refusal to provide the jury with a

26  curative instruction, and in particular, the court's rejection of his proposed jury

27  instruction, was erroneous.  As previously noted, at the conclusion of the pre-trial

28  hearing, the court held that a curative instruction was not warranted because the defense

failed to meet the standards set forth in <u>Youngblood</u> and <u>Trombetta</u> with respect to the doorjamb.  (<u>See</u> RT 197.)  The trial court also stated that: "This will not prevent - - this ruling will not prevent questioning before the jury concerning the print.  It may be somewhat embarrassing to the prosecution and the investigating officers, but that's life." (RT 198.)  During the discussion on guilt-phase jury instructions, the defense proposed the following instruction:

> There is evidence in this case the Oceanside Police Department lost the doorjamb containing the bloody print.  In considering any prosecution argument, the print on the doorjamb was not in blood, you should keep in mind it was the police department's loss of the doorjamb that made testing for blood impossible.

> Further, in considering the quality of the bloody print and the ability of the experts to examine it, you should keep in mind it was the police error in powdering the bloody print that prevented use of other methods, such as super glue, ninhydrin, and laser examination from being used to enhance the print.

> Further, in considering the testimony of the fingerprint experts, you should consider the prosecution obtained Deputy Freiberg, Joseph Sypnicki, and Larry Harper.

(RT 4741-42.)  The prosecution contended the requested instruction was argumentative, and the trial court stated: "My inclination is to sustain the objection.  You can argue this."  (RT 4742.)  After brief discussion about a proposed modification to the instruction, the trial court refused the instruction. (RT 4743.)  The defense also proposed several other instructions about the poor quality of prints obtained from the victim, the police failure to seize latex gloves from the trash, and allowing the victim's family into the home to clean a few days after the crime- each of these proposed instructions were also refused as argumentative.  (RT 4744-53; 4825.)  Defense counsel and the trial court then had the following exchange:

> Mr. Campbell:       Your Honor, maybe it would be helpful if I inquire. The defense would like to get some instruction along <u>Zamora</u> lines.  I can make these - - try to make these instructions less argumentative.  My goal is to draw the jury's attention to the fact that evidence was lost here by the prosecution and it prejudiced the defense, and thats [sic] something it ought to consider.

> The Court:          I think the only thing I can tell you, Mr. Campbell, is that I have to have a written proposed instruction upon

1   which to rule, and I don't have that right now.

2   Mr. Campbell:   All right, I understand.  Thank you.

3   (RT 4825-26.)

4   The California Supreme Court found as follows:

5   At the close of evidence, defendant verbally requested an instruction to the
    effect that the police department's loss of the doorjamb made testing the
6   print for blood impossible and police error prevented use of various
    forensic methods to enhance the print. The superior court rejected the
7   proposed instruction as argumentative, but did not preclude defendant from
    submitting a written proposed instruction concerning the doorjamb.
8   Defendant did not do so.

9   Roybal, 19 Cal. 4th at 509. The California Supreme Court rejected Petitioner's claim of

10  instructional error, reasoning that: "In light of its conclusion that the evidence did not

11  have apparent exculpatory value, it was also not error for the superior court to refuse

12  defendant's proposed instruction on the ground that it was argumentative." Id. at 511.

13  Given the trial court's reasonable conclusion that the doorjamb was not

14  exculpatory, Petitioner fails to demonstrate that refusing the proposed instruction was

15  erroneous, much less that it amounted to error of a constitutional dimension. See

16  McGuire, 502 U.S. at 68. Even assuming there was error, Petitioner fails to demonstrate

17  that the absence of this instruction had any impact on the outcome of the guilt phase

18  proceedings. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (habeas relief not

19  available unless error had a "substantial and injurious effect or influence in determining

20  the jury's verdict.") At the pre-trial hearing, the trial court explicitly noted that the

21  defense could question witnesses about the print. (PRT 198.)  While rejecting the later-

22  proposed instruction, the trial court again specifically indicated that the defense was free

23  to argue the matter, stating: "My inclination is to sustain the objection.  You can argue

24  this." (RT 4742.)

25  In opening arguments, defense counsel argued at length about the print on the

26  doorjamb- not only that the prints did not match Petitioner's, but also about the

27  processing and collection of the evidence, its loss, and the comparison of the print to

28  both the prints of the victim and those of the victim's husband, and argued that the print

1   belonged not to any of those three individuals, but belonged to the real killer. (RT 2619-

2   24, 2627.)   The defense reiterated that the doorjamb itself was missing and then

3   discussed the photographs taken of the print as follows:

> Now, realizing this was a very important print because the inference was
> obvious that it must have belonged to the killer or Yvonne Weden, realizing
> the significance of this print, the Sheriff's crime lab criminalist, Fred
> Freiberg, first photographed the print. And thank God he did because at
> this point that's the only evidence we have of this bloody print.

7   (RT 2619-20.) The defense also addressed the police department's handling of the print,

8   arguing:

> Mr. Freiberg, although he is an experienced criminalist and
> somewhat of a fingerprint expert, put this black powder on the bloody print
> on the door jamb. This was a mistake. That's not how you're supposed to
> handle prints like that because that bloody print was not a latent print, this
> is to say invisible, that you can make visible only with the application of
> powder or some other substance. Rather it was a patent print, a print that
> you can see with the eye even before you treated it. You don't put powder
> on those prints, but Mr. Freiberg did.
>
> At that point or some point later, apparently realizing the mistake had
> been made, the door jamb itself was seized in the hopes that maybe the
> powder could be removed or something retrieved from this bloody print.

15   (RT 2620.)

16   During the guilt phase, the defense elicited testimony from Freiberg about

17   powdering the print; while Freiberg testified that the powder would not have interfered

18   with later efforts to test the doorjamb for blood, the defense elicited that no such tests

19   had been done prior to the loss of the doorjamb, and that the doorjamb had not been

20   located.   (RT 3675-77.)   Similarly, the defense elicited testimony from Detective

21   Hancock about the storage of the doorjamb at the police department's evidence facility,

22   the move to a new evidence facility, that the doorjamb was noted missing in November

23   1991, and the inability to locate the doorjamb despite repeated searches. (RT 4123-28.)

24   The defense also questioned Sypnicki about procedures, and Sypnicki testified that

25   he would not have powdered the print after photographing it, but instead would have

26   attempted to examine the print first, then would have tried light and other chemicals prior

27   to powder. (RT 3181-85.) FBI analyst Harper similarly stated that he would apply

28   powder last, after first photographing the print and then attempting to use chemicals.

1   (RT 3529.)  In closing, the defense again criticized the processing of the scene, arguing

2   that: "Now, there's obviously the fact that the latex gloves were not seized.  I'll come

3   back to that.  There's the fact that the bloody print was first powdered, which destroyed

4   it for purposes of all other testing.  There's the fact that the doorjamb itself was lost.  But

5   there were other mistakes too."  (RT 4950.)   The defense asserted: "That bloody print

6   was not Rudolph Roybal's and it was not Paul Weden's.  We know that from the experts

7   who testified here."  (RT 4954.)  The defense then engaged in an extended discussion

8   on the bloody print and the expert testimony comparing the print to known prints.  (RT

9   4954-57.)  The defense also pointedly noted that the inability to test the print for blood

10  was due to its loss, arguing that: "Now, it is true that I can't prove to you by a scientific

11  test that the bloody print, I'm calling it the bloody print because it was a bloody print,

12  was in blood, and that's because the doorjamb has been lost."  (RT 4957-58.)  The

13  defense also argued that the print belonged to the perpetrator of the crime and discussed

14  the problems the experts had encountered in comparing the print to those of the victim,

15  given the quality of the victim's prints.  (RT 4958-60.)  The defense again advanced its

16  theory that the print had been made by the perpetrator, an individual wearing gloves, and

17  argued at length about latex gloves in a garbage can that had been photographed by

18  police but had not been seized.  (RT 4961-67.)

19       Thus, in light of the fact that the jury was presented with expert testimony that the

20  print did not match Petitioner, testimony and argument about the loss of the doorjamb,

21  and the resultant inability to test it for further evidence, Petitioner fails to demonstrate

22  that the trial court's rejection of the proposed instruction covering similar ground had a

23  "substantial and injurious effect or influence in determining the jury's verdict."  Brecht,

24  507 U.S. at 637.  Petitioner fails to demonstrate that the California Supreme Court's

25  rejection of this claim was either contrary to, or an unreasonable application of, clearly

26  established federal law, or that it was based upon an unreasonable determination of the

27  facts.  Petitioner is not entitled to habeas relief on Claim 1.

28

## 2.    Claim 2

Petitioner contends that the trial court erred in excusing prospective juror Cynthia Steele for cause based on her views about the death penalty, violating his right to an impartial jury, a reliable penalty determination, and due process of law under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (FAP at 217.)

Petitioner raised this claim on direct appeal, and the California Supreme Court rejected it on the merits, as follows:

> During voir dire, the superior court granted the prosecution's challenge for cause with regard to prospective juror Cynthia Steele, on the ground that she "clearly stated that her religious convictions prevent her from voting for the death penalty." Juror Steele indicated in a written questionnaire that the death penalty was against her religious beliefs. In response to the question, "In what types of cases/offenses do you feel the death penalty should be imposed?," she wrote: "In some of these case[s], when a person kill (sic) 5 or 7 people, but really can't say because it really isn't right to take another person['s] life." In voir dire, she gave consistent answers. When asked by the superior court: "Would your religious conviction prevent you from voting for a death penalty in this case knowing what you know about the legal procedures here? Would you be precluded, would you absolutely not vote for the death penalty because of your religious convictions," she responded: "Yeah, I wouldn't vote for that. I wouldn't-I-I would for guilty, but I-I wouldn't feel right. Because like I say, I'd be taking another person's life and I wouldn't feel right." Asked to give a "yes" or "no" answer to the same question, she said: "Yes." When asked, at the request of defense counsel, whether she had "some situation in mind where you think the death penalty might be appropriate," she answered: "Yes. Yes, like that case of that-that guy kills people, I can't think of his name, and he cut them up and ate parts of their body. . . . I'm not crazy about the death penalty but that was really bad." When the superior court repeated the question whether she would be unable to vote for the death penalty in this case, however, she again answered in the affirmative. The superior court denied a request by defense counsel to ask her whether she would "have an open mind" with respect to considering the death penalty "if in this case it were proven the defendant intentionally killed a 65-year-old woman in the course of a burglary of her house."
>
> Defendant claims that the superior court erred in excusing prospective juror Steele for cause. He contends that the record supports only a conclusion that she had some religious scruples about the death penalty, not blanket opposition thereto. He argues that her answer to the superior court's question regarding whether she would vote for the death penalty in this case did not support a challenge for cause. The point fails.
>
> The question on review of this claim is whether exclusion was warranted because the juror's views concerning capital punishment would "'prevent or substantially impair the performance of his duties as a juror . . . .'" (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; accord, *People v. Samayoa* (1997) 15 Cal.4th 795, 822 [64 Cal.Rptr.2d 400, 938 P.2d 2].) "When a juror's views are conflicting or ambiguous, the trial court's determination as to his or her state of mind

generally is binding on a reviewing court. When there is no inconsistency, but simply a question whether the juror's responses demonstrated a bias for or against the death penalty, the trial court's judgment will not be set aside if supported by substantial evidence." (*People v. Samayoa, supra,* 15 Cal.4th at p. 822.) Questions directed to a juror's attitudes toward the particular facts of the case are not relevant to the death-qualification process; however, "'a court may properly excuse a prospective juror who would automatically vote against the death penalty in the case before him, regardless of his willingness to consider the death penalty in other cases.'" (*People v. Pinholster* (1992) 1 Cal.4th 865, 917-918 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

The record supports the superior court's determination that prospective juror Steele harbored views unfavorable toward the death penalty that would substantially have impaired her ability to sit as a juror. She repeatedly stated that she would not vote for the death penalty "in this case," i.e., a case involving a single victim. She explained that she might do so, albeit reluctantly, only in an extreme case, such as, for example, one involving multiple victims and cannibalism. The questioning by the superior court properly elicited her views about the death penalty in the abstract; the particular facts of the case were not presented to her. Indeed, the superior court refused to permit defendant to also ask about her views regarding the specific case, i.e., whether she would have an "open mind" with respect to considering the death penalty for a person who killed a 65-year-old woman in the course of a residential burglary.

Roybal, 19 Cal. 4th at 518-19 (footnote omitted).

"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985), quoting Adams v. Texas, 448 U.S. 38, 45 (1980).

"[W]hether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.  Such determinations were entitled to deference even on direct review; '[t]he respect paid such findings in habeas proceeding certainly should be no less.'" Witt, 469 U.S. at 428, quoting Patton v. Yount, 467 U.S. 1025, 1038 (1984) (footnote omitted); see also Uttecht v. Brown, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals that compose it, a factor of critical

1    importance in assessing the attitudes and qualifications of potential jurors.")

2        After recounting several answers provided in Steele's written questionnaire, the

3    trial court inquired on voir dire as to her views about the death penalty, as follows:

[The Court]:  Do you have a firm religious conviction that taking another's life is wrong or not justified?

A:    I think it's unjustified.  I feel it's unjustified.

Q:    Unjustified?

A:    Unjustified, yeah.

Q:    All right.  Would your religious conviction prevent you from voting for a death penalty in this case knowing what you know about the legal procedures here?  Would you be precluded, would you absolutely not vote for the death penalty because of your religious convictions?

A:    Yeah, I wouldn't vote for that. I wouldn't - - I - - I would vote for guilty, but I - - I wouldn't feel right.  Because like I say, I'd be taking another person's life and I wouldn't feel right.

Q:    You've - - I need to ask the question because I need a "yes" or "no" answer, believe me.

A:    All right.

Q:    Would your religious convictions prevent you from voting for the death penalty in this case?

A:    Yes.

18   (RT 2241-42.)  After the prosecution's challenge for cause, the trial court asked if

19   defense counsel had additional questions, and the defense noted that Ms. Steele seemed

20   to indicate in her questionnaire that there may be situations for which she did not oppose

21   the death penalty.  Upon inquiry, Steele referenced the infamous Dahmer case, involving

22   both multiple murder and cannibalism, stating that, "I'm not too crazy about the death

23   penalty, but that was really bad."  (RT 2242-43.)  The Court then inquired:

Q:    Now, in that situation you would consider voting for the death penalty?

A:    Yeah, yes.

Q:    All right.  This case is not going to involve cannibalism.

A:    Okay.

Q:    Not that I know of.  Now, knowing that, that this case will not involve cannibalism, just from the little you've heard about the case, do your religious convictions tell you not to vote for the death penalty?

A:    Wait a minute.  Okay.  What I meant is, like not too crazy about the death penalty, but I'll do it if I was a juror, but I'm saying it would bother me.  I'd probably have nightmares, I'd feel - - let's see.

Q:    Would you be unable to vote for the death penalty in this case?

A:    Yes.

(RT 2243-44.)  The trial court excused Steele from the venire, stating: "All right.  The prosecution's challenge for cause is granted.  I'll make a finding that Ms. Steele has clearly stated that her religious convictions prevent her from voting for the death penalty in this case."  (RT 2245.)

Petitioner contends that Steele's answers, and general opposition to the death penalty, was insufficient to support the challenge for cause.  (FAP at 186-87.)  He asserts that the trial court's inquiry into whether Steele was able to vote for death penalty "in this case" ran counter to the Supreme Court's directions in Witherspoon, which directed that such inquiry should be in the abstract.  (FAP at 188, citing Witherspoon, 391 U.S. at 533 fn. 21.)[9]  Petitioner argues that Steele was not so opposed to the death penalty that she should have been excluded, and that the state court's rejection of this claim on direct appeal was an unreasonable application of the law to the facts under section 2254(d)(2).  (FAP at 188.)

The Witherspoon Court stated that "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him."  Id., 391 U.S. at 523 n. 21.  However, the trial court did not allow inquiry into the juror's views about the specific facts of Petitioner's case, and rebuffed defense attempts to pose pointed questions referencing the victim's age, gender, and other particular circumstances of the crime, stating that: "I've asked her and she knows from listening to my questions to the other jurors here in her presence what the procedure is,

---

[9] It appears Petitioner may be referring to page 523 of the majority opinion, which contains footnote 21, rather than page 533 as cited, which is part of a dissenting opinion.

the nature of the case and so forth." (RT 2244.)  The record also clearly reflects that Steele was aware of the nature of the case, as the prosecutor read the Amended Information, outlining the charges brought against Petitioner, to each group of prospective jurors. (See RT 2196-99.)  Instead, as the state court reasonably noted, the trial court's use of the term "in this case" was used to distinguish the general nature of the case, and Steele "repeatedly stated that she would not vote for the death penalty 'in this case,' i.e. a case involving a single victim," as opposed to a case involving "multiple victims and cannibalism," in which she could conceivably consider a death sentence. Roybal, 19 Cal. 4th at 519.

Prospective juror Steele did not merely voice a general opposition to the death penalty, but instead repeatedly affirmed an unwillingness to consider it or vote for it in all but the most "extreme" situations. "[D]eference must be paid to the trial judge who sees and hears the juror." Witt, 469 U.S. at 426.  After extended inquiry, the trial court concluded "that Ms. Steele has clearly stated that her religious convictions prevent her from voting for the death penalty in this case."  (RT 2245.)   Petitioner fails to demonstrate that the trial court's conclusion was unreasonable, and the Court finds record support for the trial court's decision given Steele's clearly stated opposition to the death penalty and unwillingness to vote for it in all but only the most "extreme" case. See Witt, 469 U.S. at 434 ("[T]he question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record."), citing Marshall v. Lonberger, 459 U.S. 422, 432 (1983).

Contrary to Petitioner's contention, "[t]he trial court's finding of bias was made under the proper standard, was subject to § 2254(d), and was fairly supported by the record." Witt, 469 U.S. at 435.  Accordingly, the state court's rejection of this claim on appeal was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claim 2.

### 3.    Claim 14

Petitioner alleges that the trial court erred in instructing the jurors that an aggravating factor, "standing alone," could support a death sentence, arguing that the instruction "effectively told the jurors that one aggravating factor alone could override the duty to compare the evidence in aggravation with evidence in mitigation," in violation of his constitutional rights to due process and a reliable penalty determination. (FAP at 301.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning as follows:

> After listing the penalty factors of Penal Code section 190.3 for the jurors, the superior court instructed: "These various factors in aggravation and mitigation may be assigned different weights by you. Thus, it is not the number of factors necessarily, but also the weight you assign to them which should control. For instance, you could find that one specific factor on one side weighs so heavily in your consideration that it outweighs all of the determined factors on the other side. . . . Any aggravating factor, standing alone, may be sufficient to support a decision that death is the appropriate punishment. [¶] If a mitigating circumstance or aspect of the defendant's background or character arouses sympathy and compassion in you, you may consider that a circumstance in mitigation and impose life in prison without possibility of parole instead of the death sentence. [¶] Any mitigating factor standing alone may be sufficient to support a decision that life without possibility of parole is the appropriate punishment."

> Defendant claims the superior court erred. He argues that the instruction was inconsistent with Penal Code section 190.3, which requires jurors to consider the aggravating and mitigating circumstances and to impose a sentence of death if it concludes that the aggravating circumstances outweigh the mitigating circumstances. He concedes that a juror could properly decide that one aggravating factor outweighed everything else and warranted a sentence of death. He contends, however, that the superior court's instruction was misleading because it referred to any aggravating factor "standing alone." He insists that the phrase "standing alone" means "by itself, without reference to anything else," and that jurors were thus instructed that they could altogether ignore mitigating evidence. He is unpersuasive.

> There was no reasonable likelihood that the jurors could have so understood the instruction. It did not, as defendant asserts, authorize jurors to disregard all mitigating evidence and consider any single penalty factor in isolation, i.e., without reference to anything else, in determining penalty. On the contrary, the superior court referred to each of the statutory factors in mitigation as well as in aggravation, and specifically instructed jurors that they could consider all the circumstances, including any sympathetic aspect of defendant's character or background as a mitigating factor. It also expressly instructed jurors to weigh all of the relevant factors in determining the appropriate punishment, while making it clear that the

1  weighing process should not consist of a merely mechanical process of
2  comparing the number of aggravating and mitigating factors. In this
   context, the phrase "standing alone" did not suggest that jurors could refuse
3  to consider mitigating evidence.[FN14]

4      FN14 Because defendant fails to establish that the superior
        court erred, his additional claims under the Fifth, Eighth, and
5       Fourteenth Amendments to the United States Constitution,
        which are predicated on such alleged error, also fail.

6  Roybal, 19 Cal. 4th at 521-22 (alterations in original).

7      Clearly established federal law instructs that in order to merit habeas relief on a

8  claim of state law instructional error, the habeas court must determine "whether the

9  ailing instruction by itself so infected the entire trial that the resulting conviction violates

10 due process. McGuire, 502 U.S. at 72, quoting Cupp v. Naughten, 414 U.S. 141, 147

11 (1973). In this instance, Petitioner argues that the instruction in question was

12 "misleading" and could have been understood by the jurors as precluding the

13 consideration of mitigating evidence. (FAP at 301-02.) As such, this Court's review

14 must focus on "whether there is a reasonable likelihood that the jury has applied the

15 challenged instruction in a way that prevents the consideration of constitutionally

16 relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990); see also Buchanan

17 v. Angelone, 522 U.S. 269, 276 (1998) ("[T]he sentencer may not be precluded from

18 considering, and may not refuse to consider, any constitutionally relevant mitigating

19 evidence. . . . However, the State may structure the jury's consideration of mitigation so

20 long as it does not preclude the jury from giving effect to any relevant mitigating

21 evidence.") (internal citations and quotations omitted.)

22     Additionally, when reviewing an instructional challenge, "[i]t is well established

23 that the instruction 'may not be judged in artificial isolation,' but must be considered in

24 the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72,

25 quoting Cupp, 414 U.S. at 147. Even if there was constitutional error, habeas relief is

26 unavailable unless that error had a "substantial and injurious effect or influence in

27 determining the jury's verdict." Brecht, 507 U.S. at 637.

28     Petitioner contends that the state supreme court's rejection of this claim is "an

unreasonable application of the law to the facts" and that the trial court's instruction "effectively told the jurors that one aggravating factor alone could override the duty to compare the evidence in aggravation with evidence in mitigation," and violated the Eighth Amendment.  (FAP at 301.)  He also asserts that this instructional error, in combination with the prosecutor's allegedly erroneous statement about weighing, raised as Claim 13 of the FAP, gave the jurors a "profoundly distorted view of California sentencing law."  (Traverse at 97.)

Petitioner fails to demonstrate that the contested language directed the jurors to disregard any evidence in mitigation.  Reviewing the instructions in context, it is clear that the trial judge explicitly instructed jurors at the commencement of the penalty phase proceedings that their duty was to weigh the evidence in aggravation against that in mitigation in rendering a penalty determination and directed the jurors: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed."  (CT 2051.)  At both the outset and conclusion of the penalty phase proceedings, the trial court also specifically instructed the jurors that they must weigh all the evidence before rendering a decision, in accordance with the standard CALJIC instruction, as follows: "Weighing the aggravating and mitigation circumstances does not mean a mere mechanical counting of the factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them.  You, the jury, are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.  [¶]  In weighing the various circumstances, you the jury determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.  [¶]  To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Compare RT 5308-

09, 6551, CT 2051 <u>with</u> CALJIC 8.88.)   This is consistent with California Penal Code section 190.3, which directs that: "After having heard and received all the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.  If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."  Cal. Penal Code § 190.3.

The additional instruction given here, that a single factor in aggravation (or mitigation) could on its own support their sentencing decision, did not direct the jurors to disregard the weighing process.  Indeed, the "standing alone" instruction was immediately preceded by instructions emphasizing the importance of "the weight" assigned to each factor in both aggravation and mitigation, and instructing that the jurors "could find that one specific factor on one side *weighs* so heavily in your consideration that it *outweighs* all of the determined factors on the other side." (CT 2122) (emphasis added.)   The contested instruction was immediately followed by a discussion of mitigating circumstances and a corresponding instruction that a factor in mitigation, "standing alone," could be sufficient to support a verdict of life in prison without the possibility of parole.  (<u>See</u> CT 2124, RT 6350.)   Other instructions continued to emphasize the weighing concept, such as: "I've given you an instruction that either aggravating or mitigating factors, one alone is sufficient, it's a weighing process that you must go through . . . ."  (RT 6382.)  The jurors were properly instructed to consider and weigh all of the evidence in reaching their penalty decision, necessarily and specifically including the evidence in mitigation.  The Court finds no "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  <u>Boyde</u>, 494 U.S. at 380.

As this contention is without merit, so is Petitioner's contention that the impact of this jury instruction, in combination with the error asserted in Claim 13, resulted in prejudice. This is because, as discussed in the adjudication of Claim 13, Petitioner fails to demonstrate that the prosecutor's statement had any prejudicial impact on the jury's consideration of mitigation. (See Claim 13, infra.)   The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Petitioner does not merit habeas relief on Claim 14.

### 4.   Claim 15

Petitioner asserts that the trial court erred in giving the jurors contradictory instructions regarding the consideration of prior crimes in aggravation, which allowed the jurors to consider non-statutory criminal acts in aggravation in violation of his constitutional rights. (FAP at 302-04.) Petitioner argues that the trial court gave two contradictory instructions and that "[t]he first told the jurors that 'other uncharged crime or crimes is or are not an aggravating factor and cannot be considered by you for any purpose in aggravation'; but the second, given within the space of a few minutes, told them that they could consider evidence of other crimes if it was proven beyond a reasonable doubt." (Id. at 305.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning as follows:

> The parties stipulated that six of defendant's prior felonies were true. The superior court instructed jurors as follows: "Neither the defendant's juvenile criminal history nor any violation of probation incurred by him may be considered or treated by you in aggravation. [¶] Evidence received in the guilt or innocence phase relating to defendant's drug use or possession or related activities ... as well as what may have been produced in the penalty phase or any other uncharged crime or crimes is or are not an aggravating factor and cannot be considered by you for any purpose in aggravation." It then listed defendant's six prior felony convictions, and continued its instruction as follows: "These prior felony offenses have been stipulated to by both the prosecution and the defendant. You may consider such crimes as aggravating circumstances in this case. [¶] These convictions-the conviction of these crimes must be proved beyond a reasonable doubt. [¶] You may not consider any evidence of any other crime as an aggravating circumstance unless such other crime has been proven beyond a reasonable doubt." After defining "reasonable doubt," the

superior court continued: "Also, evidence has been introduced for the purpose of showing that the defendant . . . has committed the following criminal acts, which involve, or allegedly involve the expressed or implied use of force or violence or the threat of force or violence." After listing four violent criminal acts allegedly committed by defendant, it instructed that before a juror could consider any of the acts as an aggravating circumstance, he or she must first be satisfied beyond a reasonable doubt that defendant committed the act. It then instructed: "A juror may not consider any evidence of any other criminal acts as an aggravating circumstance." Later in the instructions, it reiterated: ". . . I've indicated to you that certain activity, that is, the prior felony convictions and the prior acts involving threats of violence or violence, must be proved beyond a reasonable doubt."

Defendant contends that the superior court erred by giving contradictory and incorrect instructions. He argues that by instructing the jurors that they may not consider any evidence of "any other crime" unless it was proven "beyond a reasonable doubt" it improperly permitted them to consider nonstatutory aggravating circumstances, in violation of his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. He is unpersuasive.

Evidence of nonviolent crimes, except for felony convictions, may not be considered at the penalty phase. (*People v. Boyd* (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782].) The instructions at issue did not authorize the jurors to act inconsistently with that requirement. Taken as a whole, the instructions were neither contradictory nor incorrect. In context, the jurors would reasonably have understood that they could consider in aggravation only the felonies stipulated to by defendant and the prosecution, and criminal acts referred to by the superior court, and then, only if those six felonies and four criminal acts were proven beyond a reasonable doubt. There is no reasonable likelihood that the jurors would have understood that they could consider any other crimes or criminal activity in aggravation.

*Roybal*, 19 Cal. 4th at 526-27 (alterations in original).

Based on a review of this instruction in the proper context of the instructions and trial as a whole, it is clear that the statement directing that jurors could not consider evidence of "any other crime" unless it was proven beyond a reasonable doubt applied only to those other crimes specifically enumerated by the trial court. See McGuire, 502 U.S. at 72 ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."), quoting Cupp, 414 U.S. at 147. Immediately following the contested statement, the trial court recited the list of prior felony convictions and relevant law, and clearly outlined the four criminal acts alleged, instructing that: "Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant Rudolph Jose Roybal

did in fact commit such criminal act or acts. *A juror may not consider any evidence of any other criminal acts as an aggravating circumstance.*"[10]   (RT 6354) (emphasis added.)

The trial court also directed the jurors that: "Neither the defendant's juvenile criminal history nor any violation of probation incurred by him may be considered or treated by you as a circumstance in aggravation.  Evidence received in the guilt or innocence phase relating to the defendant's drug use or possession or related activities . . . as well as what may have been produced in the penalty phase or any other uncharged crime or crimes is or are not an aggravating factor and cannot be considered by you for any purpose in aggravation." (RT 6350-51.)  The jurors were specifically admonished that they were not allowed to consider those prior activities in aggravation.  The trial judge again reiterated which evidence the jury was allowed to consider in aggravation, as follows:

> You'll remember that I read to you alleged act or acts that were allegedly committed by the defendant which involved alleged force and violence or threats of force and violence, and there were four in number.
>
> By my listing those, and I'm not going to reread them, but you'll remember what they are and you'll have a written instruction along this line, by my listing those, I want you to understand that the Court, the Judge, is making absolutely no finding or is giving you no signal as to whether or not those prior acts have in fact been proven.  That's up to you to determine. . . .
>
> Now, in that same regard, I've indicated to you, I don't think there's any confusion here, but I hope I don't cause any confusion, I've indicated to you that certain activity, that is, the prior felony convictions and the prior

---

[10] At the outset of the penalty phase, the trial judge also gave a similar preliminary instruction to the jury concerning the structure of that proceeding, including the following comment:

> Now, I expect that evidence will be introduced for the purpose of showing that the defendant, Mr. Roybal, has committed certain alleged criminal acts which involve the implied use of force or violence or the threat of force or violence.
>
> Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance.

(RT 5306-07.)

acts involving threats of violence or violence, must be proved beyond a reasonable doubt.

(RT 6381-82.)

Petitioner fails to show that there is any reasonable likelihood that the jury misapplied the instructions and interpreted it to allow the consideration of nonstatutory evidence in aggravation, much less that any error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Here, the trial court's instructions were clear, correct and specifically disallowed the consideration of prior crimes aside from the six prior felony convictions and the four prior acts outlined. The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. Petitioner does not warrant habeas relief on Claim 15.

### 5.   Claim 16

Petitioner argues that the trial court erred when it modified California Penal Code § 190.3(d) to include specific reference to Petitioner's background, and asserts that "the effect of the modification was to remove consideration of evidence of 'fetal alcohol syndrome, prolonged drug and alcohol abuse and dependence, and personality disorders' from factor (k) and put that evidence in factor (d), limiting consideration of mental or emotional disturbance as a factor in mitigation only where it was 'extreme.'" (FAP at 310.) He also asserts that trial counsel's request for a pinpoint instruction on this matter constituted ineffective assistance of counsel. (Id. at 313-16.)

During a discussion on penalty phase jury instructions, defense counsel requested additional language added to California Penal Code § 190.3(d), to allow the jury to consider the evidence of fetal alcohol syndrome, drug and alcohol use and dependence, and personality disorders under that factor. (RT 5883.) The trial court initially stated that: "I'm inclined to give that, because I think that's helpful to the jury for them to understand that those diagnoses or those conditions qualify generally as mental or emotional disturbance." (RT 5886.) After reading the standard section 190.3

instructions, including factor (d) instructing that the jury could consider "(d), whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance or disturbances," and factor (k), instructing that the jurors could consider "(k), any other circumstance which extenuates the gravity of the crime, even though it is not a legal cause - - excuse me - - even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial," the trial court additionally instructed that: "I've used the phrase 'mental or emotional disturbance.' The phrase 'mental or emotional disturbance' includes fetal alcohol syndrome, prolonged drug and alcohol abuse and dependence, and personality disorders." (RT 6348-49.)

On direct appeal, the California Supreme Court rejected this claim in a reasoned decision, stating:

> Defendant contends the superior court erred: by so defining "mental or emotional disturbance," it led the jurors to understand that they could consider defendant's specific mental or emotional disorders in mitigation only if "extreme." The point is lacking in merit.
>
> As defendant acknowledges, we have repeatedly rejected challenges to the use of the word "extreme" in Penal Code section 190.3, sentencing factor (d). (See, e.g., *People v. Ray*, *supra*, 13 Cal.4th 313, 359; *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].) As we explained in *Ghent*, the statutory sentencing factor permitting consideration by the penalty jury of "'*any* other circumstance which extenuates the gravity of the crime'" is "sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme' nonetheless mitigates the seriousness of the offense." (*People v. Ghent*, *supra*, 43 Cal.3d at p. 776, italics in original.)
>
> Defendant argues that because of the additional reference to the specific forms of defendant's particular mental and personality disorder, jurors would have understood that Penal Code section 190.3, penalty factor (k) refers only to mental evidence that is extreme. He is unpersuasive. The superior court instructed the jurors that they could consider, under penalty factor (k), "*anything* about the defendant, his background, his upbringing, any sympathetic factor . . . ." They would have understood from the instruction that they could consider in mitigation any evidence of defendant's fetal alcohol syndrome, alcohol and drug abuse, and personality disorders, even if not "extreme." [FN15]
>
> FN15 Defendant asserts that the error violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the

1

2                    United States Constitution and article I, sections 15, 16, and
                     17 of the California Constitution. For the reasons stated, there
3                    was no error. In the absence of error, the claim of ineffective
                     assistance of counsel also fails.

Roybal, 19 Cal. 4th at 522-24.

4

5          As previously noted, in reviewing a claim of this type of instructional error, the

6   Court must determine "whether there is a reasonable likelihood that the jury has applied

7   the challenged instruction in a way that prevents the consideration of constitutionally

8   relevant evidence." Boyde, 494 U.S. at 380.   While Petitioner contends that this

9   instruction prevented the jurors from considering evidence of fetal alcohol syndrome,

10  drug and alcohol use and dependence or personality disorders unless it was proven to

11  have been "extreme," it is clear that the jurors were instructed at the same time that they

12  could consider under factor (k) "any other circumstance which extenuates the gravity of

13  the crime, even though it is not a legal cause - - excuse me - - even though it is not a

14  legal excuse for the crime, and *any sympathetic or other aspect of the defendant's*

15  *character or record that the defendant offers as a basis for a sentence less than death*,

16  whether or not related to the offense for which he is on trial." (RT 6348-49) (emphasis

17  added.)   Earlier, at the outset of the penalty phase proceedings, the judge explicitly

18  provided the jurors with the factor (k) instruction, additionally advising that it was "sort

19  of a catchall area." (RT 5305-06.)

20         The Court remains unpersuaded that the additional factor (d) instructions restricted

21  the consideration of mitigation, or that it moved the cited evidence from factor (k) into

22  factor (d), particularly in light of the trial court's specific directions to the jurors given

23  in response to their deadlock, which made it clear that the jurors could consider

24  mitigating evidence under more than one factor. See Roybal, 19 Cal. 4th at 523; (see

25  also RT 6654-55.)   At that time, the judge discussed factors (h) and (k) and listed several

26  examples of relevant evidence, again specifically citing to Petitioner's alcohol use and

27  abuse and mental condition, as follows:

28              (h), this has to do with the capacity of the defendant to appreciate the
                criminality of his conduct, et cetera, at the time of the offense.  The full

language is there for you.

There is evidence and it was argued that the defendant may or may not have been able to appreciate what was going on. Perhaps because he was impaired as a result of either mental disease or the affects [sic] of intoxication. You've heard evidence on this matter. I guess this also comes down to the (k) factor as well, but it's up to you to determine what weight you're going to give this. You have to first determine whether or not there was intoxication or mental disease at the time of the offense.

If you were to determine that there was not, of course, that wouldn't enter into, or that wouldn't be given any weight. If you determine that he did suffer a mental disease or defect or was under the affects [sic] of intoxication, you might give that some weight. It depends upon your own estimate of what weight you should give it.

(RT 6655-56.) The trial court immediately followed that instructions by again specifically directing the jurors that they could consider "anything" about Petitioner in mitigation under California Penal Code section 190.3(k), stating that: "The (k) factor, the last factor, which might be called the mitigating circumstance factor, although all of these other matters may have mitigating parts to them, the (k) factor, I'll just call that the mitigating factor, it's just an easy handle, *entitles you to consider anything about the defendant, his background, his upbringing, any sympathetic factor and so forth.*" (RT 6655-57) (emphasis added.)

In light of the trial record and jury instructions as a whole, the Court remains unpersuaded that the trial court's additional instruction that the jurors could consider fetal alcohol syndrome, drug and alcohol abuse and personality disorders as part of the "extreme mental and emotional disturbances" defined in factor (d), did not restrict their consideration to that factor alone. See McGuire, 502 U.S. at 72 (a challenged instruction "must be considered in the context of the instructions as a whole and the trial record.") Given the plain meaning of the factor (k) instruction, which directed the jury to consider "anything" about Petitioner in mitigation, specifically including "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial," Petitioner has not shown any reasonable likelihood that the additional instructions prevented the jury from considering the evidence offered in mitigation. Petitioner also fails to show that any alleged error had a "substantial and injurious effect or influence

1    in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

2         Because the Court finds no error in the contested jury instruction, it follows that

3    Petitioner fails to demonstrate that counsel acted deficiently in requesting modification

4    of the factor (d) instruction, much less that they amounted to error "so serious as to

5    deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland v.</u>

6    <u>Washington</u>, 466 U.S. 668, 687 (1984).  As such, Petitioner has not shown that the

7    California Supreme Court's rejection of this claim was an objectively unreasonable

8    application of <u>Strickland</u>.  <u>See</u> <u>Richter</u>, 562 U.S. at 101 ("The pivotal question is whether

9    the state court's application of the <u>Strickland</u> standard was unreasonable.")

10         The California Supreme Court's rejection of this claim on appeal was neither

11    contrary to nor an unreasonable application of, clearly established federal law, nor was

12    it based upon an unreasonable determination of the facts.  Petitioner is not entitled to

13    habeas relief on Claim 16.

14       **6.**    <u>**Claim 17**</u>

15         Petitioner alleges that the trial court erred in refusing to instruct the jurors on the

16    meaning of a sentence to life without the possibility of parole ["LWOP"], violating his

17    rights to due process and a reliable penalty determination under the Fifth, Eighth, and

18    Fourteenth Amendments to the United States Constitution.  (FAP at 316.)

19         The state supreme court considered this claim on direct appeal, rejecting it in a

20    reasoned decision as follows:

21           Defendant requested the following instruction: "Life in prison
without possibility of parole means the defendant will [not ever] have a
parole hearing. He will never be released on parole. Therefore, you must
22    assume in determining penalty in this case defendant will not be released
from prison ever." The superior court refused to give the instruction, citing
23    our decision in *People v. Ashmus* (1991) 54 Cal.3d 932 [2 Cal.Rptr.2d 112,
820 P.2d 214] to the effect that such an instruction is ambiguous and
24    misleading.

25           Defendant asserts that the court erred. He argues that the instruction
26    only requires the jurors to "assume" that he would not be released from
prison; it does not falsely state that he will never, in fact, be released. The
27    claim is lacking in merit.

28           In *Ashmus*, the superior court refused to instruct the jury as follows:
"'A sentence of life without the possibility of parole means that the

defendant will remain in state prison for the rest of his life and will not be paroled at any time.'" (54 Cal.3d at p. 994.) We held that the superior court did not err. "A court may not give an instruction that is incorrect. [Citation.] And it is incorrect to declare that the sentence of life imprisonment without possibility of parole will inexorably be carried out. [Citation.] The instruction here would effectively have made just such a declaration." (*Ibid.*)

Like the instruction in *Ashmus*, the proposed instruction was incorrect to the extent it suggested that someone who is never given a parole hearing or released on parole will, therefore, never be pardoned or have his sentence commuted. Use of the word "assume" does not cure the problem with the instruction. Like the instruction in *Ashmus*, it could reasonably be understood to have "stated all but expressly that the penalty would inexorably be carried out." (*People v. Ashmus*, *supra*, 54 Cal.3d at p. 994.)[FN16]

> FN16 Defendant also suggests that the instruction was proper because a juror might reasonably have understood the admonition to "assume" that the sentence would be carried out to imply that it might, in fact, not be carried out. If so, the instruction would be incorrect for the same reason that it is error to instruct a jury about the Governor's powers of reprieve, pardon, and commutation. (*People v. Warren* (1988) 45 Cal.3d 471, 489 [247 Cal.Rptr. 172, 754 P.2d 218] [so-called Briggs Instruction concerning the Governor's powers unconstitutionally invites the jury to be influenced by speculative and improper considerations.].) Defendant asserts that the instructional error also violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The claims are unavailing; the provisions are not implicated.

Roybal, 19 Cal. 4th at 524-25 (alterations in original).

A review of the record reflects that Petitioner's jury was instructed, both at the outset of the penalty phase proceedings and again prior to closing arguments, that the two potential penalties were "death or confinement in the state prison for life without possibility of parole." (RT 5300, 6336.)  After closing arguments, the trial judge again directed the jurors that "it will now be your duty to determine which of the two penalties, death on the one hand or on the other confinement in the state prison for life without possibility of parole, shall be imposed on the defendant."  (RT 6550.)

Petitioner contends the jury should also have been instructed on the meaning of life without the possibility of parole, specifically, that it meant Petitioner would never leave prison.  (FAP at 317.)  He argues that while the trial court and state supreme court

decisions were based on Ashmus, several United States Supreme Court decisions, one of which was issued prior to the California's Supreme Court's direct appeal opinion, have "viewed the matter differently" and that the state supreme court's rejection of this claim was contrary to clearly established federal law.  (FAP at 318-19, citing Simmons v. South Carolina, 512 U.S. 154 (1994) and Shafer v. South Carolina, 532 U.S. 36 (2001).)

Shafer and Simmons are both distinguishable from the situation presented here, as California capital procedures have significant and pertinent differences from the procedures employed in South Carolina.  While Petitioner contends that the jurors should have been informed about the meaning of life without the possibility of parole, Petitioner fails to cite to clearly established law requiring the requested instruction and has not shown that the trial court's failure to give this instruction amounted to error of a constitutional dimension.  See Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) ("'[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law' and, thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an 'especially heavy burden.'"), quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

In Simmons, the jurors were simply told that life imprisonment was a sentencing option, without any further instruction clarifying the definition of the term or offering information that the defendant would not be eligible for parole.  Id., 512 U.S. at 158.  During the penalty proceedings, the prosecutor introduced evidence of the defendant's future dangerousness, and the trial court instructed that the jurors were not to consider parole, which allowed the implication that parole was a possibility.  Id. at 170-71.  The Supreme Court held that, under those circumstances, the failure to provide an instruction regarding lack of parole eligibility was a violation of due process, reasoning that: "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that defendant never will be released on parole."  Id., 512 U.S. at 171.

Yet, as even the <u>Simmons</u> Court recognized, California's statute differs from South Carolina's in this respect, as California was one of nine states which "simply identify the jury's sentencing alternatives as death and life without parole." <u>Id.</u> at 167 n.7. As noted above, Petitioner's jury was specifically instructed that the two possible penalties were "death or confinement in the state prison for life without possibility of parole." (RT 5300, 6336.) As such, the concerns addressed in <u>Simmons</u> are not present in this case, as Petitioner's sentencing jury was well-apprised that there was no possibility of parole.

The Supreme Court's decision in <u>Shafer</u> is similarly distinguishable. In that case, the sentencing jury was told that "life imprisonment means until the death of the defendant," and the trial court refused to instruct the jurors that a life sentence would be without parole. <u>Id.</u>, 532 U.S. at 43-45. Even after the jury sent a note asking if the defendant could be eligible for parole and about the circumstances that might allow for such a possibility, the trial judge simply reiterated that life meant until the death of the defendant and stated that "[p]arole eligibility or ineligibility is not for your consideration." <u>Id.</u> at 44-45. The Supreme Court found <u>Simmons</u> applicable to <u>Shafer</u>, and stated that "whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole." <u>Id.</u> at 51. Again, in California, a jury is instructed that their penalty phase decision can either be the death penalty or life in prison without the possibility of parole. Contrary to <u>Shafer</u>, Petitioner's penalty phase jury was properly instructed pursuant to California law that the possible penalties were either "death or confinement in the state prison for life without possibility of parole." (RT 5300, 6336.) Moreover, unlike in <u>Simmons</u> or <u>Shafer</u>, there is no indication that Petitioner's jury was confused about the given instructions. <u>See</u> <u>Shafer</u>, 532 U.S. at 44-45; <u>Simmons</u>, 512 U.S. at 177-78 (O'Connor, J., concurring). Petitioner fails to demonstrate that the concerns addressed by the Supreme Court in <u>Simmons</u> and <u>Shafer</u> govern Petitioner's situation.

Petitioner points out that the California Supreme Court's opinion recognized the possibility that defendant could be released and asserts that: "The hyper-technical approach taken by the California Supreme Court in this case that a jury should not be told that they should assume a person sentenced to life without parole will never be released from prison because that was not a correct statement of the law cannot be reconciled with the jury's need to know the near impossibility Mr. Roybal would not die in prison." (FAP at 320.) Again, Petitioner's jury was instructed that life in prison meant "without the possibility of parole," and he fails to satisfy the "especially heavy burden" of demonstrating that the trial court's failure to define LWOP was prejudicial. See Villafuerte, 111 F.3d at 624, quoting Kibbe, 431 U.S. at 155. Given that Petitioner has not demonstrated any likelihood that the jury was confused about the provided instructions, the trial court was clearly within its discretion in denying the proposed instruction. In any event, even if Petitioner were able to demonstrate that the failure to give this instruction constituted error, he has not shown that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. The California Supreme Court's rejection of this claim on appeal was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. Petitioner does not merit habeas relief on Claim 17.

### 7.   Claim 18

Petitioner contends that "[u]nder California law, a jury has the discretion to impose a sentence of life without parole even if evidence is presented in aggravation and there is no evidence presented in mitigation," and the trial court's failure to instruct the jurors accordingly violated Petitioner's constitutional rights to due process and a reliable penalty determination. (FAP at 321-22.)

On direct appeal, the California Supreme Court considered and rejected this claim, reasoning:

> The superior court gave the standard instructions concerning

selection of the appropriate punishment, admonishing the jury, inter alia, as follows: "In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole."

Defendant asserts that the superior court erred in failing also to inform the jurors that they had discretion to refuse to impose the death penalty even if they found that there was no evidence in mitigation. He insists that lack of such instruction violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The claim fails. No such instruction was required.

We rejected the same point in *People v. Ray*, *supra*, 13 Cal.4th at page 355. As in *Ray*, "the standard instructions given in this case adequately guide selection of the appropriate punishment, including the jury's discretion to reject a death sentence under the circumstances highlighted by defendant. Specifically [the jury was informed] that in order '[t]o return a judgment of death, each of you must be persuaded that the aggravating [evidence is] so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.' By stating that death *can* be imposed only in one circumstance-where aggravation substantially outweighs mitigation-the instruction clearly implies that a sentence less than death *may* be imposed in all other circumstances." (*Id.* at pp. 355-356, italics in original.)

We therefore conclude, as before, that the superior court's instructions concerning its sentencing discretion adequately advised the jury of its sentencing responsibilities. "'No reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist.'" (*People v. Ray*, *supra*, 13 Cal.4th at p. 356.)

Roybal, 19 Cal. 4th at 525-26 (alterations in original).

Petitioner argues that the trial court erred in failing to inform the jury that it had the discretion to impose a sentence of life in prison without the possibility of parole even if they found evidence in aggravation and no evidence in mitigation. (FAP at 322.) As discussed in Claim 14, the trial court repeated and emphasized that the jury must engage in a weighing process, considering both the evidence in mitigation and that in aggravation to determine the appropriate penalty. The trial judge also correctly instructed the jurors that they could only impose a death sentence under very specific conditions, that is, if they found that "the aggravating circumstances were so substantial in comparison with the mitigating circumstances that it warrants death instead of life

without parole." (CT 2051; see RT 5308, 6551.)  The jury instructions clearly limited the option of a death sentence to those cases where the aggravating evidence was "so substantial" in comparison to that in mitigation, which left the jury free to impose a sentence of life without the possibility of parole under all other circumstances, including those in which the aggravating evidence simply outweighed the evidence in mitigation, or a situation in which the jurors found some evidence in aggravation but no evidence in mitigation.

In any event, Petitioner fails to show that such an instruction was constitutionally required, nor does he satisfy the "especially heavy burden" of demonstrating that the absence of the instruction amounted to error of constitutional dimension.  See Villafuerte, 111 F.3d at 624, quoting Kibbe, 431 U.S. at 155.  Respondent reasonably adds that it was "unlikely" the jury would find an absence of mitigation in this case, noting that "the defense introduced substantial evidence in mitigation." (Ans. at 98.) Indeed, the defense presented evidence about Petitioner's impoverished upbringing, replete with abuse and neglect, as well as his early alcohol and drug use and abuse, and his mental and emotional impairments.  In imposing sentence, the trial judge stated that "there was lots of evidence that was presented under the (k) factor" in particular, and considered mitigation under factors (d), (h), as well as (k) in determining that the evidence in aggravation substantially outweighed that in mitigation. (RT 6761, 6765.) In light of the acknowledged evidence in mitigation, even were the Court to find that the trial court's failure to provide this instruction was in error, Petitioner fails to demonstrate that the absence of this instruction had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  The California Supreme Court reasonably concluded that the requested instruction was not required and that the trial court's instructions "adequately advised the jury of its sentencing responsibilities." Roybal, 19 Cal. 4th at 526.  This adjudication was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on

Claim 18.

### 8.   __Claim 19__

Petitioner alleges that the trial court erred in refusing to instruct the jurors that his prior crimes and convictions could also be considered in mitigation, because his prior felonies were "not serious" but instead were "a series of petty thefts that, because of their frequency, became felony convictions," that the "evidence of petty thievery could also be considered as a product of Mr. Roybal's poverty," and that these "'acts of violence' appear quite *de minimus* when compared to the usual evidence introduced by the prosecution as evidence in aggravation in capital cases." (FAP at 326-27.)

On direct appeal, the state supreme court rejected this claim in a reasoned opinion as follows:

> Defendant requested instructions to the effect that evidence of prior felonies and prior violent criminal acts could be considered as circumstances in mitigation. Defense counsel argued: "We think the jury ought to be able to consider those crimes as a manifestation, a reflection of the poverty and deprivation of Rudolph Roybal's childhood, and in that sense, can treat them as mitigation, not aggravation. It can also consider the nature of the crimes, property crimes, and consider that as mitigation . . . ." "We think the jury can consider these prior so-called acts of violence as circumstances in mitigation, and again, we object that the jury being told, if not entirely explicitly, these are circumstances that can serve only to aggravate." The superior court denied the request on the ground that such instruction would be confusing.

> Instead, the superior court instructed the jurors, inter alia, that they could consider, under Penal Code section 190.3, penalty factor (k), "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." It also instructed the jurors that they could consider "anything about the defendant, his background, his upbringing, any sympathetic factor and so forth." In addition, it instructed that they could consider whether "at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was impaired as a result of mental disease or defect or the effects of intoxication." After the jurors indicated that they might be deadlocked, the court stated: ". . . I think the attorneys, for example, one side, argued well, these are not-there were no weapons used in any of these offenses, they were done during a time when allegedly the defendant was inebriated or under the influence or something like that; well, that's a factor you can consider."

> Defendant contends that the superior court erred in refusing his requested instruction, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution.

1   Specifically, he argues that by referring to "any sympathetic or other aspect
2   of the defendant's character or record that the defendant offers as a basis for
    a sentence less than death," the superior court implied that the jurors could
3   consider in mitigation only sympathetic evidence he offered, but could not
    regard any of the evidence the prosecution presented. He is unpersuasive.
4   There is no reasonable likelihood that the superior court's instructions,
    considered as a whole, would have led a reasonable juror to believe he or
5   she could not consider, in mitigation, *any* relevant evidence, including the
    fact that some of defendant's prior felonies were not violent, and that some
6   of his prior violent criminal acts might have been committed under the
    influence of substance abuse or a mental disorder.

7   Roybal, 19 Cal. 4th at 527-28.

8       The Supreme Court has clearly held that "the Eighth and Fourteenth Amendments

9   require that the sentencer, in all but the rarest kind of capital case, not be precluded from

10  considering, *as a mitigating factor*, any aspect of a defendant's character or record and

11  any of the circumstances of the offense that the defendant proffers as a basis for a

12  sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion)

13  (footnote omitted); see also Eddings v. Oklahoma, 455 U.S. 104, 110 (1982). Petitioner

14  contends that the trial court's refusal to specifically instruct the jurors that his prior

15  crimes and convictions could also be considered in mitigation violated his constitutional

16  rights by precluding the jury from considering relevant evidence in mitigation. (FAP at

17  326.) Petitioner asserts that the evidence surrounding these crimes, particularly evidence

18  of his drug and alcohol abuse, could have been considered as mitigation, yet the jury

19  "was instructed that this was evidence that could be used only in aggravating evidence

20  to support a verdict of death." (FAP at 328.)

21      As an initial matter, a review of the record does not support Petitioner's contention

22  that the jurors were instructed that factors (b) and (c) could "only" be considered in

23  aggravation.   The jurors were specifically directed that those prior crimes and

24  convictions may be considered in aggravation only if jurors were satisfied that the

25  offenses were proven beyond a reasonable doubt. (See RT 6352, 6354.) Petitioner

26  contends that the trial court's listing of the prior crimes and convictions, followed by the

27  instruction that "[y]ou may consider such crimes as aggravating evidence in this case"

28  limited the jury's consideration of that evidence. (RT 6352.)   The Court remains

unpersuaded that this instruction could have reasonably precluded the consideration of that evidence in mitigation. Indeed, the plain language of the instructions simply directed the jurors that "You shall consider, take into account, and be guided by the following factors . . . ." (RT 6347; see also RT 5303-04).

The trial court reasonably rejected the defense's proposed instruction, stating in part that: "[t]he (k) factor covers this, because as extenuating or mitigating circumstances, the jury is entitled to consider any other aspect of the defendant's record, so it's already covered as a mitigating factor, although under a different section, and the request that I somehow modify or pinpoint this is respectfully denied as covered. You can certainly argue it." (RT 5901.) After defense counsel contended that the instruction implied that the prior crimes mentioned in (b) and (c) could only be used in aggravation, the trial court again declined to modify the section 190.3 instructions because "the (k) factor does use the defendant's record, which would include these acts, as extenuating circumstances. The defense may argue it. I choose not to try to alter the 190.3 language. The request is respectfully denied." (RT 5904.) Upon review of the jury instructions, it is clear that factor (k) allowed this evidence to be considered in mitigation. The trial judge instructed that: "(k), any other circumstance which extenuates the gravity of the crime, even though it is not a legal cause - - excuse me - - even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (RT 6348-49.)

In closing, defense counsel also argued at length that the prior crimes and convictions should be considered in mitigation rather than in aggravation. The defense argued that Petitioner's criminal activity was connected to his history of drug and alcohol abuse, noting that one conviction resulted in Petitioner being sent to a state hospital for alcoholism, characterized another crime as a "falling-out among drug addicts" that he got involved in, and pointed out that Petitioner wielded spray paint during that crime, which he had also used as a drug. (RT 6487.) The defense also asserted that several other

incidents, such as an encounter with police at his mother's house, occurred when he was in a "drunken stupor," and asserted that "in each incident you see evidence of alcohol or drug abuse going on." (RT 6487-88.) Counsel then contended that: "I submit that you can consider those four incidents not as aggravation, but in comparison to the histories of violent criminals that perhaps this is actually mitigation, that this kind of history, four incidents in almost two decades, is not what you would expect to see of a truly violent, evil person." (RT 6488.)

The defense also argued that a judge who had previously sentenced Petitioner recognized that the criminal activity reflected his problems with substance abuse:

> By his actions, I think we can understand that the judge saw here what the prosecutor saw, Mr. Blackmer, and that was a man who, if we house him for whatever number of years in prison, he will just come out and continue, because he has a problem. He has a problem that needs to be treated. And unless that problem is treated, he will continue. [¶] And in order to protect society, not just today, but tomorrow and tomorrow, we need to get this man in a long-term live-in treatment program, with the threat of prison over his life. That's what the judge did. Because he saw there was an underlying problem, not just an evil person, but someone who needed serious, serious, help. [¶] So I ask you to look at the prior convictions and the prior so-called violent acts. Put them in the context of what this case is about, special circumstance murder. Is this what we're talking about in terms of a history. Is this aggravating?

(RT 6490-91.) Petitioner cites Cal. Penal Code § 190.3 (k), which states that the jurors can consider in mitigation any evidence "that the defendant offers," and asserts that the jurors would have understood the factor (k) instruction to apply only to evidence offered by the defense, not the prosecution. However, again, the plain language of factor (k) states that the jury could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." See Cal. Penal Code § 190.3(k). Here, the defense clearly contended the prior crimes and convictions could be considered in mitigation and, as such, offered that aspect of Petitioner's record in support of an argument that Petitioner should not be sentenced to death.

The trial court did not err in rejecting the proposed instruction, as the trial court reasonably noted that the factor (k) instruction allowed the jury to consider any evidence,

including the prior crimes, in mitigation.  The trial court reasoned that defense counsel could argue the extenuating circumstances of those crimes, and the record reflects that defense counsel made that argument before the jury.  Considering the record as a whole, Petitioner fails to demonstrate that the jurors were "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett, 438 U.S. at 604.

Even if the Court were to find that the failure to provide the requested instruction amounted to error of a constitutional dimension, because the factor (k) instruction specifically allowed the jury to consider "any sympathetic or other aspect of the defendant's character or record" in mitigation, accompanied by defense counsel's argument that the prior crimes should be considered in mitigation, Petitioner has not shown that the absence of this instruction had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  The California Supreme Court's rejection of this claim on appeal was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 19.

## 9.   **Claim 20**

Petitioner alleges that the trial court erred in preventing the defense from comparing the facts of his case with that of other notorious homicide cases and that the "trial court's instruction prohibiting the jurors from comparing circumstances of Mr. Roybal's case with those of other homicides eviscerated the constitutional premise underlying the application of the death penalty."  (FAP at 332-34.)

The California Supreme Court rejected this claim on direct appeal in a reasoned opinion:

> In closing argument, defense counsel sought to compare defendant's crime to the facts of other well-known murders-particularly the so-called "Billionaire Boys Club" case in which the defendant did not receive the death penalty. She argued that defendant's "organic impairment, emotional

impairment, psychological impairment" distinguished him from other murderers: "Should you count that? Of course you should." She then referred to the Billionaire Boys Club, "privileged kids who don't have a problem in their background, except maybe they were spoiled, coldly calculating killing people for money." The superior court sustained an objection by the prosecutor and admonished the jurors that they were "not to consider comparison with any other particular crime." During a supplemental charge to the jurors, it repeated the admonition: "[Y]ou may not attempt to compare this crime, this murder, with any other murder. In other words, you can't indulge in comparisons. If you did that, we-the attorneys would have no idea what you were comparing it with. There's no evidence before you as to what other crimes that you're to compare this with. . . . You focus on the facts associated with this case, with this defendant, with this crime."

Defendant claims error, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He argues that a juror may not be precluded from comparing the circumstances of the crime to the facts of other cases and that defense counsel should have been permitted to argue that they should do so. No error appears.

The superior court's ruling fell within its discretion to control the scope of closing argument. (*People v. Sanders* (1995) 11 Cal.4th 475, 555 [46 Cal.Rptr.2d 751, 905 P.2d 420] ["The trial court did not err in excluding references to the notorious but unrelated crimes of Charles Manson or to the penalty of life imprisonment that he ultimately received."].) As we explained in our discussion in point in *People v. Marshall* (1996) 13 Cal.4th 799, 855 [55 Cal.Rptr.2d 347, 919 P.2d 1280], meaningful comparisons with other well-publicized crimes cannot be made solely on the basis of the circumstances of the crime or the social status of the perpetrator, without consideration of the other aggravating and mitigating circumstances. Yet the superior court could properly conclude that allowing counsel to argue all such circumstances would be too time-consuming and direct the jury's focus away from the matter at issue. Defendant was not precluded from arguing his central point: that the circumstances of the crime were mitigated by his background and his mental and emotional disorders.

The trial court's instruction to the jurors that they "may not attempt to compare this crime, this murder, with any other murder," also did not constitute prejudicial error. "The focus in a penalty phase trial of a capital case is on the character and record of the individual offender." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1249 [255 Cal.Rptr. 569, 767 P.2d 1047].) The sentences received by notorious defendants in other cases, based on different facts and evidence not before the jurors, is of dubious relevance. The jurors were not instructed that they should not consider the defendant's central point, i.e., that his crime was mitigated by his personal background.

Roybal, 19 Cal. 4th at 528-29 (alterations in original).

"There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." Herring v. New York, 422 U.S.

853, 858 (1975).  However, "[t]he presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations." Id. at 862.  As noted previously, even if Petitioner is able to demonstrate that the trial court's ruling amounted to constitutional error, habeas relief is unavailable unless that error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

First, Petitioner argues that the trial judge's ruling deprived him of a reliable penalty determination, and that the restrictions on the scope of his closing argument eliminated potential comparative review, which would have provided additional insulation against the possibility of arbitrary sentencing.  (FAP at 335.)  As discussed with respect to Claim 38 below, comparative proportionality review is not constitutionally required.  What is required is the "individualized consideration" of the factors offered by a defendant in mitigation.  See Lockett, 438 U.S. at 606; see also Eddings, 455 U.S. at 100; see also Zant v. Stephens, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.")  Petitioner fails to demonstrate that these limits on closing arguments prevented or proscribed the jury's individualized decision with respect to Petitioner's punishment, as the jurors were presented with a substantial amount of evidence about Petitioner's background and factors to consider with respect to the crime.

Petitioner also contends that this argument could have mitigated his crime in the eyes of the jurors and the trial court's denial deprived him of a relevant factor in mitigation.  (FAP at 336.)  As discussed earlier, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604 (1978); see also Eddings, 455 U.S. at 110.  But Petitioner fails to persuasively explain how the facts of an unrelated case,

even as compared to that of Petitioner's, is relevant to either an "aspect of defendant's character or record" or as a part of the "circumstances of the offense." Indeed, the Supreme Court has emphasized that "an individualized decision is essential in capital cases." Lockett, 438 U.S. at 605. In closing, trial counsel conceded that all special circumstance murders were "bad," but contended that the factors must be considered in deciding the appropriate punishment, and asserted that in Petitioner's case "[t]here was organic impairment, emotional impairment, psychological impairment." (RT 6544.) Counsel argued that "[a]lmost every one of the mitigating factors apply in this case." (RT 6545.) It is clear that counsel was not precluded from arguing the individual circumstances of Petitioner's case did not warrant a death sentence. Petitioner also contends that the trial court's ruling deprived him of the effective assistance of counsel. (FAP at 337-38.) Yet, because Petitioner fails to demonstrate that this proposed argument was relevant to the jury's penalty determination, the Court finds no merit in this contention.

Finally, Petitioner asserts that because the trial prosecutor argued Petitioner's case was "horrible" and "extreme" and that Petitioner was a "rare" killer who deserved the death penalty because he stabbed the victim multiple times and slit her throat, the trial court's ruling barred the defense from relevant rebuttal argument. (FAP at 339-40.) Again, the trial court's ruling did not prevent defense counsel from arguing that Petitioner's crime was mitigated by his background and circumstances. Moreover, a review of the record clearly reflects that the prosecutor did not compare Petitioner's crimes to other unrelated crimes.

Accordingly, this claim is without merit because Petitioner fails to demonstrate that the trial court's ruling amounted to error of a constitutional dimension. Even were Petitioner able to demonstrate error, Petitioner fails to show that any such error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637. The state supreme court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was

it based upon an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 20.

### 10.  Claim 21

Petitioner asserts that the trial court erred in instructing the jurors that they could not consider their own personal views about the death penalty in making their penalty determination, arguing that "there was no legal basis for the trial court's demand that the jurors ignore their philosophical beliefs about the death penalty in determining whether it was appropriate in this case or, if they could not, to ask to be excused from the jury for violating their oath of service."  (FAP at 341-44.)

The California Supreme Court considered this claim on direct appeal, and rejected it in a reasoned decision as follows:

> After the jurors informed the superior court during deliberations that they appeared to be deadlocked, it gave a supplemental instruction as follows: "All of you took an oath and told us under oath that you would not re-debate the issue of the death penalty. Well, that was a matter that you took care of, if you were interested, in the ballot box but not in the jury setting. [¶] Along the same lines, you cannot consider the religious, philosophical or political background, the differences you may have with regard to whether the death penalty is appropriate or inappropriate. [¶] Why? Once again, you wouldn't be true to your oath. You'd be misleading the attorneys, the parties here, because they're expecting, and they've had your pledge, that those matters would not enter into your thinking."
>
> Defendant asserts error. He contends that the superior court's remarks violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He argues that under those provisions a juror may not be prohibited from considering any conscientious scruples he or she may have about the death penalty in determining the appropriate punishment at the penalty phase. The claim is lacking in merit. The superior court did not err in reminding jurors of their oath to render a verdict according only to the evidence presented and the instructions of the judge, i.e., that they should set aside their moral, philosophical, or religious reservations about the death penalty in deference to the rule of law.

Roybal, 19 Cal. 4th at 529-30 (alterations in original).

Petitioner contends that the trial court erred in instructing the jury, asserting that:

> It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law. *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

(FAP at 343.)  Petitioner also argues that, pursuant to the Supreme Court's decision in Witherspoon, jurors cannot be excluded from a venire simply because of their general views about the death penalty.  (FAP at 343); see Witherspoon, 391 U.S. at 521-22. Petitioner asserts that "there was no legal basis for the trial court's demand that the jurors ignore their philosophical beliefs about the death penalty in determining whether it was appropriate in this case or, if they could not, to ask to be excused from the jury for violating their oath of service." (FAP at 344.)

However, the Supreme Court has also instructed that a juror's views or opinions may not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. 412, 424 (1985), quoting Adams, 448 U.S. at 45.  Additionally, this Court must evaluate Petitioner's claim of instructional error by reviewing the trial record and instructions as a whole.  See McGuire, 502 U.S. at 72; Cupp, 414 U.S. at 147.  It is this review, and in particular the instructions given just prior to and after the contested portion, that clearly show the aim of the trial court's comments was to remind the jurors that their decision must be based on the evidence and the law.

In response to the jurors' statement that they were deadlocked, the trial judge noted that "there may be feelings, sentiments, worries, undeclared expressions of opinion that are entering into the deliberative process," and asked the jurors to "be very honest" with themselves to determine if they were allowing such factors to influence their deliberations. (RT 6647.) Then, the trial judge instructed that: "The items that you may not consider either overtly or even holding the card in your hand are: whether the death penalty law is good or bad.  You can't re-debate that issue." (Id.)  The trial judge reminded the jurors that during the voir dire proceedings, jurors who "could not set those matters aside" were excused from service.  (RT 6647-48.)  After the contested instruction, the trial judge offered an additional explanation and clarification:

> To put it a little bit differently, once again, if I were deciding the

case, which I'm not, if I had a personal belief that I did not approve of the death penalty and I was asked to rule on this, I would have to recuse myself. I could not in good conscience sit on the case . . . . On the other hand, let's say I had a religious belief, a very strong belief in the biblical saying that was referred to, an eye for an eye, that type of thing, and I believed that everybody that killed somebody should always receive the death penalty, and that was my mind set. Once again, I would not be an appropriate judge to hear the case. I'd have to recuse myself. [¶] So I think - - or let me put it a little bit differently. I would have to, in good conscience, be able to set aside all of those personal beliefs or feelings in deciding this case. And if I couldn't do so, then, of course, then I'd have to opt out.

(RT 6648-49.) It is evident that the trial court's supplemental instruction appropriately cautioned the jurors that their penalty decision must be based on the evidence presented during the proceedings and the law as provided. The Court finds no error, much less that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." McGuire, 502 U.S. at 72; Brecht, 507 U.S. at 637. Accordingly, the state supreme court's rejection of this claim, and declining to find that the instruction constituted error, was neither contrary to, or an unreasonable application of law, nor did it involve an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claim 21.

**11.   Claim 22**

Petitioner contends that the trial court erred in instructing the jurors that they could not place themselves in the shoes of either the victim or the defendant, and argues that this instruction limited the jury's consideration of evidence in mitigation in violation of his constitutional rights. (FAP at 346.)

On direct appeal, the California Supreme Court rejected this claim in a reasoned opinion as follows:

The superior court instructed: "Another thing you cannot do is place yourself in the shoes of the victim or of the defendant. Now, let me just-it's very common sense to me, but maybe I need to explain this. If you were to place yourself in the shoes of the victim or the shoes of the defendant in deciding this case, then you might just say, well, wait a second, if someone killed me, that guy is-deserves the death penalty. [¶] But that is not your job. Your job is a weighing process that I'll get to and I've already told you about. You can't do that. By the same token, if you place yourself in the shoes of the defendant, the death penalty would never, or at least arguably, would never, ever be imposed by a jury, because the jurors, or at least one

of the twelve would at least say, hey, I wouldn't like to be killed. So that is not a factor that you can put into the equation, so to speak."

Defendant claims that the superior court erred. He argues that jurors may not be precluded from viewing mitigating evidence from the perspective of the defendant in order to determine whether death is the appropriate punishment.[FN17]

> FN17 As defendant correctly points out, we rejected a claim in *People v. Wash*, *supra*, 6 Cal.4th at pages 263-264, that it was misconduct for the prosecutor to invite the jurors to put themselves in the shoes of the victim. "'[W]e have found such an appeal appropriate at the penalty phase because there "the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death."'" (*Id.* at p. 263.) Understandably, defendant does not assert a claim based on this portion of the superior court's instruction.

The claim fails. The superior court did not, as defendant suggests, prevent the jurors from considering mitigating evidence concerning defendant's background and character or even from sympathizing with him. Rather, its instruction directed the jurors not to substitute emotion for rational judgment. It did not err in instructing the jurors, in effect, that that [sic] they should not allow considerations about how they would personally react if they faced a sentence of death to interfere with their consideration of the evidence.[FN18]

> FN18 Defendant also asserts violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, predicating the claims on the asserted state law error. Because we reject the state law claims, the federal claims also fail.

Roybal, 19 Cal. 4th at 530-31 (alterations in original).

As discussed previously, the Supreme Court has held that a penalty phase jury must not be prevented from considering in mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604; see also Eddings, 455 U.S. at 110. Petitioner contends that the trial court's instructions, given in response to the jury's reported deadlock, "prohibited the jury from seeing the word [sic] through Mr. Roybal's eyes," including his impoverished upbringing, abandonment by his father, the alcoholism in his family, and the abuse and neglect he suffered at the hands of his mother and stepfather and improperly limited the jury's consideration of mitigation evidence. (FAP at 347.) He argues that the state court's rejection of this

claim unreasonably applied the law to the facts because that court, "in reviewing the instruction, construed it to inform the jurors they should not place themselves in the [sic] Mr. Roybal's shoes as a man facing possible execution, as an impermissible attempt to avoid responsibility, but that is not what the instruction said." (Id.)

Here, the Court finds no "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380. The jurors were instructed not to place themselves in the shoes of either the victim or the defendant, as the trial court explained that they would likely always vote for death if viewing the case from the victim's perspective, and always vote for life if viewing the case from the defendant's perspective. The trial judge directed that "[y]our job is a weighing process that I'll get to and I've already told you about." (RT 6650.) The trial judge then engaged in a detailed recitation of the aggravating and mitigating factors and again emphasized the weighing process. (See RT 6651-58.)

Viewing the instructions and record in context, it appears clear that the trial court's admonishment to the jurors against placing themselves in the shoes of the victim or the defendant did not preclude their consideration of mitigation. Just after the contested instruction, the trial court recited the factors, which included specific examples of evidence the jurors could consider in mitigation, such as Petitioner's "mental or emotional disturbance" under factor (d), evidence that "he was impaired as a result of either mental disease of the affects of intoxication" under factor (h) or (k), his age under factor (i), any accomplice evidence under factor (j), and "anything about the defendant, his background, his upbringing, any sympathetic factor and so forth" under factor (k). (RT 6656-57.)

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1977) (plurality opinion); see also California v. Brown, 479 U.S. 538, 542-43 (1987) (upholding an instruction directing

that jurors should not base their penalty decision on "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," reasoning that "a rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating.")

In this case, it is evident that the state court reasonably concluded that the contested instruction did not prevent the consideration of mitigation, but instead "directed the jurors not to substitute emotion for rational judgment." Roybal, 19 Cal. 4th at 530. Petitioner fails to demonstrate that this instruction amounted to error of a constitutional dimension or "so infected" Petitioner's trial as to result in a due process violation. McGuire, 502 U.S. at 72. The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claim 22.

### 12. Claim 23

Petitioner contends that the trial court erred in failing to instruct the jurors on the presumption of life, in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (FAP at 348-49.)

Petitioner raised this contention as Claim 8 in the state habeas petition. (Lodgment No. 133.) The California Supreme Court rejected the claim on the merits and also denied it on procedural grounds with a citation to Dixon, 41 Cal. 2d at 759. (Lodgment No. 144.) As discussed above in section III.A.1, Respondent has not carried the burden of showing that Dixon precludes the Court's review of Claim 23 on the merits.

Petitioner references a number of United States Supreme Court cases which espouse general principles such as the importance of the presumption of innocence, due process protections, and that a higher degree of scrutiny is required in capital cases. (FAP at 349, citing e.g. Estelle v. Williams, 425 U.S. 501 (1976), Gardner v. Florida, 430

U.S. 349 (1976), and <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980).)  However, it remains that Petitioner fails to offer any clearly established federal law requiring a "presumption of life" instruction, or dictating that a trial court's failure to provide such an instruction violates due process.  Petitioner also attempts to correlate the guilt phase "presumption of innocence" instruction as mandating a corresponding presumption of life instruction in the penalty phase, but again, fails to cite any clearly established law in support of his argument.

The jury was repeatedly instructed that they could only vote for a death sentence under a specific set of circumstances, that: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (RT 6551.)  The trial judge reiterated this standard in the supplemental jury charge, stating: "That's the weighing process, and that's the standard by which you then have to decide whether or not the aggravating factors so outweigh the mitigating factors that you could then render, if you wished, a verdict of death."  (RT 6658.)  The plain meaning of these instructions were that the jury could only vote for death if the aggravation was "so substantial" in comparison to the evidence in mitigation- in all other circumstances, the jury must vote for life in prison without the possibility of parole.  A jury is presumed to understand and follow the trial court's instructions.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000); <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1989); <u>see</u> <u>also</u> <u>Greer v. Miller</u>, 483 U.S. 756, 766 n.8 (1987) ("We normally presume a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, . . . .")  Petitioner has not met the "especially heavy burden" of showing that the failure to give this instruction amounted to constitutional error.  <u>See</u> <u>Villafuerte</u>, 111 F.3d at 624, quoting <u>Kibbe</u>, 431 U.S. at 155.

Given the absence of any clearly established federal law supporting this contention, the Court cannot conclude that the state court's adjudication was either contrary to, or an unreasonable application of, clearly established federal law.  Petitioner

1   does not merit habeas relief on Claim 23.

2   **13.   Claim 24**

3   Petitioner contends that the trial court's instruction and review of the evidence

4   under California Penal Code section 190.3, given in response to the jury's statement that

5   they were deadlocked, erroneously "lessened the impact of the bulk of Mr. Roybal's

6   evidence in mitigation," including the testimony of his mother, brother, other relatives,

7   former employers and counselors.  (FAP at 350-51.)  Petitioner asserts that the state

8   court's rejection of this claim was both unreasonable under section 2254(d)(1) and also

9   that "its implied finding that this instruction, among the others discussed in this traverse,

10  cured other errors and produced a reliable penalty phase determination was an

11  unreasonable determination of the facts, under 28 U.S.C. § 2254(d)(2)."  (Traverse at

12  108.)

13  Petitioner raised this contention as Claim 7 in the state habeas petition.

14  (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits and

15  also denied it on procedural grounds with a citation to <u>Dixon</u>, 41 Cal. 2d at 759.

16  (Lodgment No. 144.)  As discussed above in section III.A.1, Respondent has not carried

17  the burden of showing that <u>Dixon</u> precludes the Court's review of Claim 24 on the

18  merits.

19  In response to the deadlock, the trial judge gave the jurors a *sua sponte* instruction

20  which included a recitation of the section 190.3 factors in aggravation and mitigation,

21  including the following portion at issue in this claim:

22  The (k) factor, the last factor, which might be called the mitigating
    circumstance factor, although all of these other matters may have mitigating
23  parts to them, the (k) factor, I'll just call that the mitigating factor, it's just
    an easy handle, entitles you to consider anything about the defendant, his
24  background, his upbringing, any sympathetic factor and so forth.

25  Now, here is where there was a lot of evidence presented to you.  I -
    - I really can't review all of the evidence for you, but you had expert
26  testimony with regard to the defendant's mental condition, what the nature
    of the condition was, if any, whether it was schizoid or antisocial or a
27  combination thereof, or whatever, those are factors that you can consider.

28  Generally under this section the defendant or the defense side

-80-

presents evidence to have you consider as mitigating or extenuating circumstances or background of the defendant.

(RT 6656-57.)

Petitioner relies primarily upon Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007), in which the Supreme Court noted that: "The same principles originally set forth in earlier cases such as Lockett and Eddings have been articulated explicitly by our later cases, which explained that the jury must be permitted to 'consider fully' such mitigating evidence and that such consideration 'would be meaningless' unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." Abdul-Kabir, 550 U.S. at 259, quoting Penry v. Lynaugh, 492 U.S. 302, 322-23 (1989), overruled on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002), and citing Graham v. Collins, 506 U.S. 461, 475 (1993). Petitioner argues that the trial judge's specific mention of the expert testimony about his mental condition precluded or minimized consideration of the other evidence offered in mitigation under factor (k), including family testimony, that of his former employer, and his counselors.

A plain reading of the contested instruction does not support Petitioner's contention. With respect to the factor (k) evidence, the trial court stated that "here is where there was a lot of evidence presented to you," and that while "I - - I really can't review all of the evidence for you," noted the expert testimony about Petitioner's mental condition. But the trial judge explicitly directed that factor (k) "entitles you to consider *anything about the defendant, his background, his upbringing, any sympathetic factor and so forth*." (RT 6657) (emphasis added.) Given this instruction, the Court remains unpersuaded that the trial judge's specific mention of the expert mental state testimony somehow obstructed the jury's consideration of the other factor (k) evidence or negated the impact of that evidence. There is no indication in the record that this mention gave "a judicial *imprimatur* of importance to certain mitigating evidence to the detriment of another." (FAP at 351) (emphasis in original.) Instead, the trial judge clearly indicated that there was "a lot of evidence" introduced under factor (k) for the jury's consideration

and that the jurors were entitled to consider "anything" about the defendant's background and history in making their penalty phase determination.

Because Petitioner fails to demonstrate that the trial court's mention of the expert testimony, as an example of evidence the jury could consider under factor (k), improperly minimized the jurors' ability to consider the other evidence offered in mitigation, the claim fails.  Considering these comments "in the context of the instructions as a whole and the trial record," Petitioner fails to demonstrate that the instruction "so infected" Petitioner's trial as to result in a due process violation.  McGuire, 502 U.S. at 72.  Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that the California Supreme Court's decision was based upon an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 24.

**14.   Claim 25**

Petitioner contends that several jurors failed to disclose a prior history of child abuse or domestic violence, and that such failures "precluded Mr. Roybal's trial counsel from exploring or examining whether a particular juror could adequately consider Mr. Roybal's history of abuse as a mitigating factor." (FAP at 354.)  Petitioner argues that these false answers, evidenced by a post-conviction juror declaration stating that several jurors discussed their experiences with domestic or child abuse during deliberations, indicate bias and demonstrate that he was denied his constitutional right to a trial by an unbiased, impartial jury.  (Id.)

Petitioner raised this contention as Claim 5 in the state habeas petition. (Lodgment No. 133.)  The California Supreme Court denied the claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

Petitioner argues that this claim should be reviewed de novo "because there was a complete breakdown in the state habeas corpus procedure as a result of the destruction of the trial files by former habeas counsel." (FAP at 139.)  Petitioner contends that "the

lack of a complete or even cohesive trial record makes it impossible to determine which facts could have been presented by current habeas counsel or considered by the California Supreme Court in its 'postcard' denial on the merits." (Id.)  However, Petitioner fails to persuasively explain how the state supreme court's consideration of this claim was compromised by the destruction of trial counsels' files.  The jurors' questionnaires, voir dire responses, and the post-trial hearing on juror misconduct are all contained in the trial record, which was preserved, and a copy was lodged with the Court. (See ECF No. 11.)  Meanwhile, post-conviction counsel contacted ten of the trial jurors and one alternate, and obtained a declaration from one of the jurors who served on Petitioner's jury. (See Exs. 31, 32, Lodgment No. 138.)  As such, given the lack of any indication that the destruction of trial counsels' files has actually impacted or compromised the state court's ability to adjudicate this claim on the present record, Petitioner fails to show that de novo review is appropriate.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209,  217 (1982).  "Voir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." McDonough Power Equipment Inc. v. Greenwood, 464 U.S. 548, 554 (1984).  "[T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Id. at 556.  The Ninth Circuit has also recognized two other types of juror bias, including "actual bias, which stems from a pre-set disposition not to decide an issue impartially," as well as "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has

repeatedly lied about a material fact to get on the jury." <u>Fields v. Brown</u>, 503 F.3d 755, 766 (9th Cir. 2007).

Petitioner contends that "[t]he misconduct in this case, giving knowingly false answers in response to the jury questionnaire, could indicate either actual or implied bias against Mr. Roybal arising from a [sic] deliberately false answers given during *voir dire*." (FAP at 354.) The juror questionnaires included the following two questions:

141. Were you or anyone close to you the victim of child molestation or other forms of child abuse?

143. Were you or anyone close to you the victim of domestic violence?

(CT 2562-64.) Petitioner asserts that of the jurors and alternates that served on Petitioner's jury, only Juror Boner[11] answered that she had been a victim of domestic violence, and answered no to the question about child abuse; all other jurors and alternates answered no to both questions. (FAP at 354, citing CT 2563-64, 2606-07, 2647-48, 2689-90, 2731-32, 2774-75, 2816-17, 2858-59, 2900-01, 2942-43, 2984-85, 3028-29, 3070-71, 3194-95.) In a post-conviction declaration submitted to the state supreme court, Juror Nelson stated that "[d]uring jury deliberations on the penalty phase, about one half of the jurors discussed incidents of domestic violence and child abuse within their own extended families." (Ex. 31, Lodgment No. 138 at 1166.) Petitioner contends that "[t]he information provided by Juror Nelson showed misconduct based upon the lack of a truthful answer to questions on the jury questionnaire." (FAP at 353.) He argues that "[t]he deliberate failure to reveal that a juror had a prior history of domestic violence of [sic] child abuse in her or his family would indicate either actual bias or implied bias against Mr. Roybal," and contends that the failure to reveal this information on voir dire "precluded Mr. Roybal's trial counsel from exploring or examining whether a particular juror could adequately consider Mr. Roybal's history of abuse as a mitigating factor." (<u>Id.</u> at 354.)

---

[11] Juror Boner is referred to as Bonner in the voir dire transcript (<u>see</u> RT 2246, 61-63), while the completed questionnaire indicates a surname of Boner. (<u>See</u> CT 2960, 62.) The Court will refer to the juror's last name as written by the juror.

Federal Rule of Evidence 606(b) states: "During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The Court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Fed. R. Ev. 606(b).[12]   The Ninth Circuit has found Rule 606(b) applicable to the consideration of juror declarations in federal habeas proceedings. See e.g., Fields, 503 F.3d at 778. Indeed, the Ninth Circuit has instructed that "the appellate court on appeal must consider allegations of juror misconduct using only that evidence properly subject to consideration." United States v. Bagnariol, 665 F.2d 877, 884 (9th Cir. 1981), citing Fed. R. Evid. 606(b). "Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts." Bagnariol, 665 F.2d at 884-85.

Yet, the Ninth Circuit has on a previous occasion indicated that "[s]tatements which tend to show deceit during voir dire are not barred by [Rule 606(b)]." Hard v. Burlington Northern R.R., 812 F.2d 482, 485 (9th Cir. 1987), abrogated by Warger v. Shauers, 574 U.S. ___, 135 S.Ct. 521 (2014). While Hard appears to support the consideration of Juror Nelson's statements concerning the discussion of incidents of domestic violence and child abuse,[13] despite the fact that it concerns events that took

_____

[12] The Federal Rules of Evidence have enumerated three exceptions to this rule, allowing juror testimony in the case where the jury was: presented with "extraneous prejudicial information," subject to "an outside influence" or "a mistake was made in entering the verdict." See Fed. R. Ev. 606(b). Because Petitioner contends that the jurors' dishonesty in voir dire demonstrates bias, rather than juror misconduct as the result of a mistake or outside information or influence, it is apparent that these exceptions are not applicable to the instant claim.

[13] Juror Nelson also stated that: "The issue of violence and abuse within the extended family was discussed and I believe it effected [sic] our deliberations on the issue of whether to impose the death penalty or life without parole." (Ex. 31, Lodgment No. 138.) The Court is also clearly barred from considering whether such statements had an impact on the outcome of their penalty phase deliberations. See Tanner v. United States, 483 U.S. 107, 117 (1983) ("The near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to

place during deliberations, the Supreme Court recently held that "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*." Warger, 135 S.Ct. at 525. "As enacted, Rule 606(b) prohibited the use of *any* evidence of juror deliberations, subject only to the express exceptions for extraneous information and outside influences." Id. at 527. "Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." Id. at 529.

Even were the Court able to consider Juror Nelson's declaration, Petitioner also fails to demonstrate that the jurors' answers in the questionnaires demonstrate any misconduct or bias. First, Petitioner fails to show that any of the jurors harbored "actual bias, which stems from a pre-set disposition not to decide an issue impartially." Fields, 503 F.3d at 766. "Actual bias is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." Id. at 767. Based on a review of the record, there is no indication that any juror expressed any reservations about their ability to act impartially in this case. On the contrary, among the last questions asked in the written questionnaires were whether "[a]s a result of your having been asked to fill out this questionnaire, have you formed any opinions about this case?" and "[i]s there ANYTHING that you would like to bring to the Court's attention that might affect your ability to be a fair and impartial juror in this case?" (CT 2580.) None of the jurors or alternates that sat on Petitioner's jury indicated that they had formed an opinion on the case adverse to either side or that there was anything that would impact their ability to act as a fair and impartial juror. (See CT 2580, 2622, 2664, 2706, 2748, 2791, 2833, 2875, 2917, 2959, 3001, 345, 3211.)

Nor does the proffered evidence and argument support a claim of implied bias.

---

impeach a jury verdict.")

As noted above, the Ninth Circuit has stated that implied bias "may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." Fields, 503 F.3d at 766.  Here, there is no indication that the jurors had any relationship to the crime itself or to any of the participants.  Instead, Petitioner asserts that the jurors gave "knowingly false answers in response to the jury questionnaire." (FAP at 354.)

Based on the Court's review of the record, Petitioner fails to conclusively demonstrate that the jurors were actually dishonest, much less repeatedly so, in failing to mention incidents of abuse in their extended families, and finds no indication of implied bias.  This is because the questions posed in the written questionnaire asked only if the jurors or "anyone close to" them had been the victim of child abuse or domestic violence.  Juror Nelson's declaration indicates only that several jurors discussed abuse or domestic violence in their extended families, and a review of the record does not reveal that the trial court ever offered a definition of "anyone close to you."  Given the lack of specific direction or definition, it is unclear whether the jurors would have reasonably considered members of their extended families as being "close to" them.  Even assuming that a member of one's extended family was included in the sphere of the two questions posed, a review of the questionnaires also reveals that several jurors indicated positive responses to a number of related questions regarding experience with violence stemming from alcoholism, as well as questions asking about experience with child abuse or domestic abuse counseling, that reasonably could have contributed to the jurors' discussions of their experiences with violence and abuse.  For instance, Juror Bueche indicated having a relative who had experience working with child abuse counseling, while Juror Teller[14] indicated that her sister worked at a shelter for abused wives and children.  (See CT 2605, 3195.)  Meanwhile, Juror Christensen noted a bad

---

[14] Juror Teller, originally an alternate juror, was a member of the penalty phase jury that rendered a verdict, as she replaced Juror Boner during the penalty phase deliberations.  (See RT 6670.)

personal experience with drinking, Juror Bell stated that both parents were alcoholics and mentioned loud fights between them, Juror Teller stated that her first husband was an alcoholic who was argumentative when drinking, and Juror Boner stated that her father and several others she knew had drinking problems, in addition to her positive answers to the questions about child abuse and domestic violence. (See CT 2646, 2687-88, 2982-85, 3193.)[15]

Given the vague wording of the questions, rather than speculating as to juror bias, it is reasonable to conclude that some jurors may not have considered extended family members to be someone "close." See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) ("The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality."), citing McDonough, 464 U.S. at 555-56.  Moreover, the jurors' responses to the questions on related topics, such as counseling and alcohol-related violence, could have reasonably contributed to the discussion Juror Nelson mentioned.  The evidence presented falls far short of that rare case where [the Court] must presume juror bias." Dyer, 151 F.3d at 973-83 (juror who failed to disclose information about her brother being the victim of a homicide, later lied and stated she thought the crime was an accident, failed to mention being the victim of several burglaries, and did not disclose her husband's recent arrest and jailing or the arrests of several other relatives was impliedly biased, as "[a] juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process."); see also Green v. White, 232 F.3d 671, 676-78 (9th Cir. 2000) (juror's repeated lies about prior felony conviction, biased statements against defendant and

---

[15] The relatedness of the topics of child abuse, domestic violence, and violence as a result of alcoholism in families is also supported by trial counsel's post-trial declaration, in which she indicates that her investigator interviewed the jurors after trial to ask about the jurors' personal experiences mentioned during deliberations. (CT 2256.) Juror Thomas told the investigator some jurors "were children that had been abused by their parents and some were children of alcoholic families," while Juror Nelson stated only that "some jurors mentioned abuse in their families." (Id.)

questionable conduct "raises serious questions about his ability to impartially serve on a jury.")

Finally, there is no indication of <u>McDonough</u>-type bias, which requires a showing that "a juror failed to answer honestly a material question on *voir dire*, and []that a correct response would have provided a valid basis for a challenge for cause." <u>Id.</u>, 464 U.S. at 556. First, as with implied bias, Petitioner has not persuasively shown that jurors were dishonest in answering questions about abuse and domestic violence. Moreover, <u>McDonough</u> requires that a correct response would have been a "valid basis for a challenge for cause." <u>Id.</u> at 566. Here, Petitioner fails to show that being a victim of child abuse or domestic violence, or someone close to a victim, would have provided a basis for challenging such a prospective juror for cause. For instance, Petitioner challenged Juror Boner based on her experiences with abuse and her attitudes towards it, but the challenge was unsuccessful. (RT 2246-66.) This strongly suggests that Petitioner's efforts to remove prospective jurors for cause, solely based on positive responses regarding abuse of others, would have been unsuccessful. As such, Petitioner fails to demonstrate that abuse in history would have provided a "valid basis" for a challenge for cause in this case, given that the trial court rejected the argument that Juror Boner's experiences and attitudes provided persuasive grounds for removing her from the jury panel. Moreover, prospective jurors Cartagena and Kelly each indicated abuse in their families during *voir dire* questioning, and both parties passed for cause. (RT 1388-90, 1588-93.) Prospective juror Rogers also indicated experiences with physical abuse as a result of her ex-husband's drinking, and served as an alternate juror at Petitioner's trial. (RT 1988-04.)

Here, the proffered juror declaration, even if it could be considered, only indicates several jurors mentioned abuse or violence in their extended families during deliberations. Given the lack of definition of the term "close to you," and the affirmative responses to related questions about alcoholism in their families, violence from alcoholism, and domestic violence or abuse counseling, Juror Nelson's declaration does

not support a conclusion that the jurors were dishonest in their questionnaires or during *voir dire*. Moreover, in light of Petitioner's failure to demonstrate that an affirmative response to the cited questions would have provided a valid basis for a challenge, Petitioner fails to establish a claim of <u>McDonough</u>-type bias.

In sum, Petitioner has not demonstrated that the jurors' questionnaire and *voir dire* responses, when compared to their discussion during deliberations, evidence bias against Petitioner, for even if the jurors misconstrued the cited questions and failed to disclose experience with child abuse or domestic violence in their extended families, the claim fails in the absence of any indication that the jurors lacked impartiality. The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief or an evidentiary hearing on Claim 25. <u>See</u> <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state court record.")

## B. PROSECUTORIAL MISCONDUCT CLAIMS

### 1. <u>Claim 3</u>

Petitioner asserts that when the prosecutor objected to defense-elicited testimony and stated that Petitioner was "not unavailable" to testify, that remark constituted a comment on the fact that Petitioner had not testified, in violation of the United States Constitution. (FAP at 224-27.)

The California Supreme Court considered and rejected this claim on appeal as follows:

> Defendant sought to elicit testimony from Frank Orozco, his half brother, that he had planned to return to Santa Fe before Yvonne Weden was killed. The People objected to the testimony on hearsay grounds; the superior court ruled it admissible to show defendant's state of mind. The prosecutor argued: "The declarant is not unavailable, your honor," to which the superior court responded, "He is not unavailable at this juncture." Later, outside the presence of the jury, defendant moved for a mistrial, claiming that the prosecutor's comment was a "flag to the jury that the defendant was not testifying in the case and he was available to testify." The superior court denied the motion, explaining that it "took the objection as a legal objection, just as though it were a statement, hearsay, and an adjunct to that,

and not as a comment to the jury." Defendant requested the superior court to "consider" admonishing the jurors that he had the right not to testify. The superior court observed that it had previously so instructed "almost ad nauseam" during voir dire, and stated that it would "of course" so instruct the jury again at the end of the case. At the conclusion of both the guilt and penalty phases, it gave an instruction to the effect that defendant had a right not to testify and no adverse inferences should be drawn from his failure to do so.

Defendant claims that the prosecutor committed error under *Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. The point lacks merit.

*Griffin* holds that the privilege against self-incrimination of the Fifth Amendment prohibits any comment by the prosecution on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom. (380 U.S. at pp. 611-615 [85 S.Ct. at pp. 1231-1233].) We apply a "reasonable likelihood" standard for reviewing prosecutorial remarks, inquiring whether there is a reasonable likelihood that the jurors misconstrued or misapplied the words in question.

No error appears. Considered in context, there is no reasonable likelihood that the prosecutor's hearsay objection concerning Frank Orozco's testimony about defendant's desire to return to Santa Fe could have led jurors to misconstrue the objection as a reference to defendant's failure to testify. The comment was in the form of a legal objection, not a remark directed to the jury; it was not reasonably likely that jurors were misled into believing otherwise or that it would have increased the jury's inclination to treat the defendant's silence as an indication of his guilt.[FN9]

FN9 Defendant also asserts that the prosecutor's comment violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The claims, which derive from the claim of *Griffin* error, are similarly without merit.

Roybal, 19 Cal. 4th at 514-15.

The Fifth Amendment to the United States Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615 (1965). "While a direct comment about the defendant's failure to testify always violates Griffin, a prosecutor's indirect comment violates Griffin only 'if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" Hovey v. Ayers, 458 F.3d 892, 912 (9th Cir. 2006), quoting Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987).

As the California Supreme Court recounted during the guilt phase proceedings,

defense counsel posed a question to Petitioner's brother Frank about whether Petitioner had indicated a desire to go to Santa Fe prior to the date of the victim's murder, prompting the prosecutor to object on hearsay grounds. The trial court overruled the objection, finding the evidence admissible as to Petitioner's state of mind. Shortly thereafter, the following testimony and exchange occurred:

> Q:     When was the last time that you know that he said he wanted to go to Santa Fe?
>
> A:     The last time was that Saturday morning.
>
> Q:     Did he indicate anything about the reasons being you or your wife?
>
> A:     He indicated, yes, that my wife was treating him like a slave.
>
> [Prosecutor]:     Objection again, Your Honor, continuing objection to all this testimony.
>
> The Court:     Ladies and Gentlemen, this is being received as it applies to the declarant's state of mind, which is an exception to the hearsay rule. And I will let the attorneys argue at that time during the argument as to the probative value of this statement, but the objection is overruled. [¶] You have a continuing objection.
>
> [Prosecutor]:     Well, the declarant is not unavailable, Your Honor.
>
> The Court:     He is unavailable at this juncture. You may continue your answer.

(RT 4574.)

A short time later, outside the presence of the jury, defense counsel moved for a mistrial pursuant to Griffin, which the trial court denied, stating: "I took the objection as a legal objection, just as though it were a statement, hearsay, and an adjunct to that, and not as a comment to the jury. I overruled the objection. Mr. Koerber [the prosecutor] still contends that my ruling was in error. [¶] Be that as it may, the motion to dismiss is denied." (RT 4615-16.) Upon continued argument by the defense, the trial court stated: "As I've observed, I received that objection as a legal objection. I didn't regard it as a speaking objection arguing the case in front - - or the objection in front of the jury. [¶] I'll observe that if the prosecution makes a reference to the defendant's

1  refusal to testify, of course, [the] prosecution would be treading on very thin grounds to

2  do so.  But that, I don't perceive, has been done at this juncture."  (RT 4616.)

3      Petitioner alleges Griffin error arising from the fact that "the jury twice heard a

4  'speaking objection' beyond an objection on hearsay grounds designed to cause the jury

5  to note the [sic] Mr. Roybal was not testifying," and asserts that the comment was not

6  accidental, but that "[w]hen the prosecutor referred to the availability of Mr. Roybal as

7  the declarant to testify, that reference added nothing to the previous objection, but it had

8  one purpose and one purpose only: to draw the jury's attention to the fact that Mr.

9  Roybal was available to testify, but had not."  (FAP at 228.)

10      Here, as both the trial court and the California Supreme Court reasonably

11  concluded, the prosecutor's comments did not fall under Griffin, as the comments were

12  not directed to the jury, but instead were made in support of a hearsay objection directed

13  solely to the trial court.  Moreover, any possible prejudice arising from the comments

14  was countered by the trial court's instructions to the jurors at the conclusion of the guilt

15  phase that: "A defendant in a criminal trial has a constitutional right not to be compelled

16  to testify.  You must not draw any inference from the fact that the defendant does not

17  testify.  Further, you must neither discuss this matter nor permit it to enter into your

18  deliberation in any way."  (RT 4853.)  The trial court also instructed the jurors that

19  "[s]tatements made by the attorneys during trial are not evidence."  (RT 4842.)  A jury

20  is presumed to understand and follow the trial court's instructions.  See Weeks, 528 U.S.

21  at 234; Marsh, 481 U.S. at 211; see also Miller, 483 U.S. 756, 766 n.8 ("We normally

22  presume a jury will follow an instruction to disregard inadmissible evidence

23  inadvertently presented to it, . . . .")

24      Thus, even were this Court to conclude that the prosecutor's ill-founded hearsay

25  objection (which erroneously assumed the unavailability of a declarant is a predicate for

26  the state-of-mind exception to hearsay) contained a comment on Petitioner's failure to

27  testify in violation of Griffin, the comments were of such an indirect nature that any

28  possible error was rendered harmless by the trial court's instructions to the jury

emphasizing that Petitioner had a constitutional right not to testify, that his failure to testify could not be considered in the jury's deliberations, and that the comments of counsel were not evidence.  See Brecht, 507 U.S. at 637 (habeas relief not available unless error had a "substantial and injurious effect or influence in determining the jury's verdict.")

Because Petitioner fails to show that the California Supreme Court's rejection of this claim on appeal was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, he is not entitled to habeas relief on Claim 3.

## 2. **Claim 12**

Petitioner contends that the prosecutor's closing argument "undermined the reliability of the penalty determination process in his case," arguing that it "interject[ed] an interpretation of the Bible which is at odds with California's death penalty statutes," the argument "diminished the jurors' sense of responsibility for decision making by positing that the proper decision had been foreordained by a higher law," and it "provided a religious imperative to refuse to consider mitigating circumstances." (FAP at 290.)

The California Supreme Court rejected Claim 12 on direct appeal, finding that the claim was not preserved for review, but nevertheless failed on the merits due to a lack of prejudice.  For the reasons discussed above in section III.A.2, this court will address the merits of Claim 12.  The California Supreme Court stated:

> Toward the end of closing argument, the prosecutor referred to the Penal Code and then continued: "There is another book, written long ago, that mentions the crime of murder, and mentions what is the appropriate penalty for the crime of murder, and that book says a couple of different things. It says, 'Thou shalt not steal.' It says, 'Thou shalt not kill.' It says 'And if he smite with an instrument of iron so that he die, he is a murderer. The murderer shall surely be put to death.' [¶] It says, moreover, 'Ye shall take no satisfaction for the life of a murderer which is guilty of death, but shall be surely put to death.'" Defendant did not object.

> Defendant contends that the prosecutor's reference to biblical law constituted prejudicial misconduct. Although he concedes that his counsel failed to object, he contends that the prosecutor's argument was so

egregious that a timely objection resulting in an admonition by the superior court would, in any event, have been ineffective to cure the harm. The claim fails.

As a threshold matter, because he did not object to the prosecutor's remarks, defendant failed to preserve the claim of prosecutorial misconduct for review. (*People v. Wash* (1993) 6 Cal.4th 215, 259-260 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) But the claim also fails on its merits, in the absence of prejudice.

It is well settled that biblical law has no proper role in the sentencing process. "Penalty determinations are to be based on the evidence presented by the parties and the legal instructions given by the court. Reference by either party to religious doctrine, commandments or biblical passages tending to undermine that principle is improper. . . . What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority." (*People v. Sandoval* (1992) 4 Cal.4th 155, 194 [14 Cal.Rptr.2d 342, 841 P.2d 862].) "'Argument of this sort by a representative of the government offends California statutes and judicial decisions, which establish the positive, secular law of this state as the rule governing the choice between life and death. [Citation.] It also violates the United States and California Constitutions . . . .'" (*Id.* at p. 200 (conc. and dis. opn. of Mosk, J.).)

As a general matter, reversal for error under California law requires prejudice, and prejudice, in turn, requires a reasonable possibility of an effect on the outcome when, as here, penalty in a capital trial is involved. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1253 [270 Cal.Rptr. 451, 792 P.2d 251]; *People v. Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Similarly, it is the general rule for error under the United States Constitution that reversal requires prejudice and prejudice, in turn, is presumed unless the government shows that the defect was harmless beyond a reasonable doubt. (See, e.g., *Rose v. Clark* (1986) 478 U.S. 570, 576-579 [106 S.Ct. 3101, 3105-3107, 92 L.Ed.2d 460].)

The prosecutor's reference to biblical authority was clear misconduct. There could be no purpose for this portion of the argument other than to invite the jury to find support for a death verdict in the religious text.

Although we condemn the prosecutor's biblical references as misconduct, we also conclude that the misconduct was not prejudicial under the circumstances of this case. The prosecution's argument focused primarily, and at great length, on the brutal circumstances of the crime. He argued that although the jurors, under penalty factor (k) of Penal Code section 190.3, could be asked to show sympathy and mercy in fixing the punishment, defendant had shown no sympathy or mercy for Yvonne Weden. His brief allusions to biblical law amounted to little more than commonplaces, to emphasize his point that the jurors should instead judge defendant primarily by his acts. In context, the remarks could not have diminished a reasonable juror's sense of responsibility or displaced the superior court's instructions concerning the application of the Penal Code. FN13

FN13 Defendant also argues that his trial counsel's failure to

1
object to the prosecutor's remarks violated his right to
effective assistance of counsel. He cannot make such a
2
showing; there was no prejudicial prosecutorial misconduct.

3   Roybal, 19 Cal. 4th at 519-21 (alterations in original).

4      Clearly established federal law holds that prosecutorial misconduct, such as

5   inappropriate comments during arguments, warrants habeas relief when the conduct "'so

6   infected the trial with unfairness as to make the resulting conviction a denial of due

7   process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986), quoting Donnelly v.

8   DeChristoforo, 416 U.S. 637, 643 (1974).  "[I]t 'is not enough that the prosecutors'

9   remarks were undesirable or even universally condemned.'"  Darden, 477 U.S. at 181,

10   quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983).

11      "[T]he touchstone of due process analysis in cases of alleged prosecutorial

12   misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v.

13   Phillips, 455 U.S. 209, 219 (1982).  Alleged instances of misconduct must be reviewed

14   "in the context of the entire trial."  Donnelly, 416 U.S. at 639; see also Miller, 483 U.S.

15   at 765-66, citing Darden, 477 U.S. at 179 and Donnelly, 416 U.S. at 639.  Habeas relief

16   is warranted only if the error "had substantial and injurious effect or influence in

17   determining the jury's verdict."  Brecht, 507 U.S. at 637.

18      The California Supreme Court concluded that the prosecutor's biblical references

19   constituted "clear misconduct," and was to be "condemn [ed]."  The California Supreme

20   Court held, however, the misconduct was not prejudicial.  Roybal, 19 Cal. 4th at 521.

21   The California Supreme Court was correct in concluding that the prosecutor's comments

22   constituted misconduct, given that "religious arguments have been condemned by

23   virtually every federal and state court to consider their challenge."  Sandoval v.

24   Calderon, 241 F.3d 765, 777 (9th Cir. 2001) (collecting cases); see Roybal, 19 Cal. 4th

25   at 520 ("[I]t is well settled that biblical law has no proper role in the sentencing

26   process.").  It is without question that the prosecutor improperly urged the jurors to

27   impose a death sentence on Petitioner based on biblical law.  He first cited state law,

28   which provided for imposition of the death penalty for "certain crimes, special

circumstance crimes, crimes like [Petitioner] has been convicted of," then immediately after, began to discuss and quote from "another book, written long ago, that mentions the crime of murder, and mentions what is the appropriate penalty for the crime of murder." (RT 6470.)  In doing so, he clearly and improperly advocated that religious authority supported a death verdict.  Yet the prosecutor did not stop with simply drawing parallels between state law and biblical law which, in itself, would have been misconduct.  He went on to quote directly from the Bible, asserting that biblical text demanded a specific punishment for murder: "And if he smite with an instrument of iron so that he die, he is a murderer.  The murderer shall surely be put to death."[16]  (Id.)  Even after that clear invocation of biblical authority (i.e. God mandates that someone who kills with a knife must be put to death), the prosecutor continued with another direct quote from the Bible, imploring that: "Ye shall take no satisfaction for the life of a murderer which is guilty of death, but shall surely be put to death."[17]  (Id.)  Such argument could only have been meant to urge the jurors to find justification for a death sentence in biblical text, authority well outside the penal code, and to subvert or frustrate their consideration of the proper sentencing factors under state law.  See Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."); see also Sandoval, 241 F.3d 765, 777 (9th Cir. 2000) ("[D]elegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process.")  As the California Supreme Court reasoned, "[t]here could be no purpose for his portion of the argument other than to invite the jury to find support for a death verdict in the religious text."  Roybal, 19 Cal. 4th at 521.

While the California Supreme Court accurately concluded that such comments had

---

[16] (See Numbers 35:16, King James Bible.)

[17] (See Numbers 35:31, King James Bible.)

"no proper role in the sentencing process" and amounted to error under both the California and United States Constitutions, that court unreasonably found that the comments were harmless and that the prosecutor's improper comments were simple "commonplaces" that, given the remainder of the prosecutor's closing argument, "could not have" diminished the jury's sense of responsibility nor replaced the trial court's instructions. Id. at 520-21. In so concluding, the California Supreme Court erroneously cited the prosecutor's reference to Petitioner's "acts" as an example of proper argument. The California Supreme Court reasoned that the comments at issue were mere "commonplaces, to emphasize his point that the jurors should instead judge defendant primarily by his acts," and noted that the prosecutor's "argument focused primarily, and at great length, on the brutal circumstances of the crime." Id. Admittedly, the majority of the prosecutor's argument was focused on the murder itself but, again, with a biblical tone: "The main thing, the primary thing for you to consider is his acts. By his acts he will be judged." (RT 6470.) But this argument too, bears a strong resemblance to language found in the Bible, and followed just after the direct biblical quotations.[18] Thus, even if the reference to Petitioner's acts was not itself an explicit biblical quote or allusion, it could not cure or ameliorate the other biblical references, particularly given the context in which it was employed.

This court disagrees with the California Supreme Court's characterization of the prosecutor's direct biblical quotations as simple "commonplaces." The prosecutor quoted directly and repeatedly from Scripture demanding that a murderer "shall surely be put to death." It is evident that the prosecutor meant to intentionally and forcefully argue that religious authority mandated the death penalty. Had the prosecutor ceased referencing biblical passages after reciting "thou shalt not steal" or "thou shalt not kill,"

---

[18] The Bible repeatedly references judging individuals for their actions, including passages such as "they were judged every man according to their works," that "every man according to his deeds," and "according to their way and according to their doings I judged them." (See e.g. Revelations 20:13, Romans 2:6, Ezekiel 36:19, King James Bible.)

perhaps the California Supreme Court could have accurately discounted such references as "commonplaces," but the reasonableness of the state court's conclusion is undermined by the deeply religious context of repeated biblical exhortations.  It was objectively unreasonable for the California Supreme Court to dismiss the impact of the prosecutor's pointed and repeated biblical quotations commanding that a murderer such as Petitioner must be put to death as "mere commonplaces."

More importantly, the California Supreme Court analyzed prejudice too narrowly, by concluding there was a lack of prejudice because the prosecutor's argument "primarily" focused on the proper factors for consideration.  While it is true that the contested comments comprised only a few transcript pages of the prosecutor's lengthy closing argument which focused primarily on the evidence related to the murder, related special circumstance, and mitigation issues, the Supreme Court has instructed that misconduct be reviewed "in the context of the entire trial" to determine whether such error was prejudicial.  See Donnelly, 416 U.S. at 639; see also Miller, 483 U.S. at 765-66, citing Darden, 477 U.S. at 179 and Donnelly, 416 U.S. at 639.  The circumstances of this case strongly suggest the prosecutor's remarks were anything but harmless.  This was an extremely close penalty phase case. After a nine-day penalty phase during which the jury heard evidence of Petitioner's deprived upbringing, which was replete with physical and emotional abuse and neglect, substance abuse that started before age ten, and significant brain dysfunction and damage, the jury then deliberated for portions of six court days before reaching a death verdict.  The deliberations included requests to read back the testimony of Petitioner's alcoholic and neglectful mother, who nicknamed Petitioner "Mojo" or "Mojado", a Spanish word for the pejorative term "wetback," and who once offered to give Petitioner up in order to keep her cuckolded husband.  The jurors also asked for read backs of the testimony from both mental health experts who testified at length about Petitioner's brain dysfunction, long-standing substance abuse, personality disorders, and the possibility that he suffered from fetal alcohol effects from his mother's alcohol use when pregnant.  On both the third and fourth day of

1   deliberations, the jurors sent notes to the trial court expressing their inability to reach a

2   verdict.  Unquestionably,  the jurors struggled with their decision.

3        Here, where the state's case on guilt was entirely circumstantial, with lingering

4   questions regarding the blood evidence, and where the death verdict was so obviously

5   close and difficult, it was objectively unreasonable for the California Supreme Court to

6   expressly limit its analysis of prejudice flowing from the context of the religious

7   elements of the prosecutor's closing argument to the argument itself.

8        "In determining whether a comment rendered a trial constitutionally unfair, factors

9   we may consider are whether the comment misstated the evidence, whether the judge

10  admonished the jury to disregard the comment, whether the comment was invited by

11  defense counsel in its summation, whether defense counsel had an adequate opportunity

12  to rebut the comment, the prominence of the comment in the context of the entire trial

13  and the weight of the evidence." Hein v. Sullivan, 601 F.3d 897, 912-13 (9th Cir. 2010),

14  citing Darden, 477 U.S. at 182. "The Darden factors . . . require courts to place improper

15  argument in the context of the entire trial to evaluate whether its damaging effect was

16  mitigated or aggravated." Hein, 601 F.3d at 914.

17       In this case, the California Supreme Court's perfunctory conclusion that the

18  prosecutor's highly improper remarks "could not have" diminished the jury's sense of

19  responsibility was reached by erroneously restricting its examination to the remainder

20  of the prosecutor's closing argument and by brusquely dismissing the extended and

21  repeated biblical quotations as "mere commonplaces."  In light of the requirement that

22  such misconduct be reviewed in the context of the entire trial, the California Supreme

23  Court's cursory analysis and conclusory rejection of this error as harmless was not

24  merely erroneous, it was objectively unreasonable.  Because the California Supreme

25  Court's harmlessness determination was unreasonable, Petitioner has satisfied section

26  2254(d).  See Ayala, 135 S.Ct. at 2199 ("When a Chapman decision is reviewed under

27  AEDPA, 'a federal court may not award habeas relief under 2254 unless *the*

28  *harmlessness determination itself* was unreasonable.'"), quoting Fry, 551 U.S. at 119

1   (emphasis in original); <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18-19 (2003).

2       "[C]apital punishment decisions [are premised] on the assumption that a capital
3   sentencing jury recognizes the gravity of its task and proceeds with the appropriate
4   awareness of its 'truly awesome responsibility.'"   <u>Caldwell</u>, 472 U.S. at 341.   In
5   <u>Caldwell</u>, the "prosecutor urged the jury not to view itself as determining whether the
6   defendant would die, because a death sentence would be reviewed for correctness by the
7   State Supreme Court." <u>Id.</u> at 323.   The prosecutor's rebuttal comments were made in
8   response to defense counsel's argument to the jury during the penalty phase to the effect
9   that life is "precious," defendant's "life rests in your hands," "[y]ou can give him life or
10   death," "we are taught that an eye for an eye is not the solution," and it "is an awesome
11   responsibility" to decide defendant's fate. <u>Id.</u> at 324.   In rebuttal, the prosecutor stated
12   that the approach taken by the defense was "unfair."  "I think the lawyers know better.
13   Now, they would have you believe that you're going to kill this man and they
14   know—they know that your decision is not the final decision."   The prosecutor then
15   referred to a biblical reference made by defense counsel ("Thou shall not kill") and stated
16   that defense counsel wrongfully insinuated that, after the jury's verdict of death, the
17   defendant would be taken out of the courthouse "in moments and string him up." <u>Id.</u> at
18   325.   The prosecutor then stated that any "decision you render is automatically
19   reviewable by the Supreme Court." <u>Id.</u>

20       Honing in on the prosecutor's brief but limited argument targeting a juror's sense
21   of personal decision-making for determinations of death, the Supreme Court held that
22   "it is constitutionally impermissible to rest a death sentence on a determination made by
23   a sentencer who has been led to believe that the responsibility for determining the
24   appropriateness of the defendant's death rests elsewhere." <u>Id.</u> at 328-29.   In light of the
25   perception that jurors could reasonably believe that the state supreme court would have
26   the ultimate responsibility to review the death sentence - - despite numerous instructions
27   and admonitions to the jury that only the jury determined the fact of death  - - the
28   Supreme Court vacated the sentence of death.

Here, the prosecutor's unambiguous, repeated, and carefully timed improper exhortations to the jury to apply biblical law diminished the jurors' sense of personal decision-making for the imposition of the death penalty. In so many words, the jury was informed that the Bible requires a murderer who kills with iron (i.e. knife) to himself be put to death. The prosecutor's improper argument presented an intolerable danger that the jury minimized its role as factfinder and encouraged jurors to vote for death because it was God's will, and not that the imposition of the death penalty complied with California and federal law. In <u>Caldwell</u> the Supreme Court found that the few references to judicial review in the prosecutor's rebuttal argument was sufficient to relieve the jurors of their sense of personal decision-making because they were informed that the state supreme court would review the correctness of any decision reached by the jury. Here, in contrast to <u>Caldwell</u> where the prosecutor's comments suggested that the ultimate determination of death is delegated to "mere" mortal judges, the prosecutor in this case urged jurors to impose the death penalty because God mandates that a murderer who kills with a knife should himself be put to death. The prosecutor's repeated exhortations to apply biblical law diminished the jurors sense of personal decision-making and "was fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" <u>Id</u>. (quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976).

Indeed, it may be logically inferred that the biblical exhortations could have been used in deliberations to overcome any reluctance to invoke the death sentence for lack of evidentiary support. The jury deliberated for six days during the penalty phase; requested numerous read backs of testimony; informed the trial judge on two separate occasions that they were deadlocked on the appropriate penalty; and a juror was removed during the deliberations.[19] By any measure, this was an extremely close penalty phase trial where the prosecution sought to impermissibly minimize the jury's sense of personal

---

[19] The excused juror experienced a family emergency during deliberations and an alternate juror substituted in on the sixth day of deliberations. (<u>See</u> RT 6670-75.)

decision-making in violation of the Eighth Amendment.

Even though Petitioner has satisfied AEDPA, the Court must still apply the Brecht test to determine if this error was prejudicial. See Brecht, 507 U.S. at 637 (habeas relief is warranted only if the error "had substantial and injurious effect or influence in determining the jury's verdict."); Fry, 551 U.S. at 119, 121-22 (AEDPA established "a precondition to the grant of habeas relief . . . not an entitlement to it," and "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, supra, whether or not the state appellate court recognized the error and reviewed it for harmlessness. . . ."); Ayala, 135 S.Ct. at 2199 ("[A] prisoner who seeks federal habeas corpus relief must satisfy Brecht, and if the state court adjudicated his claim on the merits, the Brecht test subsumes the limitations imposed by AEDPA.")

A review of the record in this case compels the conclusion that Petitioner has satisfied Brecht, as the Court is persuaded that the prosecutor's biblical argument had "substantial and injurious effect or influence in determining the jury's verdict." Id., 507 U.S. at 637. First, because trial counsel failed to object to the prosecutor's obviously improper remarks, as discussed further in Claim 9, the trial court did not give any specific curative instruction nor was any attempt made to curtail or mitigate the impact of the misconduct. Moreover, in contrast to Claim 13, where the prosecutor's misstatement of law about the penalty phase determination was effectively countered by the trial court's explicit instructions on how the jurors must weigh the circumstances in aggravation and mitigation, the prosecutor's sermonizing went completely unabated and unaddressed. At the conclusion of the penalty phase proceedings, the trial court simply reminded the jurors that statements made by counsel were not evidence and that they must base their decision on the evidence and the law. (RT 6336-37, 6341; RT 6333.) This general admonition was insufficient to cure the misconduct or blunt the impact of this highly improper argument. Moreover, there is absolutely no indication in the record that the religious appeal was invited by defense counsel's own actions or argument, nor

does the record reflect that defense counsel either addressed the remarks or responded in any fashion.

The Ninth Circuit's decision in <u>Sandoval</u> is instructive in determining prejudice. The prosecutors in both cases advocated to the jurors that biblical authority supported imposition of the death penalty and repeatedly quoted Scripture in support of that argument. As in <u>Sandoval</u>, "[t]his is not a case where the evidence overwhelmingly supported the jury's verdict. The issue was life and death and the jury was sharply divided." <u>Id.</u>, 241 F.3d at 779. Citing the length of deliberations, the jurors' extended deadlock and clearly expressed difficulty in making the penalty decision, as well as the significant evidence presented in mitigation, the Ninth Circuit reasoned that "[w]e do not know what actually happened in the jury room, but we cannot assume that the prosecutor's religious argument did not persuade at least one of the jurors to change a vote for life to death . . ." <u>Id.</u>

In <u>Sandoval</u>, the jury deliberated on four counts and "was divided 6-6 on two of the counts and 7-5 on the other two," and expressed that they were "hopelessly deadlocked" after three days of deliberation prior to reaching their verdict. <u>Id.</u> Meanwhile, Petitioner's jury also engaged in lengthy deliberations spanning several court days. On the first day, the jurors requested and heard read back of witness testimony, while during deliberations on the second day, the jurors inquired about whether Petitioner had previously been incarcerated. During the third day of deliberations, the jury sent a note indicating that: "At this point, the jury has not been able to reach a unanimous decision. We are requesting the court's assistance in this matter." (RT 6595.) Upon the trial court's inquiry, the jury requested Petitioner's resume, from the guilt phase evidence, as well as a read back of both Dr. Cermak and Dr. Bucky's penalty phase testimony. (RT 6601, 6603.) On the fourth day of deliberations, the jury again expressed an inability to reach a verdict, this time sending a note stating: "The jury has explored every possibility in this trial and cannot reach a unanimous decision." (RT 6623.) Without inquiring as to the numerical division, the trial court

gave the jurors a lengthy supplemental instruction[20] that included a review of the law and comments on the penalty phase evidence. (RT 6638-39, 6652-58.) Even then, the jurors appeared to have had continued difficulty arriving at a decision, as they deliberated for two additional court days prior to reaching a verdict.

Petitioner's penalty phase jury was also presented with significant evidence in mitigation, including testimony about his mother's alcoholism throughout her pregnancy and his childhood, her prostitution, neglect of Petitioner, that Petitioner was abused by his stepfather, and Petitioner's own early use and abuse of alcohol and drugs. Petitioner's birth was the result of his mother's liaison with another man that broke up her marriage and led her to resent Petitioner. Petitioner never knew his father and was fathered outside of his mother's marriage, which led to the break-up of that marriage and her resentfulness and maltreatment of Petitioner. The jury heard evidence that Petitioner struggled with substance abuse throughout his life, starting at an extremely early age. Dr. Cermak testified at length about Petitioner's background and upbringing, substance abuse, organic brain damage, blackouts, and the possibility of fetal alcohol effects from his mother's alcohol abuse. While the murder and prior crimes were certainly aggravating, trial counsel persuasively argued that Petitioner's prior crimes were all connected to his drug and alcohol abuse and should be considered in mitigation. The jury also heard evidence that Petitioner was falling-down drunk on the evening of the murder, and were aware that a fingerprint from the scene made in a reddish substance that could have been blood did not match Petitioner's.

As discussed above, a death verdict was far from a foregone conclusion in this case, and in light of the entirety of the record and the highly improper and impassioned argument by the prosecutor, quoting from the Bible in support of the death penalty and drawing parallels between biblical law and the state penal code to argue in favor of a

---

[20] Petitioner has alleged several claims of error arising from aspects of the trial court's supplemental instructions to the jury, which are addressed in Claims 21, 22 and 24, infra.

1  death verdict, the Court finds it impossible to conclude that the misconduct was

2  harmless. "[I]f one cannot say, with fair assurance, after pondering all that happened

3  without stripping the erroneous action from the whole, that the judgment was not

4  substantially swayed by the error, it is impossible to conclude that substantial rights were

5  not affected." O'Neal v. McAninch, 513 U.S. 432, 437-38 (1995), quoting Kotteakos

6  v. United States, 328 U.S. 750, 764-65 (1946).

7      This Court is mindful of the Supreme Court's caution that it "should not lightly

8  infer that a prosecutor intends an ambiguous remark to have its most damaging meaning

9  or that a jury, sitting through lengthy exhortation, will draw that meaning from the

10  plethora of less-damaging interpretations." Donnelly, 416 U.S. at 647.  However, there

11  is no ambiguity to the remarks at issue in this case.  The misconduct was deliberate,

12  substantial, and perfectly timed with crescendo effect at the close of argument.[21]  The

13  content of the offending comments was also highly suggestive of preparation

14  beforehand, rather than the result of extemporaneous rhetoric in the moment, given that

15  the remarks contained an extended and nearly verbatim quotation from biblical text

16  specifically commanding the death penalty as a punishment for murder.  Not only did the

17  prosecutor press the jurors to find support for the death penalty in the Bible, he quite

18  literally conferred equal standing upon the Bible as a source of relevant authority.  By

19  so willfully and artfully juxtaposing the Bible ("another book") with what should have

20

21      [21] The record amply reflects the prosecutor's knowledge of, and sensitivity to, the
    rules of evidence, further supporting the conclusion that the prosecutor intentionally
22  engaged in the misconduct.  Mere minutes after the prosecutor offered egregiously
    improper argument, he promptly and repeatedly objected to defense counsel's own
23  closing argument, contesting  remarks which most would perceive as innocuous. (RT
    6471-72, 6476, 6489-90.)  Two of those objections were overruled, while one was
24  sustained on "narrow grounds."  (Id.)  It is evident that the prosecutor was well aware
    of the proper bounds of argument, given his eagerness to object to comments he believed
25  were inappropriate.  That the prosecutor, clearly aware of the rules of evidence,
    intentionally engaged in such inflammatory and condemnable conduct is deeply
26  troubling to the Court.  See Connick v. Thompson, 563 U.S. 51, ___, 131 S.Ct. 1350,
    1365 (2011) ("'It is as much (a prosecutor's) duty to refrain from improper methods
27  calculated to produce a wrongful conviction as it is to use every legitimate means to
    bring about a just one.'"), quoting Berger v. United States, 295 U.S. 78, 88 (1935).
28

been the exclusive guiding principles of the Penal Code and jury instructions, the prosecutor struck a foul blow, ignoring the admonition that government's interest in a prosecution is that justice shall be done, and that while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." <u>Berger</u>, 295 U.S. at 88.  It is equally apparent that the misconduct had its intended impact.  The prosecutor's assurances to the jury that authority no less than Scripture demanded a death verdict was aimed at controlling the outcome of the penalty phase in his favor and "sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'"  <u>Caldwell</u>, 472 U.S. at 340, quoting <u>Woodson</u>, 428 U.S. at 305.

As discussed above, the California Supreme Court correctly found that the prosecutor's religious argument was misconduct and fell outside the bounds of both state and federal law, but unreasonably found that the comments were not prejudicial.  There was no objection to the remarks in question, and the trial court failed to provide an instruction aimed at ameliorating the impact of this misconduct.  While there was significant evidence in aggravation, the record also reflects that the defense presented substantial mitigating evidence, and that the jury undoubtedly struggled with the penalty decision over numerous days of deliberation.  Based on a review of the entire trial record, the Court cannot conclude that the misconduct was harmless.

Because the Court has "grave doubt" about whether the misconduct in question impacted the jury's death penalty decision in his case, the Court resolves this claim in favor of Petitioner.  <u>See</u> <u>O'Neal</u>, 513 U.S. at 438 ("[I]f a judge has 'grave doubt' about whether an error affected a jury in this way, the judge must treat the error as if it did so."); <u>see also</u> <u>Ayala</u>, 135 S.Ct. at 2197-98 (pursuant to <u>Brecht</u>, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'") (internal quotation marks omitted), quoting <u>O'Neal</u>, 513 U.S. at 436.  Petitioner is entitled to

1   habeas relief on Claim 12.

2       **3.    Claim 13**

3       In this claim, Petitioner contends that his constitutional right to due process and

4   a reliable penalty determination were violated "as a result of the erroneous statement by

5   the prosecutor during the penalty phase closing argument that if the aggravating factors

6   outweigh the factors in mitigation, the jury must impose a sentence of death and should

7   only recommend a sentence of life without parole if the mitigating factors outweigh the

8   aggravating ones." (FAP at 296.)

9       Petitioner raised this contention as Claim 6 in the state habeas petition.

10  (Lodgment No. 133.) The California Supreme Court rejected the claim on the merits and

11  also denied it on procedural grounds with a citation to Dixon, 41 Cal. 2d at 759.

12  (Lodgment No. 144.) As discussed above in section III.A.1., Respondent has not carried

13  the burden of showing that Dixon precludes the Court's review of Claim 13 on the

14  merits.

15      During the penalty phase closing argument, the prosecutor made the following

16  remarks:

17          If you find, and your burden - - this is the jury's job during the penalty
            phase. If you decide that the penalty, that the aggravating circumstances
18          outweigh the mitigating circumstances, then you vote for death. If the
            mitigating circumstances outweigh the aggravating circumstances, then you
19          vote for life without the possibility of parole. That is the weighing process
            that you engage in back there.
20  (RT 6390.)

21      In contrast to Claim 12 above, Petitioner fails to persuasively explain how the

22  prosecutor's weighing comments "'so infected the trial with unfairness as to make the

23  resulting conviction a denial of due process.'" Darden, 477 U.S. at 181, quoting

24  Donnelly, 416 U.S. at 643. Again, the Court must review these statements "in the

25  context of the entire trial." Id. at 639. Even if the Court were to assume, without

26  deciding, that the prosecutor's argument constituted an erroneous statement of the law,

27  the trial judge specifically directed the jury that they must follow the law as provided by

28  the court, as follows: "You must determine what the facts are from the evidence received

during the entire trial, unless you are instructed otherwise. You must accept and follow the law that I shall state to you." (RT 6333.) At both the outset of the penalty phase proceedings and again at the conclusion of the attorneys' arguments in closing, the trial court gave the jurors detailed instructions on the law as it pertained to the weighing of the evidence in aggravation and mitigation, stating that:

> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You the jury are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(CT 2051; see RT 5308, 6551.) Similar to Claim 12, defense counsel did not object to the remarks nor was a specific curative instruction given to target the asserted error. However, in this instance, unlike in the prior claim, the trial court's instructions to the jury were detailed in instructing the jurors on the weighing of the evidence and clearly ameliorated the prosecutor's arguably erroneous argument.

The trial judge also generally cautioned the jurors that: "Statements by the attorneys during the trial are not evidence." (RT 6336-37; see also RT 6341, 6383.) As previously noted, a jury is presumed to understand and follow the trial court's instructions. Weeks, 528 U.S. at 234; Marsh, 481 U.S. at 211. Even were the Court to presume that the prosecutor's argument was misconduct, in light of the trial judge's specific and repeated instructions outlining the applicable law and admonishing that the statements of counsel were not evidence, Petitioner fails to show that the prosecutor's weighing argument had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; see also Wood v. Ryan, 693 F.3d 1104,

1113 (9th Cir. 2012) ("On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'"), quoting Brecht, 507 U.S. at 637. The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner does not merit habeas relief on Claim 13.

## C.  INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Pursuant to the standard set forth in Strickland, "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009), citing Strickland, 466 U.S. at 687. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.")

To establish prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; see also id. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.") "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112.

With respect to the penalty phase,"[i]n assessing prejudice, we reweigh the

evidence in aggravation against the totality of the available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534 (2003); Williams, 529 U.S. at 397-98 (the court must "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation."); Wong v. Belmontes, 558 U.S. 15, 26 (2009) (per curiam) ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."), citing Strickland, 466 U.S. at 695-96.

Moreover, when a federal habeas court is reviewing a claim of ineffective assistance of counsel previously adjudicated on the merits by a state court:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Richter, 562 U.S. at 101.

As noted above, these claims were denied on the merits by the California Supreme Court without a statement of reasoning, and Petitioner asserts that the adjudication of Claims 4-8 are "not entitled to deference because there was a complete breakdown in the state habeas corpus procedure as a result of the destruction of the trial files by former habeas counsel," and that de novo review is instead appropriate.  (FAP at 139.) Petitioner contends that  "the lack of a complete or even cohesive trial record makes it impossible to determine which facts could have been presented by current habeas counsel or considered by the California Supreme Court in its 'postcard' denial on the merits." (Id.)  Petitioner asserts that:

> The summary denial of these claims on the merits by the California Supreme Court prior to a hearing and without the means to fully examine these issues on a record the California Supreme Court knew was incomplete, denied Mr. Roybal Due Process under the Fourteenth Amendment to the United States Constitution. *Hicks v. Oklahoma*, *supra*,

447 U.S. at 346; *Gardner v. Florida*, 430 U.S. 349, 362 (1977); *Dobbs v. Zant*, 506 U.S. 357, 362 (1993). That denial of Due Process resulted in a breakdown of the state habeas procedure that removes the case from the "objectively unreasonable" standard of review and, as argued in the first claim in this petition, requires this Court's *de novo* review. *Taylor v. Maddox*, *supra*, 366 F.3d at 999.

(FAP at 197.) Petitioner also argues that review under <u>Richter</u> is inappropriate, as the state court's process "was constitutionally flawed, so this Court cannot determine if the decision of the California Supreme Court was reasonable because it was based upon a record that was incomplete, and to speculate whether there are reasons supporting the denial of the state habeas corpus petition would perpetuate that same due process violation."[22]  (<u>Id.</u> at 198.)

Essentially, Petitioner contends that the California Supreme Court's failure to hold a hearing, issue an order to show cause, or allow for other factual development was unreasonable under section 2254(d), as, given the state of trial counsels' files, this would have been the only avenue to properly adjudicate Petitioner's claims, which were based on facts outside the record.  Thus, Petitioner asserts that this Court should proceed

_____

[22] In the Traverse, Petitioner separately asserts that the rebuttable presumption that the California Supreme Court denied these claims on the merits has been satisfied, as "[t]he silent denial of these claims, where there was not an adequate record to review, and no effort to remedy that destruction, effectively rebuts that the denial of those claims were on the merits." (Traverse at 31.)  In <u>Richter</u>, the Supreme Court stated that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99.  However, the California Supreme Court clearly rejected these ineffective assistance of counsel claims on the merits in an order which stated in relevant part: "All remaining claims are denied on the merits," (<u>see</u> Lodgment No. 144), and the rebuttable presumption is therefore not applicable to this situation. <u>Johnson v. Williams</u>, 568 U.S. ___, 133 S.Ct. 1088, 1096 (2013) ("When a state court rejected a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits–but that presumption can in some limited circumstances be rebutted.")  Indeed, the Supreme Court has specifically stated that "[s]ection 2254(d) applies even where there has been a summary denial." <u>Pinholster</u>, 131 S.Ct. at 1402, citing <u>Richter</u>, 562 U.S. at 101-02.  There is no indication here that the California Supreme Court overlooked or ignored any of Petitioner's claims; Petitioner contends instead that the state court's review of his ineffective assistance claims was inadequate or unreasonable because that court did not allow for factual development, which is a separate argument.  Petitioner fails to rebut the presumption that the California Supreme Court's denial of these claims was on the merits.

directly to a de novo review in light of the California Supreme Court's silent denial of these claims without allowing for factual development. However, the Ninth Circuit has declined to require that the state court hold a hearing or order additional factual development in order to find that a claim was adjudicated on the merits, and was therefore entitled to deference under AEDPA. See Lambert v. Blodgett, 393 F.3d 943, 965-66 (9th Cir. 2004) ("We decline to hold that AEDPA's reference to 'adjudicated on the merits' authorizes us to review the form or sufficiency of the proceedings conducted by the state court. Thus, we will not read into 'adjudicated on the merits' a requirement that the state have conducted an evidentiary hearing, or indeed, any particular kind of hearing.") As such, the denial of these claims on the record presented to the California Supreme Court does not persuade the Court that that decision was objectively unreasonable, based solely on the state of trial counsels' files.

The record before the Court contains numerous documents regarding counsels' efforts in investigation and preparation for trial. Current habeas counsel has made extensive efforts to reconstruct trial counsels' files, assisted by state and federal court funding, and the cooperation of other individuals and entities. (See Exs. 33, 62, Lodgment Nos. 138, 142.) While Petitioner contends that the files remain incomplete, it is clear that numerous records have been recovered or reconstructed and are available for review.[23] For instance, the trial record (both the Reporter's and Clerk's Transcripts),

---

[23] Habeas counsel contend that despite their due diligence, they have been unable to complete record reconstruction. (Ex. 62, Lodgment No. 142 at 39.) It appears that some of the materials Petitioner cites as missing have been the subject of reconstruction efforts. For instance, counsel noted that despite their efforts, they were unable to contact or recover any substantive material concerning Dr. Swenson, a neurologist who had been retained in advance of trial, as the only records concerning him noted that he was paid $600 for his work and stated that: "Report of Dr. Swenson (6/1/92), Describes [sic] head injuries; says no brain damage." (Ex. 33, Lodgment No. 138 at 1179-80.) However, counsel acknowledge that "[t]he federal court authorized funding to reconstruct testing and analysis of some of the experts whose data has been lost." (Id. at 1180.) Both Dr. Wegman and Dr. Victoroff reviewed relevant materials, evaluated Petitioner, and submitted declarations in support of the post-conviction proceedings. Counsel states that "[t]he majority of experts who had been retained by trial counsel either never responded to my letters and phone calls or could not be located," but does not indicate how many experts were retained. (Id. at 1179.) Of the three experts that were specifically mentioned, Drs. Cermak, Koshkarian, and Friedman, Petitioner has submitted a

appellate, and post-conviction proceedings are intact and included in the record before the Court.   (See Lodgment Nos. 1-144.)   Petitioner has also provided numerous declarations from individuals who testified at trial, as well as several declarations from individuals who did not testify, and the state habeas petition was accompanied by numerous medical records, social history information, correctional records, and other documents, which has also been presented to this Court. (See Lodgment Nos. 134-39, 142.) Moreover, Petitioner attached declarations from both trial counsel, discussing their investigation and trial preparation in the context of the habeas claims.  (See Lodgment No. 143.)  The district attorney's office provided a copy of the trial discovery, including both the discovery the prosecution had previously provided to the trial defense, as well as the discovery the defense had provided to the prosecution.  (See Ex. 59, Lodgment No. 139 at 1558.)  After discovery proceedings, the state superior court held that the prosecutor's office had complied with the order granting Petitioner's discovery request. (See Ex. 64, Lodgment No. 142 at 121.)  All of these materials were part of the record

declaration or report from each of those experts in support of the habeas petition.

    Counsel also indicate that they sent releases to all penal institutions, rehabilitation centers and other programs, but several facilities never responded and others indicated they no longer had records. (Id. at 1181.)  However, records from numerous facilities are available and have been included in support of the petition, from Seadrunar, RAP, and Rio Grande ATC, three substance abuse recovery programs, as well as records from the Santa Fe Sheriff's Department, Western New Mexico Correctional Facility, Las Lunas (Central New Mexico Correctional Facility), San Diego County Sheriff's Department, and New Mexico Correctional Department.  (See Exs. 20, 23, 25-30, Lodgment Nos. 135-38.)

    Counsel also note that "[a]n example of documents that are no longer in the case file are copies of the actual documents sent to Dr. Timmen Cermak by trial counsel for Mr. Roybal.  Dr. Cermak, as he states in his declaration attached to the informal reply, no longer has these documents.  Because there is no file containing copies of documents of documents [sic] actually sent to Dr. Cermak, we are unable to determine exactly what documents he was given to review in advance of his evaluation of Mr. Roybal and his testimony during the penalty phase." (Ex. 62, Lodgment No. 142 at 38.)  Dr. Cermak provided a post-conviction declaration which contained a list of the materials he reviewed in preparation for his 1992 interview of Petitioner and trial testimony. (See Ex. 60, Lodgment No. 142 at 3-4.)  At trial, the parties also discussed providing Dr. Bucky, the prosecution's rebuttal witness, with the same materials provided to Cermak, including witness interviews and Dr. Friedman's report. (RT 5241A-42A, 5254A-56A.) Finally, at the outset of his trial testimony, Dr. Cermak also specifically listed the materials he reviewed prior to evaluating Petitioner.  (RT 6064-65.)  Therefore, it appears that the documents Dr. Cermak reviewed are mentioned at several points in the record.

presented to the California Supreme Court.

In light of the available materials, Petitioner fails to demonstrate that the California Supreme Court's adjudication of these claims on the present record without factual development, based on the state of trial counsels' files, was inadequate, violated his right to due process, or warrants de novo review. In any event, as discussed below, because Claims 4-8 fail under even a de novo review, Petitioner is not entitled to habeas relief under the appropriately deferential standard of review. See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts cannot grant writs of habeas corpus under § 2254 by engaging only in de novo review when it is unclear whether AEDPA deference applies, § 2254(d). In those situations, courts must resolve whether AEDPA deference applies, because if it does, a habeas petition may not be entitled to a writ of habeas corpus under § 2254(d). Courts can, however, deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).") In an abundance of caution, in the course of adjudicating each of these claims, the Court has conducted a de novo review, as well as evaluated whether the California Supreme Court's denial of his allegations without a hearing or other factual development was itself objectively unreasonable under either § 2254 (d)(1) or (d)(2).

## 1.   Claim 4 - Ineffective Assistance of Counsel- Failure to Investigate and Present Evidence to Rebut Flight and Consciousness of Guilt

Petitioner contends that trial counsel rendered prejudicially deficient performance in failing to investigate and present evidence to rebut the prosecution's argument about Petitioner's consciousness of guilt in leaving Oceanside the day after the victim's murder and regarding a jury instruction on flight. (FAP at 200-01.)

Petitioner raised this contention as part of Claim 1 in the state habeas petition. (Lodgment No. 133.) The California Supreme Court rejected the claim on the merits without a statement of reasoning. (Lodgment No. 144.)

Petitioner argues that "during the guilt phase, the jury learned that on June 14, 1989, two detectives from the Oceanside Police Department interviewed Petitioner in Santa Fe while he was in custody on a warrant from New Mexico- a warrant having nothing to do with the Weden homicide." (FAP at 204) (citations omitted.) Petitioner asserts that there was available evidence that he was in custody in New Mexico when he was interviewed about the victim's murder in 1989, and that he was being held at a minimum security facility when he spoke to District Attorney's office investigator Jensen in 1991, all prior to being brought to California. He argues that trial counsel was ineffective for failing to present evidence that Petitioner did not make any attempt to escape from the minimum security facility, as such evidence "would not only have rebutted the consciousness of guilt and shown an excellent institutional record, but provided additional evidence in support of [sic] mental health defense, in both the guilt and penalty phases, by showing by Mr. Roybal's actions that he did not remember what had happened." (Id. at 205.)

Petitioner argues that this evidence "would have given independent corroboration to the testimony at trial of the [sic] Frank Orozco, Mr. Roybal's older adopted brother, that Mr. Roybal had previously indicated his desire to return to Santa Fe" and "would also have corroborated the testimony of Mary Lou Orozco, Frank's wife, who testified on cross-examination as a witness for the prosecution that Mr. Roybal had been saying since he arrived at their house that he wanted to return to New Mexico." (Id. at 203-04.) Petitioner also asserts that "it would have complemented the neurological evidence that was never presented that Mr. Roybal had been suffering from alcoholic blackouts for years" and that both Frank and Mary Orozco testified that Petitioner was "falling down drunk" on the night of the crime. (Id.)

Petitioner argues that trial counsel was aware of the impact of the evidence of flight, as counsel opposed the jury instruction on flight. (Id. at 203.) The record reflects that counsel objected to the instruction and in the alternative requested modification to use the word "departure" instead of "flight"; the objection was overruled and

99cv2152

modification denied.  (RT 4698-4701.)  The trial court later added a sentence to the instruction without objection by either counsel, preserving the earlier objections for the record, and the instruction given to the jury was as follows:

> The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence.  If there was such flight, the weight which such circumstance is entitled is a matter for the jury to determine.

(RT 4852-53.)  The prosecution argued at both the guilt and penalty phases that Petitioner leaving Oceanside for New Mexico the day after the murder demonstrated his consciousness of guilt.  (RT 4909-12, 6461-62.)

Both trial counsel have submitted declarations in support of the habeas petition, stating that they knew Petitioner had been housed in a minimum security facility prior to his extradition to California and that Petitioner was aware of the extradition efforts taking place to bring him to California to face murder charges.  (Exs. 66, 67, Lodgment No. 143 at 2, 10.)  Both counsel acknowledge that they did not "present[] evidence that he did not try to escape a minimum security 'walk away' facility in New Mexico," and neither recalled a strategic or tactical reason for not doing so.  (Id. at 2, 10-11.)

Even assuming that counsels' inability to recall a tactical or strategic reason for failing to present this evidence could support a finding of deficient performance, this claim is without merit because Petitioner has not demonstrated prejudice.  It is clear that the jurors were instructed that the evidence that Petitioner left Oceanside the day after the murder was "not sufficient in itself to establish his guilt," but could only be considered in light of the other evidence.  Petitioner's brother and sister-in-law testified that Petitioner planned to return to New Mexico prior to the murder, but that evidence was contested.  Petitioner's mother testified that she was surprised when Petitioner arrived from New Mexico in early June, as she was expecting him home sometime that month, but not that day; she received a call from him that day when he was at the bus station and he arrived at her home about thirty to forty-five minutes later.  (RT 3252-53, 3260.)

Other trial evidence also supported Petitioner's consciousness of guilt.  For instance, when Petitioner spoke to the police in New Mexico, he did not mention that he had even been in Oceanside, or in California at all, telling them that he had spent the prior few months in Seattle and that he had returned to New Mexico to visit his mother, who was ill and was going to have surgery.  (RT 3361-62.)  Petitioner's mother testified that she saw Petitioner hide some items in a wall in the backyard of her home; a police search recovered jewelry belonging to the victim and her husband which had been kept in the victim's home.  (RT 3261-67, 3271-80 (Stella Roybal testimony); 2649-56 (police search); 2830-45 (missing jewelry and prior location).)  In addition to the prosecutor's argument about Petitioner's flight from California to New Mexico, the prosecutor also argued in closing that each of these factors further evidenced Petitioner's consciousness of guilt.  (See RT 4911-14, 6461-63.)  Even if the defense apprised the jury that Petitioner did not attempt to escape from minimum security custody in New Mexico, to the extent that could have arguably rebutted the evidence that Petitioner fled California the day after the murder, the evidence still supported Petitioner's consciousness of guilt.

Meanwhile, the other circumstantial evidence against Petitioner was strong. Petitioner had recently worked for the victim at her home, and was therefore aware of her advanced age and that her husband worked nights.  Numerous items of jewelry belonging to the victim and her husband were found hidden in the backyard area of his mother's home. Petitioner smoked the same brand of cigarettes, Camel, as a cigarette found on the floor of the victim's home; the victim did not smoke and her husband smoked a different brand.  There was blood and DNA on Petitioner's knife and sock which was consistent with both himself and the victim, while saliva from the cigarette was also consistent with both individuals.  Fibers similar to those on the victim's pajamas were found on clothing belonging to Petitioner.

Nor is the Court persuaded that evidence of a lack of escape attempt would have been persuasive in supporting a possible defense theory that Petitioner blacked out on the evening of the murder.  Petitioner asserts that such evidence would have also

99cv2152

"provided additional evidence in support of [sic] mental health defense, in both the guilt and penalty phases, by showing by Mr. Roybal's actions that he did not remember what had happened." (FAP at 205.)  A failure to attempt an escape from a minimum security facility weeks or years after the murder could conceivably allow the defense to argue that Petitioner did not recall the murder.  But this argument would have been of slight value, given the other evidence showing Petitioner's awareness of the situation, including failing to tell the police that he had been in California and mentioning only Seattle, his possession of jewelry from the victim's home, and his efforts to hide that jewelry.

In light of the other evidence that buttressed Petitioner's consciousness of guilt, the clear instruction to the jury on how to consider the evidence of flight, and the other evidence introduced at trial, Petitioner fails to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Thus, even under a de novo review, this claim does not merit habeas relief.  To the extent this proposed evidence could have impacted the jury's weighing of mitigation and aggravation, the claim fails for lack of prejudice as discussed in section C.5, below. Petitioner is not entitled to habeas relief on Claim 4.

## 2.   Claims 5 and 6

In Claim 5, Petitioner contends that trial counsel rendered prejudicially deficient performance at the guilt phase of trial in failing to adequately investigate and present evidence regarding Petitioner's organic brain damage.  (FAP at 206.)  Specifically, Petitioner contends that counsel failed to obtain records showing that Petitioner had suffered a number of head injuries and failed to obtain adequate testing prior to deciding against a mental health defense at the guilt phase.  (Id. at 209-10, 218-20.)  In Claim 6, Petitioner contends that trial counsel rendered prejudicially deficient performance at the penalty phase of trial in failing to adequately investigate and present evidence regarding Petitioner's organic brain damage.  (Id. at 224.)  While Dr. Timmen Cermak testified at the penalty phase about Petitioner's mental health and brain deficiencies, Petitioner

contends that counsel did not provide the expert with adequate information about Petitioner's medical and social history, failed to obtain adequate testing of Petitioner, and did not allow Dr. Cermak sufficient time to prepare.  (Id. at 225-38.)

Petitioner raised these contentions as part of Claim 1 in the state habeas petition.  (Lodgment No. 133.)  The California Supreme Court rejected that claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

## A.    Trial Counsels' Investigation and Presentation of Organic Brain Damage

The record reflects, and Petitioner acknowledges, that during the pre-trial investigation, trial counsel obtained records from the Rio Grande Alcohol Treatment Center, Las Vegas Medical Center, Seadrunar, Western New Mexico Correctional Facility and the Las Lunas Correctional Facility.  (FAP at 206-07, citing Exs. 20, 24, 26, 28, 29, Lodgment Nos. 135-137.)  Of these, Petitioner states that only the records of the Las Vegas Medical Center "mentions or discusses brain damage," which is limited to a June 10, 1982 psychiatric admission form that Petitioner showed "no head injuries or trauma," and a notation dated May 23, 1983 that Petitioner had previously suffered a prior "mild cerebral concussion."  (FAP at 207, citing Ex. 24, Lodgment No. 136 at 558.)  The Court's review of these records reveals several other notable references.  For instance, in a 1986 Rio Grande Alcohol Treatment Center record, Petitioner acknowledged having "hallucinations" and "plenty of blackouts" due to drinking, and "may have had one seizure, is not sure."  (Ex. 20, Lodgment No. 135 at 297.)  Petitioner also reported that he "was in the hospital for a week as he was hit by a car," and "[h]as been hospitalized many times when he goes into DT or been in fights."  (Id. at 298.)  A June 11, 1983, New Mexico State Hospital discharge summary also included the following note: "On 5-5-83, he was taken to St. Vincent's Hospital due to a mild cerebral concussion from having been hit over the head with a crowbar."  (Id. at 566.)  Finally, a July 1, 1986 Sixty-Day Diagnostic Evaluation at the Western New Mexico Correctional Facility indicated that Petitioner "reported one past suicide attempt in which, while

99cv2152

intoxicated, he walked in front of a moving car," and that he "sustained a fractured arm in this attempt which occurred in 1984." (Ex. 28, Lodgment No. 137 at 901.)

The record also reflects that trial counsel retained several mental health professionals, including but not limited to, psychologist Meredith Friedman, Dr. Haig Koshkarian, and Dr. Timmen Cermak, for testing and evaluation.[24] The defense retained clinical psychologist Meredith Friedman, Ph.D., who evaluated Petitioner on three occasions in February, March and April 1992, administered a number of tests, and submitted a report to counsel dated May 1, 1992. (Ex. 12, Lodgment No. 134 at 125.) Dr. Friedman discussed Petitioner's background, her own observations of his behavior and his functioning, including his history of drug and alcohol use and poor educational performance. (Id. at 125-26.) Dr. Friedman stated that Petitioner was "a soft-spoken individual who was extremely cooperative and pleasant" and that "he had difficulty understanding questions which oftentimes had to be repeated," but that he "provided a rather vague, superficial, and poorly organized history" and "[a]t various times he supplied information that differed from what he had told me in a previous meeting." (Id. at 126.) She noted that his "thinking was logical and goal-directed." (Id.)

---

[24] The state record also reflects that several other medical professionals were consulted in preparation for trial. For instance, the state record reflects that trial counsel consulted with Dr. Michael Swenson, a neurologist, who was retained by trial counsel to evaluate Petitioner before trial. (Ex. 33, Lodgment No. 138 at 1179-80.) However, current counsel's declaration indicates only that Dr. Swenson was paid $600, the record does not contain the expert's evaluation or notes, and prior appellate counsel's notes reflect only the following: "Report of Dr. Swenson (6/1/92), Describes [sic] head injuries; says no brain damage." (Id. at 1180.) Thus, this information appears to be of use only to the extent it shows that counsel consulted with another mental health professional in their investigation.

Relatedly, when the prosecution called Dr. Steven Bucky as a rebuttal witness, defense counsel contested the lack of discovery by mentioning other experts they had consulted, as follows: "Your honor, we had a witness, Doctor O'Halloran, who we talked to, we had Richard Fox, people we didn't call but, and did not write reports, but we were ordered by this Court to reduce into written form our own notes and our interviews with these experts, and we had to submit them before they would be - - before we would be considered in compliance with discovery." (RT 6244.) While it appears from a review of the record that Dr. O'Halloran's speciality was forensic science and he was consulted in relation to the victim's autopsy (see CT 1449-54), the Court finds no reference identifying the reason for consulting Richard Fox. Again, given the lack of any written reports or evaluations in the state record, this reference is relevant only to the limited extent it shows that trial counsel consulted with another expert in preparing Petitioner's defense.

Dr. Friedman stated that one intelligence test indicated Petitioner was in the "Low Average range of ability," and that there was a "highly statistically significant" difference between his language acquisition and abstract verbal reasoning, which she indicated "has been associated with bilingual impoverishment, and learning disabilities." (Id.) Dr. Friedman stated that another test also indicated learning difficulties, as well as low scores in reading, spelling, and arithmetic. (Id. at 126-27.) The Weschler intelligence test resulted in an IQ of 83, which Dr. Friedman stated was "Low Average" but again noted the differences between Petitioner's verbal and performance IQ, which "again suggests that he had noteworthy difficulty with the verbal and auditory processing of information." (Id. at 127.) Dr. Friedman performed several tests regarding organicity, found that Petitioner "did significantly poorer" on one test "in a manner expected with neurological involvement," and that results of other testing "were also positive for organicity." (Id. at 127-28.) Under "Impressions," Dr. Friedman noted "Probable Attention Deficit Hyperactivity Disorder by History with accompanying problems with written and oral language," as well as "Alcohol Dependence, Severe by History" and "Polysubstance Dependence, Other than Alcohol, Severe by History." (Id. at 128.) She also noted "Borderline Intellectual Functioning (I.Q. of 71 to 84)." (Id.)

The defense also retained psychiatrist Haig Koshkarian, M.D., who reviewed reports and records including preliminary hearing testimony, a taped interview with Stella Orozco, criminal history records, substance abuse treatment records and prior psychological reports, evaluated Petitioner on March 3, 1992 and submitted a report to counsel dated April 27, 1992. (Ex. 11, Lodgment No. 134.) Dr. Koshkarian referred to a 1986 evaluation, stating that Petitioner reportedly "had an IQ score of 73, putting him in the borderline range of intelligence, and it was noted that this score could be indicative of a learning disability or an organic brain condition due to his long history of inhalant and alcohol abuse." (Id. at 117.) He also noted Petitioner's repeated stints in substance abuse programs, lack of success, and pending charges. (Id. at 117-18.) Dr. Koshkarian conducted a three-hour interview and found Petitioner "[i]nitially wary and

a bit tense, as the interview progressed, he became more relaxed and outgoing." (Id. at 118.) Dr. Koshkarian also noted a "withdrawn quality" to Petitioner and that he "was not very expressive of feelings or emotions." (Id.) During the interview, they discussed Petitioner's criminal history, alcohol and substance abuse, and Petitioner admitted "frequent blackouts from the use of drugs and alcohol." (Id. at 118-20.) Petitioner "had been beaten up and robbed of his own money a number of times but had no memory of it. Other times he would be told by others that he had done something when he was drinking that he had no memory for. Usually, however, when he was told what he had done he could begin to piece it together and have some vague memory of it." (Id. at 120.) Petitioner also admitted that his stepfather beat him but "[h]e said that his stepfather never beat him on the head but only the 'butt.'" (Id. at 121.) Dr. Koshkarian reported that: "Roybal gave no past history of seizures, problems with memory other than when he was intoxicated, or any head injuries leading to brain damage." (Id. at 122.) Yet, Petitioner told Dr. Koshkarian that sometime during his twenties he "was hit with a crowbar during an argument with friends and he thinks that he was briefly unconscious. However, at the hospital they sutured the laceration on his forehead and determined that he had no head injury." (Id.) Petitioner also indicated that "as part of one of his suicide attempts he let a car hit him when he was intoxicated," and "he thinks he was knocked out and was unconscious briefly" but stated that he "was seen at the hospital and told that his head was okay." (Id.) Dr. Koshkarian stated that Petitioner suffered from polysubstance abuse and also diagnosed a "mixed personality disorder, antisocial and schizoid." (Id. at 123.)

The defense did not present evidence of organic brain damage during the guilt phase, but instead advanced a defense of alibi and third-party culpability. Both Frank and Mary Orozco testified that Petitioner was highly inebriated on the night of the murder and passed out at their home.

Dr. Timmen Cermak testified for the defense at the penalty phase proceedings. In preparation for his testimony, Dr. Cermak interviewed Petitioner and Frank Orozco,

listened to audio tapes of an interview with Stella Orozco, read defense investigative interviews with "about ten people involved with Mr. Roybal's life," and reviewed the Friedman and Koshkarian reports, as well as reviewed numerous correctional records, treatment records, and probation and police reports. (RT 6064-65.) Dr. Cermak testified that: "I found that we have a man who has significant impairment in several different realms. He has significant impairment cognitively due to some brain dysfunction," also found "significant impairment in terms of his personality structure," stated that Petitioner had a "schizoid personality structure," and noted that Petitioner was "profoundly chemically dependent." (RT 6066.) Dr. Cermak relied on Dr. Friedman's test results, particularly the wide variances between the two IQ test scores, and testified that based on the test results, "it is very, very likely that what we're dealing with is organic brain damage." (RT 6070.) Dr. Cermak also stated that, based on the test results, "it was almost certainly genetic and they were not the kinds of global dementia nor the kinds of frontal lobe damage that you would see predominantly from alcohol consumption." (RT 6071.) Dr. Cermak discussed the possible causes of the damage, including fetal alcohol effects, and that there was "some history of head trauma that, and physical abuse that he sustained, but there is not enough in the records to be anything more than speculative about that." (RT 6072-76.) Dr. Cermak testified at length about Petitioner's background and history, including the neglect and rejection from his mother, physical abuse, the alcoholism in the family, Petitioner's reactions to being raised in that environment, and genetic connections in alcoholism. (RT 6076-91.) Dr. Cermak also noted that blackouts were "documented in multiple, multiple places" in Petitioner's history, such as in his medical records from treatment and Frank Orozco's testimony; he also later testified that Petitioner told him he used drugs the day before the crime, next recalled exiting the bus in Santa Fe, and did not recall how he obtained the jewelry and made up a story; Dr. Cermak stated that this account was "consistent with the behavior people have after a blackout" but he had no way of knowing if it was the truth. (RT 6101, 6130-33.) Dr. Cermak also stated that he did not find evidence of frontal lobe damage, only organic

damage.  (RT 6105.)  Dr. Cermak also testified extensively about Petitioner's substance abuse, his disagreement with Dr. Koshkarian's diagnosis of antisocial personality disorder, and the significance of differences between Petitioner's upbringing compared to that of his brother Frank.  (RT 6106-25.)

### B.    Information Submitted in Post-Conviction Proceedings

Petitioner first contends that despite the mentions of prior head injuries in Dr. Koshkarian's report, "trial counsel did not obtain his medical records from St. Vincent Medical Center in Santa Fe, New Mexico."  (FAP at 209.)  Petitioner asserts that these records reflect a more extensive history of head injuries, a total of eight head injuries between 1982 and 1987, three which resulted in a documented loss of consciousness, and two resulting in a loss of consciousness resulting from either the head injury or Petitioner's intoxication.  (FAP at 209-10, citing Ex. 14, Lodgment No. 134.)  Petitioner also argues that counsel failed to prepare an adequate social history for Dr. Cermak's review, which should have included the additional background and family information contained in the declarations submitted to the California Supreme Court.[25]  (FAP at 211-15.)

Two experts tested and evaluated Petitioner during post-conviction proceedings. Thomas Wegman, Ph.D., performed a neuropsychological evaluation of Petitioner over three days in October 2006, which included an interview of Petitioner, record review, and numerous tests.  (Ex. 9, Lodgment No. 134 at 61.)  Dr. Wegman noted: "As would be expected based upon Mr. Roybal's generally normal face-to-face presentation and demeanor, his rudimentary cognitive abilities are grossly intact.  His IQ is below average but within broad normal limits; he has adequate basic skills in reading, writing and arithmetic; and he can communicate and interact normally."  (Id. at 76.)  The expert

---

[25] In Claim 7, Petitioner contends trial counsel was ineffective for failing to adequately investigate and present Petitioner's social history at the penalty phase, and relies upon the declarations of Frank Orozco, Ralph Roybal, Theresa Romero, Sylvia Sanchez and Jose Alvarez, in support of that claim.  (FAP at 247-62.)  The specifics of those declarations will be discussed in the adjudication of Claim 7, infra.

stated that "some higher-order, executive abilities are impaired" and Petitioner "has a significantly impaired ability to inhibit automatic responses when under time pressure," which meant "a problem controlling impulses which may lead to inappropriate personal behavior or possibly even violent acting out." (Id.) Dr. Wegman stated that Petitioner's score on the Halstead-Reitan tests, which measure cerebral impairment, "indicates moderately impaired cerebral functioning." (Id. at 76-77.) "That there is impaired functioning seems clear. Even the prosecution expert during the jury trial, Dr. Steven Bucky, testified that Mr. Roybal suffered from a 'mild, subtle brain dysfunction' caused by substance abuse." (Id. at 77.) He also indicated that: "Based on the records I reviewed, there is reason to think that traumatic brain injury may be a factor which adversely affects his neurocognitive functioning." (Id.) Dr. Wegman acknowledged that Petitioner's history of head injuries, alcohol, inhalant and other drug use, and genetic factors were all possible contributing factors to the impaired functioning; he stated that the tests were performed when Petitioner was "in a sober, alert state of mind," and that the results likely "would have been dramatically worse" had been Petitioner been under the influence. (Id. at 77-78.) Dr. Wegman concluded that: "Mr. Roybal has mild cerebral impairment which adversely affects his ability to inhibit automatic responses, particularly when he is under pressure." (Id. at 78.) He explained that: "Individuals with the type of mild brain impairment which affects this form of executive ability become very severely impaired when under the influence of mind-altering drugs such as alcohol. If he is under the influence of alcohol it is most likely that his ability to control his automatic impulses, inhibit panicked or frightened responses, and direct his behavior intelligently would be virtually nonexistent." (Id. at 78-79.)

Jeffrey Victoroff, M.D., a physician board-certified in neurology and psychiatry, reviewed records and prior evaluations, interviewed and evaluated Petitioner in 2007, and originally submitted a declaration in support of the state habeas petition. (Ex. 10, Lodgment No. 134 at 80-89.) After discussing Petitioner's history, Dr. Victoroff addressed how, given the additional test results and information, he would have testified

differently from Dr. Cermak and questioned the assessment of Dr. Swenson, who concluded at the time of trial that Petitioner had "no brain damage." (Id. at 94-96.) Dr. Victoroff stated: "The fact that Mr. Roybal had experienced multiple traumatic brain injuries would have been available to the court at the time of the trial if a competent neurological evaluation had been requested and conducted." (Id. at 96-97.) He also renders opinions on a number of potential and probable causes for Petitioner's functioning, including that: "Mr. Roybal *possibly* suffered brain damage in utero as a result of his mother's reported heavy drinking," that he "*possibly* suffered permanent brain injury and psychological injury due to parental deprivation and abuse," that he "*probably* suffered significant, permanent organic brain damage prior to 1989 as a result of inhalant abuse," that he "*possibly* has cortical irritability and a reduced threshold for epileptic seizures due to the combination of neurotoxicity and traumatic brain injury," that he "*definitely* also developed extremely early onset alcohol dependence and alcohol abuse," that he "*definitely* suffered from multiple close head injuries, and it is virtually certain that several of these constituted traumatic brain injuries," and that he "*probably* developed the syndrome of alcoholic blackouts early in life and has experienced blackouts obliterating any memory of some events during some episodes of intoxication ever since." (Id. at 97-100) (emphasis in original.) Dr. Victoroff concludes that: "In my opinion, as a result of a combination of inhalant neurotoxicity, alcohol abuse, and traumatic brain injuries, Mr. Roybal has now and had in 1989 an abnormal brain and multifaceted organic brain disorder." (Id. at 101.) He also opines that: "Due to the permanent, irreversible organic brain dysfunction in the frontal lobes that he had in 1989, he had a substantially reduced cerebral ability to formulate a coherent plan of action, to anticipate the consequences of his actions, or to restrain primitive behaviors." (Id. at 101-02.) Dr. Victoroff opines that "given the very strong and convergent evidence that he had an abnormal brain and multifaceted organic brain disorder and was grossly intoxicated on the night of the instant offense, his actions that night were committed under the influence of an extreme mental disturbance and his mental diseases combined with the affects [sic] of his intoxication were almost certain to have rendered him unable

to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Id. at 102.)

Timmen Cermak, M.D., a physician board-certified in psychiatry and neurology who testified for the defense during the penalty phase, also submitted a declaration during the state habeas proceedings. (Ex. 60, Lodgment No. 142 at 1-17.) He states that at the time of trial, "[t]he strategy had been determined by trial counsel that my testimony was to build, as much as possible, upon the reports of Dr. Koshkarian and Dr. Friedman[26] and my own findings in order to assist the jury in understanding how influences beyond Mr. Roybal's control, such as maltreatment during his childhood, had contributed to his personality development." (Id. at 3.) Dr. Cermak evaluated Petitioner on May 8, 1992, and submitted a report on July 1, 1992, after the guilt phase had begun, and states that "[a]s a result of the very restricted time frame, I had no opportunity to provide input regarding the quality or completeness of testing results provided me by the reports of Drs. Koshkarian and Friedman. I also had no opportunity to provide input regarding the full range of possibilities how my findings might be used (i.e., guilt vs. penalty phase)." (Id.)

Dr. Cermak reviewed his prior trial testimony, the testimony of prosecution rebuttal witness Dr. Bucky, the reports of Drs. Wegman, Victoroff, Friedman and

---

[26] In his declaration, Dr. Cermak also indicates that at the time of Petitioner's trial in 1992, "it was my belief that Meredith Friedman was a neuropsychologist," and that while he noted contradictory findings between the evidence in her report and her conclusions, "I did not question this seeming contradiction between the test results and her negative finding because when I reviewed documents and testified in Mr. Roybal's case in 1992, it was my belief that Meredith Friedman was a neuropsychologist." (Id. at 6-7.) Dr. Cermak states that the opinion of a neuropsychologist would be more informed than his own opinion, as a psychiatrist, and "What I did not know at the time was that Dr. Friedman was a clinical psychologist and not trained as a neuropsychologist." (Id. at 7.) However, Dr. Cermak's assertions in this regard do not appear to be clearly supported by the record. First, Dr. Cermak testified at trial that Dr. Friedman was a psychologist. (RT 6065, 6067.) Dr. Cermak also testified that he reviewed Dr. Friedman's 1992 report and relied on her test results. (See RT 6065, Ex. 60, Lodgment No. 142 at 4.) The letterhead on Dr. Friedman's 1992 report clearly reads "Meredith Friedman, Ph.D. Forensic and Clinical Psychology." (Ex. 12, Lodgment No. 134 at 125; see also Ex. 65, Lodgment No. 142 at 124.)

Koshkarian, and a social history compiled by Dr. Katherine DiFrancesca[27] "to determine what impact, if any, they would have on my opinions and prior testimony concerning Mr. Roybal." (Id. at 4.) Dr. Cermak stated that Dr. Friedman's report "did not provide a complete or coherent picture" of Petitioner's brain function and Dr. Koshkarian's evaluation similarly provided an "inaccurate" picture. (Id. at 5.) Dr. Cermak stated that while Dr. Friedman found evidence of organicity, her report contained contradictions and used certain terms, which "mis-guided the defense and me towards efforts to explain Mr. Roybal's personality primarily on the basis of his chemical dependence and past experiences." (Id. at 9.)

Dr. Cermak stated that Dr. Wegman's evaluation was more thorough and in-depth than that of Dr. Friedman, and contained "more evidence of specific brain damage," such as Petitioner's frontal lobe dysfunction and performance under pressure. (Id. at 11.) He stated that the results obtained by Dr. Wegman were from tests available at the time of Petitioner's 1992 trial, and "these tests would have radically changed the focus of my opinion and testimony in 1992 from personality issues to evidence of organicity and impact on behavior." (Id. at 12.) Dr. Cermak opined that "[t]he evidence of organicity would have supported a clear and non-speculative diagnosis that would have withstood the rebuttal testimony of Dr. Stephen Bucky, Ph.D., that Mr. Roybal suffered from Anti-Social Personality Disorder rather than an involuntary impairment of his higher executive functions as a result of organic brain damage." (Id. at 17.)

### C.     Claim 5- Guilt Phase

Petitioner argues that trial counsel failed to adequately investigate and present evidence of organic brain damage during the guilt phase and asserts that "[r]easonably competent counsel would have known that evidence that Mr. Roybal was unable to appreciate the criminality of his conduct or conform his conduct to the requirements of the law would have been a basis for the defense of diminished actuality and whether he

---

[27] The social history and accompanying declaration of Dr. DiFrancesca are discussed in greater detail in the adjudication of Claim 7, infra.

would have had the ability to form the specific intent necessary to commit the underlying crimes of burglary and robbery necessary for felony murder under California law." (FAP at 221) (citations omitted.)  Under clearly established federal law, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.

Defense counsel Campbell, who was primarily responsible for the guilt phase proceedings, states that: "Based upon my review of the subsequently prepared reports of Dr. Thomas Wegman, Ph.D., and the declaration of Dr. Jeffrey Victoroff, M.D., that have been filed with Mr. Roybal's habeas corpus petition, I now believe there was an inadequate investigation of organic brain injury during both the guilt and penalty phases." (Ex. 66, Lodgment No. 143 at 3-4.) He also declares that: "I recall no strategic or tactical reason not to investigate organic brain damage or to present such evidence in either the guilt or penalty[28] phases." (Id. at 4.)  Trial counsel Cannon, who primarily handled the penalty phase proceedings, offers a similar statement. (Ex. 67, Lodgment No. 143 at 12-13.)

Despite counsels' indication that they did not recall a tactical or strategic reason for failing to adequately investigate organic brain damage, the record clearly reflects that counsel conducted an extensive investigation of Petitioner's brain functioning, including specifically investigating the existence of organic brain damage.  The Public Defender was appointed in June 1991.  (See PT-1, PT-2, Lodgment Nos. 47, 48.)  During preparation for trial, counsel retained and consulted a number of mental health and medical experts in early 1992, including but not limited to Dr. Friedman, Dr. Koshkarian and Dr. Cermak.  Dr. Koshkarian's report is dated April 27, 1992 and Dr. Friedman issued a report dated May 1, 1992, which noted organicity and brain damage, over six weeks before the start of the guilt phase.  While Dr. Cermak indicates that he was not

---

[28] As discussed in more detail with respect to Claim 6, infra, the penalty phase assertion is contradicted by the record, as the record clearly reflects that the defense presented evidence of organic brain damage at the penalty phase proceedings, through the testimony of Dr. Cermak.

retained in time to provide input as to potential guilt phase defenses, his own declaration reflects that trial counsel had already decided to introduce the expert evidence at the penalty phase, not at the guilt phase.  Dr. Cermak acknowledges that "[t]he strategy had been determined by trial counsel that my testimony was to build, as much as possible, upon the reports of Dr. Koshkarian and Dr. Friedman and my own findings in order to assist the jury in understanding how influences beyond Mr. Roybal's control, such as maltreatment during his childhood, had contributed to his personality development." (Ex. 60, Lodgment No. 142 at 3.)  Thus, at the time of Dr. Cermak's evaluation, counsel had already retained two mental health experts to interview, test and evaluate Petitioner between February and April 1992, and had obtained the results of that testing, as well as reports from both individuals.  Petitioner fails to allege that either Dr. Friedman or Dr. Koshkarian recommended additional testing, and there is no indication that counsel failed to follow up on any avenue of investigation in this regard.

Dr. Bucky, who testified at the penalty phase proceedings in rebuttal, acknowledged that the tests Dr. Friedman performed were "to measure organic brain dysfunction." (RT 6269.)  He stated that the given tests did not measure "psychological functioning," and different tests, which were not given, would be used to test for antisocial personality disorder.  (RT 6270.)  Dr. Bucky stated that when an expert was retained, they were normally given a "referral question," and that based on Dr. Friedman's report: "It appears that the question was: evaluate the organic brain functioning of this individual."  (RT 6271-72.)  Dr. Bucky acknowledged that Dr. Friedman concluded Petitioner "has organic brain damage." (Id.)  Thus, despite the statement that trial counsel "recall[s] no strategic or tactical reason not to investigate organic brain damage or present such evidence in either the guilt or penalty phases," (see Ex. 66, Lodgment No. 142 at 4), the record reflects that counsel investigated this avenue.

Petitioner also asserts that trial counsel was ineffective for failing to provide Dr. Cermak and the other experts with adequate background information, particularly

1   concerning Petitioner's history of head trauma.[29]   (FAP at 208.)   Trial counsel Campbell

2   states: "I am also aware that Dr. Cermak states in his declaration that, like Drs. Friedman

3   and Koshkarian, he was not given Mr. Roybal's complete medical records prior to trial

4   and that those records, if reviewed, would have documented a history of head trauma far

5   more frequent than the two incidents noted in Dr. Koshkarian's report.   [¶]   I wish we

6   had conducted a more complete investigation into the history of organic brain injury.

7   The failure to do this more complete investigation was, as I recall, neither a strategic nor

8   tactical decision."   (Lodgment No. 143 at 5-6, Ex. 66.)

9        With respect to the guilt phase, the Ninth Circuit has declined to require counsel

10   to affirmatively provide adequate records to an expert.   See Hendricks v. Calderon, 70

11   F.3d 1032, 1038-39 (9th Cir. 1995) ("To now impose a duty on attorneys to acquire

12   sufficient background materials on which an expert can base reliable psychiatric

13   conclusions, independent of any request for information from an expert, would defeat

14   the whole aim of having experts participate in the investigation. . . . To require an

15   attorney, without interdisciplinary guidance, to provide a psychiatric expert with all

16   information necessary to reach a mental health diagnosis demands that an attorney

17   already be possessed of the skill and knowledge of the expert.")   The record reflects that

18   both defense counsel and the experts were aware of some history of head trauma, which

19   had been noted in Dr. Koshkarian's report.   There is no indication in the record that Dr.

20   Cermak requested additional records that counsel failed to provide; the record also

21   reflects that Dr. Cermak was provided with substantial background information,

22   including Petitioner's treatment records from Seadrunar and Rio Grande ATC,

23   correctional records, records from the Las Vegas Medical Center, and interviews with

24

25        [29] Based on a review of the FAP and record, it is unclear to what extent trial
     counsel obtained Petitioner's medical records before trial.   In the FAP, Petitioner
26   contends that "trial counsel did not obtain or review his medical records from St. Vincent
     Medical Center in Santa Fe, New Mexico." (FAP at 209.)   However, trial counsels'
27   declaration indicates that the "prosecution" and "defense" had Petitioner's medical
     records. In any event, this apparent contradiction does not impact Petitioner's contention
28   that counsel failed to provide Dr. Cermak and the other experts with adequate
     background information.

family members and other individuals.  Petitioner fails to demonstrate that counsel acted deficiently in this respect.

In addition to the asserted failures in investigation, Petitioner asserts that counsel was ineffective in failing to present a mental health defense at the guilt phase, and argues that the defense of alibi and third party culpability that was presented was not strategic because counsel had not adequately investigated Petitioner's brain injury.  (FAP at 222.)  Petitioner contends: "Evidence that would have shown Mr. Roybal lacked the capacity while intoxicated, as a result of a mental disease or defect, to appreciate the criminality of his conduct or conform his conduct with the requirements [sic] the law, would have been highly probative to show he did not have the specific intent to permanently deprive necessary to prove either burglary or robbery."  (Id. at 221-22.)  He also alleges that "reasonably competent counsel would also have known that evidence of organic brain injury during the guilt phase would have been highly probative on an element necessary to prove the special circumstance necessary for Mr. Roybal to be eligible for either a death sentence or a sentence of life without parole."  (Id. at 222.)

Under current California law, which was in existence at the time of the crimes at issue in this case as well as at the time of Petitioner's trial:

> Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

Cal. Penal Code § 28(a).  As such, while a diminished capacity[30] defense was not available, California law allowed for the introduction of evidence of diminished actuality.

---

[30] Diminished capacity was abolished by the California legislature in 1981, and in 1982 by the passage of Proposition 8.  See People v. Spurlin, 156 Cal. App. 3d 119, 127-28 (1984).  Both events occurred well before the June 1989 murder of Yvonne Weden.

While trial counsel now state that they did not "recall" a strategic reason not to present organic brain damage at the guilt phase proceedings, it is clear from Dr. Cermak's declaration that counsel retained his services for the penalty phase, as he was instructed to focus on Petitioner's personality issues. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. The record reflects that counsel investigated Petitioner's organic brain damage prior to the guilt phase. In light of this investigation, Petitioner fails to show that the decision to present that evidence at the penalty phase, and proceed with a different guilt phase defense, was not tactical at the time it was made. Counsel retained two experts, one who noted organicity as well as substance abuse and borderline intellectual functioning, and the other who, in addition to the substance abuse, diagnosed Petitioner as having a mixed personality disorder, including antisocial and schizoid. Neither expert offered an opinion, or any indication, that Petitioner was unable to form the intent to commit the crimes at issue, and counsel cannot be faulted for failing to present a defense that was not supported, or even indicated, by the experts' results. See Earp v. Cullen, 623 F.3d 1065, 1077 (9th Cir. 2010) ("An expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and [petitioner] has no constitutional guarantee of effective assistance of experts.")

Dr. Victoroff states that Petitioner's "actions that night were committed under the influence of extreme mental disturbance and his mental diseases combined with the affects [sic] of his intoxication were almost certain to have rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Lodgment No. 134 at 102, Ex. 10.) To the extent this opinion, had it been rendered at the time of trial, addresses whether Petitioner actually formed the required intent to commit the charged crimes rather than his capacity to commit the crime, state

law sharply limits expert testimony on this subject.  <u>See</u> Cal. Penal Code §§ 28(a), 29[31]; <u>see also</u> <u>People v. Coddington</u>, 23 Cal. 4th 529, 582 (2000) (California law allows the "introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do[es] not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." ), <u>overruled on other grounds by</u> <u>Price v. Superior Court</u>, 25 Cal. 4th 1046 (2001).  Trial counsel was undoubtedly aware of these limitations, as on June 22, 1991, the prosecutor filed a motion in limine to limit any psychiatric testimony by the defense on the subject of Petitioner's capacity, and the matter was later discussed during a motions hearing. (CT 1747-64; RT 5240-43.)  In any case, despite counsels' efforts in obtaining relevant background materials and retaining mental health experts to evaluate Petitioner before trial, neither expert indicated that Petitioner was unable to form the intent to commit the charged crimes.

More importantly, had counsel decided to present a mental health defense at the guilt phase, it clearly would have conflicted with the defense of alibi and third-party culpability.[32]  At the guilt phase, the defense contended that Petitioner was drunk and had passed out at his brother's home at the time of the crimes, and that while he was later found in possession of the victim's jewelry, there was no direct evidence that he was

---

[31] This statute reads as follows:

> In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged.  The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.

Cal. Penal Code § 29.

[32] The detailed declarations from trial counsel do not address how or when counsel arrived at their decision on what guilt phase defense to present, nor do the declarations offer any indication as to how a mental state defense should have been presented either in conjunction with, or in the place of, the defense asserted at trial.

involved in the murder.  Dr. Koshkarian's report reflects that Petitioner "denied the charges against him and said that he had found the jewelry in a sock on the street when he was riding his bicycle that day."  (Ex. 11, Lodgment No. 134 at 119.)   Both Petitioner's brother and sister-in-law testified that Petitioner was falling-down drunk that evening, his mother testified that she told police Petitioner was drunk when he called her that evening, and his brother stated that Petitioner was passed out in bed when he checked on him later that evening.

It is "within the broad range of professionally competent assistance for [defense counsel] to choose not to present psychiatric evidence which would have contradicted the primary defense theory." Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998); see also Williams v. Woodford, 384 F.3d 567, 611-12 (9th Cir. 2004) ("Having reasonably selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental-state defense."), citing Bean v. Calderon, 163 F.3d 1073, 1081-82 (9th Cir. 1998) (same).  Given the evidence and expert opinion available to counsel at the time of trial, Petitioner fails to demonstrate that counsel's performance at the guilt phase was deficient.

Even if Petitioner was able to demonstrate that counsel erred in not presenting a mental health defense at the guilt phase, the claim also fails for lack of prejudice.[33]  See Strickland, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.")  As noted above, even if an opinion such as Dr.Victoroff's was

---

[33] In the written pleadings on Claim 5, Petitioner contests Respondent's assertion that there is no prejudice due to the state law limitations on the introduction of mental state evidence at the guilt phase by arguing in part that: "It bears repeating that this was not a jury that easily reached the penalty determination.  It took days, and only after the substitution of a juror and after the erroneous supplemental instruction, did the jury return the recommendation of death."  (Traverse at 66.)  However, Claim 5 is a guilt phase claim, and references to the jury's penalty phase deliberations are of no utility to the Court's analysis of guilt phase prejudice.  The Court will consider this argument with respect to Petitioner's claims asserting ineffective assistance of counsel at the penalty phase.

available at the time of trial, California law precludes an expert from testifying that a defendant did not in fact form the intent to commit the crime, as that is a question to be determined by the jury. See Cal. Penal Code § 29. Had the defense presented mental state evidence in the guilt phase, there are numerous documents in the record that would have hindered efforts to demonstrate a lack of intent. For instance, Dr. Koshkarian diagnosed Petitioner as having a mixed personality disorder, antisocial and schizoid. (Ex. 11, Lodgment No. 134 at 123.)   Dr. Koshkarian discussed Petitioner's history, including his criminal activity and drug use, and that Petitioner's mother stated: "When he was sober he was a good person who was a responsible hard worker who helped around the house, but when he was intoxicated she was frightened of him because he sometimes would become angry and threatening with her." (Id. at 117.) Similarly, a 1976 Las Vegas Medical Center admission form, which Petitioner acknowledges was obtained during the pre-trial investigation, indicated that "[t]he patient further states that he becomes violent when intoxicated and this seems to constantly get him into trouble." (Ex. 24, Lodgment No. 136 at 537.) At the penalty phase, Petitioner introduced mental state evidence, and both defense expert Dr. Cermak and prosecution expert Dr. Bucky were examined at length about Dr. Koshkarian's report and whether or not Petitioner fit the criteria for a diagnosis of antisocial personality disorder. Had counsel advanced a mental state defense at the guilt phase, it clearly would have been harmful and at cross-purposes with the asserted alibi defense.  Given the potential for harmful cross-examination and rebuttal testimony, the evidence about Petitioner's violence when drinking, the state-law proscribed limitations on expert testimony regarding whether a defendant formed the requisite intent, and the weakness of the proposed defense in comparison to the defense advanced at trial, Petitioner fails to show any "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Petitioner is not entitled to habeas relief on Claim 5.

### D.    Claim 6

Petitioner contends that trial counsel failed to adequately investigate and present

99cv2152

evidence of organic brain damage in mitigation at the penalty phase.  (FAP at 224-47.)
In particular, Petitioner asserts that counsel failed to obtain complete medical records,
failed to compile sufficient social history information, and failed to obtain adequate
testing, which would have provided evidence with respect to two statutory mitigating
factors, Cal. Penal Code § 190.3(d) and (h).  (Id. at 241.)

A defense attorney's duty to investigate mental health issues differs between the
guilt and penalty phases.  See Hendricks, 70 F.3d at 1043 ("Evidence of mental problems
may be offered to show mitigating factors in the penalty phase, even though it is
insufficient to establish a legal defense to conviction in the guilt phase."); see also
Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999) ("Although the lawyer's failure
to develop and relay medical evidence did not constitute ineffective assistance at the
guilt phase, we concluded that sentencing- where mitigation evidence may very well be
the key to avoiding the death penalty- is different."), citing Caro v. Calderon, 165 F.3d
1223, 1227 (9th Cir. 1999).

Petitioner does not contend that trial counsel completely failed to present any
mental health evidence in mitigation, but that counsel failed to perform adequately in
several respects.  Petitioner asserts that counsel failed to provide the experts, Dr. Cermak
in particular, with Petitioner's complete medical records and social history.  Petitioner
spends significant time detailing numerous head injuries he suffered between 1982 and
1987 documented in the St. Vincent medical records which were not provided to the
experts or noted at trial.  But it is apparent that the examining experts were aware that
Petitioner had suffered prior head injuries, as Dr. Koshkarian noted several prior head
injuries in his report and evaluation, Frank Orozco noted and testified about Petitioner's
fall out of his crib as a baby, and Dr. Cermak reviewed and relied upon both Dr.
Koshkarian's report and Frank Orozco's statements.  With respect to the social history
information, the record reflects that Dr. Cermak reviewed a significant amount of
background materials, including substance abuse treatment records which detailed
Petitioner's lengthy history of alcohol and drug abuse, correctional records which

included a prior psychological assessment, probation and police reports, viewed and conducted family member interviews, and reviewed defense investigator interviews from numerous individuals connected to Petitioner. (RT 6064-65, see also Ex. 60, Lodgment No. 142 at 3.)

Trial counsel Kathleen Cannon, who was primarily responsible for the penalty phase proceedings, notes that Dr. Friedman and Dr. Koshkarian's reports do not "refer to any neuro-psychological information concerning Mr. Roybal," and declares that:

> Based upon my review of the subsequently prepared reports of Dr. Thomas Wegman, Ph.D., and the declaration of Dr. Jeffrey Victoroff, M.D., that have been filed with Mr. Roybal's habeas corpus petition, I now believe there may have been a need to do more investigation of organic brain injury during both the guilt and penalty phases. The discovery provided by the prosecution and collected by the defense prior to trial revealed that Mr. Roybal had suffered neurological damage as a result of repeated head trauma and substance abuse from his early childhood. I do not recall any strategic or tactical reason to not present evidence similar to that presented in the habeas petition.

(Ex. 67, Lodgment No. 143 at 12-13.)

Despite counsel's apparent concession, the record reflects that defense counsel did investigate and present evidence of organic brain damage at the penalty phase. It is also clear that while counsel may not have provided the experts with complete medical or social history records, the testifying expert was provided with a significant amount of background information, counsel retained a psychologist who performed a battery of tests designed to determine if Petitioner had organic brain damage, and the expert was aware that Petitioner had a history of head injuries, substance abuse, an alcoholic mother, and childhood abuse and neglect.

Dr. Cermak's declaration[34] primarily addresses how the additional testing and evaluation performed by Drs. Wegman and Victoroff would have changed or strengthened his trial testimony. Dr. Cermak found Dr. Wegman's testing to be "more

---

[34] As an ancillary matter, Dr. Cermak acknowledges that there were inaccuracies in his trial testimony. For instance, when he was asked about evidence of frontal lobe damage at trial, he testified that "testing showed no evidence" of such damage. (Ex. 60, Lodgment No. 142 at 15, citing RT 6015.) Dr. Cermak admits that "Dr. Friedman's report contained evidence of frontal lobe dysfunction," and he should have instead specified that "testers did not conclude that frontal lobe damage existed." (Id.)

thorough in quality, depth, and detail" than Dr. Friedman's evaluation.  (<u>Id.</u> at 9.)  While Dr. Friedman "documented strong evidence for organic brain damage," Dr. Cermak states that she "also reported some specific negative findings" which impacted his trial testimony.  (<u>Id.</u> at 6.)  Although Dr. Cermak testified at trial that it was "very, very likely that what we're dealing with is organic brain damage," he states that given the information in Dr. Wegman's and Dr. Victoroff's reports, he would not have equivocated, but would have "declared without hesitation that Rudolph Roybal suffers from significant organic brain damage." (<u>Id.</u> at 15, citing RT 6070.)  With this new information, Dr Cermak also would have "answered more definitively that strong evidence of frontal lobe damage exists."  (<u>Id.</u>)

Dr. Cermak asserts that the post-conviction testing and evaluations "would have made a fundamental difference" in his trial testimony, as "[r]ather than focusing on personality issues" he "would have focused on evidence that he lacked the capacity to exercise normal levels of judgment, especially when under stress and most predictably when under the influence of alcohol."  He asserts that "[t]he evidence of organicity would have supported a clear and non-speculative diagnosis that would have withstood the rebuttal testimony of Dr. Stephen Bucky, Ph.D., that Mr. Roybal suffered from Anti-Social Personality Disorder rather than an involuntary impairment of his higher executive functions as a result of organic brain damage."  (<u>Id.</u> at 16-17.)

"[T]he relevant inquiry under <u>Strickland</u> is not what defense counsel could have pursued, but whether the choices made by defense counsel were reasonable." <u>Siripongs v. Calderon</u>, 133 F.3d 732, 736 (9th Cir. 1998), citing <u>Strickland</u>, 466 U.S. at 690.  As previously discussed, Dr. Cermak states that "[t]he strategy had been determined by trial counsel that my testimony was to build, as much as possible, upon the reports of Dr. Koshkarian and Dr. Friedman and my own findings in order to assist the jury in understanding how influences beyond Mr. Roybal's control, such as maltreatment during childhood, had contributed to his personality development.  My focus, pursuant to counsel's strategy, was solely on personality issues." (Ex. 60, Lodgment No. 142 at 2-3.)

Yet Dr. Cermak's trial testimony did not exclusively address personality issues, as he discussed Petitioner's brain impairment at length and stated that Petitioner had "significant impairment in several different realms.  He has significant impairment cognitively due to some brain dysfunction." (RT 6066.)  "Most of the basis of this finding is the report generated by Meredith Friedman, the psychologist who tested him, and in my interview with Mr. Roybal, everything was consistent with that." (RT 6067.)  Dr. Cermak also testified that the results of testing "demonstrated that it is very, very likely that what we're dealing with is organic brain damage," and that the damage "was almost certainly genetic." (RT 6067-71.)  Rebuttal witness Dr. Bucky also addressed the matter of brain damage.  While Dr. Bucky contended that the test results "indicate no observable organic brain damage," he also clarified that he was not saying Dr. Friedman was wrong in finding organic brain damage, but that "if there is brain dysfunction, it is very subtle." (RT 6276.)  Dr. Bucky also acknowledged that Dr. Friedman concluded Petitioner "has organic brain damage." (RT 6271-72.)

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. 689.  This is not a situation where counsel failed to conduct any investigation into mental health mitigation, as counsel retained three mental health experts to interview and evaluate Petitioner, compiled numerous records from Petitioner's time in substance abuse treatment, as well as correctional records including a psychological evaluation, interviewed family members, friends, and acquaintances, and supplied these materials to their testifying expert.  Petitioner asserts that counsel was deficient in failing to gather evidence of additional head injuries and failing to retain an expert to conduct additional testing that would have solidified and strengthened the evidence of organic brain damage.  But the record shows that counsel furnished the retained experts with information about Petitioner's history, including that he had suffered head injuries, such as the incident where he was hit by a car, hit with a crowbar, and fell out of his crib as a baby, each necessitating a trip to the hospital.  Dr. Friedman conducted an extensive battery of tests over three days and found organic brain damage,

which counsel presented through the penalty phase testimony of Dr. Cermak.  Although Petitioner now asserts that had additional records been obtained, and had additional tests been performed, the expert testimony would have been stronger and would have withstood cross-examination and rebuttal testimony, that is not the standard.  See Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.")  In fact, the post-conviction experts concur with the results of trial counsels' investigation, as Drs. Wegman and Victoroff conclude that Petitioner suffers from organic brain damage, just as Dr. Cermak testified to at trial.

Indeed, the trial judge recognized at sentencing that with respect to Cal. Penal Code section 190.3(d), "[w]e do have testimony by several experts concerning the defendant having suffered or not suffered or to the extent to which he had suffered from alleged mental deficit, disease or organic brain syndrome" as well as fetal alcohol syndrome.  (RT 6748.)  The judge also found there was "lots of evidence on this [Cal. Penal Code section 190.3] (h) factor," and discussed Petitioner's intoxication as well as again noting the various diagnoses of the testifying experts.  (RT 6755-56.)  Given Dr. Cermak's expert testimony that Petitioner had significant impairment and "very, very" likely brain damage, as well as Dr. Bucky's concession that Dr. Friedman had found organic brain damage, defense counsel clearly presented the jury with evidence and expert testimony about organic brain damage.  Counsels' performance was not deficient.

In the alternative, the claim also fails because Petitioner is unable to demonstrate that he suffered actual prejudice from this or any other alleged instance of deficient performance, as discussed below in section C.5.  See Strickland, 466 U.S. at 697; Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence.").  As such, Claim 6 fails even under a de novo review.  Petitioner is not entitled to habeas relief on Claim 6.

### 3.     Claim 7

Petitioner alleges that trial counsel failed to adequately investigate and present evidence of his social history at the penalty phase of trial, and that additional evidence could have shown the impact alcoholism had on Petitioner's family, as well as shown the impoverished, drug-filled, violent and abusive environment in which he was raised. (Id. at 247-55.)

Petitioner raised this contention as part of Claim 1 in the state habeas petition. (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

### A.     Petitioner's Penalty Phase Presentation

In addition to Dr. Cermak's testimony about the impact of Petitioner's upbringing in an alcoholic, abusive, neglectful family, Petitioner's own substance abuse, learning disabilities, and likely organic damage, the defense also presented testimony from a number of other family members, past employers, counselors, and other individuals.  As discussed in more detail with respect to Claim 8, infra, the defense presented testimony from Lucy Madrid and Nan Busby, who had counseled Petitioner at various points during his treatment for substance abuse.  (RT 5700-5848.)  The defense also presented testimony from Anthony Roybal and Phillip Sanchez, two of Petitioner's prior employers, who each testified that Petitioner was a dependable and good worker.  (RT 5632-40, 5654-60.)  Judge James Blackmer, a former prosecutor, testified that Petitioner pled guilty to several cases and was sent to Seadrunar on a suspended sentence, for treatment, stating that Seadrunar was "one of the very top programs," and that, "It's often tougher than going into prison."  (RT 5968-76.)  The defense also presented evidence from several of Petitioner's family members, who detailed Petitioner's upbringing, the environment of alcoholism, abuse, and neglect in which he was raised, and Petitioner's own drug and alcohol use and abuse.

Petitioner's mother, Stella Orozco, testified that her own father was an alcoholic who did not work, that she was the oldest of seven children, and that she did not go to

school, but, instead, worked to help her mother support the family. (RT 5543-44.) Stella did not know how to read nor write, married at twenty, and lived in a small house with outdoor plumbing. (RT 5544-48.) Stella and her husband adopted Frank; Stella later became pregnant with Petitioner by another man, which led to her divorce. (RT 5548-52.) She at one point offered to give Petitioner away in order to keep her husband. (RT 5553.) Stella had a son, Ralphie, by a man named Bob Barry, who she later learned was married. (RT 5554-55.) Stella later met Dewey Brazfield and gave birth to Theresa. (RT 5559-60.) Stella stated that Dewey "used to drink a lot and beat me a lot," would beat her every weekend, and would beat the children as well, including Petitioner. (RT 5560-61.) After Dewey cut her arm and threatened to cut her stomach while she was eight months pregnant, Stella gave birth prematurely and lost the baby. (RT 5561-62.) Stella stated that Petitioner did not do well in school, but Stella couldn't help him, as she did not know how. (RT 5563.) She was aware that Petitioner stopped going to school, but stated that: "To tell you the truth, I didn't care whether he went or not, because I didn't know anything myself." (RT 5564.) Petitioner was good at drawing, but Stella never encouraged him or praised him. (RT 5564-65.) Stella had a nickname for Petitioner, "Mojo," which was a reference to Petitioner's father "because he was a wetback." (RT 5565.) When Petitioner was still in school, Stella took Theresa out of state for several months and left Petitioner and Ralphie, both children at the time, alone at the home with her sister living down the street to care for them; she returned every month to check on them and left them plenty of food, and she thought that was when Petitioner began to drink heavily. (RT 5565-66, 5604.) Petitioner once asked Stella about his father, and she discouraged him from looking, stating that: "There is no use in you looking for him because he's probably married over there. All of those wetbacks are married over there." (RT 5567.) Stella was aware that Petitioner sniffed paint, even while young; Dewey got angry at him for that and beat him. (RT 5568.) Stella discussed Petitioner's time in treatment and contacts with the police, and stated that: "He spent more time in the programs and in jail than he has ever spent with me." (RT 5572, 5607-

10.)  Petitioner asked Stella to go with him to the programs or meetings and she declined, telling him that he was the alcoholic, not her.  (RT 5572.)  Stella stated that Petitioner was born in 1956, while the prosecutor noted that numerous court documents indicated 1955.  (RT 5586.)  Stella tried to bring Petitioner up right, taught him the difference between right and wrong, and punished him when he stole or was bad.  (RT 5590-91, 5594, 5607.)  Dewey "used to get mad and hit" Petitioner, but Stella did not let Dewey use knives on him; she protected and loved her children.  (RT 5597-98.)  Stella admitted that she drank while pregnant with both Petitioner and Theresa, and that she used to drink all weekend.  (RT 5601.)  Theresa had not been through drug and alcohol programs.  (RT 5602.)

Eddie Montoya, who grew up in Santa Fe and was married to one of Petitioner's cousins, had known Petitioner 27 years and often socialized with the family.  (RT 5621-23.)  Montoya stated that Theresa was treated better than the boys in the family and that Stella showed her daughter more affection.  (RT 5626.)  Petitioner came to live with Montoya's family for a time to try to find a job in their area.  (RT 5626.)  Montoya acknowledged that a prior investigative report stated that Petitioner lived with them after Stella kicked him out, but his recollection was that Petitioner wanted to find a job.  (RT 5628-29.)  When he socialized with Stella, they drank together.  (RT 5630.)  Montoya never gave the children drugs or alcohol and never saw Stella hit the children in his presence; he acknowledged he did not know much about how the children had been raised.  (RT 5631.)

Frank Orozco, Petitioner's step-brother, took the stand again during the penalty phase to discuss their childhood and upbringing.  After his father left, the family was very poor and his mother drank while pregnant with Petitioner.  (RT 5849-50.)  Petitioner was a generally healthy child, but Frank recalled that Petitioner fell out of his crib at about 18 months of age, breaking his front teeth and bleeding from the mouth.  (RT 5850-51.)  Frank picked him up after unsuccessfully asking their mother to do so, and went to get his aunt for help, as she was the only one with a car and a phone.  (RT

5851.) Petitioner's aunt took him to the hospital, as Stella refused to go; Petitioner was in the hospital for about a week, had a head injury and lost his teeth, but recovered well. (RT 5852-53.) During this time, Stella "basically was a prostitute," and brought numerous men home, sometimes leaving them alone while she went out, until she became pregnant again, with Ralphie. (RT 5853-54.) Frank stated that Dewey was okay when he was not drinking, but "he'd beat us for any reason" when he was drinking. (RT 5855-56.) Dewey was sober during the week when he worked, but was drunk on weekends. (RT 5856.) Dewey treated Petitioner "like an outsider, like he wasn't part of the family. He never was," stating that when the family went camping, Petitioner would stay home. (RT 5857.) Petitioner was not good in school, was slow and hated it; Frank unsuccessfully tried to help Petitioner with his schoolwork. (RT 5858.) Frank went to live with their grandmother after he could no longer stand his mother's drinking and bringing men home. (RT 5859-60.) Dewey would beat up Petitioner "every weekend" and would use his belt to do so. (RT 5860-61.) Frank described an incident where a social worker came to the home and Dewey hid because it was against the rules to have him living there; Petitioner, who was around 4 years old, thought it was a game of peek-a-boo; Dewey slammed him to the floor from his hiding place and later beat him up after the social worker left. (RT 5861-62.) Frank also saw Dewey beat up Stella, and defended her when he was about 16, then took Stella to the hospital and returned to his grandmother's home. (RT 5862-64.) Petitioner was called stupid, a "wetback" or "mojado" because his father was one, and was unfavorably compared to Frank. (RT 5866.) When they were young, the family was very poor and would scavenge from the dump for things such as food, copper wire, and books. (RT 5868-69.) Frank never saw his mother put her arms around Petitioner; his view of her parenting was to provide food and shelter. (RT 5871-73.) Frank attributed the differences in his own life to his grandmother's influence. (RT 5873-74.) Frank stated that when Dewey was not drinking, he was a "good" or "great" guy. (RT 6010.) Their relatives were unavailable to help his family "[b]ecause they were all alcoholics and they were all as deprived of the

worldly goods as we were, if not as bad," although Frank stated that his family was "[a] hundred times poorer" than the other families in the area, as the other families had indoor plumbing while his family had an outhouse.  (RT 6011-12.)

### B.  Information Submitted in Post-Conviction Proceedings

Petitioner has submitted a number of declarations from several members of his immediate and extended family.  He contends that these individuals either were not contacted before trial or were not asked to testify, and they could have provided additional relevant information about the alcoholism in Petitioner's family and about the environment and community in which Petitioner was raised.  Petitioner also submits the declaration of a social historian.

Petitioner's younger brother Ralph, or Ralphie, Roybal, who was in prison in New Mexico at the time of his 2007 declaration, stated that he and Petitioner grew up in a very poor area, with a large amount of drinking and drug use, and that few people in the area had jobs. (Ex. 5, Lodgment No. 134 at 34.) Many of the children that grew up with them "are now either in jail or dead." (Id.)  Ralph liked school and did well, but Petitioner did not like school and skipped it to spend time with his friends. (Id.)  Ralph went into the military after obtaining his GED, left the military after a court-martial, and was charged with murder in 1987. (Id. at 34-35.)  Ralph pled guilty, was sentenced to six years in prison, and was released in 1991, stating that "[a]t the time of this offense, I was drinking a lot and I had blackouts.  I was honest when I told the judge at the time I entered the guilty plea that I could not remember everything about the offense." (Id. at 35.)  Growing up, Petitioner ran away from home for days at a time, stayed with his friends, and sniffed paint. (Id.)  Their mother and step father "drank a lot and would fight," and Ralph left home as soon as he got his GED, entering the military. (Id.)  Ralph related an incident when he went deer hunting with Dewey and his friends, and Dewey, who had been drinking, accidentally shot his friend in the back and killed him; he was not charged for the accidental murder. (Id. at 35-36.)  He also stated that: "Dewey and Stella used to discipline us when we did something wrong; Dewey spanked us with his

belt." (Id. at 36.)  Ralph stated that a number of people in their extended family, such as aunts and uncles, were heavy drinkers and "many of them died because of their drinking." (Id.)  Ralph states that "[n]o one on Rudolph's defense team ever talked to me before or during

his trial," and he would have been willing to testify.[35]  (Id.)

Theresa Romero, Petitioner's younger sister, stated that several members of the extended family died young as a result of alcoholism. (Ex. 4, Lodgment No. 134 at 31.) She stated that: "During my childhood years, both of my parents drank and fought a lot," and Petitioner would sit with her and offer to protect her. (Id.)  Her parents often broke things while fighting, such as plates on a shelf, and her last memory of her father Dewey was "him getting high on marijuana." (Id. at 31-32.)  Petitioner was "a very loving person while sober," but when he was drinking and sniffing paint Theresa "was afraid of him." (Id.)  Her grandfather was abusive and violent towards her grandmother when he was drunk, and several aunts and uncles on her mother's side were also alcoholics. (Id.)  A number of people in their neighborhood growing up died of alcoholism, were drug addicts; several others were sent to prison for various crimes, including murder. (Id.)  The defense team contacted Theresa about Petitioner's 1989 arrest, but did not ask about their family history or the history of alcoholism.  (Id.)

Petitioner also submits a declaration from his brother Frank, who adds several details to his trial testimony.  Frank stated that Petitioner was a loner as a child and did not fit in with the family. (Ex. 3, Lodgment No. 134 at 26.)  With respect to Petitioner's "mojado" nickname, Frank added that Petitioner was told a story that he was found

---

[35] The record appears to contradict this contention.  On July 28, 1992, prior to the commencement of the penalty phase proceedings, counsel and the trial judge discussed the information Dr. Cermak reviewed in rendering his opinions, which included witness interviews.  (See RT 5241A.)  Defense counsel indicated that they provided the prosecution with copies of these materials, and specifically noted that: "[t]here were two people, Mr. Abata and Ralph Roybal, Mr. Roybal's brother, who were interviewed by our office, but we do not intend to call as witnesses, so they have not been previously turned over because they were not going to be witnesses, however, their interviews were submitted to Dr. Cermak, along with several other family members whose interviews were already turned over or friends of the family whose interviews have previously been turned over." (RT 5241A-42A.)

1   floating in a tub in a river, which he believed until age 14, while, again, the real story

2   was that Petitioner's father was supposedly from Mexico.  (Id. at 26-27.)  Frank

3   reiterated the incident he related at trial concerning Petitioner's fall out of his crib as a

4   baby.  (Id. at 27.)  Frank again detailed his mother and Dewey's drinking, and added that

5   his mother sold Frank's silver dollar good luck charm to buy food; Frank was angry that

6   she deeded the house to buy liquor but not food.  (Id.)  Frank discussed the cramped

7   living conditions at home, adding that he left home under the age of 18 to join the

8   military and waited until his mother was drunk to get her signed permission.  (Id. at 28.)

9   Before Frank left home, none of his siblings were into drugs or alcohol, but after

10  returning on leave, his brothers and sisters were using drugs and drinking heavily.  (Id.)

11  Frank further discussed the alcoholism, violence, and drug use pervasive in his extended

12  family and neighborhood and that many of the people he and Petitioner grew up with

13  were either dead or recently out of prison.  (Id. at 29-30.)  Frank also added that the first

14  time he spoke to Petitioner's attorneys was the day he testified at trial.[36]  (Id. at 30.)

15      Sylvia Sanchez, Petitioner's maternal cousin, stated that her family lived close to

16  Petitioner's growing up, and several of her siblings died of alcoholism.  (Ex. 7,

17  Lodgment No. 134 at 41.)  Sanchez grew up in an abusive family and her father was an

18  alcoholic.  (Id.)  In Sanchez's opinion, Petitioner's mother "was a mean mother who I

19  believe did not love her children," and she heard Stella say she did not like Petitioner,

20  _____

21      [36] Frank Orozco does not clarify whether he first spoke to trial counsel just prior
    to his guilt phase testimony on July 7, 1992, or his penalty phase testimony in August

22  1992.  Regardless, this assertion is not supported by the record, as he testified at the
    preliminary hearing in Petitioner's case, which was held in July 1991, and was cross-

23  examined by, and ostensibly spoke to, trial counsel at that time.  (PRT 116-119.)
    Moreover, during the guilt phase, Frank testified that defense counsel asked him

24  questions at the preliminary hearing and that only defense counsel had asked him about
    Petitioner's condition on June 9, the night of the murder.  (RT 4623.)  The transcript

25  also includes the following exchange, in which Frank states that he also spoke to defense
    counsel prior to the preliminary hearing:

26      Q:  Prior to the preliminary hearing, did you tell anyone that you had
            gone to your brother's room to check on him at 11 o'clock or 10
            o'clock June 9?

27      A:  I told the - - one of the lawyers for the defense.
        Q:  Okay.  So you remember telling one of the attorneys for the defense?

28      A:  Yes.
    (Id.)

who Stella used to call a "Mexican wetback." (Id. at 42.) Sanchez stated that Dewey was mean and a heavy drinker, and related that: "One day, while I was out with my cousin Theresa, he beat both of us with a belt because Theresa had not obeyed his order to stay home." (Id.) While Ralph was violent, Sanchez stated that Petitioner was "outgoing and affectionate." (Id.) Her grandfather, as well as several uncles, were also heavy drinkers; Sanchez stated there were also several schizophrenics in the family. (Id.) The defense team did not talk to her, and Sanchez stated she would have been available to testify. (Id.)

Petitioner's cousin, Jose Alvarez,[37] stated that his mother was contacted by someone from the defense team, but they never called back. (Ex. 2, Lodgment No. 134 at 24.) Alvarez's father was a heavy drinker, violent, and beat his sisters. (Id. at 22.) Alvarez also noted that numerous relatives were alcoholics and that many died of alcoholism, while several others died of heart attacks, AIDS, or committed suicide. (Id. at 22-24.) Alvarez also detailed that several extended family members had committed violent or criminal acts, such as murder, attempted murder, attempted rape, and prostitution. (Id. at 22-24.) Alvarez started to drink and sniff paint when he was a teenager; he did not want to die and stopped drinking after finding religion, stating that: "Many of the young men that Rudolph and I grew up with and drank and sniffed paint with are now dead," and that several had been murdered. (Id.)

Petitioner also submits a declaration and social history prepared by psychologist Katherine DiFrancesca, Ph.D. (Exs. 1, 13, Lodgment No. 134 at 1-21, 129-35.) Dr. DiFrancesca interviewed Petitioner on several occasions, reviewed the Alvarez, Orozco, Romero, Roybal, and Sanchez declarations, as well as reviewed the trial testimony of

---

[37] The record reflects that the defense was aware of a potential witness named Jose Alvarez, as on May 19, 1992, the defense filed a request for Mr. Alvarez's attendance at Petitioner's trial, stating that Alvarez, who lived in Santa Fe, New Mexico, was "a necessary and material witness for the Defendant in the above-entitled case because he was a percipient witness to facts at issue in the penalty phase proceedings," and a subpoena dated May 26, 1992 was issued ordering Alvarez's appearance on June 22, 1992, the date on which penalty phase proceedings commenced in Petitioner's case. (CT 1598-99, 1605.) However, the record does not offer enough information to conclusively determine whether these references are to the same individual.

Petitioner's mother Stella and brother Frank.  (Id. at 3.)  She detailed Petitioner's upbringing, his mother's drinking, the violence in his family and environment, maternal rejection, poverty, lack of education, his substance use and abuse, fights, and a car accident which put him at risk for brain damage. (Id.)  She outlined several differences between Petitioner's upbringing and those around him, such as his brother Frank or sister Theresa, in that Petitioner was rejected and not wanted, had learning difficulties, and was more abused than his siblings.  (Id. at 17.)

## C.   Discussion

Trial counsel indicate that they did not recall any strategic or tactical reason for not presenting a more "complete social history," such as that outlined in Dr. DiFrancesca's declaration. (Exs. 66, 67, Lodgment No. 143 at 6, 15-17.)  Specifically, counsel Kathleen Cannon, who handled the penalty phase presentation, states:

> I do not recall any strategic or tactical reason not to prepare and present a more complete social history that would have shown the pervasive effect of alcoholism and poverty on all of the petitioner's immediate and extended family.  Such evidence could have shown how there was no place for the petitioner to escape from the abusive and destructive forces of his childhood and young adulthood.

(Id. at 13-14.)  She also indicates that:

> It is my opinion that had a mitigation specialist or similarly trained expert been retained early in the preparation of the defense, this information would have been obtained and could have been presented at the penalty phase.  Although we presented evidence of an abusive upbringing and maternal neglect and use of alcohol and drugs, there was further evidence that could have been presented that would have been more persuasive in sparing Mr. Roybal's life by showing the pervasive environment of violence, alcoholism, physical, emotional, and substance abuse that affected all in [sic] his family members except his older adopted brother, Frank Orozco, who managed to get out by joining the Marines.

(Id. at 16.)  Campbell adds that: "Funds were not approved for a mitigation specialist or similarly trained expert, other than an investigator.  I believe it was the policy of the Public Defender's Office that investigators are sufficient and mitigation specialists unnecessary.  I believe that a mitigation specialist or similarly trained social worker would have been helpful to the defense."  (Id. at 2-3.)

But, as Petitioner and trial counsel concede, the defense presented several relatives as witnesses to testify about Petitioner's social history, including his upbringing, maternal rejection, poverty, substance abuse, alcoholism, abuse, and learning difficulties. Dr. Cermak also testified about Petitioner's background and upbringing, in addition to his testimony about Petitioner's mental condition and brain abnormalities.

Petitioner cites to the prosecutor's closing argument, including the prosecutor's contention that Frank's testimony was not believable because help could have been available from the community, that Frank's testimony only detailed abuse until Frank left home when Petitioner was 14, and that the defense was attempting to blame Stella but did not produce corroboration, as well as the testimony of Dr. Bucky challenging the defense's claim that the alcoholism was genetic. (FAP at 252.) Petitioner argues that the five declarations "would have addressed each of these points." (Id.)

Reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." Strickland, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. It is clear that Petitioner's contention, that these new declarations rebut the prosecution's arguments, is offered in hindsight. The record shows that counsel investigated Petitioner's background and interviewed a significant number of family members, counselors, and former employers. Counsel presented that social history evidence at trial, and called witnesses to testify about Petitioner's impoverished, neglected and abusive upbringing, his substance abuse, and his work ethic.

Much of the evidence Petitioner now presents is cumulative. For instance, Petitioner asserts that the additional information presented during post-conviction proceedings "would have shown the pervasive and pernicious effect alcoholism had on the family." (FAP at 251.) The record reflects that counsel was aware of the family history of alcoholism, given the testimony of Dr. Cermak, the questions defense counsel

posed to Dr. Bucky, and Dr. Koshkarian's report, which indicates that "[t]here was a strong family history of alcoholism on his mother's side of the family and a maternal grandfather plus three cousins died from complications of alcohol." (Ex. 11, Lodgment No. 134 at 121-22.)  Several penalty phase witnesses testified about the alcoholism in Petitioner's family. Stella testified that her own father, Petitioner's maternal grandfather, was an alcoholic who never worked, and it was up to her mother to support the family. (RT 5541-46.) Cousin Eddie Montoya testified that when he socialized with Stella, they drank.  (RT 5630.)  Frank went into great detail about their mother and stepfather's drinking, fights, neglect and abuse and testified that their extended family "were all alcoholics." (RT 5855-61, 6011.) Dr. Cermak discussed Stella's alcoholism, including the fact that she drank while pregnant with Petitioner and throughout his childhood, described Petitioner's family as an "alcoholic family," and discussed the potential genetic connection to Petitioner's own substance abuse.  (RT 6074-79, 6087-88.)  Even Dr. Bucky agreed that it "certainly" would be significant that Stella's father, Petitioner's grandfather, died of alcoholism, and he too noted the history of alcoholism in Petitioner's family.  (RT 6312, 6319.)  The jury was well aware that substance abuse was a problem throughout Petitioner's immediate and extended family.   The proposed testimony identifying other individuals in Petitioner's extended family who were alcoholics only offers additional details on a matter that was already presented to the jury.  See Wong, 558 U.S. at 22-23 (trial counsel is not required to present cumulative mitigating evidence).  While Frank's post-conviction declaration largely repeats his trial testimony, he provides some additional details, such as that their maternal grandfather sold his ranch for a car, and that Frank, who was underage at the time he wanted to join the military, waited until Stella was drunk to ask her to sign the enlistment papers.  But Petitioner has not shown that counsel was deficient in failing to uncover these details, as Frank does not indicate whether he ever mentioned these incidents to trial counsel, and in any event, the information merely offers additional ancillary details on subjects that were already before the jury.  See id.

Both Frank and Stella Orozco testified about the family's impoverished situation, and Frank discussed the poverty in their surrounding community, as well as noting that their family was poorer than the other families.  Additional details about the violence and substance abuse throughout Petitioner's community may have provided a fuller picture of his surrounding environs, but in light of the deference required in evaluating counsel's performance from their perspective at the time of trial, the Court cannot conclude that trial counsel acted unreasonably in failing to uncover and present this additional evidence.  See Bobby v. Van Hook, 558 U.S. 4, 11 (2009) ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.")  Deciding to present the testimony of more immediate relatives such as his mother and brother, powerful testimony which starkly illustrated Petitioner's background and the circumstances of Petitioner's upbringing, and to not seek out additional evidence about his more distant relatives and community fell "well within the range of reasonably professional judgments."  Strickland, 466 U.S. at 699.

The fact remains that trial counsel investigated and presented numerous witnesses to testify in mitigation about Petitioner's background and upbringing.  The trial judge acknowledged at sentencing that there was "lots of evidence that was presented under the (k) factor" during the penalty phase.  (RT 6761.)  The judge reviewed the evidence that had been presented to the jury, and noted that Petitioner was "born into a family that was dysfunctional," that Petitioner's "mother was a prostitute," his "father left at about the time of his birth, abandoned him," and that "[h]is stepfather, Dewey, was abusive." (RT 6762.) The judge also acknowledged that Petitioner was "called a wetback, ignored, unloved, and the like," and that he "ended up as a transient worker, an alcoholic and dependent on drugs."  (Id.)  Thus, most of the subject matter Petitioner discusses in this claim was already presented during the penalty phase proceedings, and counsels' performance in presenting Petitioner's social history stands in contrast to other cases in which trial counsel's performance was found inadequate.  See e.g., Wiggins, 539 U.S.

at 515 (trial counsel introduced evidence that someone other than the petitioner committed the murder, argued that the defendant had no prior convictions, and while promising to introduce information on the petitioner's background during opening statements to the jury, "counsel introduced no evidence of Wiggins' life history" at the penalty phase); Rompilla v. Beard, 545 U.S. 374, 390 (2005) (counsel failed to obtain school records, juvenile and adult correctional records, failed to investigate the petitioner's alcohol abuse, despite indications that he was drinking at the time of the offense, and failed to review the file on his prior conviction, which the prosecution intended to use as an aggravator and which contained "a range of mitigation leads that no other source had opened up.")

This claim also fails because Petitioner is unable to demonstrate that he suffered actual prejudice from these and the other instances of alleged deficient performance, as discussed below in section C.5.  See Strickland, 466 U.S. at 697; Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence.")  Claim 7 fails even under a de novo review. Petitioner is not entitled to habeas relief on Claim 7.

### 4.   Claim 8

Petitioner asserts that trial counsel rendered prejudicially deficient performance in failing to present available detailed evidence from treatment and correctional facilities that demonstrated his "positive institutional adjustment."  (FAP at 263.)

Petitioner raised this contention as part of Claim 1 in the state habeas petition. (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

Petitioner's institutional history was referenced at the penalty phase, but only in relation to his repeated stints in alcohol and drug abuse treatment programs.  Santa Fe Recovery of Alcoholics ["RAP"] program worker Lucy Madrid, who was Petitioner's counselor starting in 1976, stated that he went through portions of the program about twenty times over ten years and made efforts to learn during his time there.  (RT 5700-

11.)  At one point, Madrid spoke to Petitioner about the possibility that he could become a counselor.  (RT 5714-15.)  Madrid acknowledged that Petitioner had been referred to RAP through the court system.  (RT 5737.)  Nan Busby, the director of Seadrunar, a substance abuse treatment center in Seattle, stated that Petitioner was a client in that program for approximately two years, between June 1987 and February 1989.  (RT 5758-59.)  Petitioner completed and repeated portions of the program over several years, and relapsed several times.  (RT 5773.)  Busby explained that the first phase had greater structure and close supervision, less so in the second phase or aftercare; Petitioner had a "hard time" in the second phase.  (RT 5774-84.)  Busby recounted several relapses and returns to the program, stating that Petitioner's probation officer authorized Seadrunar to accept Petitioner into the program again.  (RT 5786-95.)  Petitioner came to the program while on probation for four felony offenses; Seadrunar had a copy of Petitioner's criminal record.  (RT 5806-08.)  Seadrunar's intake records reflected that Petitioner stated he had gone through various treatment programs fourteen times, eight through RAP, and three each with two other centers in New Mexico (ATU and Rio Grande), and "has been court committed to treatment all but four times"; Busby explained that a court commitment "means in lieu of incarceration they can come to a treatment program."  (RT 5812-13.)  With respect to one of Petitioner's relapses, Busby was only aware of what Petitioner told them, which was that he drank a six pack of beer.  (RT 5827.)

Petitioner contends counsel should have presented more evidence of his positive institutional history.  For instance, Petitioner states that his Seadrunar records do not reflect any violent or disruptive behavior; the only noted violations are for drinking beer and cocaine use.  (FAP at 263-64, citing Ex. 26.)  Petitioner also points out that his records from the Las Lunas facility show no attempted escapes, no misconduct, and good behavior; records note only one disciplinary report, for refusing to provide a urine sample.  (FAP at 264, citing Ex. 29.)  Petitioner's San Diego County correctional records reflect one complaint by Petitioner about a lockdown of his cell block and a subsequent

refusal to open his door and come out; he was later classified a risk due to his death

sentence. (FAP at 264, citing Ex. 30.) Petitioner also cites to numerous other available

records from correctional institutions, recovery programs, and hospitals. (FAP at 265.)

Craig Haney, Ph.D., a professor who specializes in "psychology and law,"

examined Petitioner's records and concluded as follows:

> Mr. Roybal had a long institutional record that was amassed because of his
> life-long struggle with drug and alcohol addiction.  Virtually every one of
> his crimes was in some direct way related to his intoxication or the need to
> maintain a drug addiction.  Yet his institutional record stood in stark
> contrast to his problematic life in free society.  Rudy Roybal had an
> excellent record of institutional adjustment, one that he had achieved in a
> variety of institutional settings, including various drug and alcohol
> treatment programs, a residential therapeutic community, and several New
> Mexico penitentiaries.  Moreover, given the way that he responded
> positively to more structured institutional settings, there was every reason
> to believe that he would make an excellent adjustment to prison– especially
> to a maximum security Level IV prison of the sort a life without parole
> sentenced prisoner is sent to in California.

(Ex. 22, Lodgment No. 135 at 321-22.)

Dr. Haney found a "pattern" to Petitioner's participation in recovery programs and

other admissions, as Petitioner participated but continued to drink, and was often

removed from the programs, or "[a]lternatively, he would complete some aspects of the

program but, as soon as the structured and regulated nature of the confinement was

relaxed, he relapsed and his drinking problems surfaced again." (Id. at 323.) At the time

of his 1992 trial, Dr. Haney noted that Petitioner was "middle-aged by prison standards,

and certainly on the verge or past the age at which the overwhelming majority of

prisoners 'age out' and become rule abiding and conforming prisoners." (Id.) Similarly,

Dr. Koshkarian stated in his 1992 evaluation of Petitioner that: "If placed in prison,

based on his personality and past behavior he would probably lead a quiet, productive,

and incident-free existence." (Ex. 11, Lodgment No. 134 at 124.)  Attorney Cannon

reviewed Dr. Haney's declaration and stated that:

> All of the records attached as exhibits to Dr. Haney's declaration were
> documents either provided in discovery prior to trial or collected by the
> defense in preparation for trial.  There was no tactical or strategic reason to
> not hire an expert on institutional adjustment to explain to jurors that Mr.
> Roybal could and would perform well in institutional settings.  Dr. Haney's

opinion that Mr. Roybal had an 'excellent record of institutional adjustment, one that he had achieved in a variety of institutional settings, including various drug and alcohol treatment programs, a residential therapy community, and several New Mexico penitentiaries' could have been critical evidence to present in a penalty phase. I recall that during deliberations the jurors asked for evidence of the petitioner's institutional history either in jail or prison prior to the commission of the offense. I do not recall any strategic reason not to present this obvious evidence in mitigation that, as it turned out, jurors sought to hear.

(Ex. 67, Lodgment No. 143 at 17-18.)

While it appears that trial counsel concedes that they did not have a tactical reason for presenting expert testimony about Petitioner's institutional history, the defense called Nan Busby and Lucy Madrid to testify about Petitioner's performance in treatment. The general tenor of the testimony was similar to Haney's conclusions, that Petitioner made an effort to obtain treatment, that he did better with a structured program, and that he relapsed when the structure was relaxed. In closing arguments, the defense repeatedly referenced Petitioner's struggles with substance abuse, arguing that his prior sentencing judge, who sent Petitioner to a treatment program, appeared to have recognized that Petitioner "has a problem that needs to be treated. And unless that problem is treated, he will continue. [¶] And in order to protect society, not just today, but tomorrow and tomorrow, we need to get this man in a long-term live-in treatment program, with the threat of prison over his life." (RT 6490.) The defense argued that the judge "saw there was an underlying problem, not just an evil person, but someone who needed serious, serious, help." (RT 6490-91.) The defense also asserted that "when he was in the program where that structure was given, he operated within the guidelines. He tried. Yes, he marked time, but he didn't leave. He also showed growth." (RT 6525.)

The record also reflects that trial counsel made specific choices on what questions to ask, and what evidence to elicit, on this subject in order to avoid potential cross-examination on future dangerousness. At trial, the prosecutor pointed to defense counsel's questions to Dr. Cermak about Petitioner's prognosis with respect to treatment for his substance abuse, and stated: "I would like to ask the doctor whether he can guess whether the defendant will kill again, and the area of future dangerousness is not - - but

I believe they've broached the subject by trying to get the doctor to guess at what the future is going to be like for this guy, whether in custody or not, or in custody." (RT 6196.) Defense counsel objected, arguing that their questions were specifically directed towards Petitioner's prospects for successful treatment of his substance abuse, rather than his potential for future violence: "So my questions were specifically tailored toward his chemical abuse, could he ever develop himself to the point where he could be free of chemical abuse. . . . I did not ask whether he was a danger, if he's a dangerous person out of custody, and the Court knows the case law is very, very clear about the prospect of future dangerousness.  It is not appropriate and can't be talked about in trial.  This doctor is not talking about future dangerousness.  He's talking about if there was ever any possibility for Rudolph Roybal." (RT 6196-97.)  The trial court denied the prosecution's request to ask the proposed question. (RT 6197.)  This exchange reflects that counsel's decision on how to present this evidence was strategic.

The prosecution also tried to introduce evidence about Petitioner's possession of a simulated weapon during his time at Seadrunar, and asserted that the defense placed Petitioner's character in issue through their presentation of witnesses. (RT 5840-46.) Defense counsel responded that: "From the beginning I've indicated to the court and prosecution very clearly.  We have very specific issues.  [¶]  Character in the program. You want to impeach him about what's wrong with him in the program, impeach him with his behavior in the program.  Character at work, how he worked for Anthony Roybal.  You can talk about how he worked for Anthony Roybal.  But we have been tailoring this very narrowly." (RT 5845.)  The trial court denied the request, and held that "the defense has not opened up his character for violence or for the use and other possession of weapons." (RT 5846-47.)  In particular, the Court noted that the defense had declined to call the witness who the prosecution could have questioned about this incident, and held that the matter was therefore moot. (RT 5847.)  These exchanges also reflect that counsel had a strategic and tactical approach concerning this evidence in light of the potential for the introduction of rebuttal evidence.

Petitioner concedes that trial counsel presented some of this evidence in mitigation but argues that "[t]rial counsel failed to present any of these institutions- related themes in any coherent or remotely effective way.  Although there was an occasional witness called who mentioned one or another institutions-related issue in passing, trial counsel never structured or presented this testimony in a manner that would have allowed jurors to understand Mr. Roybal's institutional history in a meaningful way or to grasp how it helped to explain and mitigate his behavior outside of institutions."  (FAP at 268.)

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689.  Given Strickland's dictate that a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," the Court is not persuaded that trial counsel was deficient in presenting the mitigation in this manner.  See id.  Presenting testimony and argument on Petitioner's attempts at recovery, rather than detailing his largely positive correctional history, focused the jury's attention on Petitioner as an individual with a substance abuse problem in need of treatment, rather than allowing for further discussion of his criminal activity and subsequent incarcerations.

Petitioner contends that "[t]he prejudice resulting from the failure of trial counsel to present this critical mitigating evidence became apparent when the jury requested information concerning Mr. Roybal's prison and jail records prior to the commission of the offense, indicating that the jury on its own believed this was a critical fact in its decision as to whether to impose a sentence of death or life without parole."  (FAP at 269.)  After reviewing the record, it appears that the jury's request and subsequent discussion between the Court and counsel also support a conclusion that counsel's decisions in this regard were tactical.

During deliberations, the penalty phase jury submitted the following question to the court: "From the record we want to know if Roybal has ever been incarcerated in a prison/jail prior to the murder, and if so, how long?"  (RT 6570, CT 2188.)  The trial judge and counsel engaged in an extended discussion on how to address that question,

and the judge stated: "I don't think there's anything directly in evidence about if he's ever been incarcerated at all before, at all." (RT 6571.) Defense counsel added, to agreement from all parties, that: "I think the only records that have been discussed were the Las Lunas Prison records, and they were subsequent." (RT 6571-72.) The parties were unable to reach a stipulation, and the trial judge informed the jury as follows: "After conferring with the attorneys, I need to tell you that I can't answer the question. There is no evidence before this jury, even in the penalty phase, as to whether the defendant did or did not ever serve time in prison and/or jail," and admonished that: "I have warned you before that you're not to speculate as to items as to which there is no evidence, so it would be incorrect for you to assume or speculate that he had or had not been so incarcerated as your question suggests." (RT 6581-82.)

The defense later reconsidered, and the parties entered into a stipulation. (RT 6592-95.) The trial court informed the jurors that:

> First, prior to the murder, the defendant, Mr. Roybal never served time in state prison on a state prison commitment. [¶] Second, and you've already heard this evidence, I think it was in the 1986 proceedings on the four felonies, the defendant did serve, or probably a better term would be 'spent', 60 days in a state prison diagnostic facility, but not under a state prison commitment. You've heard evidence of that before. So to answer your question on the second part, he did spend 60 days in a state prison facility, but only under a diagnostic study. [¶] All right. And third, the longest period of confinement that the defendant has experienced prior to the murder was a county jail sentence, which he served, which totaled 364 days gross time. Gross time simply means that's what the judge pronounced. The exact amount of time that he actually served is unknown or undetermined at this point.

(RT 6592-93.)

The record also reflects that the jury was already aware that Petitioner had been arrested on multiple prior occasions, had violated parole, and had a juvenile history, although the jury had been instructed that such evidence was not to be considered in aggravation. (RT 6139.) Six prior felony convictions had been alleged in aggravation, but again, the jury was only provided limited information on prior incarcerations.

Respondent argues that presenting additional information about Petitioner's past institutional behavior would have opened the door to incidents in which he did not

follow the rules, citing several incidents while Petitioner was in treatment or in correctional facilities, and "supports counsel's tactical decision."   (Ans. at 72.) Petitioner maintains that Respondent fails to point to any evidence of future dangerousness that would have rebutted the value of the mitigation.   (FAP at 271, Traverse at 87.)

While counsel states that she does not now "recall any strategic reason" for not presenting the institutional history in the manner now advanced by Petitioner, this does not mean that the decisions made at the time of trial are not entitled to deference.  See Strickland, 466 U.S. at 689.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id.  Here, counsels' decisions concerning how to present the penalty phase evidence were made to avoid areas of cross-examination or prevent the introduction of certain evidence in rebuttal, and were tactical.

Claim 8 also fails because Petitioner is unable to demonstrate that he suffered actual prejudice from this and his other allegations of deficient performance, as discussed in section C.5.  See Strickland, 466 U.S. at 697; Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence.").  Claim 8 fails even under a de novo review.  Petitioner is not entitled to habeas relief on Claim 8.

## 5.    Penalty Phase Prejudice

As discussed above, the Court rejects Petitioner's assertions regarding the alleged deficiencies in trial counsel's penalty phase performance, as the record reflects that counsel investigated Petitioner's social history by interviewing witnesses, gathering a substantial amount of background records and presenting numerous witnesses at trial, as well as investigating and presenting evidence that Petitioner suffered from organic brain damage.  The record also reflects that the decisions made with respect to the introduction of Petitioner's institutional history appear tactical in nature and were

calculated in an effort to avoid potentially damaging areas of cross examination or rebuttal. Even were Petitioner able to demonstrate that counsel was deficient in one or more of the respects alleged, his claims of ineffective assistance of counsel at the penalty phase also fail for lack of prejudice. See Strickland, 466 U.S. at 687 (a petitioner asserting a claim of ineffective assistance of counsel must show both deficient performance and prejudice).

Thus, as an alternative ground for the result, the Court evaluates the potential prejudicial impact of counsels' alleged deficient performance at the penalty phase by reweighing the evidence in mitigation and aggravation. See Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence."), see also Williams, 529 U.S. at 397-98, Wong, 558 U.S. at 26 ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."), citing Strickland, 466 U.S. at 695-96.

At trial, Petitioner's mother and brother discussed Petitioner's upbringing, including his mother's alcoholism throughout her pregnancy and his childhood, her prostitution and neglect of Petitioner, abuse by his stepfather, and Petitioner's own early use and abuse of alcohol and drugs. Petitioner's birth was the result of his mother's liaison with another man that broke up her marriage and led her to resent Petitioner. Petitioner never knew his father, but his mother nicknamed Petitioner "Mojo," or "wetback," given his father's background. Two of Petitioner's prior substance abuse counselors testified about Petitioner's efforts in treatment and his extended battle with alcoholism and substance abuse, while two of Petitioner's former employers found Petitioner to be a hard and dependable worker. As discussed previously, Dr. Cermak also testified at length about Petitioner's background and upbringing, substance abuse, organic brain damage, blackouts, and the possibility of fetal alcohol effects from his mother's alcohol abuse.

As discussed in Claims 4 through 8, Petitioner now alleges that counsel was deficient for failing to present several additional avenues of mitigation, as well as failing

to present additional evidence with respect to Petitioner's background and mental health that would have provided the jury with a more complete picture of Petitioner's upbringing, community, and brain deficiencies. Petitioner asserts that evidence of his lack of flight from the minimum security facility in New Mexico would have supported a defense argument that he did not recall the murder and had suffered a blackout that evening. Petitioner also contends that his positive institutional record and expert testimony about his anticipated adjustment to prison would have provided additional evidence in favor of a life sentence. Petitioner had a generally good institutional record with only minor infractions during prior incarcerations, and expert Craig Haney states that Petitioner was likely to have made an excellent adjustment to life in prison.

Several post-conviction expert evaluations and testing results provide additional support for a diagnosis of organic brain damage and medical records detail a larger number of head injuries Petitioner suffered in the years prior to the murder than the few injuries discussed at trial. Dr. Cermak, who testified at Petitioner's penalty phase proceedings, states that the new results would have changed the focus of his testimony from Petitioner's personality to the evidence of organic brain damage, and that the diagnosis based on this evidence would have withstood rebuttal testimony about anti-social personality disorder.

Several family members, including his sister, cousin, and aunt, detail abuse and alcoholism throughout Petitioner's extended family and community. Petitioner's brother Frank, who testified at trial, discusses more of the family history, such as his grandfather's alcohol abuse as well as other incidents with respect to their mother's alcoholism, and the poverty, alcoholism, and violence throughout their community.

In aggravation, the circumstances of the crime were particularly brutal and cruel. Yvonne Weden, an elderly woman, was attacked at night in her own home, robbed and killed for her jewelry. She suffered over a dozen stab wounds to her neck and chest, and her throat was slit. The stab wounds penetrated her lung, damaged her ribs, hit her aorta, and the wounds to her neck were multiple and severe, severing her voice box. She also

suffered numerous bruises and contusions, and her cause of death was lack of oxygen and loss of blood. Petitioner knew the elderly victim, as he had done yard work for her, and knew her husband worked nights. The day after the murder, Petitioner left California and went to his mother's home in New Mexico, where he hid the jewelry in his mother's backyard. When questioned later by police, Petitioner lied and failed to mention that he had been in California. The jury found two special circumstances to be true- murder in the commission of a robbery and murder in the commission of a burglary. The jury heard evidence of four prior incidents of violent criminal activity, and that Petitioner had suffered six prior felony convictions.

Considering all of the evidence in mitigation, both that presented at trial as well as the additional test results, evaluations, declarations, and arguments now offered, and reweighing it against the evidence in aggravation, Petitioner fails to demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Petitioner's lack of an attempt to escape from a minimum-security facility weeks or years after the murder could conceivably allow the defense to argue that Petitioner did not recall the murder. But this argument would have been of slight value given the other evidence showing Petitioner's awareness of the situation, including hiding the fact that he had been in California, as well as his possession of jewelry from the victim's home and his attempts to hide that jewelry.

Evidence of Petitioner's positive institutional record, and accompanying expert testimony that he would make a good adjustment to prison, could have been somewhat favorable to Petitioner but would have likely opened the door to rebuttal with incidents of rule breaking that would have, at the very least, dulled the positive impact of such evidence. See People v. Rodriguez, 42 Cal. 3d 730, 792 n. 24 (1986) ("[T]he scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf.") Had the defense called an expert or other individuals to testify about Petitioner's positive

prison history and likelihood of good future conduct in prison, it appears that several incidents could have been discussed in rebuttal.  As Respondent outlines:

> Roybal's records from the New Mexico State Hospital show that he drank while admitted to the Alcoholism Treatment Unit (ATU), was observed drunk at the treatment unit, and was discharged from ATU for breaking the rules. (LD 135, Vol. 2, Ex. 17 at 276, Ex. 18 at 285.)  Roybal also engaged in criminal behavior while in ATU at the New Mexico State Hospital.  After admission to ATU in 1983, Roybal was arrested and jailed on a burglary charge while on a week-end pass.  (LD 135, Vol. 2, Ex. 19 at 292.)  In 1990, the New Mexico Corrections Department noted in a custody classification evaluation that Roybal had probation violations pending. (LD 135, Vol. 2, Ex. 23 at 442.)  On October 30, 1990, a judge of the New Mexico District Court ordered Roybal "unsatisfactorily discharged" from probation.  (LD 135, Vol. 2, Ex. 23 at 479.)  In 1991, Roybal was written up for violating New Mexico Correctional Facility policy for refusing to submit a urine sample.  He was referred to a disciplinary officer who found Roybal guilty of the misconduct.  (LD 135, Vol. 2, Ex. 23 at 531-35.)

(Ans. at 72.)   As noted above, there is also the 1989 incident report from Seadrunar where Petitioner admitted using drugs, aborted treatment rather than return, and a gun was found among his personal items.  (Ex. 26, Lodgment No. 136 at 758-62.)  Seadrunar personnel reported the program termination, drug use, and gun incident to Petitioner's supervising officer in Washington State, and action was taken in Washington and New Mexico to revoke his probation.  (Id.; Ex. 28, Lodgment No. 137 at 940-45.)

Petitioner points out that "more structured the setting, the better Mr. Roybal performed," and that the "only incident Respondent can focus on while in a secure setting was a refusal to give a urine sample, hardly what one would call violent behavior indicative of future dangerousness." (FAP at 86.)  While this may be the case and would not have precluded a defense argument that he would perform well in a structured setting, the fact also remains that Petitioner also committed a crime while on a weekend pass from treatment, repeatedly broke rules, and violated his probation- this information would certainly have had rebuttal value against evidence of good behavior and a corresponding defense argument that his behavior weighed in favor of a life sentence.

Medical records show that Petitioner suffered a greater number of head injuries than the ones mentioned at trial, but, again, the jury was aware, through the testimony of Dr. Cermak and Frank Orozco, that Petitioner had suffered several head injuries in the

past.  Meanwhile, the new expert declarations and evaluations largely agree with Dr. Cermak's trial testimony that Petitioner suffers from organic brain damage, likely caused from a combination of factors, including head injuries as well as his abuse of alcohol, inhalants, and other drugs.  While Petitioner argues that the new evidence provides more definitive support for the diagnosis of organic brain damage, Dr. Cermak apprised the jury that Petitioner suffered brain damage, supported by a discussion of test results.

The declarations from Petitioner's sister, brother, cousin, and aunt are in part cumulative to the testimony of Petitioner's brother and mother at the penalty phase-indeed, Frank's declaration repeats in part his trial testimony while adding some details about other incidents, extended family, and individuals in their community.  Petitioner's other family members offer additional details about alcoholism, violence, and abuse in Petitioner's extended family and community, such as the fact that numerous extended family members died from diseases related to alcoholism, that several were either victims or perpetrators of violent acts, and that abuse was prevalent throughout Petitioner's extended family.  But yet again, the jury was already aware that Petitioner was abused and neglected as a child, that his mother was an alcoholic who drank while pregnant, that Petitioner grew up in an alcoholic family, and that he started to abuse drugs and alcohol at a young age.  Moreover, both Frank and Stella Orozco testified about their poverty, and Frank also discussed the fact that while the surrounding community was also poor, his family was significantly more impoverished.  The social history evidence Petitioner now offers is largely cumulative to that presented at trial, and, at most, the new evidence only adds slight depth to the evidence already before the jury.

When ruling on the defense's post-trial motion to modify the jury's death verdict, the trial judge reviewed the evidence that had been presented to the jury.  The judge recognized that "[w]e do have testimony by several experts concerning the defendant having suffered or not suffered or to the extent to which he had suffered from alleged mental deficit, disease or organic brain syndrome" as well as fetal alcohol effects.  (RT 6748.)  The judge also indicated that the jury had been presented with "lots of evidence

on this [Cal. Penal Code section 190.3] (h) factor," including Petitioner's intoxication and the various diagnoses of the testifying experts.  (RT 6755-56.)

During the motion hearing, the trial judge reasoned that despite Petitioner's intoxication and mental condition, he "had the presence of mind to strike out" at the victim, then "had the presence of mind to then go through the house almost systematically looking for other property," that he "had the presence of mind to leave the Oceanside area later that day, the next day for Albuquerque," and that he "had the presence of mind to hide the jewelry," and stated: "I think from all of that, even if he were intoxicated or suffering from some mental disorder or some personality disorder, he knew what he had done."  (RT 6757-58.)  The judge reasoned as follows:

> Accordingly, I would conclude under the (h) factor that even if there were evidence of intoxication, and there is some evidence of that, and evidence of some personality disorder or mental disease or defect, I conclude that it did not impair his ability to appreciate the fact that he had committed a crime or to otherwise prevent him from conforming his conduct to the legal requirements. [¶] To put it simply, if you know that you have done something wrong and take steps to hide the fact that you have done something wrong, you obviously have known that what you did was wrong.

(RT 6759.)

The trial judge also acknowledged that there was "lots of evidence that was presented under the (k) factor," such as Petitioner's dysfunctional family situation, including his mother's prostitution, his father's abandonment, and his stepfather's abuse. Petitioner "was treated by his mother and the males with whom his mother associated with either contempt, was passed off as an unwanted child, called a wetback, ignored, unloved and the like," and the jury had been apprised of Petitioner's juvenile legal problems, lack of performance in school, and early abuse of drugs and alcohol.  (RT 6761-62.)

In sum, while Petitioner undoubtedly had a dysfunctional background and upbringing, suffered from a serious substance abuse problem as well as organic brain deficiencies, much of the information Petitioner now offers was presented to the jury at the penalty phase.  The jury was aware of the neglect, the abuse, the organic brain

damage, and Petitioner's alcohol, inhalant, and drug addiction.  The new arguments in mitigation, such as the lack of an escape attempt and positive institutional history, are only of marginal benefit given the facts of the crime and the possibility of cross-examination and rebuttal on Petitioner's prior infractions as well as opening the door to discussion of prior incarcerations that had not been mentioned to the jury.

Based on a review of this record, the Court is not persuaded that there is "a reasonable probability" that presenting the additional mitigation evidence would have resulted in a different penalty phase verdict.  See Strickland, 466 U.S. at 694, see also Richter, 526 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.")  Thus, Petitioner's claims of ineffective assistance of counsel during the penalty phase proceedings fail under a de novo review for lack of prejudice.

Petitioner requests an evidentiary hearing on Claims 4 through 8, specifically with respect to: (1) "What information Mr. Roybal's trial counsel had concerning any brain damage Mr. Roybal may have suffered prior to June, 1989"; (2) "What information from family members or others familiar with Mr. Roybal who were alive in 1992 but are now deceased could have been obtained and presented during his trial"; and (3) "Whether the destruction or inability to locate jail or prison records that would show Mr. Roybal's positive institutional adjustment makes it impossible on habeas corpus to show the full extent of his positive institutional adjustment."  (Pet. EH Mem. at 11, 13, 15.)

Under a de novo review, an evidentiary hearing is warranted if the petitioner: (1) "has alleged facts that, if proven, would entitle him to habeas relief," and (2) "did not receive a full and fair opportunity to develop those facts in a state court."  Williams, 384 F.3d at 586.  As discussed above, Petitioner fails to show that the asserted instances of deficient performance were prejudicial.  This Court has thoroughly reviewed the merits of Claims 4-8, including the pleadings and numerous exhibits, and concludes that there is no reasonable probability of a different result at either the guilt or penalty phases.  (See Claims 4-8, supra.)  Because Petitioner's allegations, even if proven to be true, would not entitle him to habeas relief, the Court need not hold an evidentiary hearing.  See

1    <u>Totten</u>, 137 F.3d at 1176 ("[A]n evidentiary hearing is *not* required on issues that can be

2    resolved by reference to the state court record.").  Petitioner is not entitled to habeas

3    relief on Claim 8.

4        **6.    <u>Claim 9</u>**

5        Petitioner contends that trial counsel was ineffective for failing to object to the

6    prosecutor's improper  statements during closing arguments, including: (1) erroneous

7    statements about the weighing of aggravating and mitigating evidence, and (2) references

8    to, and recitation of, biblical law.[38]  (FAP at 272-74.)

9        Petitioner raised this contention as part of Claim 1 in the state habeas petition.

10   (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits

11   without a statement of reasoning.  (Lodgment No. 144.)  Petitioner previously raised the

12   biblical law aspect of this claim on direct appeal, along with a corresponding claim of

13   prosecutorial misconduct.  (<u>See</u> Lodgment No. 123 at 187-98.)  The California Supreme

14   Court rejected Petitioner's claim of ineffective assistance of counsel for failing to object

15   to the prosecutor's biblical remarks in a footnote to the adjudication of the corresponding

16   claim of prosecutorial misconduct, as follows:

17           FN13 Defendant also argues that his trial counsel's failure to
18           object to the prosecutor's remarks violated his right to
             effective assistance of counsel. He cannot make such a
19           showing; there was no prejudicial prosecutorial misconduct.

20   <u>Roybal</u>, 19 Cal. 4th at 521.

21       Petitioner argues that the Court should review Claim 9 de novo because "it is

22   impossible to find, beyond speculation, what was the reason for the California Supreme

23   Court's 'post card' denied [sic] of this claim on the merits."  (FAP at 275.)  Petitioner

24   asserts that if the California Supreme Court denied this claim on the performance prong,

25   such a conclusion was an unreasonable application of <u>Strickland</u> to the facts, and if the

26   state court denied the claim for lack of prejudice, "such a determination would have been

27   ─────────────────

28           [38] In the FAP, Petitioner raised corresponding claims of prosecutorial misconduct as Claims 13 and 12, respectively, which the Court addressed above.  (<u>See</u> <u>supra</u>.)

based on an incomplete trial record." (Id.)  Only part of this claim was denied without a statement of reasoning.  As noted, the California Supreme Court heard and rejected the biblical law aspect of this claim in a reasoned opinion on direct appeal, stating that there was no prejudicial prosecutorial misconduct and thus no ineffective assistance. Therefore, the grounds for the state court's rejection of the biblical law portion of the claim are clearly stated, and do not persuade the Court that de novo review of that aspect of the claim is appropriate.

With respect to the other aspect of this claim, allegations of misconduct stemming from the prosecutor's argument about weighing the penalty phase evidence, Petitioner's reference to the "incomplete trial record" belies the fact that there is a complete record of the trial, appellate, and post-conviction proceedings; Petitioner appears to be instead referring to the completeness, or lack thereof, of trial counsels' files.  Here, the contested remarks and lack of objection by trial counsel are contained in the record, as are declarations from both trial counsel, in which each attorney states that they did not recall any strategic or tactical reason for failing to object to the prosecutor's weighing argument.  (See Exs. 66, 67, Lodgment No. 143 at 7, 18.)  Given these materials, Petitioner fails to show how stated deficiencies in trial counsels' files precluded the California Supreme Court from adjudicating Claim 9 on this record.

In Claim 13, this Court held that even were it to assume, without deciding, that the prosecutor's weighing argument was an erroneous statement of law, Petitioner failed to demonstrate that the statement "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden, 477 U.S. at 181, quoting Donnelly, 416 U.S. at 643.  Particularly in light of the trial court's detailed instructions to the jurors about weighing the evidence in aggravation and mitigation, which served to ameliorate any negative impact brought about by the prosecutor's argument, the Court cannot conclude that counsel's failure to object amounted to prejudicially deficient performance.  The state court's rejection of this aspect of Claim 9 was not objectively unreasonable.

With respect to Claim 12, the California Supreme Court acknowledged that the prosecutor's biblical references constituted "clear misconduct," but found that the misconduct was not prejudicial. Roybal, 19 Cal. 4th at 521. Both the California Supreme Court and this Court agree that the prosecutor clearly committed misconduct in his repeated use of biblical scripture to support his argument that the death penalty was warranted in Petitioner's case, and urging the jurors that the Bible stated that a murderer "shall surely be put to death." (RT 6470.) However, this Court has found that the California Supreme Court's prejudice determination was unreasonable, and that the error asserted in Claim 12 had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

It is similarly evident to this Court that defense counsel's failure to object to the prosecution's improper biblical argument constituted prejudicially deficient performance and that the California Supreme Court's rejection of this claim was objectively unreasonable. Under Strickland, "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." Mirzayance, 556 U.S. at 122, citing Strickland, 466 U.S. at 687. On habeas review, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 562 U.S. at 101.

The California Supreme Court acknowledged that trial counsel failed to object to the prosecutor's improper religious argument, but reasoned that the claim of ineffective assistance of counsel was without merit because "there was no prejudicial prosecutorial misconduct." Roybal, 19 Cal. 4th at 521 fn. 13. For the reasons discussed in greater detail in the adjudication of Claim 12, the California Supreme Court was objectively unreasonable in concluding that any error was harmless and did not result in prejudice to Petitioner. Accordingly, because the California Supreme Court's adjudication was based on an erroneous and unreasonable prejudice determination, the Court will conduct a de novo review of this claim. See Richter, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the Strickland standard was unreasonable.")

99cv2152

To begin with, "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." Cunningham, 704 F.3d at 1159, quoting Necoechea, 986 F.2d at 1281. In this instance, it is clear that the prosecutor's closing remarks, which repeatedly quoted biblical passages commanding that a murderer "shall surely" be put to death, drew parallels between state law and biblical law to support his case, and advocated that the Bible demanded a death sentence constituted "egregious misstatements." Trial counsel did not raise any objection to this argument and failed to either request a curative instruction or address the comments in their own closing argument.

Nor does the record support a conclusion that counsel made a tactical decision to refrain from objecting during closing arguments. The record shows that defense counsel made numerous objections to other portions of the prosecutor's closing argument. (See e.g. RT 6399, 6404, 6420, 6429, 6433, 6444.) These other objections only serve to underscore that counsel's failure to object to the prosecutor's reliance on biblical authority fell outside the "wide range" of reasonable conduct. Had counsel raised a timely objection after the prosecutor's initial reference, he could have at the very least curtailed the remainder of the argument and requested a curative instruction neutralizing the condemnable misconduct. On this record, counsels' complete silence and utter lack of action in the face of such clearly improper and inflammatory argument cannot be considered reasonable or tactical.

Yet, in order to warrant habeas relief, a petitioner must also establish prejudice from counsels' deficient performance, by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112. Because of defense

counsels' complete failure to object to the clear misconduct in this case, the biblical argument went unchallenged and unaddressed. Compare Donnelly, 416 U.S. at 645 (finding a lack of prejudice where the challenged comment, "admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions.") As discussed at length in Claim 12 above, the biblical comments here were unambiguous, calculated for dramatic effect at the close of argument, and comprised of direct biblical quotations demanding a sentence of death. Moreover, the offending references were presented in juxtaposition to the guiding principles of the Penal Code, as if the jury had an alternative to returning a death verdict if they could not base such a result upon the law as set forth in the jury instructions. It is quite evident that the prosecutor "clearly intended to appeal to religious authority" and "meant this argument to have an effect on the jury." Sandoval, 241 F.3d at 780. Here, where the jury clearly struggled with the penalty phase determination, deliberated for portions of six court days after hearing nine days of penalty phase testimony, and on two separate days expressly informed the trial judge that they were unable to reach a unanimous sentencing decision, it is clear that given the severity of the misconduct, counsel's concurrent failure to act was prejudicial.

Had counsel raised a timely objection to the prosecutor's biblical argument, the trial judge could have instructed the jurors to confine their penalty phase deliberations to the law as set forth in the jury instructions and completely disregard the religious authority cited by the prosecutor. The failure of defense counsel to object to such egregious misconduct and secure an admonition deprived defendant of the fundamental fairness of a death penalty proceeding free from foul prosecutorial blows. Given the misconduct and its likely impact on the jury's deliberations, the failure of defense counsel "undermine[d] confidence in the outcome" of Petitioner's penalty phase proceedings. Strickland, 466 U.S. at 694. Given the nature and context of defense counsels' ineffectiveness, the Court is convinced that there existed a "substantial" likelihood of a different result had counsel performed effectively. See Richter, 562 U.S.

1    at 112.  Petitioner is entitled to habeas relief on Claim 9.

2        **7.**    **Claim 10**

3        Petitioner contends that trial counsel rendered prejudicially deficient performance

4    in failing to obtain juror declarations in support of the defense motion for a new trial

5    because "reasonably competent counsel would have been aware that California law

6    required, in order to get a hearing on juror misconduct, sworn declarations of jurors

7    detailing the misconduct," and argues that trial counsel's failure to secure declarations

8    "foreclosed Mr. Roybal from examining jurors" to determine if there was bias or if the

9    jurors could be fair in considering the evidence in his case.  (FAP at 277-80.)

10       Petitioner raised this contention as part of Claim 1 in the state habeas petition.

11   (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits

12   without a statement of reasoning.  (Lodgment No. 144.)

13       Similar to his contention in Claim 9, Petitioner contends that because this claim

14   was denied without an adequate record, de novo review is necessary.  (FAP at 280-81.)

15   He asserts that if the California Supreme Court found no showing of deficient

16   performance, such a conclusion would have constituted an unreasonable application of

17   Strickland. (FAP at 281.)  Petitioner argues that the "only possible basis for a denial of

18   relief on this claim was that Mr. Roybal failed to demonstrate prejudice, but such a

19   determination would have been based on an incomplete trial record without a hearing to

20   determine if there was actual or implied bias against him."  (Id.)  Yet, as with Claim 9,

21   Petitioner's reference to the "incomplete trial record" does not address the fact that there

22   *is* a complete record of the trial, appellate, and post-conviction proceedings; again,

23   Petitioner appears to be instead referring to the completeness, or lack thereof, of trial

24   counsels' files.  The record contains a transcript of the post-trial hearing and counsels'

25   arguments regarding the juror misconduct, the motion for a new trial and counsels'

26   declarations, and the post-conviction declaration of Juror Nelson.  Both trial attorneys

27   have submitted declarations from both trial counsel stating that neither recall any

28   strategic or tactical reason for failing to obtain juror declarations in support of the motion

1    for a new trial rather than supporting the motion with the declaration of counsel.  (See
2    Exs. 66, 67, Lodgment No. 143 at 7-8, 18-19.)   Petitioner fails to show how any
3    deficiencies in the completeness of trial counsels' files compromise the adequacy of the
4    record with respect to this claim.

5        After Petitioner's conviction and penalty phase verdict, the defense moved for a
6    new trial on several grounds, including juror misconduct.  (See RT 6705-15.)  The
7    defense alleged that during deliberations, several jurors discussed their own experiences
8    with abuse in their families, even though only one juror indicated such a history in the
9    completed juror questionnaires.  (CT 2241-46, 2256-57.)  The defense's investigator
10   contacted the jurors after the trial, obtained substantive responses from Jurors Thomas
11   and Nelson, and counsel indicated that: "Mr. Kennedy [the defense investigator]
12   attempted to have further interviews with some of the jurors.  I am informed and believe
13   that some of the jurors were hesitant to speak further with Mr. Kennedy." (CT 2256-57.)
14   The prosecution objected to defense counsel's declaration and moved to strike it as
15   hearsay. (RT 6705, 6707-10.)  Defense counsel explained that the investigator was on
16   vacation when the motion was filed, but had interviewed the jurors and was present in
17   the courtroom, and stated that: "The jurors were not very open to Mr. Kennedy upon his
18   second effort to contact them, and I'm not sure why that was, but we were unable to
19   obtain affidavits from the jury on our efforts to get back to the jury."  (RT 6706.)
20   Specifically, defense counsel noted that the investigator spoke again to Juror Thomas,
21   and: "Mr. Thomas was unable to give us any further information to us at that time, and
22   the impression was left that he did not want to talk to Mr. Kennedy any further about
23   this."  (RT 6708.)   The trial court granted the prosecution's motion to strike the
24   declaration as hearsay and concluded that any similar statement by the defense
25   investigator would also constitute hearsay.  (RT 6714-16.)

26       Petitioner points out that he was able to obtain a juror declaration during post-
27   conviction proceedings, and argues that trial counsel was ineffective for failing to obtain
28   post-trial declarations from the jury members.  Juror Nelson states that "I spoke to an

investigator for the defense after the verdict in 1992, and I relayed this information to him, but no one asked me to provide a declaration on this topic until now."  (Ex. 31, Lodgment No. 138 at 1166-67.)  Trial counsel both state:

> Unlike the affidavit I filed in support of the motion for new trial, the declaration of juror Nelson filed with the habeas petition was not hearsay but described what the juror saw and heard from other jurors as to the conduct of those jurors.  I recall no strategic reason for me not to follow the existing case law requiring a declaration from the juror directly and not what was told to my investigator.

(Exs. 66, 67, Lodgment No. 143 at 7-8, 18-19.)

In any event, regardless of counsels' asserted failure to obtain post-trial declarations from the jurors, this claim is without merit because Petitioner fails to demonstrate prejudice.  As discussed in greater detail in Claim 25, even to the extent the Court can consider the content of the submitted juror declaration, Petitioner has not shown that the jurors were intentionally dishonest in their questionnaire or voir dire responses, or that they were biased against Petitioner.  (See Claim 25, supra.)  The questionnaires covered a range of topics and a number of jurors indicated experience with matters similar to child abuse and domestic violence, such as alcoholism in their families, child abuse, or domestic violence counseling, and violence as a result of alcoholism, as well as the vague wording and lack of definition of the term "close to you," and the Court cannot conclude that the jurors' answers to the cited questions were either deliberately dishonest or indicative of bias.  See Dyer, 151 F.3d at 973 ("[A]n honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality."), citing McDonough, 464 U.S. at 555-56.  Based on this review of the record, Petitioner has not demonstrated a "reasonable probability that, but for  counsels' allegedly unprofessional errors in failing to obtain juror declarations, the result of the proceedings would have been different."  Strickland, 466 U.S. at 694.  Petitioner does not merit habeas relief or an evidentiary hearing on Claim 10.  See Totten, 137 F.3d at 1176 ("[A]n evidentiary hearing is *not* required on issues

1  that can be resolved by reference to the state court record.").  Petitioner is not entitled

2  to habeas relief on Claim 10.

3  **8.  Claim 28**

4  Petitioner asserts that his "direct appeal did not allege either prosecutorial

5  misconduct as a result of the prosecutor's erroneous argument that discounted the effect

6  of any one factor in mitigation as a reason not to impose a sentence of death, and the

7  related error arising from the trial court's sua sponte instructions that minimized the

8  evidence in mitigation of Mr. Roybal's character and background that was offered under

9  California Penal Code § 190.3, subdivision (k)," and that appellate counsel's failure to

10 raise these meritorious issues, Claims 13 and 24 in the FAP, constituted ineffective

11 assistance.  (FAP at 380.)

12 Petitioner raised this contention as part of Claim 10 in the state habeas petition.

13 (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits

14 without a statement of reasoning.  (Lodgment No. 144.)

15 "[A] criminal defendant has a right to effective assistance of counsel on a first

16 appeal as of right." Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 284 (1998),

17 citing Evitts v. Lucey, 469 U.S. 387, 394-96 (1985).  However, "appellate counsel has

18 no constitutional obligation to raise every non-frivolous issue requested by the

19 defendant." Miller v. Keeney, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989), citing Jones v.

20 Barnes, 463 U.S. 645, 751-54 (1983).  "In many instances, appellate counsel will fail to

21 raise an issue because she foresees little or no likelihood of success on that issue; indeed,

22 the weeding out of weaker issues is widely recognized as one of the hallmarks of

23 effective appellate advocacy." Miller, 882 F.2d at 1434.  To merit relief, a petitioner

24 must satisfy Strickland by showing both that counsel's performance was deficient, and

25 "that there is a reasonable probability that, but for counsel's unprofessional errors,

26 [petitioner] would have prevailed on appeal." Id. at 1433-34, citing Strickland, 466 U.S.

27 at 688, 694.

28 While not raised on direct appeal, Claims 13 and 24 were each raised in the state

habeas petition, and the California Supreme Court found that Petitioner was not entitled to habeas relief on either claim.  Petitioner also raised these two claims in the instant Petition, and this Court has similarly found the claims lacking in merit.  With respect to Claim 13, in which Petitioner asserts that the prosecutor committed misconduct by making an erroneous statement about California sentencing law in closing arguments, the Court concluded that even assuming the argument constituted misconduct, given the trial court's instructions to the jury outlining the correct legal standard and admonishments that the statements of counsel were not evidence, the statement did not render the proceedings unfair.  (See Claim 13, supra.)  With respect to Claim 24, the Court rejected Petitioner's contention that the trial court erred in giving the jury a sua sponte instruction in response to their deadlock that improperly minimized the evidence presented in mitigation, reasoning that a simple mention of expert testimony did not minimize the jury's consideration of the other mitigation evidence, as the trial court clearly stated that there was "a lot" of evidence in mitigation and directed the jurors as to factor (k), which allowed them to consider in mitigation "anything about the defendant, his background, his upbringing, any sympathetic factor and so forth." (See Claim 24, supra, quoting RT 6657.)

Thus, even had appellate counsel raised Claims 13 and 24, the Court finds no "reasonable probability" of a different result on appeal.  Strickland, 466 U.S. at 694; see also Miller, 882 F.2d at 1434 n. 9 (in evaluating a claim of ineffective assistance of appellate counsel, "the appeal is the relevant proceeding to consider."), citing United States v. Birtle, 792 F.2d 846, 849 (9th Cir. 1986) and Strickland, 466 U.S. at 694. "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel." Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982).

The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 28.

**D.   CLAIMS CONCERNING POST-CONVICTION PROCEEDINGS**

    **1.   <u>Claims 26 and 27</u>**

In Claim 26, Petitioner contends that "[t]he destruction of the trial files denied Mr. Roybal his Due Process Right under the Fourteenth Amendment to the effective assistance of habeas counsel given that California has created the right to appointed counsel in habeas corpus proceedings" and "rendered effective judicial review of any habeas corpus claim in state court impossible, a further Due Process violation making it impossible for Mr. Roybal to pursue habeas relief in state court." (FAP at 356.)  In Claim 27, Petitioner argues that "[t]he destruction of the trial files not only made it impossible for successor counsel to determine what issues could be raised and substantiated, but also irreparably compromised the ability of a reviewing court to conduct a meaningful review of the claims raised on habeas corpus," depriving him of his constitutional rights.  (FAP at 376.)

Petitioner raised these claims as Claim 11 of the state habeas petition. (Lodgment No. 133.)  The California Supreme Court rejected that claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

Specifically, Petitioner asserts that the actions of prior habeas counsel, who was responsible for the destruction of trial counsels' files, combined with the lack of supervision and monitoring by the California Supreme Court and state agencies responsible for monitoring capital cases, have rendered current habeas counsel ineffective and violated his right to due process.  (FAP at 355-63, 367-71.)  Petitioner asserts that despite the substantial efforts of counsel, the complete files could not be recovered or reconstructed.  (<u>Id.</u> at 363-67.)  Petitioner states that: "The destruction of the trial files vitiated Mr. Roybal's right under California law to habeas corpus attacking a capital conviction because the destruction of the trial files rendered it impossible to determine what trial counsel knew or could have known because trial counsel's records have been destroyed." (<u>Id.</u> at 377.)  Petitioner nevertheless argues that "it is possible to identify some areas where the lack of trial files directly compromises Mr. Roybal's

ability to present an effective habeas corpus petition on the issue of ineffective assistance of counsel." (Id.) He has identified five areas in which he alleges that his ability to present an effective habeas corpus petition has been compromised:

1.  Information trial counsel had concerning any brain damage he may have suffered prior to June 1989.

2.  Information from family members or other individuals, who were alive in 1992 but are now deceased, that could have been obtained and presented at trial.

3.  Ability to preserve/present information re: juror misconduct- i.e., Juror Hat, who indicated misconduct, is now deceased.

4.  Destruction or inability to locate jail records showing Petitioner's "positive institutional adjustment."

5.  Destruction "also makes it impossible to determine if the prosecution had produced all discovery" under state law and Brady/Kyles.

(Id. at 377-78.)

Petitioner argues that both a current practicing habeas practitioner and former habeas counsel Babcock "stated the need for habeas corpus counsel to review the trial files in order to assess any prejudice from trial counsel actions or omissions, and that counsel could not present an effective habeas corpus petition with the state of the trial files in this case." (Traverse at 45-46.) At a 2007 state superior court hearing on Petitioner's post-conviction discovery motion, Babcock was asked about the files he recovered from Barranco in 2004: "As former habeas counsel, do you think you could have prepared the habeas corpus petition with the boxes in condition they were in?" to which he replied "It would be impossible." (Ex. 59, Lodgment No. 139 at 1536-37.) Meanwhile, in 2008, attorney Verna Wefald, an appellate and habeas practitioner in California state and federal court, reviewed nine boxes of recovered trial files kept in storage, and stated:

In my opinion, these boxes and their contents are completely useless in assisting Mr. Roybal's current counsel in raising habeas claims. The boxes and their contents would not assist in refreshing anyone's recollection. The boxes and their contents cannot be used to prove what investigation was done by trial counsel and/or what evidence was disclosed by the prosecution at the time of trial. Because of the poor condition of the trial

files, in my opinion Mr. Roybal will be deprived of his right to investigate, to plead and to prove IAC or Brady claims.

(Ex. 61, Lodgment No. 142 at 33.)

Both Claims 26 and 27 are centered on Petitioner's contention that the destruction of trial counsels' files has prevented the effective presentation and review of his habeas corpus petition and frustrated the exercise of his right to habeas corpus review. Because these claims are premised on events that took place during post-conviction proceedings, namely, the destruction of trial counsels' files by prior habeas counsel, Petitioner fails to show that federal habeas is an appropriate forum. See Murray v. Giarratano, 492 U.S. 1, 10 (1989) ("State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal.") The Ninth Circuit has held that "a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989); see also Villafuerte, 111 F.3d at 632 n.7 (petitioner's claim that "he was denied due process in his state habeas corpus proceedings" was "not addressable in a section 2254 proceeding."), citing Franzen, 877 F.2d at 26; see also Cooper v. Neven, 641 F.3d 322, 331-32 (9th Cir. 2011) (dismissing petitioner's alleged violations of due process "stemming from the state trial court's failure to conduct an in camera inspection of the prosecutor's trial file during the post-conviction evidentiary hearing" and "arising from the State's destruction or loss of the prosecutor's trial notes," stating that the claims "are not cognizable for federal habeas review."), citing Franzen, 877 F.2d at 26.

In any event, to the extent the Court can even address Petitioner's contention that he was denied the exercise of federal habeas review, given that the asserted error took place during post-conviction proceedings and were the result of actions by prior counsel rather than the State, the United States Supreme Court has generally affirmed that "prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821 (1977). "[Supreme Court] decisions have consistently required States to

shoulder affirmative obligations to assure all prisoners meaningful access to the courts." Id. at 824.  To demonstrate a claim for relief, a petitioner must show "actual injury," for instance, that a "nonfrivolous legal claim had been frustrated or was being impeded." Lewis v. Casey, 518 U.S. 343, 351-53 (1996).

Petitioner speculates that with complete trial counsels' files, he may have been able to raise additional claims of ineffective assistance of counsel or Brady violations, but Petitioner fails to demonstrate that he was prevented from raising any specific claim due to the destruction of the files.  In 2004, Babcock stated that the effective preparation of a habeas petition would have been "impossible," and attorney Wefald states that the condition of the files she viewed in 2008 would prevent Petitioner from investigating, pleading, or proving Brady claims or claims of ineffective assistance of counsel, but Petitioner fails to show that he was actually prevented from raising or proving such claims.  Indeed, the state habeas petition contained several claims alleging ineffective assistance of counsel, supported by numerous volumes of exhibits.   The FAP, meanwhile, contains those same claims of ineffective assistance of counsel asserting deficiencies in pre-trial preparation, as well as the guilt phase, penalty phase, and post-trial actions of counsel, in addition to the alleged failures of appellate counsel.

Petitioner asserts that the loss of the files compromises his ability to present an effective petition with respect to evidence that could have been presented at trial, such as evidence in trial counsels' possession of brain damage, family member evidence from individuals alive in 1992 who are now deceased, juror information, and jail records. Again, Petitioner only speculates that such information may have been contained in counsels' files and was destroyed.  Moreover, Petitioner presented several claims in both the state and federal habeas petitions, supported by declarations and other documentation.  In Claims 5 and 6 of the instant Petition, Petitioner contends that trial counsel was ineffective for failing to present evidence of Petitioner's brain damage during the guilt and penalty phases, and has attached numerous expert declarations and copies of evaluations performed both in preparation for trial and during post-conviction

proceedings.  (See Exs. 8-12, Lodgment No. 134; Exs. 60, 65, Lodgment No. 142.)  In Claim 7, Petitioner asserts that counsel failed to properly investigate and present his social history, and has attached numerous declarations from family members and a social history prepared by a psychologist.  (See Exs. 1-5, 13, Lodgment No. 134.)  In Claim 8, Petitioner asserts that trial counsel failed to present evidence of Petitioner's positive institutional adjustment, and has attached numerous correctional records as well as an expert declaration from a professor specializing in psychology and law.  (See Exs. 21-23, 27-29, 30, Lodgment Nos. 135, 137, 138.)  Finally, in Claims 10 and 25, Petitioner raises claims regarding juror misconduct and ineffective assistance of counsel, and has attached one juror declaration, as well as a declaration from an investigator who located and interviewed ten of Petitioner's trial jurors, as well as one alternate juror.  (See Lodgment No. 138 at 1166-69, Exs. 31, 32.)  The claims of ineffective assistance of counsel are also supported by the declarations of both trial counsel regarding their recollections and review of available documentation.  (See Exs. 66, 67, Lodgment No. 143.)  Given that the state habeas petition contained a total of twenty claims, and was supported by over 60 exhibits totaling over 1500 pages, Petitioner fails to specify how the destruction of trial counsels' files resulted in "actual injury," such as preventing him from raising valid claims for relief.

Petitioner also fails to offer any indication that the destruction of the trial files prevented the presentation of a Brady claim.  The only claim in the FAP that implicates Brady is Claim 1, which was raised on direct appeal.  As such, there is no indication that the destruction of trial counsels' files had any impact on current counsels' ability to plead or prove this claim.  Petitioner fails to show the existence of any other Brady claim that he was unable to present because of the loss of files.  During post-conviction proceedings, the record reflects that the trial prosecutor assisted habeas counsel in their attempts to reconstruct the record by providing copies of the trial discovery, which included both discovery provided to the defense by the prosecution, as well as discovery the prosecution was provided by the defense.  (See Exs. 59, Lodgment No. 139 at 1558.)

After continued litigation on the post-conviction discovery issues, including extended discussion regarding the continued inability to locate the lost doorjamb evidence, the state superior court ruled that the prosecutor had complied with the discovery order. (See Ex. 64, Lodgment No. 142 at 121.)

In sum, while Petitioner speculates that with intact trial counsels' files, he *may* have been able to raise additional claims of ineffective assistance of counsel or Brady violations, he has not demonstrated "actual injury" with respect to his ability to present a habeas corpus petition in state or federal court, nor has he pointed to any specific claim that he was unable to present. Casey, 518 U.S. at 351-53. Thus, even to the extent this contention may be cognizable on federal review, Petitioner fails to demonstrate a constitutional violation based on his prior habeas counsels' destruction or loss of trial counsels' files.[39] As such, these claims fail even under a de novo review.

Accordingly, for the reasons discussed above, with respect to the entirety of Claims 26 and 27, the Court cannot conclude that the California Supreme Court's rejection of these claims was either contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on these claims. Accordingly, the Court denies Petitioner's request for an evidentiary hearing or discovery on these claims. See Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless

---

[39] Petitioner's assertion in Claim 26 that the destruction of trial counsels' files denied him the effective assistance of counsel in his habeas proceedings also fails to find support in clearly established federal law. "There is no constitutional right to an attorney in state post-conviction proceedings." Coleman v. Thompson, 501 U.S. 722, 752 (1991), citing Pennsylvania v. Finley, 481 U.S. 551 (1987) and Murray v. Giarratano, 492 U.S. 1 (1989). "Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman, 501 U.S. at 752, citing Wainwright v. Torna, 455 U.S. 586 (1982) (per curiam); see also Bonin v. Calderon, 77 F.3d 1155, 1159 (9th Cir. 1996) ("We and the Supreme Court repeatedly have held that there is no constitutional right to effective assistance of counsel in habeas corpus cases."), citing Coleman, 501 U.S. at 755, Finley, 481 U.S. at 551, 555, Bonin v. Vasquez, 999 F.2d 425, 429 (9th Cir. 1993), Harris v. Vasquez, 949 F.2d 1497, 1513-14 (9th Cir. 1990). Section 2254 clearly states that: "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i).

once the district court has determined that § 2254(d) precludes habeas relief."); <u>Kemp v. Ryan</u>, 638 F.3d 1245, 1260 (9th Cir. 2011) ("Because Kemp is not entitled to an evidentiary hearing, the district court did not err in denying his request for discovery, as well as his request for a hearing.")

### 2. Claim 29

Petitioner asserts that he was deprived of the effective assistance of counsel and equal protection under the Sixth and Fourteenth Amendments to the Constitution "because private attorneys are appointed to prepare his petition for a writ of habeas corpus. Similarly situated condemned prisoners who are represented by the Habeas Corpus Resource Center or the Office of the State Public Defender have more resources devoted to their cases." (FAP at 380-81.) Petitioner also challenges numerous aspects of the State of California's post-conviction procedures, including the compensation system, filing deadlines, and the fact that the petition is heard only by the California Supreme Court, asserting that the California Supreme Court "is more vulnerable to political pressure than appellate courts." (<u>Id.</u> at 380-83.) He also asserts equal protection violations based on filing deadlines in capital cases that do not exist in non-capital cases and differences in the appellate review system for capital and non-capital petitioners. (<u>Id.</u> at 382-83.)

Petitioner raised this claim as Claim 13 of the state habeas petition. (Lodgment No. 133.) The California Supreme Court rejected this claim on the merits without a statement of reasoning. (Lodgment No. 144.)

As an initial matter, with respect to Petitioner's equal protection claims stemming from the different procedures for petitions from capital and non-capital prisoners, the Court addresses this constitutional issue in greater detail in the adjudication of Petitioner's equal protection claim. (<u>See</u> Claim 35, <u>infra</u>.) Briefly, as capital and non-capital prisoners are not "similarly situated" to one another, different rules regarding the adjudication of their petitions do not appear amenable to an equal protection analysis. <u>See</u> <u>Massie v. Hennessey</u>, 875 F.2d 1386, 1389 (9th Cir. 1989) ("The relevant

comparison for equal protection purposes is between two defendants, both of whom are sentenced to death.") Petitioner fails to cite to any clearly established law supporting his contention that the State of California's capital case filing deadlines or the California Supreme Court's jurisdiction over capital petitions offends federal constitutional principles. Moreover, Petitioner fails to offer any indication that the existence of filing deadlines or the California Supreme Court's jurisdiction prejudiced his ability to prepare and file a state habeas petition, complete his state habeas proceedings, or violated his federal constitutional rights.

Petitioner also asserts that he "and all other condemned prisoners are prejudiced because their post conviction procedures only go to one court, the California Supreme Court, which is more vulnerable to political pressure than appellate courts, since three members of the Bird court were voted off the court because of death penalty decisions," and contends that appointments to the California Supreme Court "are more political" than those to the lower state appellate courts. (FAP at 382.) However, Petitioner fails to offer any factual support for this generalized and conclusory assertion of prejudice. See Withrow v. Larkin, 421 U.S. 35, 47 (1975) (a claim of judicial bias "must overcome a presumption of honesty and integrity in those serving as adjudicators.") Petitioner fails to cite to any evidence in the record demonstrating that the California Supreme Court justices who adjudicated his direct appeal or state habeas petition were influenced by political pressure which impacted their decisions in this case.

Next, Petitioner contends that his due process rights were violated "by an inherent conflict that exists for all cases in which private counsel are appointed because the same court that rules on the petition also controls and limits the resources of the attorney who prepares the petition." (FAP at 383.) Again, Petitioner fails to offer facts showing that his direct appeal or state habeas petition were impacted by any such conflict.

Finally, Petitioner contends that several aspects of California Supreme Court policies violate constitutional guarantees, particularly the limitations on fees for the investigation and preparation of the state habeas petition by appointed counsel, as

counsel was required to either "agree to a fix fee payment for his or her services at the outset of their appointment" or to be compensated on an hourly basis; "[h]owever, the limit placed on hours for which both counsel will be compensated for preparation of the petition is about 500 hours total, an amount of time completely inadequate for the preparation of a petition in a case of this complexity and history."   (Id. at 381.) Petitioner argues that "the use of flat fees, caps on compensation and lump sum contract is improper under the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 9.1.B.1."   (Id.)   Here too, Petitioner fails to offer any evidence that the California Supreme Court's policies or fee agreement prejudiced his ability to prepare and file a state habeas petition, complete his state habeas proceedings, or violated his federal constitutional rights.   Petitioner contends that the ABA Guidelines "have been repeatedly used by the United States Supreme Court in determining the reasonableness of counsel's performance under the Sixth and Fourteenth Amendments to the United States Constitution in capital cases. (*Rompilla v. Beard, supra*, 545 U.S. at p. 387; *Wiggins v. Smith, supra*, 539 U.S. at p. 522.)"   (FAP at 382.) While these guidelines have been used as tools to evaluate claims of ineffective assistance of counsel, Petitioner fails to offer any clearly established authority supporting their application in this context.   In any event, the United States Supreme Court has made it clear that the guidelines are useful "as evidence of what reasonably diligent attorneys would do," as opposed to outlining requirements for the performance of counsel.   See Van Hook, 558 U.S. at 8 ("Strickand stressed, however, that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition."), quoting Strickland, 466 U.S. at 688.   As such, Petitioner fails to demonstrate that the ABA Guidelines' general disapproval of a capital case fee structure such as California's is sufficient to state a claim of constitutional error.

Petitioner also fails to offer any facts demonstrating that the sums provided for his state post-conviction representation were insufficient for the necessary investigation in this case.   See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations

which are not supported by a statement of specific facts do not warrant habeas relief.") The habeas petition filed before the California Supreme Court in this case was over two hundred pages in length, contained twenty enumerated claims, and was accompanied by six volumes of exhibits.

In sum, given the absence of any controlling authority supporting his contention, the Court cannot conclude that the California Supreme Court's rejection was either contrary to, or an unreasonable application of, clearly established federal law, nor has Petitioner shown that it was based on an unreasonable determination of the facts. Petitioner also requests discovery and an evidentiary hearing on this claim in order to present evidence about the disparity in resources between state agencies and private counsel.  (See Traverse at 117; see also Pet. EH Mem. at 8-9.)  Because Petitioner fails to demonstrate that the facts alleged, if proven, would entitle him to habeas relief, evidentiary development is not warranted on this claim.  See Williams, 384 F.3d at 586.

## E.   STATUTORY CLAIMS

### 1.   Claim 30

Petitioner asserts that his conviction and sentence were imposed in violation of his state and federal constitutional rights, state statutory rights, and international law, "because the death penalty is imposed arbitrarily and capriciously depending on the county in which the case is prosecuted."  (FAP at 383.)

Petitioner relies on Bush v. Gore, 531 U.S. 98 (2000) (per curiam), in asserting that "the United States Supreme Court established that fundamental rights cannot be denied based upon arbitrary and disparate statewide 'standards.'"  (FAP at 384.)  He argues that "the Court held that where a single state entity has the power to assure uniformity in implementing a fundamental right, there must be assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied," and that "[p]ursuant to Gore, implementation of the death penalty in California violates the Equal Protection Clause because the decision whether to seek the death penalty against

a potentially death eligible defendant (i.e., one against whom a murder with special circumstances has been charged) is left solely to the discretion of the prosecutor in the county where the crime was committed." (Id.) However, in Bush v. Gore, a case concerning legal challenges arising from the 2000 presidential election, the Supreme Court specifically stated that "*our consideration is limited to the present circumstances*, for the problem of equal protection in *election processes* generally presents many complexities." Id., 531 U.S. at 109 (emphasis added). Petitioner fails to offer any legal authority in support of his assertion that the case is applicable in this context. Given the expressly limited nature of the Supreme Court's holding, the Court remains unpersuaded that Bush v. Gore is relevant to the issue at hand.

The Supreme Court has also repeatedly rejected the argument that prosecutorial discretion in capital charging violates constitutional principles. See e.g. Jurek v. Texas, 428 U.S. 262, 274 (1976); Proffitt v. Florida, 428 U.S. 242, 254 (1976); Gregg v. Georgia, 428 U.S. 153, 199-200 (1976). The California Supreme Court, applying these holdings, has similarly rejected this contention. See e.g. People v. Williams, 16 Cal. 4th 153, 278 (Cal. 1997), quoting People v. Keenan, 46 Cal. 3d 478, 505 (Cal. 1988) ("[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment."), citing Jurek, 428 U.S. at 274, Proffitt, 428 U.S. at 254, Gregg, 428 U.S. at 199-200.

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Petitioner requests discovery and an evidentiary hearing on this claim in order to "present evidence of the disparity in charging of the death penalty in various counties in California." (Traverse at 132; see also Pet. EH Mem. at 8-9.) Because Petitioner fails to demonstrate that the facts alleged, if proven, would entitle him to relief, evidentiary development is not warranted. See Williams, 384 F.3d at 586.

### 2.   <u>Claim 31</u>

Petitioner contends that his conviction and death sentence violate the California and United States Constitutions "because California's method of execution constitutes cruel and unusual punishment and was adopted by means which violate fundamental principles of procedural and substantive due process."  (FAP at 386.)

Petitioner raised this claim as Claim 19 of the state habeas petition.  (Lodgment No. 133.)  The California Supreme Court denied the claim, stating: "Claim 19 is denied as premature without prejudice to petitioner's filing a renewed petition after any execution date is set.  (*People v. Lawley* (2002) 27 Cal.4th 102, 169, fn. 25.)" (Lodgment No. 144.)

Respondent maintains that the claim is unripe for review.  (Ans. at 123, citing <u>Payton v. Cullen</u>, 658 F.3d 890, 893 (9th Cir. 2011).)   In the Traverse, Petitioner acknowledged that the California Supreme Court denied this claim as premature and concedes that the California Department of Corrections and Rehabilitation ["CDCR"] has not yet put forth new proposed regulations, yet requests that:

> In an abundance of caution and to unquestionably preserve this issue for review, Mr. Roybal asks this Court to not only not dismiss this claim as premature, but to grant discovery and an evidentiary hearing on the constitutional [sic] of lethal injection as a means of carrying out the penalty of death in California if and when the CDCR puts forth its proposed protocol.

(Traverse at 115.)  Petitioner did not include this claim in his Memorandum in Support of Request for an Evidentiary Hearing or Discovery.  (<u>See</u> ECF No. 249.)

The California Court of Appeal has held that the most recent revised protocol is invalid and has "permanently enjoin[ed] the CDCR from carrying out the execution of any condemned inmate by lethal injection unless and until new regulations governing lethal injection execution are promulgated in compliance with the APA [Administrative Procedure Act]."  <u>Sims v. Cal. Dep't of Corrections & Rehabilitation</u>, 216 Cal. App. 4th 1059, 1083-84 (Cal. App. Ct. 2013).

As the parties appear to agree that California lacks a lethal injection protocol at

present, the claim does not appear to be ripe for review.  See Payton, 658 F.3d at 893 ("No new protocol was in place when the district court ruled" on a lethal injection challenge and "the claim was unripe, and it should have been dismissed.")  Other courts in this district have previously denied habeas challenges to California's lethal injection procedures without prejudice as premature.  See Michaels v. Chappell, No. 04cv0122 JAH (JLB) 2014 WL 7047544, at *118-19 (S.D. Cal. December 18, 2014); Ayala v. Chappell, No. 01cv0741 BTM (MDD), 2013 WL 1315127, at *41 (S.D. Cal. March 28, 2013); Carter v. Chappell, 06cv1343 BEN (KSC) 2013 WL 1120657, at * 196-97 (S.D. Cal. March 18, 2013).  This Court is in accord with those decisions.  Claim 31 is denied without prejudice as premature.  Neither discovery nor an evidentiary hearing is warranted on this claim.

### 3.    Claim 32

Petitioner asserts that his conviction and sentence were imposed in violation of his rights under the federal and state constitutions and international law, "because his convictions and sentence were based on inaccurate, unreliable evidence, ambiguous instructions, misleading argument and are disproportionate to Mr. Roybal's culpability." (FAP at 397.)  He argues that due to the ineffectiveness of trial counsel, the jury was not accurately apprised of his mental impairments, the extent of the neglect and abuse he suffered, his head injuries, and his family's mental health history or history of alcohol and drug abuse.  (Id. at 400.)  Petitioner contends that "had trial counsel conducted a reasonably competent investigation and prepared and presented the plethora of available information concerning his harrowing upbringing and psychological and neurological impairments, and had there been meaningful intercase proportionality review, the gross disproportion of his sentence would be readily apparent."  (Id.)

Petitioner raised this claim on state habeas review and the California Supreme Court rejected it on the merits without a statement of reasoning.  (See Lodgment Nos. 133, 144.)  Respondent maintains that "[t]hese contentions are simply a generalized summary of ineffective assistance of counsel arguments made by Roybal in Claims Five,

99cv2152

Six, and Seven of the FAP," and that the California Supreme Court reasonably rejected this claim on habeas review. (Ans. at 124.)

Based on a review of the pleadings and record, it appears that Petitioner has combined and restated his claims of ineffective assistance of counsel to assert that because of counsels' failings, the jury was not provided with accurate information upon which to based their sentencing determination, and that "[t]he person whom the jury believed it was sentencing to death bore little resemblance to Mr. Roybal." (FAP at 400; see also Traverse at 119.) Petitioner claims that counsels' failings deprived him of his right to a reliable and individualized sentencing determination. (FAP at 399.)

The Supreme Court instructs that "an individualized decision is essential in capital cases." Lockett, 438 U.S. at 605. The jury was presented with an extensive mitigation presentation, including expert testimony about Petitioner's organic brain damage, mental health issues, and history of substance abuse. The jury was also presented with detailed testimony about Petitioner's background, including that he was born to an alcoholic mother who prostituted herself, that she neglected Petitioner, resented him for being the product of an affair and breaking up her marriage, and gave him a derogatory nickname, that Petitioner was abused as a child by his stepfather, and that he started abusing inhalants, alcohol, and other drugs at an extremely early age and had struggled with substance abuse issues over several decades. Petitioner's former counselors testified about his efforts in substance abuse treatment and several former employers testified about how Petitioner was reliable and a hard worker. While Petitioner now contends that counsel could have presented additional details about Petitioner's upbringing and the surrounding community, as well as more concrete test results and evidence about his organic brain damage and brain deficiencies, the Court rejected Petitioner's claims of ineffective assistance of counsel. The fact remains that the jury was aware of these factors in mitigation, both Petitioner's dysfunctional and disadvantaged upbringing as well as his mental difficulties, and nevertheless voted to impose the death penalty.

Petitioner also contends that his punishment was disproportionate to his moral

culpability.  Petitioner notes that this was a murder of a single victim and "when compared with other death-eligible cases in which multiple murders, and in the case of infamous capital cases in this district, where over 1,000 murders have been committed by one person or organization, it is not the 'worst case' by the 'worst offender.'" (Traverse at 119.)

"Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" Roper v. Simmons, 543 U.S. 551, 568 (2005), citing Atkins, 536 U.S. at 319.  Certain crimes have been exempted from capital punishment. See e.g. Kennedy v. Louisiana, 554 U.S. 407, 437 (2008) ("As it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the victim's life was not taken."); Enmund v. Florida, 458 U.S. 782, 797 (1982) (death sentence violated Eighth Amendment where the defendant "aid[ed] and abet[ted] a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.")  Certain classes of offenders have also been declared ineligible for the death penalty.  See e.g. Roper, 543 U.S. at 571 ("Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity."); Hall v. Florida, 572 U.S. __, 134 S.Ct. 1986, 1992 (2014) ("No legitimate penological purpose is served by executing a person with intellectual disability."), citing Atkins, 536 U.S. at 317, 320.

While this crime involved a single murder victim, Petitioner fails to demonstrate that the death penalty is disproportionate to his culpability.  Petitioner was convicted of murdering an elderly victim in her home, stabbing her repeatedly and slitting her throat, leaving her to die from deprivation of oxygen and blood loss, in order to steal jewelry. The victim's age, condition, and vulnerability was known to him, as he had done yard work for her and her husband, and was aware that her husband worked nights.  He fled

the state, hid the proceeds of the burglary and robbery, and lied to the police in omitting that he had recently been in California.  Again, the jury was aware of the mitigating circumstances concerning Petitioner's background, upbringing, and mental deficiencies, but still opted for the death penalty.  The trial court, and later the California Supreme Court, upheld these findings.  Petitioner fails to cite to any clearly established law indicating that the death penalty is a disproportionate punishment for a single murder victim.  To the extent Petitioner contends that Petitioner's sentence should be compared to those rendered in other cases, as discussed in Claim 38, <u>infra</u>, comparative proportionality review is not constitutionally mandated.

Because Petitioner fails to demonstrate that the California Supreme Court's conclusion was contrary to, or an unreasonable application of, clearly established federal law, he is not entitled to habeas relief on Claim 32.

### 4.   Claim 33

Petitioner contends that his death sentence "was rendered in violation of his rights under customary international law and *jus cogens*, which prohibit the execution of mentally disordered individuals, and are part of the federal law of the United States and thus the supreme law of the land under Article V1 [sic], Section 2 of the Constitution of the United States (the 'Supremacy Clause')."  (FAP at 401.)

Petitioner raised this contention as Claim 4 in the state habeas petition.  (Lodgment No. 133.)  The California Supreme Court rejected the claim on the merits and denied it on procedural grounds with a citation to <u>Dixon</u>, 41 Cal. 2d at 759.  (Lodgment No. 144.)  As discussed above in section III.A.1, Respondent has not carried the burden of showing that <u>Dixon</u> precludes the Court's review of Claim 33 on the merits.

Petitioner contends that "international law is our law" and that "[t]he prohibition against the imposition of the death penalty on the mentally disordered qualifies as legally binding international law."  (FAP at 401-02.)  Petitioner cites to statements and standards issued by the United Nations, the Council of Europe, the International Convention on the Elimination of All Forms of Racial Discrimination ["CERD"] and the International

1   Covenant on Civil and Political Rights ["ICCPR"] in support of his contentions.  (FAP

2   at 401-07, Traverse at 119-20.)  However, Petitioner fails to offer any support for his

3   contention that these international agreements and statements are enforceable on federal

4   habeas review, nor does he cite to any clearly established law in support of this claim.

5   Meanwhile, the Ninth Circuit has specifically held that "customary international law is

6   not a source of judicially enforceable private rights in the absence of a statute conferring

7   jurisdiction over such claims."  <u>Serra v. Lappin</u>, 600 F.3d 1191, 1197 (9th Cir. 2010).

8   Accordingly, Claim 33 is without merit, as Petitioner "can point to no statute that brings

9   [his] claim within [the Court's] purview."  <u>Id.</u>

10      Given the lack of any clearly established federal law supporting this claim, the

11  Court cannot conclude that the California Supreme Court's rejection of this claim was

12  either contrary to, or an unreasonable application of, clearly established federal law.

13  Petitioner is not entitled to habeas relief on Claim 33.

14      **5.   <u>Claim 34</u>**

15      Petitioner argues that his lengthy confinement under a death sentence, currently

16  over twenty years, and the prospect of execution after such extended confinement,

17  constitutes cruel and unusual punishment.  (FAP at 407-08.)  Petitioner contends that:

18          Carrying out Mr. Roybal's death sentence after the inordinate delay
            described in this claim would violate the Eighth and Fourteenth
19          Amendments because confinement of Mr. Roybal under a sentence of death
            for this extremely prolonged period of time constitutes cruel and unusual
20          punishment in that it subjects Mr. Roybal to extraordinary psychological
            duress as well as the severe physical and social restrictions that inhere in
21          life on death row, and because execution of Mr. Roybal so long after his
            conviction and judgment of death would be excessive, since the penalty
22          would no longer serve the penological purposes either deterrence or
            retribution, which are the only legitimate and constitutionally recognized
23          justifications for capital punishment.

24  (FAP at 408.)

25      Petitioner previously raised this claim as Claim 12 in the state habeas petition, and

26  the California Supreme Court rejected it on the merits without a statement of reasoning.

27  (<u>See</u> Lodgment Nos. 133, 144.)

28      "The Supreme Court has never held that execution after a long tenure on death row

-196-

is cruel and unusual punishment." <u>Allen v. Ornoski</u>, 435 F.3d 946, 958 (9th Cir. 2006). Indeed, the Supreme Court has repeatedly declined to address this question.  <u>See</u> <u>e.g.</u> <u>Lackey v. Texas</u>, 514 U.S. 1045 (1995) (mem.) (Stevens, J., discussing denial of certiorari and observing that the claim has not been addressed, noting "the Court's denial of certiorari does not constitute a ruling on the merits"); <u>see also</u> <u>Valle v. Florida</u>, 564 U.S. ___, 132 S.Ct. 1 (2011) (mem.); <u>Thompson v. McNeil</u>, 556 U.S. 1114 (2009) (mem.); <u>Smith v. Arizona</u>, 552 U.S. 985 (2007) (mem.); <u>Foster v. Florida</u>, 537 U.S. 990 (2002) (mem.).  The Ninth Circuit has also held that <u>Lackey</u> claims are barred by <u>Teague</u>. <u>See</u> <u>Smith v. Mahoney</u>, 611 F.3d 978, 998-99 (9th Cir. 2010) ("[A] state court considering [Petitioner's] Eighth Amendment claim at the time his conviction became final would not have felt compelled by existing precedent to conclude that the rule sought was required by the Constitution.")

In support of his argument, Petitioner relies upon an 1890 United States Supreme Court decision stating that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." (FAP at 409, Traverse at 121, quoting <u>In re Medley</u>, 134 U.S. 160, 172 (1890).) Petitioner argues that because the length of time in <u>Medley</u> was four weeks, "as recognized by Justice Stevens, <u>Medley's</u> description should apply with even greater force in a case such as this, involving a delay that has lasted over fifteen years." (FAP at 49, citing <u>Lackey</u>, 514 U.S. 1045.)  However, in light of the fact that the Supreme Court has on numerous occasions declined to address the claim advanced here, and that the Ninth Circuit has explicitly stated that a <u>Lackey</u> claim does not find support in clearly established law, Petitioner fails to demonstrate how <u>Medley</u> compels the result he seeks.

Recently, Petitioner also submitted as an exhibit several documents and orders filed in a California capital habeas petition in another district court.  (<u>See</u> ECF No. 262, Ex. 68.)  In that case, the petitioner raised a claim contending "that as a result of systemic and inordinate delay in California's post-conviction review process, only a random few

of the hundreds of individuals sentenced to death will be executed, and for those that are, execution will serve no penological purpose." Jones v. Chappell, 31F.Supp.3d 1050 (C.D.Cal. 2014.) The district court vacated the petitioner's death sentence, finding that California's capital system was unconstitutional due to arbitrariness and delays in the post-conviction review process. Id. at 1054. This authority does not support Plaintiff's argument because the Ninth Circuit recently reversed Jones, holding that Teague v. Lane, 489 U.S. 288 (1989) prevents the district court from "consider[ing] novel constitutional theories on habeas review." Jones v. Davis, __ F.3d __. 2015 WL 6994287 (9th Cir. 2015). Petitioner simply fails to provide any clearly established authority in support of his contention. He has not demonstrated that the California Supreme Court's rejection of this claim on appeal was either contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on Claim 34.

### 6.   Claim 35

Petitioner alleges that California's death penalty statute "provides significantly fewer procedural protections for persons facing a death sentence than are afforded for persons charged with non-capital crimes." (FAP at 412.) Respondent maintains that "[c]apital and non-capital defendants are not similarly situated, so the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to non-capital defendants." (Ans. at 131.)

Petitioner's specific arguments are that:

An enhancing allegation in a California non-capital case is a finding that must, by law, be unanimous. *See, e.g.*, California Penal Code §§ 1158, 1158a. No such unanimity is required before a juror can find that a particular fact is aggravating and militates in favor of death. *See, e.g., People v. Prieto*, 30 Cal.4th 226, 265 (2003). When a California judge in a non-capital case is considering which sentence is appropriate: "The reasons for selecting the upper or lower term shall be stated orally on the record, and shall include a concise statement of the ultimate facts which the court deemed to constitute circumstances in aggravation or mitigation justifying the term selected." California Rules of Court, Rule 4.42(e). No such requirement exists in a capital case. *See, e.g., People v. Fauber*, 2 Cal.4th 792, 859 (1992). Furthermore, in a non-capital case, "[c]ircumstances in aggravation and mitigation shall be established by a preponderance of the evidence." Rule 4.42(b). There is no standard of proof in the penalty phase of a capital case. *See, e.g., People v. Hawthorne*,

*supra*, 4 Cal.4th at 79.  In non-capital cases,  defendants are entitled to disparate-sentence review.  California Penal Code § 1170(d).  Those sentenced to death are not. *See, e.g., People v. Crittenden*, 9 Cal.4th 87, 153 (1994).

(FAP at 413-14.)

Petitioner raised this contention as Claim 14 in his state habeas petition and the California Supreme Court denied it on the merits without a statement of reasoning. (See Lodgment Nos. 133, 144.)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985), quoting Plyler v. Doe, 457 U.S. 202, 216 (1982).  The Supreme Court has noted that "the penalty of death is qualitatively different from a sentence of imprisonment, however long." Woodson, 428 U.S. at 305.  "Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is an appropriate punishment in a specific case." Id.

Again, the Ninth Circuit has held that "[t]he relevant comparison for equal protection purposes is between two defendants, both of whom are sentenced to death." Massie, 875 F.2d at 1389.  The Ninth Circuit has also specifically rejected an equal protection challenge to a state rule allowing for different filing deadlines in capital and non-capital petitions.  See Rhoades v. Henry, 638 F.3d 1027, 1055 (9th Cir. 2011) (rejecting due process and equal protection challenge to Idaho statute "which imposes a forty-two day time limit for the filing of post-conviction proceedings in capital cases whereas non-capital defendants have five years within which to pursue post-conviction relief."), citing Hoffman v. Arave, 236 F.3d 523 (9th Cir. 2001).  Moreover, there are procedural protections afforded capital defendants that are not provided to non-capital defendants. Compare e.g., Beck v. Alabama, 447 U.S. 625, 638 (1980) ("[I]f the unavailability of a lesser included offense instruction enhances the risk of an

unwarranted conviction, [the State] is constitutionally prohibited from withdrawing that option from the jury in a capital case.") with Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question.")

Ultimately, because Petitioner has not offered any clearly established law dictating that the existence of different procedural rules for capital and non-capital defendants violate equal protection principles, he fails to show that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on Claim 35.

### 7.   Claim 36

Petitioner contends that the "California death penalty statute under which Petitioner was convicted and sentenced to death fails to adequately narrow the class of persons eligible for the death penalty and creates a substantial and constitutionally unacceptable likelihood that the death penalty will be imposed in an arbitrary and capricious fashion."  (FAP at 415.)

Respondent argues that the "United States Supreme Court has held that California's death penalty statute appropriately narrows the class of death-eligible defendants and does not apply to every defendant convicted of murder.  Tuilaepa v. California, 512 U.S. 967, 972, 114 S. Ct 2630, 129 L. Ed. 2d 750 (1994)."  (Ans. at 132.) Petitioner contends that Tuilaepa is "not controlling," and cites to Justice Blackmun's dissent and Justice Stevens' concurrence, which each "noted that the question whether the later California statute actually complied with Furman [v. Georgia, 408 U.S. 238 (1972)] remained open."  (Traverse at 115.)

"Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. at 189 (plurality opinion).

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Lowenfield v. Phelps, 484 U.S. 231, 244 (1988), quoting Zant, 462 U.S. at 877.

Petitioner argues that California's 1978 death penalty statute, "which was enacted by an initiative measure, violates the Eighth Amendment by multiplying the 'few' cases in which the death penalty is possible into the many." (FAP at 416.) He argues that at the time Petitioner was charged, 28 special circumstances existed, "embracing every type of murder likely to occur," and the current statute contains 33 special circumstances. (Id.) At the time he was charged with first-degree murder, Petitioner argues that 87% of first-degree murderers were death-eligible under California law, while only 9.6% of convicted first-degree murderers were sentenced to death. (Id. at 418.) Petitioner notes that at the time of Furman, "the evidence before the high court established, and the justices understood, that approximately 15-20% of those convicted of capital murder were actually sentenced to death." (Id. at 417.) He contends that California's death penalty law, in which such a high percentage of first-degree murders are death-eligible, does not sufficiently narrow, and the percentage of those actually sentenced to death demonstrates that the statute "permits an even greater risk of arbitrariness than the schemes considered in Furman." (Id. at 418-19.)

Petitioner asserts that "it is in this failure to 'genuinely narrow' that the California death-eligible scheme fails." (Traverse at 116.) However, Petitioner fails to offer controlling authority that supports his argument. Petitioner cites to Wade v. Calderon, 29 F.3d 1312 (9th Cir. 1994), which involved a successful challenge to a jury instruction on the torture-murder special circumstance. Id. at 1319, overruled on other grounds by Rohan ex rel. Gates v. Woodford, 334 F.3d 803 (9th Cir. 2004). Yet Wade is not on point, as Petitioner's case does not involve the torture special circumstance nor any corresponding error in articulating the elements of that circumstance to the jury. Instead, Petitioner alleges that California's statute as a whole is constitutionally infirm. The

Ninth Circuit has rejected this argument on several occasions. For instance, in <u>Karis v. Calderon</u>, 283 F.3d 1117 (9th Cir. 2002), the Ninth Circuit specifically rejected a constitutional challenge to California's capital sentencing statute as a whole, concluding that:

> With regard to this claim, we reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The California statute satisfies the narrowing requirement set forth in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. <u>See id.</u> at 972, 103 S.Ct. 2733. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime. *See id.* California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Arave v. Creech*, 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

<u>Karis</u>, 283 F.3d at 1141 n. 11; <u>see also</u> <u>Mayfield v. Woodford</u>, 270 F.3d 915, 924 (9th Cir. 2001) (en banc) ("A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional.")

Given the lack of clearly established federal law supporting Petitioner's contention that the California capital statute runs afoul of the constitution, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on Claim 36.

**8.   <u>Claim 37</u>**

Petitioner generally contends that the "California death penalty statute is unconstitutional on its face and as applied to Mr. Roybal" because the statute: (1) fails to explain which factors are mitigating and which are aggravating, (2) contains factors that are unconstitutionally vague, standardless, and fail to guide the jury in its penalty determination, (3) does not require written findings as to aggravating factors found true, (4) fails to require unanimity regarding finding an aggravating factor true, (5) fails to require that the jury unanimously and beyond a reasonable doubt find that the

aggravation outweighs the mitigation in order to arrive at a death verdict, (6) fails to provide for comparative appellate review, and (7) fails to require that inapplicable aggravating factors are excluded from the jury's consideration.  (FAP at 419-20.)

Petitioner raised this argument as Claim 17 in his state habeas petition. (Lodgment No. 133.)  The California Supreme Court denied the claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

### A.   Statute Does Not Explain Which Factors are Mitigating and Which Are Aggravating

In support of Claim 37, Petitioner generally asserts that "[s]ection 190.3 requires the sentencing body to consider a unitary list of factors without explaining which factors are aggravating and which are mitigating."  (FAP at 419.)

Petitioner fails to cite any clearly established law supporting his claim.  The Ninth Circuit has specifically rejected this contention.  See Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995) ("The death penalty statute's failure to label aggravating and mitigating factors is constitutional."), citing Harris v. Pulley, 692 F.2d 1189, 1994 (9th Cir. 1982), reversed on other grounds by Pulley v. Harris, 465 U.S. 37, 53-54 (1984). Moreover, the United States Supreme Court has also explicitly rejected the argument that a unitary list of factors rendered California's capital sentencing statute constitutionally infirm, as follows:

> Petitioners also suggest that the §190.3 sentencing factors are flawed because they do not instruct the sentencer how to weigh any of the facts it finds in deciding upon the ultimate sentence.  In this regard, petitioners' claim that a single list of factors is unconstitutional because it does not guide the jury in evaluating and weighing the evidence and allows the prosecution (as well as the defense) to make wide-ranging arguments about whether the defendant deserves the death penalty.  This argument, too, is foreclosed by our cases.  A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.

Tuilaepa, 512 U.S. at 978-79.

In light of this authority, the Court cannot conclude that the California Supreme Court's rejection of this contention was either contrary to, or an unreasonable application of, clearly established federal law.

### B.   Vague and Standardless Factors

Petitioner contends that "[t]he section 190.3 factors are unconstitutionally vague and standardless and fail to guide the jury in distinguishing between those defendants who deserve the death penalty and those who do not."  (FAP at 419.)

Again, Petitioner fails to cite any clearly established law supporting his contention.  The Supreme Court has previously upheld the constitutionality of the California death penalty statute, specifically rejecting challenges of vagueness as to factors (a), (b), and (i). See Tuilaepa, 512 U.S. at 975-78.  The Tuilaepa Court stated that "vagueness review is quite deferential," and explained that "a factor is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'"  Tuilaepa, 512 U.S. at 973, quoting Jurek, 428 U.S. at 279 (White, J., concurring).

In light of explicit authority upholding California's capital statute in the face of a vagueness challenge, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law.

### C.   Statute Does Not Require Written Findings

Petitioner argues that California's capital statute is unconstitutional because "[t]here is no requirement of written findings on an aggravating factor found to be true."  (FAP at 419.)

The Ninth Circuit has held that California's death penalty statute "need not require written jury findings in order to be constitutional." Williams, 52 F.3d at 1484-85, citing Harris, 692 F.3d at 1195-96, reversed on other grounds by Harris, 465 U.S. at 53-54.  Petitioner fails to cite any clearly established federal law supporting his contrary contention.

In the absence of any such authority, this Court is unable to conclude that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law.

**D.     Statute Does Not Require Unanimity Regarding Aggravating Factors**

Petitioner generally asserts that "[t]here is no requirement of penalty jury unanimity regarding the presence of an aggravating factor found in support of the death judgment." (FAP at 420.)

Petitioner does not offer substantive argument, or cite to any clearly established law, to support of his contention. As such, Petitioner has failed to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or involved an unreasonable application of, clearly established federal law.

**E.     Statute Does Not Require Unanimity Beyond a Reasonable Doubt As To the Penalty Decision**

Here, Petitioner generally asserts that "[t]here is no requirement that the penalty jury determine beyond a reasonable doubt and unanimously that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty beyond a reasonable doubt." (FAP at 420.)

Again, Petitioner fails to offer any substantive argument, or cite to any clearly established law, supporting this contention. As noted above in the discussion of Claim 37.a, the United States Supreme Court has upheld the California capital statute and stated that: "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." Tuilaepa, 512 U.S. at 979 ("'Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.'"), quoting Ramos, 463 U.S. at 1008. Moreover, the Ninth Circuit rejected a similar challenge to California's capital sentencing statute. See Williams, 52 F.3d at 1485 ("[T]he failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional.")

Petitioner fails to demonstrate that the California Supreme Court's rejection of this

1    claim was either contrary to, or an unreasonable application of, clearly established
2    federal law.

3           **F.      Statute Does Not Require Comparative Appellate Review**

4           Petitioner also asserts that the statute is constitutionally infirm because "[t]here
5    is no provision for comparative appellate review to prevent inconsistency,
6    disproportionality, and discrimination." (FAP at 420.)  This contention appears similar
7    to Claim 38, in which Petitioner contends that California's death penalty statute, as
8    interpreted by the California Supreme Court, forbids comparative proportionality review.

9           As discussed in Claim 38, _infra_, the _Harris_ Court upheld California's capital
10   sentencing statute despite the fact that the statute did not require proportionality review.
11   See _id._, 465 U.S. at 50-51 ("There is thus no basis in our cases for holding that
12   comparative proportionality review by an appellate court is required in every case in
13   which the death penalty is imposed and the defendant requests it.")  Also, as discussed
14   below, both the Supreme Court and Ninth Circuit have rejected challenges to the
15   constitutionality of California's capital sentencing statute despite the statute's lack of
16   comparative proportionality review.  (See Claim 38, citing _Harris_, 465 U.S. at 43-46 and
17   _Allen v. Woodford_, 395 F.3d 979, 1018 (9th Cir. 2005).)

18          Given the lack of any controlling authority in support of his contention, Petitioner
19   fails to demonstrate that the California Supreme Court's rejection of this claim was either
20   contrary to, or an unreasonable application of, clearly established federal law.

21          **G.      Statute Does Not Exclude Inapplicable Factors in Aggravation**

22          Petitioner also contends that California's capital statute is unconstitutional because
23   "[t]here is no requirement that non-statutory unspecified or non-applicable aggravating
24   factors be excluded from juror consideration." (FAP at 420.)

25          This contention has been rejected by both the United States Supreme Court and
26   the Ninth Circuit.  The Ninth Circuit held:

27          Nothing in the Constitution limits the consideration of nonstatutory
             aggravating factors. See _Barclay v. Florida_, 463 U.S. 939, 956, 103 S.Ct
28          3418, 77 L.Ed.2d 1134 (1983) (holding that nothing in the Constitution
             prohibits consideration of non-statutory aggravating factor); _Harris v._

1

2

<u>Pulley</u>, 692 F.2d 1189, 1193-94 (9th Cir. 1982) (rejecting the argument that California death penalty statute is unconstitutional because it places no limit on the introduction of aggravating factors), *rev'd in part on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

3

4

<u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1178 (9th Cir. 1998).

5

6

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

7

Petitioner is not entitled to habeas relief on Claim 37.

8

      **9.**    **Claim 38**

9

10

Petitioner asserts that California's capital sentencing statute not only fails to properly narrow the class of death-eligible defendants and lacks a number of procedural

11

12

safeguards, but that "[t]he lack of comparative proportionality review has deprived California's sentencing scheme of the only mechanism that might have enabled it to

13

'pass constitutional muster.'" (FAP at 421.)

14

Petitioner raised this contention as Claim 18 in the state habeas petition, and the

15

California Supreme Court rejected the claim on the merits without a statement of

16

reasoning.  (<u>See</u> Lodgment Nos. 133, 144.)

17

Petitioner argues that "[t]wenty-nine of the thirty-eight states that have reinstated

18

capital punishment require comparative, or 'inter-case,' appellate sentence review,"

19

while California's statute has no such requirement.  (FAP at 422-23.)  Petitioner asserts

20

that the California statute also does not preclude such review, and that "[t]he prohibition

21

on the consideration of any evidence showing that death sentences are not being charged

22

or imposed on similarly situated defendants is strictly the creation of this Court.  See,

23

e.g., <u>People v. Marshall</u>, 50 Cal.3d 907, 946-947 (1990)." (<u>Id.</u> at 423.)  Petitioner argues

24

that "this Court's categorical refusal to engage in inter-case proportionality review now

25

violates the Eighth Amendment." (<u>Id.</u>)

26

As noted in the discussion of Claim 37, <u>supra</u>, Petitioner's contention fails to find

27

support in clearly established law.  In fact, the Ninth Circuit specifically rejected the

28

contention that the 1978 California death penalty statute violates the constitution due to

a lack of proportionality review, reasoning that such an "argument is foreclosed by the

Supreme Court's holding in <u>Pulley v. Harris</u>, 465 U.S. 37, 43-46, 104 S.Ct 871, 79 L.Ed.2d 29 (1984), that neither the Eighth Amendment nor due process requires proportionality review in imposing the death penalty." <u>Allen</u>, 395 F.3d at 1018.  As the <u>Harris</u> Court clearly indicated that proportionality review is not constitutionally compelled, Petitioner's argument that the California Supreme Curt's failure to conduct such review violated the federal constitution is accordingly without merit.

In sum, as Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, habeas relief is not warranted on Claim 38.

## F.   ATKINS CLAIM AND CUMULATIVE ERROR

### 1.   Claim 11

Petitioner contends that available evidence "demonstrates that Mr. Roybal's death sentence was imposed for behaviors he lacked the capacity to comprehend, modulate, control or avoid," and argues that his death sentence "is an unconstitutional punishment because evolving standards of decency prohibit the execution of a person for conduct he was unable to control."  (FAP at 286.)

Petitioner raised this contention as Claim 3 in the state habeas petition, and the California Supreme Court rejected the claim on the merits without a statement of reasoning.  (See Lodgment Nos. 133, 144.)

"[T]he Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability." <u>Hall</u>, 134 S.Ct. at 1990, citing <u>Atkins</u>, 536 U.S. at 321.  California has implemented rules and procedures to adjudicate claims of intellectual disability,[40] defining the term as follows: "As used in this section, 'intellectual disability' means the condition of significantly subaverage intellectual

---

[40] The current version of section 1376 uses the term "intellectual disability," replacing the term "mentally retarded," which was used in a prior version of the statute. This change in terminology has been adopted by numerous courts and organizations, including the Supreme Court.  See e.g. <u>Hall</u>, 134 S.Ct. at 1990 ("Previous opinions of this Court have employed the term 'mental retardation.'  This opinion uses the term 'intellectual disability' to describe the identical phenomenon.")

functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age."  Cal. Penal Code § 1376(a).  California's definition of intellectual disability appears consistent with both the definition articulated by the Supreme Court and as used in the medical community.[41]  See Hall, 134 S.Ct. at 1994 ("As the Court noted in Atkins, the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and the onset of these deficits during the developmental period."), citing Atkins, 536 U.S. at 308, n. 3.

In order to demonstrate a post-onviction claim of intellectual disability under section 1376, the California Supreme Court requires a prisoner to submit a habeas petition and accompanying expert declaration.  See Hawthorne, 35 Cal. 4th at 47.  "[T]he expert's declaration must set forth a factual basis for finding the petitioner has significantly subaverage intellectual functioning and deficiencies in adaptive behavior in the categories enumerated above.   The evidence must also establish that the intellectual and behavioral deficits manifested prior to the age of 18."  Id. at 48.  In state court, Petitioner presented expert declarations, medical and psychiatric records, declarations from family members, and social history information, in addition to information about his IQ test scores.  As noted above, the California Supreme Court denied the claim on the merits without a statement of reasoning.

---

[41] In a prior motion, Petitioner contended that the Hall decision rendered his Atkins claim unexhausted and requested a stay in order to again present this claim to the California Supreme Court. (See ECF No. 246.) The Hall Court rejected Florida's "rigid rule," which "defines intellectual disability to require an IQ test score of 70 or less" and refuses to consider additional evidence if IQ testing is above that cutoff, as unconstitutional. Hall, 134 S.Ct. at 1990. The California Supreme Court specifically declined to adopt an IQ cutoff like the one at issue in Hall, explaining that "a fixed cutoff is inconsistent with established clinical definitions and fails to recognize that significantly subaverage intellectual functioning may be established by means other than IQ testing." In re Hawthorne, 35 Cal. 4th 40, 48 (2005). Section 1376 also provides for the presentation of other evidence of intellectual disability even if an IQ score is above 70. Id. Thus, as the Court previously held in denying Petitioner's motion for a stay, Petitioner "fails to persuasively explain how the procedures currently implemented by California courts for the analysis and resolution of claims of intellectual disability by capital petitioners are materially impacted by Hall." (ECF No. 261 at 5.)

In his instant claim in the FAP, Petitioner has again presented the materials previously presented to the state court, including numerous tests performed on Petitioner in 1992 by Dr. Friedman, including an IQ test, and numerous tests performed in 2006 by Dr. Wegman, which also included an IQ test.  (Exs. 9, 12, Lodgment No. 134.) Petitioner relies heavily on the declaration of Dr. Jeffrey Victoroff, a physician who is board certified in neurology and psychiatry, in support of this claim.  (See FAP at 284-87.)  Also included is a declaration from Dr. Timmen Cermak, who testified at the penalty phase proceedings, as well as Petitioner's medical and correctional records.  The Court has reviewed these documents, and fails to find support for a conclusion that Petitioner is intellectually disabled.  That is, Petitioner fails to demonstrate "significantly subaverage intellectual functioning and deficiencies in adaptive behavior" and "that the intellectual and behavioral deficits manifested prior to the age of 18."  Hawthorne, 35 Cal. 4th at 47-48.  Indeed, none of the expert declarations Petitioner submits indicate that Petitioner is intellectually disabled.

Instead, the experts offer varying opinions touching on different aspects of Petitioner's cerebral functioning and the causes of his behavior.  The experts appear to agree that Petitioner has impairments in functioning, but there is conflicting evidence on the severity of the impairments and whether Petitioner displays deficiencies in adaptive behavior.  Finally, Petitioner fails to offer any support that the asserted deficits manifested prior to the age of 18.

A review of the record reveals that IQ testing performed at different points in Petitioner's life consistently reflect that Petitioner was in the average, low-average, or dull normal ranges.  For instance, in 1976, when Petitioner was in his early 20's, medical records indicate an: "Estimate of intelligence dull normal." (Ex. 15, Lodgment No. 135 at 263.)  In 1979, records reflect that Petitioner "appeared to be of average intelligence, but demonstrated poor judgement through his drinking." (Ex. 17, Lodgment No. 135 at 277.)  In 1982 and 1983 admissions, Petitioner's IQ was estimated to be "average." (Ex. 18, Lodgment No. 135 at 282, 288.)  A 1986 diagnostic evaluation measured Petitioner's

IQ at 73, and indicated that: "When compared to others in his age group, he scores within the Borderline range of intelligence." (Ex. 21, Lodgment No. 135 at 315.) The evaluation noted the possibility of either a learning disability or that his results were due to inhalant and alcohol abuse, and stated that: "He answered all questions in a polite and cooperative manner and provided additional relevant information. His speech was fluid and clear with an adequate command of vocabulary and ability to abstract." (Id. at 314.)

Dr. Wegman's 2007 evaluation revealed that: "Mr. Roybal has mild cerebral impairment which adversely affects his ability to inhibit automatic responses, particularly when he is under pressure." (Ex. 9, Lodgment No. 134 at 78.) In discussing the test data, Dr. Wegman stated that: "His IQ is below average but nevertheless within broad normal limits; he has adequate basic skills in reading, writing and arithmetic; and he can communicate and interact normally." (Id. at 76.) Far from supporting Petitioner's argument, Dr. Wegman's evaluation appears to contradict the assertions made in this claim, as the expert indicates that any impairment was "mild," that Petitioner's IQ was "within broad normal limits," and did not indicate any deficits in adaptive functioning, characterizing those abilities as "adequate."

Dr. Koshkarian, who interviewed Petitioner in advance of trial in 1992, offered some indication of deficits in adaptive behavior and functioning, as Petitioner reported that school was "always difficult for him," he repeated two grades, and he dropped out in the 7th grade. (Ex. 11, Lodgment No. 134 at 122.) However, Petitioner also explained that he spoke Spanish at home, and that it was therefore difficult to speak English at school. (Id.) Moreover, Petitioner also spent time in the Job Corps, learned vocational skills, and once worked three jobs at a time. (Id.) Thus, the language differences could reasonably explain some of Petitioner's academic difficulties, while the Job Corps and other work experience appears to demonstrate some measure of adaptive behavior, which does not support a claim of intellectual disability. While Dr. Koshkarian indicated that Petitioner was of "limited intelligence and social skills" and would function best in an institutional setting, stating that: "This fits his personality

which has limited his ability to function adequately and successfully in the community," the expert did not conclude that Petitioner was intellectually disabled.  (Id. at 123.) Instead, Dr. Koshkarian concluded as follows: "He showed no evidence of psychotic behavior or thinking and I estimated his intelligence to be in the below average range. His memory and ability for abstract thinking, consistent with his intelligence, was intact and there was no clinical evidence of an organic brain syndrome."  (Id. at 118.)

Dr. Meredith Friedman, who also evaluated Petitioner in 1992 in advance of trial, indicated that Petitioner had "difficulty understanding questions which oftentimes had to be repeated," but also stated that: "His thinking was logical and goal-oriented." (Ex. 12, Lodgment No. 134 at 126.) As for Petitioner's intelligence, Dr. Friedman stated that one test result indicated a "Low Average range of ability" and explained that differences in percentiles in the performance and verbal portions of the test "has been associated with bilingual impoverishment, and learning disabilities," noting that the verbal IQ portion was "borderline." (Id.) On the Weschler IQ test, Petitioner scored an 83, which Dr. Friedman indicated was in the "Low Average range of ability" and again noted the differences between Petitioner's between performance and verbal IQ. (Id. at 127.) Dr. Friedman also wrote that: "Limitations with reading, writing, naming objects (expressive aphasia) and understanding speech (receptive aphasia) are suggested as well as overall reduced intelligence." (Id. at 128.) In her conclusions, Dr. Friedman noted: "Axis II: 1. Borderline Intellectual Functioning (I.Q. of 71 to 84)." (Id.)

At trial, both Dr. Cermak, for the defense, and Dr. Bucky, in rebuttal for the prosecution, addressed the implications of Dr. Friedman's test results. Dr. Cermak testified at trial that Petitioner's IQ tests indicated Petitioner was "borderline mentally retarded." (RT 6067.) Dr. Cermak cited in particular the difference between Petitioner's performance and verbal IQ's, as tested by Dr. Friedman, and stated that the results of those and other tests "demonstrated that it is very, very likely that what we're dealing with is organic brain damage." (RT 6067-70.) He stated that the damage "was almost certainly genetic." (RT 6071.)

Meanwhile, Dr. Bucky stated that "the evidence from the intelligence test was inconsistent with an individual that's retarded." (RT 6274.) He testified as follows:

> You would say from the scores that I observed here that this is an individual functioning in the low-average range of intelligence. Average range is 90 to 100, low-average range is from 80 to 89. My best judgment is that this individual is functioning at the lower end of the low-average range of intelligence, which is not somebody who is retarded.

(RT 6274-75.) Dr. Bucky also stated that the test results "indicate no observable organic brain damage." (RT 6276.) He indicated that he was not saying Dr. Friedman was wrong in finding organic brain damage, but stated instead that "if there is brain dysfunction, it is very subtle." (Id.)

Dr. Cermak submitted a post-trial declaration in which he discussed how additional testing and information about Petitioner's background would have informed his opinion and changed the testimony he provided at the penalty phase in several respects and strengthened his opinion that Petitioner had organic brain damage, but did not specifically address whether or not Petitioner was intellectually disabled. (See Ex. 60, Lodgment No. 142.)

Again, Petitioner primarily cites Dr. Victoroff's evaluation, who, after extended discussion of Petitioner's history, testing, and evaluation, concluded: "In my opinion, as the result of a combination of inhalant neurotoxicity, alcohol abuse, and traumatic brain injuries, Mr. Roybal has now and had in 1989 an abnormal brain and multifaceted organic brain disorder." (Ex. 10, Lodgment No. 134 at 101.) Dr. Victoroff discussed a myriad of possible or probable causes for Petitioner's brain damage, and concluded that there was "very strong evidence that in 1989 at the time of the instant offense and in 1992 at the time of the trial, Mr. Roybal suffered from neurologically significant brain damage due to an extraordinarily long and frequent exposure to neurotoxic inhalants." (Id. at 99.) Yet, while Dr. Victoroff discussed Petitioner's history at length and addressed a myriad of potential causes for Petitioner's functioning at the time of the offense in 1989 and the time of trial in 1992, he did not offer any specific conclusions about Petitioner's functioning prior to the age of 18. Dr. Victoroff discussed the

potential impact of Petitioner's inhalant abuse, early alcohol use, and later brain injuries, the possible impact of his mother's drinking, the possible impact of parental abuse and neglect, and the probable impact of his own substance use and abuse, but similarly absent from his declaration is any conclusion or opinion that Petitioner is intellectually disabled.

Thus, the fact remains that none of the experts whose declarations have been submitted in support of this claim actually conclude that Petitioner meets the definition of intellectual disability.  Under California law:

> To state a prima facie claim for relief, the petition must contain 'a declaration by a qualified expert stating his or her opinion that the (petitioner) is mentally retarded . . . .' (§1376 subd. (b)(1).)  Not only must the declarant be a qualified expert, i.e., an individual with appropriate education, training, and experience, the declaration must explain the basis for the assessment of mental retardation in light of the statutory standard.

Hawthorne, 35 Cal. 4th at 47.  Given the lack of any expert declaration concluding that Petitioner is intellectually disabled and outlining how Petitioner meets the criteria, it appears clear that Petitioner did not state a prima facie case for relief before the California Supreme Court.  The Atkins Court specifically left "to the State(s) the task of developing appropriate ways to enforce the constitutional restriction upon (their) execution of sentences." Atkins, 536 U.S. at 317, citing Ford v. Wainwright, 477 U.S. 399, 405, 416-17 (1986).  As discussed above, California's definition of intellectual disability appears to comport with the definition articulated by the Supreme Court and used within the medical community.  See Hall, 134 S.Ct. at 1994.  Because Petitioner failed to state a prima facie case for relief, the California Supreme Court's rejection of this claim was reasonable.

As a part of this claim, Petitioner also separately argues that his impairments rendered him incompetent to stand trial, asserting that:

> Mr. Roybal suffered from myriad, serious mental and neurological impairments, all of which individually and in combination effected [sic] his abilities [sic] to make reasoned judgments, to rationally and effectively modulate his impulses and behaviors, to understand the consequences of his actions, to exercise volitional control of his behavior, and to meaningfully

comprehend and follow the capital trial proceedings and assist in his own defense. These mental impairments include, but are not limited to, neuropsychological deficits in his brain function.

(FAP at 285-86.) Petitioner contends that "the additional facts regarding Mr. Roybal's borderline retardation, combined with additional evidence he suffered organic brain damage and possibly the Fetal Alcohol Effect [Petitioner's Exhibit 10, ¶ 46, Victoroff declaration, p.97], established a *prima facie* case Mr. Roybal was not competent to stand trial." (FAP at 287.)

"[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" Godinez v. Moran, 509 U.S. 389, 396 (1993), quoting Dusky v. United States, 362 U.S. 402 (1960) (per curiam); see also Drope v. Missouri, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.")

A review of the record does not reflect that anyone involved in the trial voiced a concern about Petitioner's competence to stand trial. There is no indication that a competency hearing was ordered, or ever contemplated. Indeed, the record reflects a number of occasions where Petitioner interacted with the trial court- for instance, in order to waive his personal presence at hearings, to enter a plea, and for other procedural matters and that Petitioner was responsive upon inquiry by with the trial court. (See e.g., RT 157-58 (waiver of presence at discussion regarding scheduling of voir dire proceedings), RT 540-41 (same), RT 570-71 (waiver of presence at sidebar discussions on minor issues), RT 576-77 (entry of not guilty plea and denial on charged special circumstances and priors).)

In support of this contention, Petitioner cites to a section in the Victoroff declaration where the expert discusses the possibility that Petitioner suffered brain

damage and the Fetal Alcohol Effect due to his mother's drinking.  (See FAP at 287, citing Ex. 10, Lodgment No. 134 at 97.)  But Dr. Victoroff does not indicate any concern that Petitioner was unable to understand the trial proceedings, communicate with counsel, or assist in his own defense.  Nor does Petitioner cite to any evidence or expert opinion stating that Petitioner was not competent to stand trial.  Mental health experts, who examined and interacted with Petitioner in 1992 and 2006, respectively, did not indicate any concerns that Petitioner was not competent to stand trial.  Meredith Friedman, Ph.D., who examined Petitioner in 1992, stated that: "Mr. Roybal presented as a soft-spoken individual who was extremely cooperative and pleasant with this examiner.  It was noted that he had some difficulty understanding some questions which oftentimes had to be repeated."  (Ex. 12, Lodgment No. 134 at 126.)  Meanwhile, Thomas Wegman, Ph.D., indicated that with respect to his 2006 examination, which took place over the span of three days: "At each of the three examination sessions, he was energetic, lively, alert and well-oriented in all respects" and that Petitioner "paid attention and responded intelligently to my questions.  He had a normal understanding of directions during my examination of him, and there was minimal need for repetition." (Ex. 9, Lodgment No. 134 at 66.)  Both trial counsel have also submitted declarations in support of the habeas petition (see Exs. 66, 67), yet neither attorney stated that Petitioner was either unable to understand the proceedings, communicate with counsel, or assist in his own defense.  See Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991) ("While the opinion of [defendant's] counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings."); see also Medina v. California, 505 U.S. 437, 450 (1992).

Petitioner does not offer any record support for his contention that he was unable to understand the proceedings against him or communicate with and assist counsel in preparing his defense at trial.  In the absence of any indication from those involved in the trial proceedings, such as the trial court, counsel, or the examining experts that Petitioner was incompetent, this claim fails on the merits.

Petitioner fails to demonstrate that the California Supreme Court's rejection of Claim 11 was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts. Petitioner requests an evidentiary hearing as to "[w]hether Mr. Roybal is eligible for the death penalty under Hall v. Florida," and proposes to call Drs. Wegman and Victoroff as witnesses to determine "[w]hat information Drs. Wegman and Victoroff have reviewed, either from Mr. Roybal's medical and educations records, test results obtained prior to his trial, or their own test results, that indicate Mr. Roybal suffers from an intellectual disability as defined by the United States Supreme Court in Hall, and the extent of that disability." (Pet. EH Mem. at 17-18.)  However, both Drs. Wegman and Victoroff have submitted declarations in support of the state and federal habeas petitions, outlining the tests they reviewed, conducted, and/or relied upon in rendering their opinions as to Petitioner's mental health.  Neither expert has opined that Petitioner is intellectually disabled, nor has either expert discussed how Petitioner meets the criteria for such a diagnosis, as state law requires.  Given Petitioner's failure to present a prima facie case for relief before the state court, the California Supreme Court's rejection of this claim was not unreasonable and an evidentiary hearing is not warranted on Claim 11.  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate."); see also Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.").  Petitioner is not entitled to habeas relief on Claim 38.

### 2. Claim 39

Petitioner contends that his conviction, sentence and imprisonment were obtained in violation of his constitutional rights "in light of the multiple constitutional errors committed by the prosecutor, trial counsel and the trial court and which together rendered Mr. Roybal's trial fundamentally unfair and rendered the resulting verdicts and

1    judgments unreliable." (FAP at 424.)

2        Petitioner raised a cumulative error claim on direct appeal, raising allegations of

3    prosecutorial misconduct, trial court error, and ineffective assistance of counsel, which

4    the California Supreme Court rejected, reasoning: "Defendant contends that the

5    cumulative prejudice of prosecutorial misconduct and the superior court's errors at the

6    guilt and penalty phases require reversal.   We have concluded that none of the

7    defendant's claims was meritorious.   Accordingly, we also reject his claim that

8    cumulative error affected the process or result of the trial to his detriment." Roybal, 19

9    Cal. 4th at 531.  Petitioner re-raised this claim as Claim 20 in his state habeas petition,

10   raising additional allegations of trial error, prosecutorial misconduct, and ineffective

11   assistance of counsel. (Lodgment No. 133.) The California Supreme Court rejected that

12   claim on the merits without a statement of reasoning.  (Lodgment No. 144.)

13       "The Supreme Court has clearly established that the combined effect of multiple

14   trial court errors violates due process where it renders the resulting criminal trial

15   fundamentally unfair."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing

16   Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973); see also Killian v. Poole

17   (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several

18   substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to

19   require reversal.'"), quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996).

20       As a practical matter, it appears redundant to decide this claim, as the Court has

21   already concluded Petitioner is entitled to penalty phase habeas relief as the result of two

22   separate, and individually prejudicial, constitutional violations.  First, the Court found

23   that the California Supreme Court's harmless error analysis was unreasonable with

24   respect to Petitioner's claim of prosecutorial misconduct raised as Claim 12.  The Court

25   also held that the claim, on its own, satisfied Brecht, and that the error in arguing to the

26   jurors that the Bible mandated a death sentence in his case had a "substantial and

27   injurious effect of influence" in the jury's sentencing determination, given the severity

28   of the misconduct and the closeness of the penalty phase case. The Court also separately

concluded that the state court unreasonably rejected Petitioner's related claim of ineffective assistance of counsel, raised as Claim 9, and that trial counsel's failure to object to the prosecutorial misconduct constituted prejudicially deficient performance.

Because each of the claims identified above warrant penalty phase habeas relief, granting relief based on the cumulative impact of these errors merely offers another route to the same outcome. However, in an abundance of caution and as an alternative ground for the Court's determination that penalty phase relief is warranted in this case, the Court also concludes that the California Supreme Court's rejection of his claim of cumulative error was objectively unreasonable and that Petitioner warrants habeas relief due to the cumulative impact of these specific errors at his penalty phase proceedings.

The California Supreme Court rejected this claim on direct appeal, reasoning that cumulative error did not negatively impact his case based on the determination that: "We have concluded that none of the defendant's claims was meritorious." Roybal, 19 Cal. 4th at 531. In doing so, the state court failed to acknowledge that cumulative error analysis does not require independently meritorious claims, but instead provides an avenue for relief in the event of multiple errors that only amounted to prejudice when considered together. Instead of addressing and evaluating the impact of these errors, such as the acknowledged instance of "clear misconduct" by the prosecutor in advocating a death sentence on biblical grounds, the California Supreme Court simply concluded that because none of Petitioner's claims was independently meritorious, the cumulative error claim necessarily failed as well. This determination was both incorrect and unreasonable.

Reviewing Petitioner's contentions as a whole, including the prosecutor's misconduct quoting from the Bible in his closing argument and urging the jury that biblical law demanded a death sentence, the deficiencies of trial counsel in failing to object to the misconduct and request a curative instruction, in combination with any other potential errors that, individually, do not rise to the level of a constitutional violation, the Court is persuaded that Petitioner has shown a due process violation. See

<u>Parle</u>, 505 F.3d at 927 ("The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."), citing <u>Chambers</u>, 410 U.S. at 290 n.3. In making this determination, the Court is cognizant not only of the jury's extreme difficulty in rendering a penalty phase decision, but also the significant evidence in mitigation presented during Petitioner's penalty phase proceedings, such as Petitioner's upbringing, which was replete with abuse and severe neglect, his early and continued use and abuse of alcohol and drugs, testimony that Petitioner suffered from organic brain damage, blackouts, and the possibility of fetal alcohol effects due to his mother's alcohol abuse during pregnancy. For these reasons, as well as those discussed above with respect to Claims 9 and 12, the Court is persuaded that these errors, considered together, as well as in conjunction with Petitioner's other penalty phase claims, had a "substantial and injurious effect or influence" on the jury's penalty determination. <u>Brecht</u>, 507 U.S. at 637. Accordingly, the Court concludes that Petitioner is entitled to penalty phase habeas relief on Claim 39.

## VI. CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253 provides for a "certificate of appealability" for § 2254 cases under the following circumstances:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

"Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy section 2253(c) is straightforward: The petitioner must

1 demonstrate that reasonable jurists would find the district court's assessment of the

2 constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484

3 (2000); see also Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) ("Indeed, a claim can

4 be debatable even though every jurist of reason might agree, after the COA has been

5 granted and the case has received full consideration, that Petitioner will not prevail.")

6      A claim may also warrant a certificate of appealability when the "questions are

7 adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S.

8 880, 893 n. 4 (1983) (citation omitted), superseded on other grounds by 28 U.S.C. §

9 2253(c)(2).   Given the "relatively low" threshold for granting a certificate of

10 appealability, Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002), and that "the

11 petitioner need not show that he should prevail on the merits," Lambright v. Stewart,

12 220 F.3d 1022, 1025 (9th Cir. 2000), quoting Barefoot, 463 U.S. at 893 n.4, the Court

13 finds Claims 4-9, 12 and 39 suitable for a COA.

14 ## VII.  CONCLUSION

15      For the reasons discussed above, the Court **DENIES** Respondent's request to

16 dismiss Claims 12, 13, 23, 24, and 33 on the basis of state procedural bars, **DENIES**

17 Claims 1-8, 10-11, 13-30 and 32-38 on the merits, **DENIES** Claim 31 without prejudice

18 as premature, **DENIES** Petitioner's request for an evidentiary hearing and/or discovery

19 on Claims 4-8, 10-11, 25-27 and 29-31 and **GRANTS** the petition for a writ of habeas

20 corpus on Claims 9, 12, and 39.  In the final order, entered contemporaneously with the

21 present order, the Court **GRANTS** a COA on Claims 4-9, 12 and 39, and **DENIES** a

22 COA on Claims 1-3, 10-11, and 13-38.

23      **IT IS SO ORDERED.**

24 DATED:  December 2, 2015

25 

26            Hon. Jeffrey T. Miller
           United States District Judge

26 cc: All parties

27 

28 

99cv2152